### The Jury Charge

The court did not deliver a charge, instructing the jury on the defense of justification. Nor did she instruct the jury to disregard her comments on the reliability or unreliability of documentary evidence. [A 197-198/T 946-947]

### The Deliberations and Verdict

Barely two hours after the court's charge, the jury sent a note requesting, among other things, the testimony of Mills, Reynolds and Hayslett. In addition, the jury sought the testimony and DD-5 of Perez as well as testimony indicating when and to whom Reynolds spoke concerning the incident on trial. [A 199-200/T 974-975] Later, the jury asked for an additional read-back of Hayslett's testimony as well as her cooperation agreement. [A 201, 202/T 981, 985] The jury was informed that the Perez DD-5 was not in evidence [A 203/T 977] and that Hayslett did not testify before the grand jury [A 204/T 978].

### The Sentencing

Requesting imposition of the maximum sentence, the prosecution offered for the court's consideration "some information that was developed in the course of the investigation. That was not part of the record at trial." [A 205/S 3] This information was provided by appellant's estranged girlfriend:

> [N]umber one, she told people he was an active narcotics trafficker. Number two, that he carried the murder weapon in this case and most importantly he put that gun to her head and said in the course of their

argument, I've already killed somebody before and I can do the same to you.  [A 206/S 5]

Despite defense objections, the court was of the opinion she could consider this rank hearsay since "the People have a good faith basis for offering [it] and [it] goes to [appellant's] background, character, et cetera, which I'm supposed to take into account when I sentence the defendant."  [A 207/S 4]  In the end, the court sentenced appellant to twenty-five years to life, the maximum allowable penalty, finding "nothing mitigating in the defendant's background.  Everything I looked to is aggravating, as the items that Mr. Schellhammer pointed to."  [A 208/S 12]

<u>ARGUMENT</u>

<u>POINT ONE</u>

APPELLANT'S DUE PROCESS AND TRIAL
RIGHTS, UNDER BOTH THE STATE AND
FEDERAL        CONSTITUTION,        WERE
DEFEATED   BY   THE   TRIAL   COURT'S
IMPROPER   RESTRICTION   ON   CROSS-
EXAMINATION AND ON THE ADMISSION
OF       EVIDENCE       FAVORABLE       TO
APPELLANT; ERRONEOUS ADMISSION OF
UNFAVORABLE EVIDENCE; DELIVERY OF
UNBALANCED       INSTRUCTIONS;       AND
FAILURE TO MEANINGFULLY RESPOND TO
THE JURY'S REQUEST FOR INFORMATION.

A criminal defendant is entitled to a "fair trial in a fair tribunal." *In Re*

*Murchinson,* 349 U.S. 133, 136 (1955); *United States v. Manko,* 979 F. 2d 900 (2nd

Cir. 1992); *Johnson v. Scully,* 563 F. Supp 851 (1983); *People v. Yut Wai Tom,* 53

N.Y. 2d 44 (1981); *People v. DeJesus,* 42 N.Y. 2d 519 (1977); *People v. Bell,* 38

N.Y. 2d 116 (1975); *People v. Williams,* 225 A.D. 2d 447 (1st Dept. 1996); *People*

*v. Robinson,* 202 A.D. 2d 225 (1st Dept. 1994); *People v. Watkins,* 157 A.D. 2d 301

(1st Dept. 1990). Appellant's due process and trial rights, including the right of

confrontation and the right to a jury trial, under both the New York State and

United States Constitutions, were defeated where, as here, the court repeatedly

restricted proper cross examination, barred evidence favorable to the defense while

admitting evidence unfavorable to the defense, gave unbalanced charges and failed

to meaningfully respond to the jury's request for the testimony of a key witness. In

short, the court conducted the trial in a manner which undermined and usurped the fact finder's province.

### The Improper Restriction on Cross-Examination and on the Admission of Evidence Favorable to the Defense

To begin with, the court improperly curtailed cross-examination on matters crucial to the defense and, in the process, demeaned or obstructed the admission of key pieces of testimonial and documentary evidence. This was error of constitutional proportion. Cross-examination is the core value protected by the right of confrontation. *Davis v. Alaska*, 451 U.S. 308 (1974); Wigmore, Evidence, § 1367; Prince, Richardson on Evidence, § 6-301. In *Crawford v. Washington*, 541 U.S. 36, 61 (2003), the United States Supreme Court reaffirmed the overarching purpose and significance of the Confrontation Clause:

> To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

Over and over again, the trial court prevented appellant from testing the credibility of the witnesses gathered against him.

### The Clarke DD-5

He was barred during the examination of Det. Clarke. In response to questions first posed by the prosecution, the defense attempted to explore, as part of its

stance at trial, his failure to thoroughly pursue leads, identifying others as perpetrators of the crime for which appellant was falsely accused. In the course of this exploration, Det. Clarke testified inconsistently with respect to the contents of an anonymous Crime Stopper call which he had memorialized in a DD-5. When defense counsel sought to impeach the detective with the DD-5, the court blocked the examination, denied admission of the report and struck the detective's complete testimony concerning the Crime Stopper call.

If this were not enough, the court delivered a fervent instruction, demeaning the evidentiary value of the DD-5 as "the most blatant, most obvious form of hearsay. *We* don't know, [continued the court] who the person is. The person isn't here. *We* can't cross-examine the person." Coming as it did on the heels of an impeachment effort by the defense, the instruction portrayed both the DD-5 and the defense as worthless. Moreover, through use of the pronoun, "we," the court isolated the defense from the prosecutor and the court, insinuating that defense counsel acted unprofessionally and irresponsibly by attempting to offer the document into evidence.

Later, when a stipulation revealing the contents of the DD-5 was introduced into evidence, the court made no effort to cure the prejudicial impact of the previous instruction. Her too simple statement that, "stipulation means there's no facts in dispute, both sides agree to those facts," skirted the question raised by her

initial instruction, specifically what weight, if any, to give to the hearsay evidence and whether the court – who, along with the prosecutor, comprised "we" – also agreed to those facts.

Nor did the court take the opportunity during her final charge to deliver a balanced instruction. Again, she skirted the questions raised by her prejudicial comments on the impeachment evidence. At no point did she provide the thorough instructions approved by the Court of Appeals for the Second Circuit in *United States v. Manko*, supra, where questioning by the trial court improperly advanced the government's theory of the case. Sensitive to the potential for harm to the defense, the trial court delivered "extensive" instructions, tailored to address its excesses:

> With respect to factual matters, it is your recollection that controls. Nothing that counsel for either the government or the defendant may have said with respect to matters of evidence, either in their openings or in their summations, is evidence in this case; nor are any remarks that I may have made during the course of this charge, or have made during the course of this trial – that is not evidence.
>
> I remind you that nothing I may have said, even my questions to witnesses during trial when they were on the stand, those questions should be given no undue weight for their sole purpose was to clarify and aid you in understanding what the content of the testimony was to be. So you are to place no undue weight, one way or another, on the fact that I may have asked questions of the witnesses.

Unlike the trial court in *Manko*, the trial court here neither acknowledged nor specifically addressed the prejudicial impact of rulings and remarks which were – or appeared – unfavorable to the defense.

This failure conflicts with the settled rule articulated by this Department over half a century ago, in *People v. Johnson*, 6 A.D. 2d 181, 183 (1st Dept. 1958) and later quoted, with approval, by the Court of Appeals in *People v. Bell*, supra, to the effect that "the duty rests on the Trial Judge to give adequate and balanced instructions to the jury in a criminal case." In *Bell*, the instructions delivered and facts marshaled by the trial court favored the prosecution.   Reversing and remanding for a new trial, the *Bell* Court declared, "a charge which ignores or unfairly discredits the contentions of either the People or the defense cannot be countenanced." *See also, People v. Williams*, supra, (reversing and remanding for a new trial where trial court's use of hypothetical in final charge "possibly indicat[ed] the Judge's belief in the defendant's guilt and imping[ed] on the jury's province as factfinder."); *People v. Robinson*, supra, (reversing and remanding for a new trial where remarks "reflect the court's opinion as to how the issues should be resolved."); *People v. Watkins*, supra, (reversing and remanding for a new trial where the trial court's charge encouraged the jury to disregard the non-recovery of buy money)

The Perez DD-5

Curtailment of cross-examination and disparagement of the defense, its proofs and its theory of the case were repeated, with slight variation, when the defense confronted Det. Perez. Summoned by the defense, he claimed Mills was confused and equivocal when she indicated, contrary to her testimony at trial, that appellant was not the shooter but was standing next to him. This statement, according to Det. Perez, was preceded by the words, "I think." In response to questioning by defense counsel, Perez admitted that neither the words, "I think," nor any indication that Mills was confused appeared in his DD-5. In fact, he claimed his report contained only "the gist" of her comments.

Defense counsel asked a series of questions leading to, and laying the foundation for, admission into evidence of Det. Perez' inconsistent DD-5. When counsel sought to move the report into evidence, the court postponed her decision. Like an adult delaying a child's punishment until a more suitable or convenient time, the court said, "we'll discuss that later." Later, the court denied admission of the DD-5 because "it [was] not a direct quote from [Mills].... Plus, [Det. Perez] admitted everything you sought to introduce."

This was error. Perfect identity between inconsistent statements is not required. In *People v. Wise*, 46 N.Y. 2d 321, 326-327 (1978) the Court of Appeals explained, "it is enough that the testimony and statements are inconsistent and tend

37

to prove differing facts." See also, Prince, Richardson on Evidence, § 6-412. Furthermore, there is no evidentiary rule which precludes documentary proof of an inconsistent statement merely because the witness admits the inconsistency. Wigmore, Evidence, § 1037; Prince, Richardson on Evidence, § 6-411. Nor is it the prerogative of the court to decide how the parties prove their case. [5]

More than merely erroneous, the trial court's comments and her ruling, denying admission into evidence of the Perez DD-5, were prejudicial. Perez' reluctant testimony aside, his DD-5 constituted the single piece of definite, unconditional proof that Mills, an undisputed eyewitness to the crime, previously exculpated appellant. No wonder the jurors asked to see the report. When told it was not in evidence, they must have recalled the tense circumstances under which counsel sought to introduce it and wondered whether its absence reflected the court's displeasure with counsel or her distaste for DD-5's. Either way, a singularly important document for the defense – and for the jury – was improperly and intolerably suppressed.

The Daley DD-5

The pervasive restriction on cross-examination and on the admission of evidence favorable to the defense was palpable during the testimony of Inv. Daley.

---

[5] Significantly, the trial court did not premise her ruling on the supervisory authority of the court to oversee the process of cross-examination. Even if she had, appellant contends that such administrative authority must yield to the search for truthful information favorable the accused. *Kyles v. Whitley*, 514 U.S. 419 (1995)

This time, the court blocked defense efforts to impeach the credibility of Hayslett.

Evidence from Daley indicating that she had been asked, on November 14, 2003,

whether appellant was responsible for the shooting death of Nelson would have

thrown her credibility into further doubt and buttressed the defense contention that

she implicated an innocent man in order to advance her own self-interest.  As

amply demonstrated by the record, the court frustrated disclosure of this evidence:

> Q. Did you or any of the other officers present during that questioning
> [on November 14, 2003] ever ask her who committed the crime?
>
> MR. SCHELLHAMMER:     Objection.
>
> THE COURT:     Sustained.
>
> MS. COHEN:     Well, Judge, that's a direct
> impeachment of her statement on –
>
> THE COURT:     She admitted that.
>      Sustained.
>
> MS. COHEN:     No, Judge, she did not.
>
> THE COURT:     No argument in front of the jury.
>
> MS. COHEN:     Then let's have argument over
> here.
>
> THE COURT:     You can continue on another
> matter.
>
> MS. COHEN:     I can't continue on another matter.
>
> THE COURT:     I'm not having you ask these
> questions.
>
> MS. COHEN:     I'm done, then.

Following additional interruptions, defense counsel gave up: "Nothing further

because of your curtailing my cross examination."  Through incessant interference

and admonishment, portraying counsel as quarrelsome, dramatic, unprofessional

and, at times, underhanded, the trial court chipped away at counsel's autonomy,

indirectly commanding the evidence which the jury would receive and consider. Not surprisingly, counsel offered: "Judge, perhaps, you would like to try this case."

Circumstances like those present at bar led the Court of Appeals, in *People v. DeJesus*, supra, at 524 to reverse and remand for a new trial. As the court observed:

> [W]here there were sharp issues of credibility...the demeaning of counsel, his dismissal as though unworthy of respect and attention, the casting of a pall of suspicion over his case and the interjection of extraneous considerations unfairly burden[s] the defendant with the obligation, not only of rebutting the proof of the People, but also of countering the implications imputed by the court.

### The Erroneous Admission of Evidence Unfavorable to the Defense

#### Rodney's Out-of-Court Statement Implicating Appellant

The court's tight rein on the admission of evidence favorable to the defense was juxtaposed against the court's use of expansive rationalizations to admit evidence unfavorable to the defense. For example, the court incorrectly permitted Reynolds to testify that Rodney "had his cousin knock [Nelson] off." Neither rationale used to justify admission of this palpably damaging statement is persuasive. To begin with, the rule is well established that admission of a declaration against penal interest requires circumspection. Implicating interests protected by the Confrontation Clause, admission is limited to statements, or portions thereof, which unequivocally inculpate the speaker.

40

Assuming, *arguendo*, Rodney made the statement attributed to him by Reynolds, it "was not restricted to self-inculpation, but as well implicated defendant." *People v. Geohegan*, 51 N.Y. 2d 45, 49 (1980); Prince, Richardson on Evidence, § 8-407. Moreover, as counsel argued below, it was not made under circumstances evincing Rodney's awareness that the statement "compromised" his penal interest. Id., § 8-411. If it was made at all, it sounds like a boast, motivated by misplaced bravado. Finally, as counsel also pointed out, its admission failed to comport with the right of confrontation.

The record does not support the court's alternative rationale for admitting Rodney's supposed statement through the testimony of Reynolds.   Appellant argues here, as he did below, that the evidence did not establish a *prima facie* case of conspiracy.  Even if it did, the proffered statement clearly did not take place "in the course and in furtherance" of the alleged conspiracy between appellant and Rodney, since the statement was made nearly four months after Nelson's death. Prince, Richardson on Evidence, § 8-236. [6]

Reynolds Prior Consistent Statement

Tellingly, the lower court cited the damage done to Reynolds' credibility as her reason for admitting his prior consistent statement: "I allowed him to get it clear in

---

[6] Nor can it be successfully argued that Reynolds and Rodney conspired to destroy evidence since Reynolds was serving in his capacity as a government agent at the time Rodney's statement is said to have been made.

two sentences when he saw the gun in the apartment, because you were attacking him on that he never saw the gun." This was plain error. It is fundamental that use of a prior consistent statement to rehabilitate the credibility of witness is anathema. Prince, Richardson on Evidence, § 6-503  Furthermore, where, as here, the theory of the defense is that the witness fabricated his testimony, *ab initio*, reliance is misplaced on the witness' "recent fabrication" as a basis for admission of the statement. *People v. Davis*, 44 N.Y. 2d 269 (1978).

The Improper Admission of Unnoticed Statements

As part of a regular course of conduct, the trial court denied the defense timely access to the record in order to advocate for the admission of favorable evidence or to preempt the admission of prejudicial evidence.  For example, during Inv. Daley's direct testimony, prompt access was sought, but denied.  Counsel's attempt to prevent the jury from hearing unnoticed statements, revealing prior bad acts and suggesting a false alibi, was dismissed by the court: "You can make your record afterwards." *People v. O'Doherty*, 70 N.Y. 2d 479 (1987). Of course, "later is too late," as the Court of Appeals recognized in a different context. *People v. Chapple*, 32 N.Y. 2d 112, 115 (1975). By the time access was allowed, the damage was done.

## The Charging Errors

### The Refusal to Charge Justification

In addition to the errors of instruction set out above, appellant contends the trial court erred in refusing to charge justification. In the Second Circuit, it is well settled that "a criminal defendant is entitled to have instructions presented relating to any theory of defense for which there is any foundation in evidence, no matter how weak or incredible that evidence maybe." *United States v. Pedroza*, 750 F.2d 187, 205 (1984); *United States v. Goldson*, 954 F.2d 51 (1992); *United States v. Durham*, 825 F.2d 716 (1987); *United States v. Alfonso-Perez*, 535 F. 2d 1362 (1976). In New York, it is equally clear that a criminal defendant is "entitled to have the jury instructed on the law as an essential of the trial." *People v. Wallens*, 297 N.Y. 57, 62 (1947). The New York Court of Appeals has consistently held that where a request is made, the trial court must instruct on a claimed defense if, considered in the light most favorable to the defendant, any reasonable view of the evidence supports it. *People v. Padgett*, 60 N.Y. 2d 142 (1983); *People v. Torre*, 42 N.Y. 2d 1036 (1977)

This is so even if the requested justification charge is inconsistent, as here, with innocence and primarily based on evidence presented by the prosecution. *People v. Steele*, 26 N.Y. 2d 526 (1970). In this case, the defense of justification was substantiated by the testimony of the prosecution's witness, Hayslett. She not only

described Nelson as a "bully" and as "gun-happy;" but also described Nelson's verbal threat to Rodney ("I don't use my hands") as well as his threatening behavior (keeping his hand in the pockets of his jacket).

Plainly, there was evidence sufficient to support a reasonable belief that deadly physical force, directed at appellant's own person or at a third person, was imminent. *See*, e.g., *Shorter v. People*, 2 N.Y. 193 (1849) (one is justified in killing another in self-defense when reasonably apprehending death or serious bodily harm, "although it may afterward turn out that the appearances were false, and there was in fact neither design to do serious harm, nor danger that it would be done."); *People v. Reeder*, 209 A.D. 2d 551 (2nd Dept. 1994) (appearing to reach for a gun by reaching into coat pocket sufficient to support reasonable belief that deadly physical force was imminent.); *People v. Williams*, 151 A.D. 2d 276 (1st Dept. 1989) (appearing to reach for and draw out a gun sufficient to support reasonable belief that physical force was imminent.).

Considered in the context of the entire trial, the lower court's refusal to deliver the requested instruction reveals unwillingness, as demonstrated throughout the trial, to cede fact-finding to the jury. The court substituted her judgment, opinion and outlook for that of the jury, denying the admission of evidence she found less than probative and rejecting defense theories she found less than persuasive. On

more than one occasion, defense counsel found it necessary to reminded her, at sidebar, she was "not the trier of fact."

### The Failure to Meaningfully Respond to the Jury's Request for Information

It is fundamental that a trial court is required to meaningfully respond to a request from the jury for information or instruction. *United States v. Holmes*, 863 F.2d 4 (2nd Cir. 1988); *United States v. Criollo*, 962 F.2d 245 (2nd Cir. 1992); *People v. Lourido*, 70 N.Y.2d 428 (1987); *People v. Malloy*, 55 N.Y.2d 296 (1982); N.Y. Crim. Proc. Law. § 310.10. Testimony of the witnesses at trial is precisely the sort of information to which the jury is entitled. Indeed, the Court of Appeals for the Second Circuit has expressed a preference for providing this information, upon request of the jury. *United Sates v. Holmes*, supra, ("[G]enerally, the better course of action is for a district court to allow the reading of testimony requested by the jury."); *United States v. Criollo*, supra, (Reversing and remanding for a new trial where the district court erroneously prohibited readbacks before deliberations began.)

In *People v. Lourido*, supra, the New York Court of Appeals reversed and remanded for a new trial where the trial court failed, among other things, to provide the requested readback of the complainant's cross-examination. The *Lourido* Court held that "the [trial] court's response was not meaningful because it was no response at all." Id., at 435. Here, the trial court not only failed to provide

the requested testimony but also indicated – inaccurately – that it did not exist. Since the defense explicitly relied on Hayslett's grand jury testimony when impeaching her testimony at trial, the court's misstatement must have been "perplexing and confusing to an attentive juror" Id., at 435.

Impairment of the deliberative process was also eroded by denial of access to information, bearing on the main question confronting the jurors: whether to believe the prosecution witnesses. It is clear from their communication with the court that this was the question holding their attention; the notes requested information about Reynolds, Hayslett and Mills. Significantly, the information requested, but denied, constituted impeachment evidence: grand jury testimony and Perez' DD-5. Appellant was plainly prejudiced by the trial court's refusal, during the trial, to admit the DD-5 and her mistaken belief, during deliberation, that Hayslett did not testify before the grand jury. In each instance, the jury was deprived of evidence essential to a just and reliable verdict.

In sum, the "conglomeration of errors" committed by the trial court denied appellant the right to mount a defense and have the jury fairly consider it. Id, at 435. As such, he is entitled to a new trial where he will benefit from fair process, genuine confrontation and informed deliberation.

## POINT TWO

APPELLANT'S CONSTITUTIONAL RIGHT TO THE
ASSISTANCE OF CONFLICT-FREE COUNSEL WAS
DEFEATED BY DEFENSE COUNSEL'S FAMILIAL
RELATIONSHIP TO THE ASSISTANT DISTRICT
ATTORNEY WHO INVESTIGATED THE CASE AND
TESTIFIED AT TRIAL.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused

shall enjoy the right ...to have the Assistance of Counsel for his defence." *U.S.*

*CONST. AMEND. VI* This right to counsel includes a "correlative right to

representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S.

261 (1981); see also *Cuyler v. Sullivan*, 446 U.S. 335 (1980) The Second Circuit

has grouped attorney conflicts of interest cases into two categories, those which are

waivable and those which are not. The first category includes actual conflicts; the

second category includes potential conflicts. Within the first category are conflicts

so severe they are deemed *per se* violations of the Sixth Amendment. These

violations do not require a showing of prejudice. Reversal is automatic. *United*

*States v. Fulton*, 5 F.3d 605 (2nd Cir. 1993); *United States v. Novack*, 903 F.2d 883

(2nd Cir. 1990). Also within this category are conflicts which, while severe, are not

so severe as to justify dispensing with a showing of its adverse effect on counsel's

performance. Appellant contends that the conflict arising from the consanguineous

relationship between defense counsel and the prosecutor was so severe it amounted

to a *per se* violation, rendering his waiver ineffective and mandating reversal.

To date, the United States Court of Appeals for the Second Circuit has recognized two *per se* violations of the Sixth Amendment. The first occurs when defense counsel is not authorized to practice law based on the failure to satisfy substantive admission requirements. *United States v. Novack*, supra. The second occurs when counsel is implicated in the same, or closely related, criminal conduct for which the client is on trial. *United States v. Fulton*, supra. In both instances, the Second Circuit has identified fear as the factor animating the conflict. That is, neither the attorney who is unauthorized to practice law nor the attorney who is suspected of crimes for which her client is charged is ever "wholly free from fear of what might happen if a vigorous defense should lead the prosecutor or the trial judge to... discover" the misdeeds. *United States v. Solina*, 709 F.2d 160, 164 (1983)

At the core of conflict analysis and adjudication is the recognition that certain pervasive influences are beyond our ability to control or contain. For example, in *United States v. Schwartz*, 283 F.3d 76 (2nd Cir. 2002), the Second Circuit held that defense counsel's multi-million dollar retainer agreement to represent the Police Benevolent Association created an actual, though not *per se*, conflict of interest with the defendant on trial, whose best defense required counsel to implicate a member of the Association. Desirous of protecting his lucrative retainer, defense counsel's advocacy suffered. In *Schwarz*, the Second Circuit explained the

difference between waivable and unwaivable conflicts of interest. The Court distinguished "between conflicts that implicate the attorney's self-interest and those that implicate the attorney's ethical obligation to someone other than the defendant, noting that the former are 'of a different character' than the latter." The former are unwaivable because self interest "permeates" advocacy and "because no rational defendant would knowingly and intelligently be represented by a lawyer whose conduct [is] guided largely by a desire for self-preservation."

Appellant contends that the desire for self-preservation is at play when defense counsel is bound by blood to his adversary. Research in sibling dynamics reveals that the fraternal bond, characterized by rivalry and competition, on the one hand, and by solidarity and support, on the other, contributes powerfully to identity formation and development. Kory Floyd, *Brotherly Love II: Perspectives on Liking, Love and Closeness in the Fraternal Dyad,* 1997 Journal of Family Psychology 196. It is formed from the mix of, among other things, jealousy, resentment, guilt, attachment, and loyalty. *Id.* Social, cultural and unique familial expectations also inform sibling identity. [7]

At all times, siblings are operating with a dual consciousness and engaged, to the exclusion of others, in a private interpersonal exchange. They must constantly manage the constellation of factors like competition, resentment and attachment,

---

[7] Popular representations of brotherhood are found in such movies as Rain Man and The Godfather, Part II. Literary representations are found in such classics as Fyodor Dostoyevsky's THE BROTHERS KARAMAZOV.

which has shaped their unique identity and which trigger dispensations toward rivalry or solidarity. Lucy Hadfield, SIBLING IDENTITY AND RELATIONSHIPS (2006 Routledge).

More importantly, they must manage these factors with a view toward their own understandable but selfish desire to protect their good standing and acceptance in the family unit, to guard the family's reputation and to meet the family's and society's expectations. These personal and primal interests are as strong, if not stronger, than lucrative retainers and the fear of prosecution. They permeate advocacy and decision-making to the same, if not greater, extent. Just like the defense attorney who is implicated, along with his client, in wrongdoing or who is unlicensed, the defense attorney who is related by blood to the prosecutor will make strategic decisions based on self-interest. He will choose a course of action least likely to jeopardize the integrity of the familial unit and his relationship to it.

New York's long-standing *per se* rule disqualifying judges and jurors by reason of consanguinity eliminates the conflict based on family loyalty. N.Y. Jud. Law, § 14; N.Y; Crim. Proc. Law, § 270.20 (1) (c). New York Judiciary Law, § 14 provides, in pertinent part:

> A judge shall not sit as such in, or take any part in the decision of, an action, claim, matter, motion or proceeding to which he is a party, or in which he has been attorney or counsel, or in which he is interested, or if he is related by consanguinity or affinity to any party to the controversy within the sixth degree.

Likewise, New York Criminal Procedure Law, § 270.20 (1) (c) provides, in pertinent part:

> A challenge for cause is an objection to a prospective juror and may be made only on the ground that:
> (c) He is related within the sixth degree of consanguinity or affinity to the defendant, or to the person allegedly injured by the crime charged, or to a prospective witness at the trial, or to counsel for the people or for the defendant....

There is no principled basis for distinguishing between judges and jurors, on the one hand, and defense counsel, on the other hand. The risk, or appearance, of impropriety is the same. Accordingly, appellant urges the court to reverse and remand for a new trial where he will have the assistance of counsel who is not conflicted, or who does not appear conflicted, by reason of his familial relationship to the assistant district attorney who investigated the case and testified at the trial. [8]

---

[8] The prosecution's anticipated reliance on *Morgenthau v. Crane*, 113 A.D.2d 20 (1st Dept. 1985) is misplaced. There, this Department vacated and set aside the order of the trial court in *People v. Nuzzi*, 128 Misc.2d 502 (1985),

## POINT THREE

### APPELLANT'S CONSTITUTIONAL RIGHT TO DUE PROCESS WAS DEFEATED BY THE TRIAL COURT'S CONSIDERATION, AT SENTENCING, OF UNRELIABLE AND INACCURATE ALLEGATIONS OF UNCHARGED CRIMINAL CONDUCT

It is firmly established that sentencing is a critical phase of the criminal process which must comport with the requirements of the Due Process Clause. *Gardner v Florida*, 430 US 349, 358 (1977). To this end, "the sentencing court must assure itself that the information upon which it bases the sentence is reliable and accurate." *Mempa v Rhay*, 389 U.S. 128, 133 (1967); *Townsend v Burke*, 334 U.S. 736, 741 (1948); *United States v Lee*, 818 F.2d 1052, 1055 (2nd Cir 1987); *United States v. Pugliese*, 805 F.2d 1117 (2nd Cir. 1986); *People v. Naranjo*, 89 N.Y.2d 1047 (1997); *People v. Outley*, 80 N.Y.2d 702 (1993); *People v. Gardner*, 28 A.D.2d 1221 (4th Dept. 2006), *People v. Bratcher*, 291 A.D.2d 878 (4th Dept. 2002); *People v. Quinones*, 11 Misc.3d 582 (2005). Put differently, as a "matter of due process, an offender may not be sentenced on the basis of 'materially untrue' assumptions or 'misinformation.'" *United States v. Pugliese*, supra, at 1123. Appellant maintains that the trial court's reliance on untrue and unreliable allegations of misconduct violated due process.

---

appointing a special prosecutor after disqualifying the entire District Attorney's office because a single assistant was the cousin of the defendant.

In *Naranjo*, the Court of Appeals disapproved judicial reliance on "pure speculation." There, the prosecution claimed the defendant was involved in the uncharged shooting of a deli employee in order to prevent his testimony at trial. In advancing this claim, the prosecution argued that the defendant bore a "striking resemblance" to the masked attacker and stood before the court convicted of robbing the very deli where the shooting occurred. The *Naranjo* Court found that the sentencing court's consideration of these allegations was an improper violation of due process.

In accord are recent decisions of the Fourth Department. For example, in *People v. Bratcher*, supra, the court remitted for re-sentencing where, as here, the court imposed the maximum penalty after taking into account the prosecution's unsupported allegations that defendant was involved in an uncharged series of bank robberies. *See also People v. Gardner*, supra, (Requiring sentencing court to insure reliability and accuracy of information used to arrive at sentence.)

Similarly, in *People v. Quinones*, supra, the sentencing court declined the prosecution's invitation to consider unreliable allegations provided by defendant's estranged companion, who claimed he was responsible for the murder of a prostitute and a hotel manager. Aware the informant was alleged to have been assaulted by defendant, the court concluded "her accusations may have been tainted by her own hostility against him."

Likewise, the allegations offered against appellant were supplied by a biased and hostile informant. Moreover, the claims of the estranged girlfriend to the effect that appellant was involved in drug dealing, weapons possession and menacing are uncharged and entirely uncorroborated. Further, despite the court's unsound conclusion that the prosecutor had a "good faith basis" for the proffer, the record does not support the conclusion that he was personally informed. On the contrary, it appears from the record that the statements, if made at all, were made to unnamed and unidentified "people." Given the totality of circumstances, the statements offered were patently untrustworthy.

Accordingly, the court committed constitutional error in relying on them to impose the maximum penalty upon appellant, who stood before the court, at almost thirty years of age, without a single felony conviction.

## **CONCLUSION**

Based on the foregoing, appellant respectfully requests that this Court reverse his conviction and remand the matter for a new trial.

Dated:   New York, New York
August 1, 2008

Respectfully submitted,

Gail Gray, Esq.
Attorney for Defendant-Appellant
770 Broadway – 2nd Floor
New York, New York 10003
(646) 495-6067

## STATEMENT PURSUANT TO RULE 5531

1.  The indictment number in the court below was 662/2004 (New York County).

2.  The full name of the original parties were the People of the State f New York against Vone Wynn, defendant.

3.  The action was commenced in the Supreme Court of the State of New York, County of New York, by the filing of an indictment on February 1, 2004.

4.  The indictment charged one count of murder in the second degree.

5.  This appeal is from a judgment of conviction rendered on March 24, 2005 (Wittner, J.).

6.  The appeal is being perfected on the appendix method.

## CERTIFICATION OF COMPLIANCE
### Pursuant to 22 N.Y.C.R.R. § 670.10.3 (f)

I, Gail Gray, an attorney licensed to practice law in the courts of the state of New York hereby certify that the brief for Defendant-Appellant in the instant matter, the *People of the State of New York v. Vone Wynn*, filed under Indictment Number 662/2004 was prepared on a computer, using a proportionally spaced typeface, specifically Times New Roman typeface, in fourteen (14) point.

The document is double-spaced and the total number of words in the brief is thirteen thousand (13,000), inclusive of point headings and footnotes and exclusive of pages, table of citations, proof of service, certificate of compliance, or any authorized addendum.

Dated:     New York, New York
           August 1, 2008


                              Gail Gray, Esq.
                              Attorney for Defendant-Appellant
                              770 Broadway – 2nd Floor
                              New York,. New York 10003
                              (646) 495-6067

## CERTIFICATION OF COMPLIANCE
### Pursuant to C.P.L.R. 2105

I, Gail Gray, an attorney licensed to practice law in the courts of the state of New York hereby certify, pursuant to C.P.L.R. 2105, that the papers contained in the annexed Appendix for Defendant-Appellant have been personally compared by me with the originals on file in the office of the Clerk of the Supreme Court, New York County, and I found them to be true and complete copies of those originals.

Dated:      New York, New York
            August 1, 2008

Gail Gray, Esq.
Attorney for Defendant-Appellant
770 Broadway – 2nd Floor
New York,. New York 10003
(646) 495-6067



RECEIVED

AUG 01 2008

APPEALS

# Exhibit B

*To be argued by*
DANA POOLE

# New York Supreme Court

Appellate Division - First Department

---

## THE PEOPLE OF THE STATE OF NEW YORK,

*Respondent,*

- *against* -

## VONE WYNN,

*Defendant-Appellant.*

---

## BRIEF FOR RESPONDENT

ROBERT M. MORGENTHAU
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
(212) 335-9000

DANA POOLE
ASSISTANT DISTRICT ATTORNEY
*Of Counsel*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION.............................................................................................................. 1

THE EVIDENCE AT TRIAL ........................................................................................... 3

    The People's Case ...................................................................................................... 3

    The Defense Case ..................................................................................................... 44

POINT I

        DEFENDANT'S GUILT WAS PROVEN BEYOND A
        REASONABLE DOUBT........................................................................... 46

POINT II

        AFTER EXTENSIVE WARNINGS FROM THE
        COURT, DEFENDANT WAIVED THE POTENTIAL
        CONFLICT OF INTEREST WITH ONE OF HIS TWO
        TRIAL ATTORNEYS; HE CANNOT NOW BE
        HEARD TO COMPLAIN THAT HE WAS DENIED
        CONFLICT-FREE COUNSEL................................................................... 51

POINT III

        THE COURT PROPERLY ADMITTED CERTAIN
        DETAILS OF DEFENDANT'S STATEMENT THAT
        WERE NOT INCLUDED IN THE VDF BUT WERE
        LITIGATED AT THE SUPPRESSION HEARING............................. 69

POINT IV

        THE COURT STRUCK DETECTIVE CLARKE'S
        REFERENCES TO THE CONTENT OF AN
        ANONYMOUS CRIME STOPPER'S TIP AND, UPON
        DEFENDANT'S REQUEST, ADMITTED THE
        CONTENTS OF THE DD-5 DEFENDANT HAD
        WANTED TO USE TO IMPEACH HIM. ................................................ 75

POINT V

    THE COURT PROPERLY PRECLUDED THE DD-5
    REPORT PREPARED AFTER TAISHA MILLS
    IDENTIFIED DEFENDANT IN A PHOTO ARRAY........................ 87

POINT VI

    THE COURT PERMITTED THE DEFENSE TO ASK
    DALEY A QUESTION DESIGNED TO IMPEACH
    HAYSLETT'S TESTIMONY. .................................................................. 93

POINT VII

    THE TESTIMONY ELICITED FROM LAMONT
    REYNOLDS ON REDIRECT EXAMINATION DID
    NOT CONSTITUTE A "PRIOR CONSISTENT
    STATEMENT". ........................................................................................... 95

POINT VIII

    THE COURT DID NOT ADMIT EVIDENCE OF
    WILSON'S STATEMENT ABOUT DEFENDANT'S
    INVOLVEMENT IN THE SHOOTING.............................................. 100

POINT IX

    THE COURT PROPERLY DECLINED TO INSTRUCT
    THE JURY ON THE DEFENSE OF JUSTIFICATION................... 102

POINT X

    THE JUDGE PROPERLY DECLINED TO PROVIDE
    THE JURY WITH GRAND JURY TESTIMONY NOT
    ADMITTED INTO EVIDENCE, AND HER
    MISSTATEMENT FOR THE REASON CAUSED NO
    PREJUDICE TO DEFENDANT............................................................ 107

POINT XI

    THE COURT CONSIDERED PROPER FACTORS IN
    FASHIONING DEFENDANT'S SENTENCE ................................. 112

CONCLUSION ............................................................................................... 117

## TABLE OF AUTHORITIES

### FEDERAL CASES

Cuyler v. Sullivan, 446 U.S. 335 (1980) ............................................................. 63

Townsend v Burke, 334 U.S. 736 (1948) ........................................................... 115

United States v. Manko, 979 F.2d 900 (2d Cir. 1992) .................................... 84-85

United States v. Pugliese, 805 F.2d 1117 (2d Cir. 1986) ................................. 115

Wood v. Georgia, 450 U.S. 261 (1981) .............................................................. 63

### STATE CASES

Crawford v. Nilan, 289 N.Y. 444 (1943) ............................................................ 99

People ex rel. DeMauro v. Gavin, 92 N.Y.2d 963 (1998) ................................ 84

People v. Adams, 72 A.D.2d 156 (1st Dept. 1980),
    aff'd, 53 N.Y.2d 1,
    cert. denied, 454 U.S. 854 (1981) .............................................................. 91

People v. Allah, 80 N.Y.2d 396 (1992) ............................................................. 64

People v. Arroyave, 49 N.Y.2d 264 (1980) ...................................................... 63

People v. Bell, 38 N.Y.2d 116 (1975) ............................................................... 86

People v. Butler, 84 N.Y.2d 627 (1994) .......................................................... 103

People v. Butts, 72 N.Y.2d 746 (1988) ........................................................... 103

People v. Caban, 246 A.D.2d 438 (1st Dept. 1998) ....................................... 114

People v. Caban, 70 N.Y.2d 695 (1987) ..................................................... 66, 69

People v. Cochran, 29 A.D.3d 365 (1st Dept. 2006) ....................................... 80

People v. Collice, 41 N.Y.2d 906 (1977) ......................................................... 104

People v. Conyers, 189 A.D.2d 607 (1st Dept. 1993) .................................... 116

People v. Davis, 58 N.Y.2d 1102 (1983) .......................................................... 81

People v. De Jesus, 42 N.Y.2d 519 (1977) ...................................................... 95

People v. Dillon, 30 A.D.3d 1135 (2006) ........................................................ 73

People v. El, 250 A.D.2d 395 (1st Dept. 1998) ............................................. 114

People v. Evans, 258 A.D.2d 273 (1999)......................................................... 73

People v. Gaimari, 176 N.Y. 84 (1903)............................................................ 48

People v. Goetz, 68 N.Y.2d 96 (1986) ........................................................... 104

People v. Gomberg, 38 N.Y.2d 307 (1975)...................................1-2, 52, 55, 59, 63-64, 68

People v. Gonzales, 244 A.D.2d 570 (2d Dept. 1997) ............................... 92, 110

People v. Gonzalez, 253 A.D.2d 684 (1st Dept. 1998)................................... 92

People v. Gonzalez, 39 A.D.3d 434 (1st Dept. 2007)..................................... 80

People v. Harris, 99 N.Y.2d 202 (2002)..................................................... 63, 68

People v. Harrison, 82 N.Y.2d 693 (1993) ................................................... 114

People v. Johnson, 6 A.D.2d 181 (1st Dept. 1958)......................................... 86

People v. Jones, 3 N.Y.3d 491 (2004) ........................................................... 103

People v. Junco, 43 A.D.2d 266 (1st Dept.),
    aff'd., 35 N.Y.2d 419 (1974) ................................................................... 116

People v. Kinchen, 60 N.Y.2d 772 (1983)..................................................... 115

People v. Kirkland, 89 N.Y.2d 903 (1996) ..................................................... 73

People v. Leon, 225 A.D.2d 481 (1st Dept. 1996) ......................................... 92

People v. Lewis, 116 A.D.2d 16 (1st Dept. 1986) ......................................... 102

People v. Lombardo, 61 N.Y.2d 97 (1984) ................................................ 64, 68

People v. Lourida, 70 N.Y.2d 428 (1987)..................................................... 110

People v. Malizia, 92 A.D.2d 154 (1st Dept. 1983),
    aff'd, 62 N.Y.2d 755,
    cert. denied, 469 U.S. 932 (1984) ............................................................ 50

People v. McClean, 69 N.Y.2d 426 (1987) ................................................ 98

People v. McDonald, 68 N.Y.2d 1 (1986) ...................................... 63-64, 68

People v. Melendez, 55 N.Y.2d 445 (1982) .......................................... 98, 100

People v. Mendes, 3 N.Y.2d 120 (1957) .................................................. 86

People v. Moye, 66 N.Y.2d 887 (1985) .................................................. 102

People v. Naranjo, 89 N.Y.2d 1047 (1997) ....................................... 114-115

People v. Norman, 173 A.D.2d 572 (2d Dept. 1991) .............................. 99

People v. Ortiz, 49 N.Y.2d 718 (1980) .................................................. 67

People v. Ortiz, 76 N.Y.2d 652 (1990) .................................................. 63

People v. Padgett, 60 N.Y.2d 142 (1983) .............................................. 103

People v. Peralta, 248 A.D.2d 300 (2d Dept. 1998) ............................. 112

People v. Piazza, 48 N.Y.2d 151 (1979) ................................................ 92

People v. Reynoso, 73 N.Y.2d 816 (1988) ............................................ 104

People v. Rivera, 306 A.D.2d 186 (1st Dept. 2003) .............................. 73

People v. Rodriguez, 228 A.D.2d 391 (1st Dept. 1996) ..................... 2, 110

People v. Rosa, 176 A.D.2d 188 (1991) ................................................ 68

People v. Rosen, 96 N.Y.2d 329,
    cert. denied, 534 U.S. 899 (2001) ................................................... 114

People v. Salaman, 231 A.D.2d 464 (1st Dept. 1996) ........................... 92

People v. Salcedo, 68 N.Y.2d 130 (1986) .............................................. 68

People v. Santana, 40 AD3D 230 (1st Dept. 2007) ........................... 92, 110

People v. Scarborough, 49 N.Y.2d 364 (1980) ..................................... 103

People v. Seplow, 226 A.D.2d 178 (1st Dept. 1996) ....................................................... 114

People v. Singleton, 41 A.D.3d 117 (1st Dept. 2007) ..................................................... 81

People v. Starling, 85 N.Y.2d 509 (1995) ................................................................92, 109

People v. Steele, 26 N.Y.2d 526 (1970) ........................................................................ 104

People v. Tineo, 64 N.Y.2d 531 (1985) .......................................................................... 63

People v. Wandell, 75 N.Y.2d 951 (1990) ....................................................................... 64

People v. Watts, 57 N.Y.2d 299 (1982) .......................................................................... 102

People v. White, 272 A.D.2d 239 (1st Dept. 2000) ........................................................ 91

People v. Winkler, 71 N.Y.2d 592 (1988) ....................................................................... 68

## FEDERAL STATUTES

U.S. Constitution, Amendment VI ................................................................................. 63

## STATE STATUTES

Criminal Procedure Law 470.05(2) ............................................................ 80, 92, 109, 114

N.Y. Constitution, Article I, Section 6 ........................................................................... 63

Penal Law § 35.15(2) ..................................................................................................... 103

Penal Law § 125.25(1) ...............................................................................................1-2, 46

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK,

          Respondent,

     -against-

VONE WYNN,

        Defendant-Appellant.

## BRIEF FOR RESPONDENT

## INTRODUCTION

Defendant Vone Wynn appeals a March 24, 2005 judgment of the Supreme
Court, New York County (Charles Solomon, J. at Gomberg inquiry; Bonnie G.
Wittner, J. at hearings and trial), convicting him after jury trial of Murder in the
Second Degree (Penal Law § 125.25[1]) and sentencing him to an indeterminate
prison term of 25 years to life.

In the early morning hours of September 26, 2003, defendant's cousin, Rodney
Wilson, got into a verbal altercation with Jonadial Nelson in a courtyard of the
Lincoln Projects in upper Manhattan.  Nelson was with his girlfriend; Wilson was with
his girlfriend, defendant, and another man.  As the argument escalated, defendant
drew a gun and shot Nelson as he ran, hitting him six times in the arm and back.
Wilson's girlfriend, as well as a passer-by who knew Wilson, saw defendant firing the

gun. Defendant, Wilson, and the third man fled the scene. Nelson died from his wounds that same morning. After Wilson's girlfriend came forward to police several months later, defendant was arrested on February 9, 2004. The passer-by who saw defendant shoot Nelson, identified defendant in a line-up later that day. In oral statements to police and a videotaped statement to a prosecutor, defendant denied having been present at the time of the shooting.

By New York County Indictment Number 662/2004, filed February 11, 2004, defendant was charged with Murder in the Second Degree (Penal Law § 125.25[1]). On June 10, 2004, the Honorable Charles H. Solomon presided over a <u>Gomberg</u> inquiry at which defendant waived the potential conflict posed by the fact that one of his defense attorneys was the brother of the Assistant District Attorney who took his defendant's statement and might be called as a witness at trial. Following a <u>Huntley</u>/<u>Wade</u> hearing on August 19 and 24, 2004, the Honorable Bonnie G. Wittner, in a written order and decision dated October 5, 2004, denied defendant's motions to suppress his statements and the identification evidence against him. Following a mid-trial <u>Rodriguez</u> hearing on February 22, 2005, Justice Wittner denied defendant's motion to suppress the identification made by Robin Hayslett, Wilson's girlfriend.[1] Justice Wittner presided over defendant's jury trial, which began on February 17, 2005, and concluded on March 4, 2004, when the jury convicted him as charged.

---

[1] The lower court's suppression rulings are not at issue on this appeal.

On appeal, defendant complains that he was denied his right to the assistance of conflict-free counsel, that the court incorrectly declined to instruct the jury on the defense of justification, that the court failed to respond adequately to certain jury requests during deliberation, and that the court considered improper factors at defendant's sentencing.   Defendant also raises numerous evidentiary complaints; specifically, that the court improperly admitted portions of his statement to police that were not included in the People's Voluntary Disclosure Form, limited his ability to impeach several of the People's witnesses, admitted a prior consistent statement of one of the People's witnesses, and admitted improper hearsay evidence.

THE EVIDENCE AT TRIAL

The People's Case

The Victim, Jonadial Nelson, Began Dating Taisha Mills Over A Year Before He Was Killed.

On February 28, 2003, TAISHA MILLS met Jonadial Nelson through her best friend, who was also Nelson's niece (Mills: 90, 95; Exhibit 14: photo of Nelson).[2] Nelson lived in the Lincoln Projects in upper Manhattan, received Social Security checks, and did not have a job.  Nelson had tried to find employment, but was unable secure a job because he had been in jail (Mills: 91, 94-96).   Mills and Nelson

---

[2] Nelson was also known as "Jon-Jon" and is often referred to by that nickname, alternatively spelled "John-John," throughout the transcript.

-3-

maintained a telephone relationship until Mills moved to New York City in August 2003 and began working as a contract coordinator for the Visiting Nurse Service of New York (Mills: 89-92).

Mills, who was about 25 years old at the time, fell in love with Nelson, and the couple saw each other two to three times a week. Mills was the mother of two young twins, so the couple usually spent their time with her children watching movies at each other's homes or going out to dinner. Nelson had a "wonderful relationship" with Mills's children and was "very good to them." Mills described Nelson as her "best friend" who was "just a nice, caring person, very open to help people." Nelson "drank a lot," but became "laid back," rather than violent, when he did so. Mills had "never seen him upset, never seen him violent" (Mills: 90-93, 95-97).

Robin Hayslett Met Defendant Through Her Relationship With His Cousin, Rodney Wilson, And She Was Also Familiar With Nelson.

ROBIN HAYSLETT, who was 41-years-old at the time of trial, had moved to the Lincoln Projects in 2003 after she was kicked out of a drug treatment program that was part of her plea agreement from a 2002 arrest (Hayslett: 231, 252-260; 406).[3]

---

[3] Hayslett, who described herself as a drug addict, began smoking crack when she was 18 years old. She was initially able to continue working, but ultimately was unable to maintain consistent employment because "you can't hold a job and crack at the same time" since, "when you start smoking, you just be smoking" (Hayslett: 231, 233-234, 236-237). At the time of trial, Hayslett was incarcerated for a drug sale conviction (Hayslett: 229). She had 10 to 15 prior arrests, including 5 felony convictions (Hayslett: 229-230, 389).

(Continued…)

Knowing that she had never provided the courts with a Lincoln Projects address, Hayslett went there to stay with her sister-in-law in Apartment 10-B at 2140 Madison Avenue (Hayslett: 253, 257-258, 260-261, 347-348, 407).

Hayslett's sister-in-law introduced her to Rodney Wilson, who was also known as "Raw," and Hayslett began buying drugs from him. Eventually, Hayslett began selling drugs for Wilson from her apartment and the lobby of her building. Hayslett smoked crack regularly and sold crack for Wilson "[e]very day, all day" (Hayslett: 263-265, 282-283). For a period of time, Wilson and his employees became the "biggest dealers in the projects" and other dealers complained that they were not making as

_____

(...Continued)

When she was 15 years old, Hayslett was arrested for graffiti in Westchester and received a sentence of probation (Hayslett: 230). In 1985, Hayslett was attempting to buy drugs when a police officer intervened and she spit in his face; she was charged with disorderly conduct and resisting arrest (Hayslett: 230-231). Later, she was charged with drug possession (Hayslett: 237). In 1990, Hayslett was sentenced to 2 years in prison on a felony assault conviction, stemming from an incident in which she had been selling crack in Harlem, got into an altercation with a man who owed her money, and "end[ed] up cutting the guy" with a box cutter (Hayslett: 237-241, 390, 392-393). In 1994, Hayslett pled guilty to selling drugs to an undercover officer and was sentenced to 2½ to 5 years in prison (Hayslett: 242-243). She entered prison in 1995, attended a drug program there for about 6 months, and was released in December 1996 (Hayslett: 243-245).

Hayslett, who was then married to a drug dealer, was introduced to Lincoln Projects by her sister-in-law when she was released from prison in 1996 (Hayslett: 245-246). Hayslett went there to get high because there were "places in the projects where you go to smoke." By 1998 or 1999, Hayslett was using drugs every day and made money by selling crack (Hayslett: 245-246, 248-249). In 1999 she "got arrested for misdemeanors like possession and trespassing"; she usually pled guilty and was sentenced to time served (Hayslett: 251). In 2000, Hayslett pled guilty to selling drugs to an undercover officer and spent 16 months in prison, getting paroled in June of 2002 (Hayslett: 251-254). After her 2002 arrest, Hayslett was sent to a drug treatment program, but was kicked out after 90 days, having been caught "sexually acting out" with a man. A warrant was issued for her arrest, and Hayslett fled (Hayslett: 252-260, 406).

much money as they once had.  Regarding Wilson, Hayslett explained, "People was hating on him, put it like that" (Hayslett: 282-283, 285).  In September 2003, Hayslett realized that she was several months pregnant by Wilson (Hayslett: 266-270, 309, 399-400, 403-404).  When she discovered she was pregnant, Hayslett continued selling crack for Wilson, but at his behest, cut down on smoking crack and cigarettes and drinking alcohol.  Nevertheless, she continued "dipping and dabbing" in crack, and mostly smoked it when Wilson was not around so that he would not see (Hayslett: 309-310).

Hayslett met defendant, who was Wilson's cousin, in June 2003.  Wilson had initially introduced defendant as his "brother," and Hayslett believed that the two cousins had grown up in the same home.  When Wilson first introduced Hayslett to defendant, they all bought crack together.  Since then, Hayslett had been with defendant "a lot of times."  Defendant and Hayslett did not "hang out" together on their own, but defendant "hung out" with Wilson and often came to Hayslett's apartment looking for Wilson.  Defendant also called for Wilson on Hayslett's cell phone whenever he could not get through on Wilson's phone, so Hayslett often spoke to defendant (Hayslett: 272-281, 359-360).

From living and selling crack in the Lincoln Projects, Hayslett was also familiar with Jonadial Nelson because she had seen him selling drugs in the lobby of her building.  She knew him to be a "bully," a "drug dealer," and "gun happy" (Hayslett: 285-287; Exhibit 1: photo of Nelson).  The people at the Lincoln Projects, including

-6-

Hayslett, "knew" that it was Nelson's "MO" to carry a gun, but Hayslett had never seen it (Hayslett: 407-408).

The Day Before He Is Killed, Nelson Tells Mills That He Has Begun Selling Drugs.

Mills had never seen Nelson sell drugs, but Nelson had told her that he had previously been incarcerated for drug arrests, including possession of narcotics (Mills: 91, 64).  During a telephone conversation on September 24, 2003, Nelson told Mills that he was staying out that night because he was starting to sell drugs and he needed to get his money together.  Mills understood that Nelson was selling crack-cocaine at the Lincoln Projects (Mills: 98, 134).  Mills "didn't feel comfortable about that situation" and wanted to talk to Nelson about it.  The two arranged to meet the next day (Mills: 98).

Mills and Nelson met at 132nd Street and Fifth Avenue around 8:30 or 9:00 on the evening of September 25, 2003.  Nelson arrived with a friend called "Buddha" and another man whom Mills did not know.  The foursome traveled around the upper west side looking for a place to get food and then hung out in the park until around 1:00 a.m., when Mills had to use the bathroom.  They all went to Buddha's apartment in the Lincoln Projects, and when Mills came out of the bathroom, two more men had arrived.  Mills told Nelson that she wanted to go home (Mills: 99-103, 125-126, 134; Exhibit 6: diagram of Lincoln Projects).

Nelson walked with Mills to the other side of the projects, so she could catch a cab on Madison Avenue. On their way, Nelson stopped to talk to a man Mills did not know.[4] Since the man had money to give to Nelson, Mills assumed that he had been selling drugs for Nelson (Mills: 103-104, 127; Exhibit 6: diagram of Lincoln Projects). Mills, who had wanted to talk to Nelson privately rather than "make a scene in front of his friends," never got to "really talk" about her concerns about his drug dealing because people were always around (Mills: 104, 134).

<u>Hayslett Tries To Find Wilson To Give Him The Money From Her Drug Deals That Day.</u>

Meanwhile, Hayslett had been selling drugs for Wilson that day. Wilson, who was at his mother's apartment in building 2201, called Hayslett, who was in her apartment in building 2140, to find out if she was finished selling for the night. He told her to bring the money downstairs to him (Hayslett: 307-308, 310, 312-313). When she came downstairs, Hayslett did not see Wilson. Defendant was not there either, but Hayslett saw three men "leaning against" his car, which was parked on Fifth Avenue (Hayslett: 314). Hayslett recognized the "grayish" or "silver colored" car because she had been in it "a lot of times" with defendant (Hayslett: 272, 274-275). Hayslett asked the men where "Ra[w]" – referring to Wilson – was, but they did

---

[4] Mills did not "hang out" at the projects and so did not know many people there (Mills: 103).

not respond.  So Hayslett went to a store across the street to buy a soda or a beer and "kill a little time" (Hayslett: 314-315).

<u>Nelson Is Summoned To Meet Wilson In An Alleyway.</u>

After Nelson talked to the man who had apparently been selling drugs for him, Nelson and Mills soon reached the exit of the projects.  There, two men approached Nelson and told him that "Raw" wanted to "speak to him."  Nelson asked the men "where is he at," and one of the men said, "[I]n front of his building."  Mills did not know who "Raw" was, and Nelson did not say anything about him.  Mills followed Nelson down Fifth Avenue and into a "little alleyway."  As they turned into the alley, a man spotted them and immediately turned back around.  Mills had never seen him before and had not seen him since (Mills: 105-107, 127; Exhibit 6: diagram of Lincoln Projects).

<u>Wilson, Defendant, Hayslett, Nelson, And Mills Converge In The Alleyway.</u>

At about the same time, Hayslett was returning through the entrance to the projects sometime after midnight, when she saw Wilson and defendant coming out building 2201 (Hayslett: 315-316, 409, 326-327, 329, 348, 350; Exhibit 2: photo of building 2201; Exhibit 3: photo of alley; Exhibit 6: diagram of Lincoln Projects; Exhibits 25A, C: photos of building 2201).[5]  Defendant said to Wilson, "[Y]o, I'm out

_____

[5] Hayslett identified defendant at trial (Hayslett: 272).

here, fuck this bullshit," and then he walked away (Hayslett: 316, 327, 409; Exhibit 3: photo of alley). As he walked past her, defendant asked, "What is up, Robin?" and she responded, "What is up V?" As defendant was trying to leave, Nelson arrived "with some girl" whom Hayslett had never seen before (Hayslett: 316, 410).

Hayslett knew that there was "some kind of bad blood" between Wilson and Nelson. Wilson once told Hayslett that a "little Puerto Rican kid" had "said something" that caused Wilson to slap him. The "kid" told Nelson about the incident and there was "a little beef or something" between Nelson and Wilson. But Hayslett did not know what happened after that (Haslett: 287-288, 407)

Mills, who was still with Nelson when he reached his destination near 2140 Madison and 2101 Fifth Avenue, saw "Raw," whom she identified as Wilson, along with defendant, whom she had never seen before and identified at trial.[6] Mills also noticed a "crack head lady" who looked like she wanted to buy drugs and was "trying to get the attention of the defendant." (Mills: 106-107, 109-110, 122, 124, 128-129; Exhibits 7A-B: diagrams; Exhibit 15: photo of Wilson; Exhibit 16: photo of defendant).

---

[6] Mills noted that defendant's hair was different at the time of trial in that, on September 26th, his "braids were coming down instead of going straight back" (Mills: 107, 109-110).

-10-

Wilson And Nelson Argue.

Nelson and Wilson approached each other until they were standing face-to-face.  Defendant stood back, "a little closer to the building," near Wilson (Mills: 112, 129; Exhibits 7A-B: diagrams; Exhibits 25A, C: photos of building 2201).  Nelson said to Wilson something to the effect of, "[Y]o, I heard you were looking for me" (Hayslett: 316-317) or "[W]hat's up, you wanted to talk to me" (Mills: 107).  Wilson denied that he had wanted to talk to Nelson.  Nelson asked, "[W]hy would somebody tell me that you wanted to talk to me, I come over here and now you are telling me you don't want to talk to me" (Mills: 107-108).  Wilson said that, based on what he had been told by another man called "Air," he believed that Nelson had been looking for him (Hayslett: 316-317).

LAMONT REYNOLDS – who was familiar with Nelson and knew Wilson "[f]rom the hood" (Reynolds:  506-508, 513, 517-521, 559-560, 564; Exhibit 1: photo of Nelson) – was walking down 135th Street at the time and noticed Wilson and Nelson "arguing" near the near the playground at Fifth Avenue (Reynolds: 510-511, 526-527; Exhibit 2: photo of building 2201; Exhibit 3: photo of alley).  Reynolds heard Nelson deny that he had been looking for Wilson (Reynolds: 512-513).

Wilson and Nelson continued "arguing back and forth exchanging words" (Hayslett: 317, 322).  Mills could tell that Nelson was "getting a little aggravated" and that the situation "was going to get tense" (Mills: 108).  During the argument, Wilson was waving his hands as if the two men were about to fight, but he was not holding a

gun or anything else (Mills: 108-109; Hayslett: 319-320; Reynolds: 514-515).
Although Reynolds recalled that Nelson was "waving his hands too" (Reynolds: 515),
Hayslett noticed that Nelson kept his hand in the pocket of the gold-colored hoodie
he was wearing (Hayslett: 318-319, 330; Exhibit 4: photo of hoodie).

Hayslett thought that Nelson had a gun, even though she never saw a gun or
anything else in his pocket (Hayslett: 319, 410, 462-463).   And, from Nelson's
"reputation," Hayslett thought that he was going to "use" the gun (Hayslett: 410-411,
462).   Thinking that Wilson might be too much "in a rage" to "recognize what was
going in front of him," Hayslett intended to step behind Nelson to warn Wilson by
"[e]ye contact" that she thought Nelson had a gun (Hayslett: 318, 321, 414).

Defendant Shoots Nelson.

During the argument, Wilson's "attitude changed" and he moved closer to
Nelson. Wilson told him, "[N]ah, I ain't want to talk to you because you know … I
don't fuck with you like that" (Mills: 108, 113). At the same moment, Hayslett began
to "step out" to catch Wilson's attention. She was then "eye-to-eye" with defendant,
and, as she "looked [defendant] dead in his eyes," he began shooting a gun.   The
bullets fired so close to Hayslett that, if she had moved "one more step," they "might
have hit" her (Hayslett: 322-323, 411, 414).

Reynolds, who had "kept passing" when he saw Nelson and Wilson arguing,
heard shots firing. Reynolds turned around and, from about 30 to 35 feet away, saw

-12-

defendant "point a gun shooting at [Nelson]" (Reynolds: 515-516, 523, 530-531; Exhibit 16: photo of defendant).[7] The gun in defendant's hand was a silver .357 caliber handgun, and sparks flew from it as defendant fired (Hayslett: 322-323, Reynolds: 523).

As he was shooting, defendant continued walking forward (Hayslett: 323). Nelson ran away from defendant, jumping over a fence. At that point, Reynolds saw Nelson "get hit by the bullets." Now bleeding, Nelson "grabbed onto the gate and started crawling down" (Reynolds: 524-526; Exhibit 4: photo of hoodie; Exhibit 5: photo of bloody sidewalk near fence).

<u>After Mills And Hayslett Drop To The Ground, Defendant And His Cohorts Flee.</u>

Mills had heard only one gun shot before she saw "a flash" and "everything just got dark" (Mills: 109, 113-115, 151). She and Hayslett "hit the floor" (Hayslett: 318, 324, 353, 414). After blacking out, the next thing Mills knew was that she was "on the floor" in a "sitting position," but she did not how she had gotten there and seemed to be "in a state of shock because [she] didn't really know what was going on at the time" (Mills: 114-117). Mills and Hayslett "stayed on the ground" until "everything got real quiet" (Hayslett: 324, 326, 353). Hayslett knew that Nelson had run away because when she "looked up, nobody was left there" (Hayslett: 413-414, 463).

---

[7] Reynolds, who knew defendant only as Wilson's cousin and not by name, identified defendant in court (Reynolds: 515-516, 580).

-13-

Hayslett and Mills "kind of like crawled to the Fifth Avenue entrance" (Hayslett: 324, 326, 328, 353).

Defendant, Wilson, and a third man "with dreads" ran to a grey or silver-colored car parked on Fifth Avenue (Mills: 116-118; Hayslett: 324, 326; Reynolds: 527-528).[8] Mills, who had "seen like three shadows dart past" her, looked at the car and saw defendant "looking over" at her. Mills recognized defendant from the altercation between Wilson and Nelson. She and defendant "made eye contact" before defendant got into the passenger side of the car which then drove off (Mills: 114, 116-118).

Mills Finds Nelson Bleeding On The Ground.

Realizing that "something was wrong" because Nelson was no longer with her, Mills ran back into the projects the same way she had exited. As Mills was running, she heard someone say that "somebody is lying over there." Mills found Nelson, who was on the ground with his eyes closed. He was still breathing, but "started to make a gurgling noise." Blood was seeping through his sweater and onto his hands. (Mills: 113-115, 118-119, 127, 130; Exhibit 6: diagram of Lincoln Projects; Exhibits 7A-B: diagram).

---

[8] Hayslett saw "some guys jump in the car," but "it was dark and [she] didn't know who it was" (Hayslett: 324, 326).

Mills "started screaming and crying" (Mills: 119). Hayslett, who was no longer with Mills, heard Mills "scream" Nelson's name, saying, "John-John, no" (Hayslett: 324-325, 354). Mills "stood over him" and told Nelson to "just be strong, keep breathing" (Mills: 118, 130, 135). A "lady" put something under Nelson's head, and someone handed Mills a cell phone which she used to call her best friend – Nelson's niece – to tell her that her uncle had just been shot (Mills: 119-120, 130). Hayslett stayed away from the scene and instead, "walked all the way around" and came through the Madison Avenue entrance (Hayslett: 354). In the meantime, a crowd began to gather (Mills: 120).

## The Police Respond To The Scene And Speak To Mills.

Police Officers KAREN SMITH and DIANA PERRY were called to the scene shortly after 2:00 a.m. A crowd of 10 to 15 people had gathered. Nelson, who had several gunshot wounds, was still alive, but lying on the ground and bleeding. The officers called to make sure that Emergency Medical Services were on the way (Smith: 35-38, 44-45, 47-49, 59-60; Perry: 476, 482; Exhibit 1: photo of Nelson; Exhibit 2: photo of building 2201; Exhibit 6: diagram of Lincoln Projects).

Mills was still with Nelson and "[c]rying hysterically." Officer Smith was able to calm Mills enough to speak with her (Smith: 38-39, 59-60, 64; Perry: 477-478, 483). Mills told the officer that she was Nelson's girlfriend and had been with him when a

-15-

man walked up to them and told them to go around the corner.[9]  Mills reported that she and Nelson had gone to talk to the men and that immediately afterward, she heard the shots.  Mills could not tell the officers who shot Nelson because she had not seen "where the shot came from"; she "[j]ust remembered the flash … and the noise" (Smith: 40-42; Mills: 121-122).

Mills described the three men she saw just before hearing the shots, including Wilson, defendant, and the first man she saw in the alleyway (Smith: 40; Mills: 121, 131, 42).  One man she described as a 5'5" black man in his 30's with "braids going down the side" and wearing a red and black t-shirt and blue jeans.  Another she described as a black man with "braids going down the back" and wearing a white t-shirt and a blue cap.  The third she described as a 5'9" black man in his 20's with a "Caesar haircut" and wearing a t-shirt and a tan hoodie (Smith: 40-41).  Mills did not know the names of the men she saw, but, according to Smith, noted that the third man "frequented Lincoln."  Mills told the officer that the three men had run past her on Fifth Avenue and left in a grey, four-door car (Smith: 40-42, 63).

---

[9] On the following day, Mills was interviewed by Detective THOMAS CLARKE (Mills: 138; Clarke: 626, 672-674).  Clarke recalled that Mills told him that Nelson had been selling crack in front of the building when a man walked up and said that somebody wanted to speak to him (Clarke: 626)

No Other Witnesses Come Forward At The Scene.

Nobody in the crowd around Nelson matched the descriptions of the three perpetrators provided by Mills, so Officer Smith radioed the descriptions. She and Officer Perry then began asking the people in the crowd if they saw anything (Smith: 37, 42-43). Everybody questioned by the officers denied having seen or heard anything (Smith: 43; Perry: 477). Smith remembered "one gentleman was eating a burger like it was nothing." She "kind of got upset" because "this time of the morning everybody is outside, nobody sees anything, you just hanging around eating a burger like it's nothing, like it's a movie," so she "started dispersing everybody," telling them, "If you didn't see anything, it's not a show" (Smith: 43, 59, 62).

As Hayslett completed her more circuitous route to Nelson's location, the police had already arrived. An officer stopped her to ask if she had seen anything. Hayslett lied, telling the officer, "[N]o." She then "kept on going" (Hayslett: 325, 354, 456; Exhibit 5: photo of bloody sidewalk near fence).

Reynolds, who had run into one of the buildings after defendant shot Nelson, came back outside after the police arrived. Reynolds did not know any of the responding officers and did not speak to any of them (Reynolds: 522-523, 527-528, 531). Instead, Reynolds, a registered confidential informant who had worked with

-17-

Detective Mike Paul for about 15 years, called Detective Paul about 40 to 60 minutes

after Nelson was shot (Reynolds: 498-499, 532).[10]

Reynolds did not reach Paul until the next morning, at which point he reported

that "somebody got shot over here." Reynolds said that Wilson's cousin – defendant

– was the person who did the shooting, and that he could both describe and identify

defendant. Reynolds did not know the third man who had been with defendant and

---

[10] In 1989, when he was 17 years old and in jail on a petit larceny charge, Reynolds met Detective Paul, who helped Reynolds get out of jail and gave him some money in exchange for help with a homicide case; Reynolds later pled guilty and received a sentence of time served (Reynolds: 487-488, 498-499). Since that time, Reynolds reported to Paul about crimes he saw "going down on the street" (Reynolds: 500, 505-506). About 10 times, Reynolds received about $1000 or $1500 for providing information (Reynolds: 501-502, 505). If Reynolds did not receive money, Paul would sometimes help him out of "trouble" (Reynolds: 502). Reynolds had not received any money for the testimony he had previously provided in defendant's case and he would not be receiving money for the testimony he was providing at defendant's trial (Reynolds: 504, 602).

Since 1989, Reynolds had been arrested several more times on charges of domestic violence and driving with a suspended license. In 1992 or 1993, Reynolds got into a fight with his wife, who told police he had "pushed her and she fell"; even though he denied pushing her, Reynolds pled guilty and was sentenced to time served, which was about 15 days (Reynolds: 488-489). He was arrested in 1995 or 1996 for driving with a license that had been suspended for "about 51 violations," including lack of insurance; he pled guilty and received a sentence of 90 days in jail and 5 years probation (Reynolds: 489-491). In 1999, while he was still on probation, he was arrested again for driving with a suspended license; he pled guilty, spent 90 days in jail, and had his probation reinstated (Reynolds: 491-492). In 2001, he was arrested after a verbal fight with his child's mother, when she claimed he had stolen her money although he had not; Reynolds spent no time in jail and the case was dismissed when she dropped the charges against him (Reynolds: 492-494). He was arrested again in 2002 for another domestic violence charge against the same woman, but she dropped the charges again (Reynolds: 494).

At the time of trial, Reynolds was incarcerated upstate. He had been arrested again for driving with a suspended license and was found to be in possession of "two dime bags of weed" and "some money" (Reynolds: 486-487, 495-496). Reynolds had sold marijuana about 5 or 6 times in the past without having been arrested, and he had illegally possessed and sold guns, but was not arrested for those crimes (Reynolds: 496-498, 505).

Wilson that night.  Paul told Reynolds that the homicide was not his case and that he did not have jurisdiction in it, but he would put Reynolds in touch with the proper authorities (Reynolds: 528-529, 533-534, 567-568, 582-585).

Nelson Is Taken To The Hospital Where He Dies.

From the scene, Emergency Medical Services took Nelson to Harlem Hospital in an ambulance (Smith: 38; Mills: 119; Perry: 478).  Mills stayed behind with police, but Officer Perry followed Nelson to the hospital (Smith: 62; Mills: 130; Perry: 478-479).[11]  At the hospital, Nelson was "taken to the trauma room and they were desperately trying to save him" (Perry: 478).  When the medical staff removed Nelson's clothes, they brought Perry a piece of plastic wrap holding "chunks of crack-cocaine" that they found in his jeans (Smith: 51-53; Perry: 478-481; Exhibit 10: crack-cocaine).  Before she left the hospital at about 6:00 a.m., Perry received a paper bag that contained Nelson's clothing and boots.  No gun was included in Nelson's

---

[11] At some point, police took Mills to a show-up of "someone on the highway that fit the description," but it "wasn't him" (Mills: 131).  Later that night, the police took her to the precinct stationhouse to view photographs, but Mills did not recognize anyone who had been involved in the shooting (Mills: 131-132).

Several hours after the shooting, investigators from the Crime Scene Unit, including Detective PAUL WALSH, responded to the scene and took photographs of the evidence from where Nelson's body had been found (Smith: 38, 43, 44-46, 49; Walsh: 160-164, 170-173; Exhibit 4: photo of Nelson's hoodie; Exhibit 5: photo of bloody sidewalk near fence; Exhibit 17: gold hoodie with bullet holes).  Officers found no usable fingerprint evidence.  Detective Walsh searched the area where Nelson's body was found as well as the pathway and grass nearby, but found no ballistics evidence.  Although Walsh spoke to officers on the scene, he did not find out where the shooting had occurred and he did not necessarily know the relevant areas to search (Walsh: 161-162, 165-168, 170, 174-179).

-19-

personal effects, and, as far as Perry knew, Nelson had not possessed a gun that night (Perry: 480).

While Mills was at the stationhouse, her best friend's mother informed her that Nelson had died (Mills: 133). In all, Nelson had been shot six times (Doctor KRISTEN LANDI, Office of the Chief Medical Examiner: 72). The shot that killed Nelson had entered the right side of his back and exited the left side of his chest, tearing through his kidney, bowel, stomach, and liver (Landi: 74-75, 79-82; Exhibits 9, 11, 13: autopsy photos).[12]

In addition to the fatal shot, Nelson suffered a "graze wound" that extended from his left hand and up his arm. Another bullet had penetrated the inside of his left arm and exited near his elbow. Three bullets had entered his body just above his left buttock. Two of those bullets exited the left side of his chest. None of the bullets remained in Nelson's body (Landi: 73-75, 79-84; Exhibits 11, 13: autopsy photos).[13]

The majority of the gunshot wounds, including the fatal shot, were consistent with the gun having been fired from behind Nelson on his right side. None of the entrance wounds were on the front of Nelson's body. The medical examiner could

---

[12] Officer Smith, as the first officer on the scene, identified Nelson's body as the man she found there (Smith: 54-55; Landi: 84-85; Exhibit 8: Smith's identification of Nelson).

[13] The medical examiner found a full copper-jacketed, non-distorted bullet in the upper part of the right side of Nelson's back. That bullet had "been there for a while" and was not related to this shooting (Landi: 78-79). The autopsy also revealed that Nelson had a blood alcohol level of .07 percent and a vitreous humor alcohol level of .09 percent, indicating that he had ingested alcohol and was "on the clearing side of it" (Landi: 87-88).

-20-

tell that Nelson had been moving when he was shot, but could not determine the order in which each of the bullets had hit him.  It was possible that Nelson was shot in the arm from the front and then turned before the other shots were fired (Landi: 75, 85-87).

Hayslett And Wilson Spend The Night In A Hotel, Then Return To Selling Drugs.

After the shooting, Hayslett went to a friend's home.  After Wilson called her at about 3:30 that morning, they went to a hotel to spend the night (Hayslett: 416-417).  After Hayslett woke up at about 1:00 in the afternoon, she returned to her apartment and Wilson went to his mother's home.  At about 3:00 or 4:00 that afternoon, Wilson brought Hayslett crack-cocaine to sell and told her that he would be at his grandmother's house with defendant and to call him there if she needed more drugs to sell.  Hayslett sold drugs for the rest of the day.  People in the projects were "talking about what happened, but it ain't change nothing, people was still buying drugs" (Hayslett: 354-360).

Hayslett Talks To Defendant And Wilson On The Phone.

The evening after the shooting, defendant called Hayslett on her cell phone; she recognized his voice and had programmed her cell phone to display "V" when he called (Hayslett: 360, 386-387, 418-420, 459, 461-462).[14]  Defendant asked whether

---

[14] Before the grand jury, Hayslett testified that defendant had called her about twenty minutes after she met up with Wilson just after the shooting (Hayslett: 460).

she had seen Wilson. Hayslett responded, "[N]o, I thought he was with you." Defendant asked, "[D]id I hit you, you all right, you ain't hurt?" Hayslett assured defendant that he did not hit her and that she was "good" (Hayslett: 360-361, 387). Hayslett did not speak to defendant after that (Hayslett: 467).

Later, Hayslett spoke to Wilson, who was at his grandmother's house. Hayslett told Wilson that defendant had called for him. She "suppose[d]" Wilson called him back, but she did not know. Wilson asked Hayslett, "[N]obody ain't saying nothing to you, nobody ain't messing with you?" and Hayslett told him, "[N]o, I am all right." Wilson asked if Hayslett wanted to "leave town with him" and Hayslett said, "[N]o." Wilson warned her, "[Y]ou can't say nothing," and Hayslett told him, "[A]ll right" (Hayslett: 357-358, 360-361).

Detective Clarke Is Led To Wilson, Who Leads Clarke To Defendant.

On the day after Nelson was shot and killed, Detective Thomas Clarke was assigned to investigate the case (Clarke: 622-623, 655), and then-Assistant District Attorney PATRICK BRACKLEY "picked up the case" the same day (Brackley: 800-802).[15] Detective Clarke spoke to Mills, canvassed the area of the shooting, and

---

[15] Brackley had since left the District Attorney's Office and was a lawyer at a large commercial firm in Denver, Colorado (Brackley: 798). Prior to Brackley's testimony, the trial judge informed the jury that he was the brother of defendant's trial attorney, Patrick Brackley, but that, "in another proceeding" it had been determined that the was "no conflict" in Patrick Brackley's representation of defendant. The judge therefore instruction the jury to "draw no inferences" about the relationship between the two men (617-618).

contacted people who had called 911 that night. But he was unable to locate anyone who said they saw the homicide, and he had no suspects identified at that time (Mills: 138; Clarke: 623-625, 636, 673, 687).

On the evening of October 6, 2003, Detective Del Castro of the Crime Stoppers Unit notified Detective Clarke that an anonymous person had called the tip line and informed the police that the shooter in the Nelson homicide was a man known as "Rodney" or "Raw." The anonymous tipster stated that Rodney/Raw was "wearing a black hooded sweatshirt and hanging out in front of 2140 Madison" (Stipulation: 830). Clarke went to that location and found Wilson, whom he then interviewed at the stationhouse (Clarke: 638-641; Exhibit 15: photo of Wilson). During the interview, Wilson said that his cousin – defendant – had been present at Nelson's shooting (Clarke: 702-703).

On the same day, Mills viewed more than 100 photographs at the police station and identified a picture of Wilson as the man who had argued with Nelson before the shooting (Mills: 132, 140-141; Clarke: 707-708). Mills also told Clarke that, since the shooting, she had heard that Wilson's cousin was the one who had fired the gun (Clarke: 703, 708). Based on the information he had gathered, Clarke decided to interview Hayslett and defendant (Clarke: 641).

<u>Wilson Instructs Hayslett To Lie To Police And She Complies.</u>

After being questioned by the police about the shooting, Wilson warned Hayslett that the police were also going to question her, because he had told them that he had been with her that night.  Wilson instructed Hayslett about what she should say to the police (Hayslett: 289-290, 357-358).

On October 7th, Detective Clarke went to Hayslett's apartment and brought her to the stationhouse to be interviewed about the incident (Hayslett: 288-289, 358, 362; Clarke: 645, 706).[16]  Hayslett, whom Clarke described as "very evasive at the time," lied to them (Hayslett: 289, 305-306, 358, 422, 457; Clarke: 645, 650).  The police asked her if she had been present when Nelson was killed, and she told them she had not and that she "didn't know nothing" (Hayslett: 289-290).  An officer told her, "[W]ell, your boyfriend already told us everything" (Hayslett: 362).  Hayslett responded, "Yes, I was there with him, but I didn't see nothing" (Hayslett" 362, 421-422; Clarke: 650).  Hayslett said that Nelson had appeared to have had a gun (Hayslett: 472).  And she reported that defendant had also been present (Clarke: 703).  Hayslett told police that that she saw three men jump into a silver station wagon after the shots were fired, but she claimed that defendant and Wilson were not among

---

[16] Hayslett initially testified that the police had come to speak to her the morning after they had spoken to Wilson (Hayslett: 362).  During cross-examination, Hayslett did not dispute defense counsel's characterization of the police interview having occurred either a week later or on October 7th (Hayslett: 420, 457, 471).

those three men (Hayslett: 422).  Hayslett did not provide a written statement to police (Clarke: 706).  After Hayslett spoke to the police, they let her go (Hayslett: 362).

Afterward, Hayslett told Wilson that she "told them what he said to say," and Wilson "was like all right" (Hayslett: 362-363).  Hayslett had followed Wilson's instructions to lie to the police because she was "still in the mix of everything that is going on."  Hayslett was "on the streets still using, selling drugs in the projects.  And nobody in their right mind is going to say anything that position."  At the time, she was still "involved with" Wilson and selling drugs for him, and she "had to go back with" him after meeting the police.  Had she told the police what she saw, Wilson and his cohorts would have known she was the one who had given them up, making her the "next candidate" for their violence.  She explained, "If I watch you do something to one person, what makes you think that you are not going to do it to me?" (Hayslett: 289, 294-295, 363, 433).

Detective Clarke Interviews Defendant And Releases Him.

On October 6th, Detective Clarke went to the address he believed to be the home of defendant's grandmother.  No one was home, so the detective left a business card with a note for defendant to contact him.  When Clarke got to the precinct at 8:00 a.m. on the morning of October 8th, defendant was there to speak to him.  At that point, Clarke did not consider defendant a suspect, but just a witness to the Nelson shooting.  Defendant was "very hostile," and told Clarke, "I don't appreciate

-25-

you coming to my house. I don't appreciate you looking for me. I don't know anything about this. I wasn't there." At one point during the interview, defendant told Clarke, "[I]f I'm not under arrest I want to leave." Clarke replied, "[A]ll right, I guess you can leave," but the two men ended up speaking for "quite a while" (Clarke: 641-642, 644, 700-702, 704-706) (Clarke: 644)

Defendant claimed that he had not been at the Lincoln Projects at the time of Nelson's shooting. Rather, defendant said that he had been with Wilson – his cousin – at the home of his aunt – Wilson's mother – until about 2:00 a.m. that morning when he left and took the train at the Lenox Avenue station. Defendant admitted that he was close with Wilson, but said he had not spoken to Wilson since September 26th. Defendant said that did not know why Wilson told Clarke that defendant had been with him at the time of the shooting. Defendant knew that Wilson and Nelson had a lot of "beef" with each other since they had both been selling crack in front of building 2140 in the Lincoln Projects. Defendant said that Wilson had not contacted him about Nelson getting shot. At the end of the interview, Detective Clarke got defendant's contact information from him, and defendant left the stationhouse (Clarke: 643-644, 704-706).

Mills Identifies Defendant In A Photo Array.

While Clarke was speaking with defendant on October 8th, he sent Detectives Perez and Enriquez to visit Mills at her job and show her a photo array with

-26-

defendant's photograph in it (Mills: 141-146, 152-153; Clarke: 709-710).   Mills identified defendant.   Detective Perez asked Mills where she had seen defendant and whether he had been "at the scene," but he never asked if defendant had been the shooter.   Mills told Perez that defendant had been "the last guy in the car."   Mills did not tell Perez that defendant had been standing next to the shooter (Mills: 143-145, 148).[17]

Wilson Offers To Sell The Murder Weapon To Reynolds.

After Nelson's shooting, Reynolds did not see Wilson again until January 2004 (Reynolds: 536-537, 606-607).   Wilson told Reynolds that he had gotten Nelson killed (Reynolds: 537).   Wilson displayed a gun that Reynolds recognized as the same .357 caliber gun used to shoot Nelson.   Reynolds – who had previously been asked given guns by people who "didn't want them" and wanted him to "get rid" of them – was asked by Wilson if he knew anyone who would want to buy the gun for $700. Reynolds said he did not know of anyone, but would check into it.   Wilson "was like just give me six hundred dollars for it."   Reynolds said it would "see about it and get back to him later" (Reynolds: 496-497, 551-552, 589).

---

[17] Sometime after defendant's arrest, Mills spoke to Leroy Sweeney, an investigator for the defense.   And later, both Sweeney and Defense Counsel Patrick Brackley came to speak with her about the case.   Mills told Sweeney and Brackley that she had not seen who shot Nelson.   She did not tell them that that she saw a man pulling the trigger of the gun and that it had not been defendant (Mills: 137-138, 146-149, 151-154, 154).

Reynolds contacted Detective Paul to tell him about Wilson's offer to sell the gun that had killed Nelson. Paul instructed Reynolds to make efforts to buy the gun, but when Reynolds twice saw Wilson after that, Wilson "never said nothing else about it." Reynolds never bought the gun (Reynolds: 552-555, 577-578, 603, 607; Clarke: 653).

On January 21, 2004, Detective Clarke arrested Reynolds on an unrelated domestic violence case (Reynolds: 565-566, 607, Clarke: 651, 729-733).[18] This was the first time that Clarke – who had been informed several months earlier by Detective Paul that Reynolds was a confidential informant who was also an eyewitness to the homicide – had spoken to Reynolds directly (Clarke: 646-648, 700, 716-717, 725-727, 729, 731, 734-736; Brackley: 803-804).[19] Reynolds told Clarke that he had seen the person who killed Nelson. Reynolds did not know the shooter's name, but had been told by Wilson that he was Wilson's cousin (Reynolds: 534-536, 586). Reynolds also told Clarke that Wilson had tried to sell him the gun "several days" after the shooting (Clarke: 735-736).

---

[18] Reynolds denied any physical fight, but admitted that he had gotten into an argument with the mother of his child, and she wanted him out of the home. Since Reynolds did not want to leave, the police "had to arrest" him and take him to the stationhouse (Reynolds: 534-535). The woman did not, however, want to press charges (Reynolds: 535, 575-576).

[19] Detective Paul did not involve himself in the domestic violence arrest (Reynolds: 570-571).

Clarke swore out a search warrant based on his conversations with Reynolds (Clarke: 734, 736; Brackley: 809, 817). The next day, Reynolds was brought before a judge regarding the search warrant application (Reynolds: 553-554, 566, 571-572, 574-576, 597-598, 603, 607). The judge issued a warrant to search for Rodney Wilson and the gun that was used in the homicide (Clarke: 652, 732; Brackley: 817). Reynolds received no money or other benefit for his cooperation in the matter (Brackley: 821-822).

The police were not successful in locating Wilson or the gun (Clarke: 652-654, 732; Brackley: 809). When the police arrived at Wilson's apartment, they arrested four "crackheads," who later explained that Wilson had gone to "re-up" his crack supply and had taken the gun with him. Detective Clarke tried looking for Wilson afterward, but learned that he was "gone" (Clarke: 652-654).

Hayslett Eventually Agrees To Cooperate With Law Enforcement.

Hayslett continued selling drugs for Wilson during October 2003. At some point, however, she fled the projects because she was afraid that Nelson's friends or family were going to retaliate against Wilson by coming after her. She "hid out" with some friends on 119th Street. About two weeks later, when she was staying in a hotel on 112th Street, Wilson found her, beat her up, and took her "back uptown." Wilson threatened that, if Hayslett did not get her "shit together," he would tie her up and throw her in the river. Hayslett was still pregnant at the time, and Wilson told her,

"[F]uck the baby," accusing Hayslett of not caring about the fetus since she was "smoking, this, that and the other." Hayslett returned to the Lincoln Projects and continued selling crack-cocaine for Wilson (Hayslett: 363-366).

Around November 14, 2003, Hayslett was arrested. The arrest stemmed from an incident in August when woman had stolen money from Wilson so Hayslett "beat her up," and the woman called the police. Ultimately, the assault case was dismissed in February, but that dismissal had nothing to do with her cooperation in the instant case against defendant. Despite the case being dismissed, Hayslett was kept in custody due to the warrant that had been issued when she left the drug program related to her arrest in 2002 (Hayslett: 290-292, 367, 395-397, 424, 426-428, 458).[20]

On the night of her arrest, Hayslett provided the police with another statement about Nelson's shooting (Hayslett: 428-430; Clarke: 650, 711-712, 738; Exhibit B: Hayslett's statement). Hayslett was high at the time (Hayslett: 444, 455; Clarke: 650). Detective Clarke asked Hayslett who had committed the shooting (Clarke: 738). Hayslett remembered that the police did not "directly" ask her whether defendant specifically had done anything, so she did not believe that she lied when she did not volunteer information about his involvement (Hayslett: 458). She also remembered telling the police that "about a week after" Nelson was killed, she got a phone call

---

[20] In November, while she was in jail, Hayslett's pregnancy ended in miscarriage (Hayslett: 367-368).

-30-

from defendant in which he asked whether she was "all right" and whether he had "hit" her, and Hayslett responded, "[A]lmost, but you didn't" (Hayslett: 431-432). Over all, however, Hayslett could not remember many of the details of her conversation with police, explaining, "I was so high I don't know what I told the detectives, I ain't going to lie. I was tired, they had me up for like eight hours. They left me in the room for like six hours before they even started questioning me. I was tired, I was high and I don't know what I probably told them" (Hayslett: 444-455).

Around December, Hayslett, who was still in jail, decided to tell the police what she knew about the Nelson shooting. She explained, "It's like after they found me in jail, the drugs is out of my system and everything and … I am having nightmares about the incident and I can't sleep and I'm just like ready to get my life, turn my life around and everything, so I go to the detective and tell him everything that I seen from A to Z" (Hayslett: 367). Hayslett was "having flashbacks of the incident" and trouble sleeping, and her conscience was "messing with" and "bothering" her. Now drug-free and feeling safer, she decided to "just tell Mr. Brackley everything that happen[ed]." Hayslett first spoke to ADA Brackley, who told her that if she was honest and helped him, that he would help her (Hayslett: 293, 298, 430).[21]

---

[21] Hayslett confirmed that ADA Brackley was not the same Brackley who was representing defendant at trial, but she believed was his brother (Hayslett: 293).

After she spoke to ADA Brackley, Hayslett also spoke to detectives working on the case and, this time, she told them the truth (Hayslett: 293, 306).  A detective told her, "[I]f that is what you [are] sure you want to do, if you help me then I am gonna help you" (Hayslett: 367).  Although she knew that she was facing a serious jail sentence on her own case, her willingness to speak to the detectives had "nothing to do with the jail."  She explained, "I could do the three to six, that ain't – that's not why I talked to these detectives.  I talked to the detectives because my conscience is not letting me sleep and I witnessed something that to me is not right" (Hayslett: 294).

After speaking with the detectives, Hayslett conferred with her lawyer and later entered into a cooperation agreement (Hayslett: 339, 295-297, 304-305, 435-435; Brackley: 804-805; Exhibit 23: Hayslett's cooperation agreement).[22]   Hayslett understood the cooperation agreement to mean that she was required "[t]o tell the truth, to cooperate and to be honest in speaking here today" at the trial.[23]   In exchange for her cooperation, Hayslett would be allowed to enter a drug treatment program (Hayslett: 297-298).  If she were to leave the program, she would "go upstate" for 3 to 6 years, and if she violated the rules of the program, her prison term

---

[22] Hayslett's attorney was present in court during her trial testimony (see 332).

[23] Hayslett also testified before the grand jury (Hayslett: 368).

could be 3½ to 7 years.  She also faced prison if she lied or got arrested (Hayslett: 303-304).

Hayslett wanted to get into drug treatment because she wanted to "get [her] life back."  For her, it was "not a matter of not going back to jail or not," but rather she felt that "jail doesn't rehabilitate you" because "[y]ou don't get help in jail."  Hayslett was "tired."  She had been using drugs for "a long time" and had "seen a lot of things," but she had never witnessed anything like Nelson being killed, describing that as "like the ultimate."  She said, "I want to stop using this time.  I want to stop getting high.  I want to get out of the environment that I would be in, away from the projects and that life-style."  She explained, "I wanted to learn how to attack this disease, this addiction that I have, to cope with it and to deal with it" (Hayslett: 299-301).

ADA Brackley arranged for Hayslett to get into a drug program prior to her testimony at defendant's trial, and she entered the Project Green Hope treatment program on June 28, 2004 (Hayslett: 301, 368-369; Brackley: 821-822).  She did not use drugs while in the program and she went to classes and earned "certificates" (Hayslett: 369-370, 373-374).  She reported that this drug treatment program was different than her previous attempts while incarcerated because, "I got into myself.  It was different because when you want to do something it makes it easier to get done.  I was more accept[ing of] the things that the counselor would tell me, I would listen to it and take advice and suggestions and following the rules and regulations."  She learned "a lot" about her addiction and herself (Hayslett: 302-303).

As part of the program, Hayslett went to school and completed job training. Eventually, she began working at the Kelly Hotel on 127th Street and Amsterdam Avenue. Hayslett regularly visited her family on the weekends while she was in treatment, unlike when she had been selling crack in the Lincoln Projects and would not contact her family because "I didn't want them to see me the way I was" (Hayslett: 302-303, 369).

At the direction of the prosecutor, Hayslett kept in contact with Wilson's mother, writing letters to her and letters for her to give to Wilson, so that "things wouldn't seem unnormal." She did not tell anyone in the treatment program that she was cooperating with the District Attorney's Office in this case because she was afraid that if she told anyone, that person "might tell somebody else then people might come after" her. Instead, she told people that she had been able to get into the program because her lawyer had helped her by talking to the judge in her case and had managed to get her back into the program (Haslett: 370-372, 424-425, 427).

In December 2004 or January 2005, Hayslett "got scared" because "[g]irls in the facility and the counselors kept saying that some guys was coming around there looking for" her. Hayslett was afraid of defendant, Wilson, and their family, and she "thought that they was coming to get [her] in the program." She therefore left the program and did not tell the detectives or the prosecutor, thereby breaking her promise (Hayslett: 374-376, 438-440).

-34-

Hayslett "hid out" at a friends home in Harlem and lost her job (Hayslett: 376). She soon started selling crack again, although she did so on 132nd Street, about five blocks away from the Lincoln Projects. She was not selling crack for Wilson, and she did not know where he was. She "went around the projects sometimes" to find out if anybody was "looking for" her. On February 10, 2005, she was arrested in the projects and was brought to see the prosecutor. She had since been held in jail (Hayslett: 376-377, 441-442).[24]

Hayslett hoped to return to the drug treatment program after her testimony, but she did not know what would happen to her. She understood that it would be up to the prosecutor and the judge to determine her fate, and that the factor that they would consider is whether she was "[b]eing honest and telling the truth." The prosecutor had told her that when they went to see the judge, "depending upon what the judge says, he would try to get [her] back into the program" (Hayslett: 298, 443, 470).

Prior to testifying, including while she was in the drug treatment program, Hayslett continued speaking with the prosecutor. They talked about her life, about what happened on the night of the shooting, and about her testimony. The prosecutor told her "[t]o be honest and tell exactly what happened" (Hayslett: 304-305, 370). Hayslett denied testifying because she stood to "benefit" from her

---

[24] Hayslett's trial testimony occurred on February 22 and 23, 2005.

cooperation. She explained, "I can do state time. It is easier for me to do state time than it is to sit here and be honest and tell the truth about what I saw," since "I don't know what [defendant] may have in store; his family have in store for me, I still don't know. So it would be more safer and more easier for me to do three to six than to sit here and do this" (Hayslett: 434-435). When asked if she was testifying because she would "get something out of it," Hayslett said, "I get to tell the truth, I get to claim my conscience and I get to free myself, that is what I actually get, that is what I get the most of" (Hayslett: 454).

Defendant Is Arrested On February 9, 2005 And Identified By Reynolds; Defendant Denies Knowledge Of The Homicide.

Defendant was arrested at about noon on February 9, 2004.[25] Detective Clarke provided defendant with his <u>Miranda</u> warnings, and defendant "adamantly" denied any knowledge of the homicide (Clarke: 656-657, 715). Defendant was placed in a lineup, from which Reynolds identified defendant as "the guy who killed [Nelson]" (Reynolds: 555-556, 569, 580, 601).[26] After the lineup, Detective Clarke informed defendant that he had been identified and would be brought to Central Booking to be processed and charged with murder (Clarke: 658-659).

---

[25] Unlike at trial, defendant had braids at the time of his arrest (Clarke: 661-662; Exhibit 16: photo of defendant).

[26] Mills never viewed a lineup (Mills: 132).

Defendant Admits To Detective Clarke That He Had Been Present During The Argument Between Wilson And Nelson, But Left Before Hearing Gunshots.

A short time later, as Clarke was about to leave, defendant asked to speak to him. At that point, defendant "changed his story." He told the detective that, on the night of the shooting, he had been with Wilson and "another guy named Keith." The three men were looking for Nelson because Wilson "had a beef" with him. When they spotted Nelson, they approached him. Nelson said, "I heard you were looking for me," and Wilson replied, "I don't fuck with you like that, you know that."[27] As "words were exchanged" between Wilson and Nelson, defendant said, "I'm out" and started walking toward Fifth Avenue. When he heard gunshots, he ran to the train station at Lenox Avenue (Clarke: 659).

Detective Clarke had earlier obtained video surveillance of an area of Fifth Avenue adjacent to the scene of the shooting, where there was a grey car with its headlights on double-parked on the eastbound side of Fifth Avenue (Clarke: 623-624, 629-635; Exhibit 6: diagram of Lincoln Projects; Exhibit 26: video still; Exhibits 27-28: enlarged video stills). Days after the shooting, Mills identified that car as the one she had seen defendant and his cohorts flee in after defendant shot Nelson (Mills: 139-140). Detective Clarke showed defendant a still photograph from the video tape, and defendant said that the car looked like one owned by his grandmother. Clarke

---

[27] The transcript shows that Clarke testified that Nelson made the comment, "I don't fuck with you like that," but it is clear from the context that Clarke was confusing the two men's names at that point in his testimony (Clarke: 659).

asked defendant if he had gotten into his grandmother's car when he left Wilson and Nelson on the night of September 26th. Defendant replied, "I didn't get into the car, you know, [Wilson] borrows the car also" (Clarke: 659-660; Exhibit 26: video still).

### Defendant Tells Senior Investigator Daley That He Left Wilson Just Before The Shots Were Fired.

The next morning, February 10th, Detective Clarke brought defendant to meet with ADA Brackley (Clarke: 660). There, Senior Investigator GEORGE DALEY, of the New York County District Attorney's Homicide Investigation Unit, met with defendant. Daley provided defendant with his Miranda warnings. Defendant agreed to speak with the investigator about Nelson's murder (Daley: 743-745, 752-753, 761; Exhibit 31: Miranda warnings).

Defendant first claimed that he and Wilson had left the projects and went to 125th Street and 7th Avenue to see a "movie with Denzel Washington in it," but he could not remember the name of the movie. Defendant then said that, in fact, he had not gone to a movie, but had gone to shoot pool at 125th Street and 7th Avenue. Defendant said he then met up with Wilson at the Lincoln Projects and then "along came" Nelson "with a girl." Wilson and Nelson got into a heated argument in the alleyway behind a building on Fifth Avenue. Defendant "felt that something was going to jump off," so he decided to leave. As he was crossing Fifth Avenue toward the Chase Manhattan Bank, defendant heard shots ring out. He did not go back to

-38-

find out what happened, but ran to the subway station on Lenox Avenue and took the train home to the Bronx (Daley: 747-748).

### During Questioning By Detective Clarke, Defendant Asks For A Definition Of "Justifiable Homicide."

Detective Clarke also spoke to defendant at the District Attorney's Office. Defendant "kept telling" the detective that he was "just with" Wilson and "this other person Keith who he said did the shooting." Defendant said that, before the shooting, he had said, "I'm out" and left. He had been on his way to the subway when he heard the gunshots. Clarke told defendant, "I understand this guy [Nelson] was a bad guy, he was a drug dealer. You might have been afraid for your life. If you felt that you were in fear of your life, you do have the right to defend yourself." Toward the end of their conversation, defendant "kept asking" Clarke to "explain to him justifiable homicide" and "what justifiable homicide would be like, if he was in fear, would he have the right to shoot." Clarke told defendant "that there is homicide which is justified if you're in fear for your life" (Clarke: 660-662).

### In Videotaped Statement To ADA Brackley, Defendant Asks How Many Years He Would Spend In Jail If He Claimed It Was A Justifiable Homicide.

When ADA Brackley arrived outside the interview room, he heard defendant say to Detective Clarke: "[W]ell, if it was self defense what will happen[? C]an I go home if I just take a hit for the gun?" (Brackley: 811, 818). Brackley decided to allow Daley and Clarke to finish speaking with defendant and then he entered the room as

the video camera started recording (Brackley: 812; Exhibit 30: videotaped statement). Defendant immediately told the prosecutor he "just want[ted] to go home" and was willing to "do anything" in order to be able to "go home with the least amount of time" (Exhibit 30: videotaped statement).

The prosecutor then introduced himself, confirmed that defendant had been given his <u>Miranda</u> warnings and voluntarily waived his rights, and asked defendant to "tell the truth" about "what happened."  Defendant referred to having heard about "justifiable homicide" and asked the prosecutor, "Just hypothetically speaking, if I go with that, how many years does that hold?"  The prosecutor refused to answer the question and asked defendant to tell him "what happened" on the night of the shooting (Exhibit 30: videotaped statement).

Defendant said that he had been with his cousin, Rodney Wilson, that day, walking around the projects with another man named Carl or Keith.[28]  The other man "kept asking, 'where this nigger at?'"  At the time, defendant thought Wilson and Carl/Keith were "probably looking for a friend or something," but defendant was now "piecing it together" that they were looking for "that guy that guy got shot" (Exhibit 30: videotaped statement).

---

[28] Defendant said he had never heard his cousin called "Raw" other than by "the detectives" (Exhibit 30: videotaped statement).

Later, as they came out of building 2201 of the Lincoln Projects, defendant, Wilson, and Carl/Keith encountered a "crowd" consisting of two men and two women, none of whom defendant had ever seen before. One of the men, who was there with a woman, began "confronting" Wilson, saying, "What's up?" and, "I heard you was looking for me." As Wilson and the man "exchanged words," Carl/Keith "kept walking back and forth, back and forth, back and forth." Defendant "kind of figured he was holding a weapon," even though he had not seen Carl/Keith with a gun at any point during the day, because from the way that he held himself Carl/Keith looked like "quote unquote, he was holding." Defendant described the scene as "kind of stand-off-ish" (Exhibit 30: videotaped statement).

From "the way their body language was and the way they was talking," defendant "had a funny feeling something was going to happen," so he left, walking toward Fifth Avenue to go to the 2 train. He did not see his grandmother's car parked on Fifth Avenue. Defendant had already crossed Fifth Avenue and was almost directly in front of the Chase Bank when he heard gunshots. Defendant "kind of figured" that "somebody got shot." Because his cousin had "friends there," defendant "kind of knew that [Wilson] was alright, he didn't get shot." Defendant did not call Wilson later to find out if he was, in fact alright, because their mothers were sisters, so defendant would have heard if anything was wrong. Defendant did not see Wilson until a few weeks later, in church, but the two men did not speak to each other

at that time.   Defendant did not hear about the actual victim of the shooting until he "came to the precinct" (Exhibit 30: videotaped statement).

About a half-hour into the interview, defendant said to ADA Brackley, "I don't want to go to jail.  I know this is a big case.  Can you help me?"  The prosecutor told him to tell the truth about what had happened on the night of the shooting.  Soon afterward, defendant asked to speak to Brackley "personally ... without the cameras and the microphone and everything."  Brackley agreed, but asked to bring Investigator Daley into the room.  Defendant consented to Daley's presence and confirmed that he wanted the video recording to cease; the video camera was turned off (Daley: 748, 750-751; Brackley: 812-813; Exhibit 30: videotaped statement).

During the break in the recording, defendant "started a negotiation" with Brackley.  Defendant asked, "[I]f I admit to the gun, can I go home?" "[H]ow much time is it just for the gun?" and "[I]f it was self defense, can I go home?"  Although defendant never admitted to shooting Nelson, Brackley understood his questions "to mean, look, I shot him, but it was in self defense, so I'm not guilty because I did it in self defense, but I had a gun I shouldn't have had, so I'll plead guilty to that, but since I shot him in self defense, I'm not guilty of that."  Brackley replied, "[Y]ou know, I'm not talking to you about this.  This is[n't] a negotiation, we're not going to talk about it, you know, if you want to go back on camera, we'll talk about it on camera that way it will be clear I'm not promising you anything, I'm not telling you anything.  This is just a conversation you and I can't have" (Brackley: 813-814, 819-821).  Defendant

-42-

talked about Carl/Keith, saying he did not know the man, but that he "look[ed] like" defendant and wore his hair in similar braids (Daley: 751, 754-755).[29]

After about six minutes, the videotape resumed, and defendant asked, "Can you help me?" ADA Brackley explained on camera, "You asked me if I could help you if you told me certain things." Brackley went on to report that he had told defendant he did not want to talk about that. And when defendant had "started to talk about Keith" again, the prosecutor had asked to turn the video camera back on (Exhibit 30: videotaped statement).[30]

Defendant insisted, "I didn't do it and I could point the person who did it." Defendant claimed to not know the name of the man who shot Nelson, but agreed it was the same "Keith" about whom he had spoken earlier. Defendant said that he had not seen the shooting, but had "hear[d] things" that made him know that Keith was responsible. Defendant said, "I'm gonna make that guy turn hisself [sic] in." When asked how he would accomplish that, defendant said that, because the shooter was Wilson's friend, he would have to contact Wilson to "[s]ee if he can get that guy for me again" (Exhibit 30: videotaped statement).

---

[29] Neither the name Carl nor Keith had ever come up in the course of the investigation. Following the videotaped statement, the People tried to find out who the man was, but by the time Brackley "turned over the case" to the next assigned ADA, he had never learned anything about Carl/Keith (Brackley; 814-815).

[30] At trial, Brackley did not recall defendant having said anything about Keith or Carl when video camera was turned off, but stated that he would have "put it on the tape afterward," if defendant had, in fact, done so (Brackley: 815).

About 43 minutes into the interview, defendant was "finished" speaking to the prosecutor and the videotape was stopped. About 35 minutes later, the videotape resumed. Regarding the break in recording, Brackley explained, "I kept getting up to leave and you kept asking me if I could help you." Brackley had refused to "negotiate" with defendant about the matter, and eventually had had the video camera turned back on (Exhibit 30: videotaped statement). On camera, defendant indicated that he wished to speak to a lawyer, and Brackley ended the interview (Daley: 750-751; Brackley: 815; Exhibit 30: videotaped statement).

The Defense Case

Detectives EUSEBIO PEREZ and Enriquez were asked by "the lead detective" to show a photo array to Taisha Mills.[31] Perez explained to Mills that they were going to show her an array of pictures of suspects, that she should look at each one, and she should determine whether she could identify any of them as the possible perpetrator. From the array of six photographs, Mills identified defendant as one of the people involved in the shooting (Perez: 840-843).

Mills was "crying, nervous, rambling and wasn't sure of anything" other than that defendant was "one of the guys there" (Perez: 849-851). Mills "basically" told Perez, "[Y]es, that the guy, he was there, he was there. Umm, he was in the bunch"

---

[31] The transcript misspells Detective Perez's first name as "Eseubio" (838).

and "I think he was the last guy to get in the car, in the passenger side." Mills was "basically confused trying to get her thoughts gathered together" (Perez: 844, 848-849). She "basically" said that "this is the guy that did this," but she was not 100 percent certain (Perez: 847). At one point, Mills said that she thought that defendant had been standing next to the shooter (Perez: 845). After meeting with Mills, Perez prepared a DD-5 report in which he "put the gist of what she said." He explained, "[T]hat statement is my words, a brief summary of the things she said." He did not include her qualification of "I think" regarding the statement that defendant had been standing next to the shooter (Perez: 844-845).

LEROY SWINNEY, who had retired from the New York Police Department, was a licensed private investigator. He was contacted by Defense Counsel Patrick Brackley, who wanted him to speak to Taisha Mills, who purportedly had information that would exonerate defendant.[32] Brackley gave Swinney a DD-5 report and a letter from ADA Schellhammer. Swinney then located Mills and "questioned her about what she saw and who did what in regards to defendant." Swinney called defendant by his full name, and Mills, who had been given defendant's name by the detectives, knew to whom Swinney was referring. Mills confirmed that defendant was not the shooter, but had been the person standing next to the shooter. Swinney later spoke to

---

[32] Swinney was paid by the "assigned counsel plan" at a rate of $32 per hour (Swinney: 834-835).

Mills again; Brackley and an associate of his were also present. Mills "repeatedly" reiterated that defendant was not the shooter (Swinney: 831-834, 836-838).

## POINT I

### DEFENDANT'S GUILT WAS PROVEN BEYOND A REASONABLE DOUBT (And Is Not Contested On Appeal).

Defendant stands convicted of second-degree murder for shooting and killing Jonadial Nelson on September 26, 2003. On appeal, defendant does not challenge the legal sufficiency of the People's evidence against him. He does, however, suggest that the evidence was less than overwhelming by complaining about the credibility of two of the People's witnesses, as well as the lack of forensic evidence directly implicating him in the murder (Defendant's Brief at 3). All of the supposed weaknesses in the People's case, as cited by defendant, were fully aired before the jury, however. And the totality of the evidence against defendant remained nothing short of crushing.

"A person is guilty of murder in the second degree when[, w]ith intent to cause the death of another person, he causes the death of such person." Penal Law § 125.25(1). There has never been dispute that, on the night of September 26, 2003, Nelson was killed by gunfire at the end of an argument with defendant's cousin, Rodney Wilson. The only contested question before the jury was whether defendant was the man who pulled the trigger. The jury correctly determined that he was.

-46-

After all, two separate witnesses testified to seeing defendant holding the gun that fired the bullets into Nelson's body. Robin Hayslett and Lamont Reynolds, who both knew defendant prior to that night, saw defendant firing that gun. Hayslett was standing in the group of people surrounding Wilson and Nelson as they argued, and Reynolds was walking by when he noticed the altercation. Both witnesses were close enough to see sparks fly from the gun as it fired (Hayslett: 322-323, 411, 414; Reynolds: 515-516, 523, 530-531).

Indeed, Hayslett was so close to the shooting that she was, herself, in danger of being hit – a fact recognized by defendant who soon after called her to make sure that she had escaped uninjured (Hayslett: 323, 357-358, 360-361). And Reynolds, from a slightly safer distance, was able to watch as Nelson ran from defendant, who kept firing at his fleeing victim until he finally felled him with the fatal shot to the back (Reynolds: 524-526). Of course, given that defendant fired at Nelson no fewer than six times and all of those bullets hit Nelson as he turned and fled, the jury could have reached no other conclusion that defendant fully intended the result he caused: Nelson's death. The jury, then, had no reasonable doubt about defendant's guilt and correctly convicted him of second-degree murder.

Defendant suggests, however, that the jury should not have credited Hayslett's and Reynolds's testimony since Hayslett was "a predicate felon who sought leniency in exchange for her cooperation" and Reynolds was "a registered confidential informant who was regularly paid for his information" (Defendant's Brief at 3). But

-47-

information about the witnesses' histories and criminal backgrounds was fairly –
indeed, exhaustively – presented for the jurors' consideration (Hayslett: 229-270, 282-
285, 290-305, 309-311, 367-377, 388-393, 396-397, 399-400, 403-407, 419-420, 424-
436, 438-444, 452, 454-455, 458-459, 467-468, 470; Reynolds: 486-502, 504-506, 532,
602).    And the jury was fully qualified to make an accurate assessment of the
witnesses' credibility.   See People v. Gaimari, 176 N.Y. 84, 94 (1903).   Having seen
and heard these witnesses, the jurors determined that their accounts were, indeed,
credible.

The jury's credibility determination was certainly influenced by the fact that the
accounts of the shooting provided by Hayslett and Reynolds were not only consistent
with each other, but corroborated by Nelson's girlfriend, Taisha Mills.   All three
witnesses recounted the verbal argument between Wilson and Nelson, with each man
claiming that the other was looking for him (Mills: 107-108; Hayslett: 316-317, 322;
Reynolds: 512-513).   And all three witnesses recalled that Wilson had no gun or
weapon in his hand (Mills: 108-109; Hayslett: 319-320; Reynolds: 514-515).

Although Mills blacked out when she heard the gunfire and did not see who
fired at her boyfriend (Mills: 109, 113, 115, 133, 144, 150-152), she verified that
defendant had been standing with Wilson just before the shooting (Mills: 106-107,
109-110, 112, 122, 124, 128-129; Exhibits 15: photo of Wilson; Exhibit 16: photo of
defendant).   And, after she regained consciousness, Mills saw defendant and his
cohorts running from the scene, another aspect of the crime to which Hayslett and

-48-

Reynolds testified (Mills: 116-118; Hayslett: 324, 326; Reynolds: 527-528). Mills even made eye-contact with defendant before he jumped into the grey car that drove him away (Mills: 114, 116-118).

Moreover, Mills was able to identify that car from video stills. And even defendant himself confirmed that the very same car belonged to his grandmother (Mills: 139-140; Clarke: 659-660; Exhibit 26: video still). Thus, not only did Mills's testimony provide further corroboration of the testimony provided by Hayslett and Reynolds, it refuted defendant's claims to police that he had left the scene before any shots were fired.

To be sure, in order to bolster his claim that he could not have been the shooter, defendant attempted to suggest to the jury that Mills had made pre-trial statements to Detective Perez and Defense Investigator Swinney, in which she asserted that defendant had been "standing next to the shooter" (Perez: 845; Swinney: 831-834, 836-838). But, Mills consistently denied that she had seen which man had been holding the gun and fired at Nelson (Mills: 133, 144, 150-152). And she specifically refuted that she had said otherwise to either Perez or Swinney (Mills: 137, 143-144, 146-148, 151-152, 154). Perez explained that Mills had been "nervous" and "crying" during their conversation and did not appear sure of what defendant's role in the shooting had been, but she was certain that defendant, had indeed been present (Perez: 844, 848-851). Additionally, Officer Smith, one of the first responders, testified that Mills had told her only that she had "heard" the gunshots and provided

-49-

descriptions of the three men who had been present (Smith: 40-42); even at that point, Mills was unable to say which man had shot Nelson, since she had never seen the gun (Mills: 121-122).

Having heard this testimony, the jurors had every reason to conclude that, even if they believed that Mills had provided confused or confusing statements at certain points about defendant's role in the shooting, she had "no discernible reason to lie" about the identity of the men present at the scene. People v. Malizia, 92 A.D.2d 154, 158 (1st Dept. 1983), aff'd, 62 N.Y.2d 755, cert. denied, 469 U.S. 932 (1984). Indeed, even on appeal, defendant describes Taisha Mills as "a disinterested civilian witness" (Defendant's Brief at 3), and can proffer no reason that, had Mills really seen someone other than defendant holding the gun, she would have prevaricated at trial and thereby risked having her boyfriend's actual murderer go free. In short, the jury had every reason to credit Mills's testimony that defendant had been standing with Wilson at the time of the shooting. And with the eyewitness testimony of Hayslett and Reynolds that defendant had been the one to draw the gun and pull the trigger, the jury was provided with simply overwhelming evidence of defendant's guilt.

The fact, then, that the police failed to locate any "forensic evidence tying [defendant] to the crime" (Defendant's Brief at 3) – by which defendant presumably means scientific evaluations of ballistics and fingerprint evidence – does not negate the power of People's case against defendant. Indeed, the crime scene detective who failed to locate bullets, casings, or fingerprints from the scene took the witness stand,

-50-

and law enforcement officials involved with searching for the murder weapon testified about their unsuccessful attempts to locate it (Walsh: 160-168, 170-179; Clarke: 652-654, 732, 734, 736; Brackley: 809-817). The jury, of course, realized that, regardless of the reason for the People's inability to locate such evidence, there was no doubt that a shooting occurred that night. Thus, presented with the question of who was responsible for the shooting, the jurors correctly relied on the account of the eyewitnesses from the scene. And their evidence proved beyond any reasonable doubt that defendant had been the shooter.

In sum, the People's evidence against defendant was overwhelming, and defendant's guilt was proven beyond a reasonable doubt.

### POINT II

> AFTER EXTENSIVE WARNINGS FROM THE COURT, DEFENDANT WAIVED THE POTENTIAL CONFLICT OF INTEREST WITH ONE OF HIS TWO TRIAL ATTORNEYS; HE CANNOT NOW BE HEARD TO COMPLAIN THAT HE WAS DENIED CONFLICT-FREE COUNSEL (Answering Defendant's Brief, Point Two, pp. 47-51).

Defendant complains that he was denied his constitutional right to the assistance of conflict-free counsel because the Assistant District Attorney (ADA) who was initially assigned to investigate this case, interviewed defendant on videotape, and testified in the People's case at defendant's trial – Ryan Brackley – was the brother of defendant's retained attorney – Patrick Brackley (Defendant's Brief at 47-51; see

Defendant's Brief at 26-28).[33]   Defendant maintains that the fraternal relationship between Ryan Brackley and Patrick Brackley amounted to a *per se* conflict, and he asks this Court to remand the case for a "new trial where he will have the assistance of counsel who is not conflicted, or who does not appear conflicted, by reason of his familial relationship to the assistant district attorney who investigated the case and testified at the trial" (Defendant's Brief at 49, 51).   Defendant's argument fails to note several salient facts, however.   First and foremost, Patrick Brackley was not defendant's only legal representative during the pre-trial and trial proceedings; defendant was also represented by Lori Cohen, Esq., who was responsible for, *inter alia*, conducting the cross-examination of Ryan Brackley.   Thus, defendant has already received the remedy he seeks on appeal: the assistance of defense counsel who has no conflict – *per se*, actual, or apparent – with one of the People's witnesses.   Moreover, as defendant also fails to mention in his brief, he was extensively advised and warned – by the court, Ms. Cohen, and Patrick Brackley – about the potential for conflict by retaining Patrick Brackley on his defense team, and defendant waived any potential conflict at a Gomberg inquiry.

---

[33] It should be noted that, although defendant refers to Ryan Brackley as "the prosecutor" (see Defendant's Brief at 49), he did not prosecute the trial against defendant, but only testified as a witness (see Jury Instruction: 617-618; Brackley: 797-618).   Soon after defendant was indicted and arraigned, Ryan Brackley left the District Attorney's Office and became a litigator in Colorado (4/8/04:2; 4/29/04: 2-4; Brackley: 798).   Defendant's trial was prosecuted by ADA Thomas Schellhammer (Colloquy: 1).

The Relevant Proceedings

### February 26, 2004: Supreme Court Arraignment

At defendant's Supreme Court arraignment before the Honorable Charles Solomon on February 26, 2004, he was represented by Lori Cohen, Esq., of the 18-b panel. The People were represented by ADA Ryan Brackley, who had been assigned to prosecute the case (Court Action Sheet).

### April 8, 2004: Calendar Call[34]

At the following appearance, on April 8, 2004, ADA William Schaeffer appeared on behalf of the People. Ms. Cohen again appeared on behalf of defendant, but was accompanied by defense attorney Patrick Brackley, who had since been retained by defendant (4/8/04: 1-2). Justice Solomon noted that Patrick Brackley's retention "present[ed] somewhat of a novel issue" since his brother, Ryan Brackley, had been prosecuting the case earlier (4/8/04: 2). ADA Schaeffer confirmed to the court that ADA Brackley would soon be leaving the District Attorney's Office but might be called as a witness at defendant's trial (4/8/04: 2-3).

Patrick Brackley informed the court that he believed that any potential conflict could be "worked out with the defendant's consent should the case go to trial" in that "another attorney" could examine any "portion of the evidence" that involved Ryan

---

[34] Under separate cover, respondent will provide copies of the transcripts from the court proceedings of April 8 and 29, May 13, 21, and 27, and June 10, 2004, as well as the suppression hearing of August 19 and 24, 2004.

Brackley (4/8/04: 2).  Mr. Brackley asked that Ms. Cohen remain defendant's attorney for "at least the next two appearances" so that defendant would "have the benefit of another attorney to advise him about these issues."  And Mr. Brackley stated that, should the court require a hearing regarding the potential conflict, he would request the presence of counsel to advise defendant.  The judge concurred that there would "have to be further inquiry of defendant" at a later date.  (4/8/04: 3-4).

April 29, 2004: Calendar Call

At the next calendar date, April 29, 2004, both Ms. Cohen and Mr. Brackley appeared for defendant, and ADA Christopher Conroy appeared for the People (4/29/04: 2).  Mr. Brackley informed the court that Ms. Cohen would be conferring with defendant "independently," and outside of Mr. Brackley's presence, regarding the potential conflict of interest with Mr. Brackley (4/29/04: 3).   Justice Solomon reiterated that the potential conflict stemmed from the fact that Mr. Brackley's brother had been the "former prosecutor in this case [and] took some statements from the defendant."   The judge was currently "not so sure of" whether that constituted an "inherent conflict," and he asked both the defense and prosecution to research the issue (4/29/04: 3-4).

May 13, 2004: Calendar Call

At the next court date, on May 13, 2004, Ms. Cohen and Mr. Brackley both appeared on defendant's behalf (5/13/04: 1-2).  Ms. Cohen informed the court that

she had spoken to defendant at Rikers Island "regarding any possible conflict" and that he was "prepared to be allocuted" by the judge on that issue (5/13/04: 2). Justice Solomon adjourned the case until May 21st, and stated that "a Gomberg Hearing with respect to the potential conflict" would be held on that day, if counsel were "so inclined to do it that day" (5/13/04: 3-4).

May 21, 2004: Calendar Call

Both Mr. Brackley and Ms. Cohen appeared on May 21st (5/21/04: 1-2). The court confirmed that Mr. Brackley had spoken to defendant about counsel's brother's "involvement in this case" (5/21/04: 2). The judge did not conduct a full-blown hearing at that time, but began a "Gomberg inquiry" by asking defendant to confirm his knowledge that his attorney, Patrick Brackley, was the brother of Ryan Brackley, who had conducted a videotaped interview of defendant (5/21/04: 2-3). Justice Solomon informed defendant that, should defendant's motion to suppress that videotaped statement be denied and the statement be admitted into evidence at trial, the jury would be made aware that the interviewer in that videotape and defendant's attorney were brothers (5/21/04: 3). The judge also informed defendant that it was possible that Patrick Brackley would "be at counsel table" with defendant while "his brother, Ryan Brackley," would be "on the witness stand in front of a jury" (5/21/04: 3).

The judge warned defendant that "there's a danger" in "any case" where the defense attorney is related to a witness, because the "relationship" could prevent the

attorney from asking "the questions that might be in [the client's] best interest." The judge warned that, in this particular case, "Mr. Brackley might not go after his own brother the way that he would go after another witness on cross-examination." The judge told defendant that he did not "know" whether that would occur, but he asked whether defendant understood that it was "a possibility," and defendant said he did (5/21/04: 3-4).

Justice Solomon was "not implying" and "not suggesting" that defendant should not keep Mr. Brackley as his lawyer. He told defendant, "Whatever your decision is, it doesn't matter to me as long as you consider everything and then come to a decision as to how you want to proceed" (5/21/04: 5-6).   The judge assured defendant that he could certainly have Mr. Brackley represent him, but only with a full understanding of the "potential risks" and "potential conflict" that existed (5/21/04: 4-5). Justice Solomon also told defendant that if he decided he would be "best suited with another lawyer," he would be given other counsel even if he could not afford to retain an attorney (5/21/04: 5).

Justice Solomon reminded defendant that he faced "life imprisonment" for the charges against him, and stated, "This is a big decision for you and I want you to make an informed decision" (5/21/04: 5). The judge instructed defendant to consult with Mr. Brackley and with Ms. Cohen, and told defendant that he would ask him "more questions" about it at the next court date (5/21/04: 5-6).

Mr. Brackley assured the court that he "recognize[d] what the potential conflict" was, and that he did not believe that "under any circumstances," he would "ever cross-examine any member of [his] family on a case such as this" (5/21/04: 7-8; 10). Thus, were the case to go to trial, Mr. Brackley intended to have Ms. Cohen remain available as co-counsel in order to conduct any necessary cross-examination of Ryan Brackley and to deal with any issues arising from the introduction of defendant's videotaped statement to then-ADA Brackley (5/21/04: 9-10). Mr. Brackley stated that he "would not be involved in that portion of the trial" (5/21/04: 9).

### May 27, 2004: Calendar Call

At the following court appearance, Justice Solomon acknowledged Mr. Brackley's proposition that Ms. Cohen "would conduct any cross-examination, if necessary, of … Mr. Ryan Brackley" and that "Mr. Patrick Brackley would not be involved in any way in cross-examining his own brother" (5/27/04: 3-4). The court noted, however, that that was "not the end of the inquiry" and that there would be "further inquiry today" (5/27/04: 4).

ADA Conroy expressed concern that the potential conflict between the Brackley brothers could extend to "more than just the cross-examination of the former prosecutor who happens to be the brother of the defense attorney." The ADA noted, for instance, that the defense could pursue a strategy in which they challenged "the conduct of a prosecutor in investigating and prosecuting a case," which would implicate then-ADA Brackley since he "conducted an investigation here,

met many witnesses, [and] put the case into the grand jury." (5/27/04: 6).   Although ADA Conroy did not believe that the was any actually "questionable conduct" by ADA Brackley, he noted that such a "path of cross-examination" was "a pretty standard defense argument" and "frequently" pursued by defense attorneys regardless of the actual merits.   Since ADA Conroy wished to avoid "the possibility that somewhere down the line" defendant might decide to claim that his attorney did not pursue such a theory "vigorously" enough because the prosecutor at issue was his brother, he asked that defendant be made "fully aware" of and "waive that issue if he want[ed] to continue with Mr. Brackley as his lawyer" (5/27/04: 6-9).

Ms. Cohen identified herself as a seventeen-year veteran of the defense bar and acknowledged having raised just such a defense "on several occasions."   She had thus discussed that potential source of conflict, amongst others, when she had a one-on-one conversation with defendant regarding Patrick Brackley's representation of him. Following that discussion Ms. Cohen believed that defendant was "fully aware" of "the possible ramifications" and "possible conflicts" posed by having Mr. Brackley remain on the defense team (5/27/04: 9).

Justice asked defendant to speak again with his family, Mr. Brackley, and Ms. Cohen, before the next court date.   At that time, the judge would permit defendant to ask the court any questions he might have "about this issue" and then ask him to make a decision about whether the keep Mr. Brackley as his attorney (5/27/04: 11-12).

June 10, 2004: Gomberg Hearing

On June 10, 2004, Justice Solomon conducted a Gomberg inquiry. First, the judge reiterated the concern that Ryan Brackley could be called as a trial witness and once again informed defendant that he was entitled to a lawyer who was "not related to one of the potential witnesses at the trial" (6/10/04: 3). The judge noted that the defense had already determined that Ms. Cohen would be responsible for cross-examining Ryan Brackley, should he be called as a witness, but stated the possible concern that Patrick Brackley's mere presence "at counsel table" could render such representation "not as effective as a lawyer who is no affiliated in any way or associated in any way with Patrick Brackley" (6/10/04: 4). Defendant affirmed that he understood the concern (6/10/04: 4).

Justice Solomon assured defendant that he could still "have Mr. Brackley as part of [his] defense," but he had to be "aware of the risks" and "waive" them in order to do so (6/10/04: 4). Defendant affirmed his understanding (6/10/04: 4). The following exchange then took place:

> THE COURT:  So, again, [defendant], you've thought about this over the last several weeks I take it?
>
> THE DEFENDANT: Yes.
>
> THE COURT:  And have you talked to M[s.] Cohen and Mr. Brackley about this?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And do you have any questions of me?

-59-

> THE DEFENDANT: No.
>
> THE COURT: Is there anything that I haven't gone over with you that you feel you want to ask me or you feel might be a problem, anything whatsoever?
>
> THE DEFENDANT: No.
>
> THE COURT: Have you made a decision about this?
>
> THE DEFENDANT: Yes.
>
> THE COURT: How do you wish to proceed?
>
> THE DEFENDANT: I want to stay with Mr. Brackley.
>
> THE COURT: You said you want to stay with Mr. Brackley?
>
> THE DEFENDANT: Yes.

(6/10/04: 4-5). The judge then turned to Defense Counsel Brackley, and the

following exchange occurred.

> THE COURT: Again, just so we're clear, Mr. Brackley, should your brother, Ryan Brackley, be called as a witness for the prosecution in this trial, you will not be involved in the cross-examination of him, that's what you're saying?
>
> MR. [PATRICK] BRACKLEY: That's correct, Judge. I do believe the record reflects numerous times that it was myself who requested the presence of attorney Lori Cohen to speak with [defendant] independent of myself and also for the purposes of cross-examination if ADA Brackley should be called at any time, assuming the statement is deemed admissible and assuming the case gets to that point and assuming he does testify, I believe M[s.] Cohen has graciously accepted that responsibility if that's acceptable to this court.

-60-