(6/10/04: 5-6).  The judge permitted Mr. Brackley to remain as one of defendant's attorneys (6/10/04: 6).

### August 19 & 24, 2004: Suppression Hearing

At the Huntley/Wade hearing, which began on August 19, 2004 and concluded on August 24, 2004, both Mr. Brackley and Ms. Cohen appeared on defendant's behalf (H: 1-2, 60-61).  Mr. Brackley explained to the Honorable Bonnie Wittner that Ms. Cohen would be questioning all of the witnesses (H: 2).  Mr. Brackley noted that the videotaped statement was at issue in the trial and had been conducted by ADA Ryan Brackley.  Thus, "for the purposes of maintaining as much of a conflict-free environment as [they could]," the defense had opted to have Ms. Cohen question the witnesses (H: 2-3).

### February 15, 2005: Pre-Trial Proceedings

Prior to voir dire, Justice Wittner verified that Mr. Brackley and Ms. Cohen would both be serving as trial counsel to defendant.  Mr. Brackley asked that they be referred to as "co-attorneys" and stated that Ms. Cohen might be examining some of the witnesses (2/15/05: 6-7).  Following an "informal conversation off the record," Justice Wittner stated,

> I'm going to tell the jury that there is a very unusual circumstance here, that one of the witnesses to the trial used to be a[n assistant] district attorney and he happens to be the brother of one of the defense counsel.
>
> It's not anything that they should be concerned about.  All legal issues have been taken care of, but just to make sure

there is no problem, M[s.] Cohen is going to cross-examine
that witness.

That's all I'm going to say.

(2/15/05: 19).  Defense Counsel Brackley replied, "That's fine" (2/15/05: 19).

February 24 & March 2, 2005: Trial

After several of the People's witnesses had testified, and prior to the testimony

of Ryan Brackley, Justice Wittner addressed the jury:

I just want to bring to your attention something that has
occurred during the trial.  It's kind of unusual.

You may have heard during the questioning reference[s] to
ADA Brackley an assistant district attorney.

He's no longer in the office.  He is the brother of this
defense[ ] attorney Patrick Brackley.

However, Mr. Brackley used to be with the District
Attorney's Office.  His only involvement was initially taking
a statement from this defendant, which is going to come
out later in the trial.

However, in another proceeding it's been determined that
there is no conflict at this point for Mr. Patrick Brackley to
be representing the defendant.

So, you are to draw no inferences one way or the other, and
I just wanted to bring that to your attention because there's
been talk about Mr. Brackley an [A]ssistant [District
Attorney]

(617-618).    Defense Counsel Cohen conducted the cross-examination of Ryan

Brackley during the People's case (Brackley: 816-822).

-62-

Analysis

It is well established that both the Federal and State Constitutions guarantee a right to conflict-free representation by counsel who will act with single-minded devotion on his or her client's behalf. See Wood v. Georgia, 450 U.S. 261 (1981); Cuyler v. Sullivan, 446 U.S. 335 (1980); People v. Ortiz, 76 N.Y.2d 652, 656 (1990); People v. McDonald, 68 N.Y.2d 1, 9 (1986). It is equally well-established that a defendant's constitutional right to counsel includes the right to be represented by counsel of one's own choosing, U.S. Const. amend. VI; N.Y. Const. art. I, § 6; People v. Tineo, 64 N.Y.2d 531, 536 (1985), and, to effect this right, a defendant must "be accorded a reasonable opportunity to select and retain his [own] counsel." People v. Arroyave, 49 N.Y.2d 264, 270 (1980).

"[W]hen a retained attorney is involved in an apparent conflict of interest," however, "the right to effective assistance of counsel and the right to retain counsel of one's choice may clash." People v. Gomberg, 38 N.Y.2d 307, 313 (1975). In such a situation, the trial court must honor its "duty to protect the right of an accused to effective assistance of counsel," but simultaneously refrain from "arbitrarily interfer[ing] with the attorney-client relationship." Id. Thus, the court is required to ascertain whether the defendant is aware of the potential risks involved in such representation and to ensure that "the defendant's decision to proceed with his attorney is an informed decision." Id. at 313-314; People v. Harris, 99 N.Y.2d 202,

212 (2002); People v. Allah, 80 N.Y.2d 396, 400 (1992); People v. Wandell, 75 N.Y.2d 951, 952-953 (1990).

Here, the court was presented with what it aptly described as a "novel" situation (4/8/04: 2). After arraignment, defendant retained an attorney who was the brother of the Assistant District Attorney who had initially been assigned to investigate the homicide, had interviewed defendant after his arrest, and might be called as a People's witness at trial. Justice Solomon realized that the fraternal relationship between retained counsel and one of the People's witnesses required the court to conduct a Gomberg inquiry to ensure that defendant was made aware of the possible risks of continuing with his selected attorney and that, were he to opt to do so, his decision would be made knowingly. See, e.g., Wandell, 75 N.Y.2d 951, 952-953 (1990) ("the principles of People v. Gomberg, [38 N.Y.2d at 307] and People v. Macerola [47 N.Y.2d 257 (1979)] apply to the potential conflicts that arise from a defense counsel's representation of an important prosecution witness, as well as to counsel's representation of a codefendant"), citing People v. Lombardo, 61 N.Y.2d 97 (1984) (counsel previously represented the People's "chief witness"), and McDonald, 68 N.Y.2d at 8-9 (same where counsel previously represented a witness who "provided important evidence" even if he "was not the People's chief witness").

Indeed, over the course of two months, Justice Solomon addressed this issue at no fewer than six court appearances (4/8/04; 4/29/04; 5/13/04; 5/21/04; 5/27/04; 6/10/04). In doing so, the judge was careful to assure defendant that he was free to

-64-

have Defense Counsel Brackley continue representing him so long as he did so with the knowledge of the potential risks (5/21/04: 4-6). Moreover, the judge informed defendant that, should he decide against keeping Mr. Brackley as his attorney, he was still entitled to legal representation, including by assigned counsel should he be unable to afford to retain counsel (5/21/04: 5). The judge repeatedly warned defendant about the potential conflict that could arise should Defense Counsel Brackley be faced with advocating on defendant's behalf and against the testimony of his own brother (4/29/04: 3-4; 5/21/04: 3-4; 6/10/04: 3-4). Specifically, the judge warned that Defense Counsel Brackley "might not go after his own brother the way that he would go after another witness on cross-examination" and possibly refrain from asking questions in defendant's "best interest" due the fraternal relationship. The judge could not "know" for certain that Patrick Brackley would, in fact, pull his punches, but duly warned defendant of the "danger" of that "possibility" (5/21/04: 3-4).

Significantly, however, the bulk of those specific concerns were addressed by Defense Counsel Brackley, who was himself duly aware of the conflict that could arise should his brother be called as a witness at trial. Thus, from the very beginning, Defense Counsel Brackley made clear that "another attorney" would handle that cross-examination, thus eliminating the awkward entanglement of having a defense attorney questioning a member of his own family (4/8/04: 2, 5; 5/21/04: 7-10). Indeed, Defense Counsel Brackley specifically asked that Ms. Cohen remain assigned to the case, first so that she could advise defendant about whether to waive the

potential conflict of Mr. Brackley's representation, and also so that she could cross examine Ryan Brackley should he be called as a witness (4/8/04: 2-4; 4/29/04: 3; 5/21/04: 7-10; 6/10/04: 5-6).   Although "there is no per se rule requiring consultation with independent counsel," People v. Caban, 70 N.Y.2d 695, 697 (1987), the court exercised wise discretion by not only permitting Ms. Cohen to remain as co-counsel, but insisting that defendant consult with her about the choice of whether to continue retaining Mr. Brackley.

Of course, the judge correctly realized that the fact that Mr. Brackley would cede cross-examination of his brother to Ms. Cohen did not entirely erase the potential for conflict.  Since Mr. Brackley's very presence "at counsel table" could possibly affect how the defense was conducted (6/10/04: 4), Justice Solomon ensured that defendant was alerted to that possibility and provided extensive time for defendant to consult with his attorneys before rendering a decision about whether to continue with Mr. Brackley despite the potential conflict.  Indeed, Ms. Cohen met with defendant outside of Mr. Brackley's presence to discuss the issue.  Afterward, Ms. Cohen confirmed that she and defendant had discussed the potential for conflict, including the possibility that that the defense might challenge Ryan Brackley's handling of the investigation into Nelson's murder and defendant's alleged involvement with it.  After their consultations, Ms. Cohen believed that defendant was "fully aware" of the "possible ramifications" and "possible conflicts" inherent in having Patrick Brackley remain on the defense team (5/27/04: 9).

After providing defendant with yet another adjournment in which to contemplate his decision, the court asked defendant to whether he understood the possible conflict that could arise from having a lawyer who was related to a witness against him, and defendant confirmed that he did. Defendant also affirmed that he had given the matter thought over the weeks of adjournments and had consulted with both of his attorneys about the matter. The judge permitted defendant to ask any questions he might have for the court, but defendant had none. The judge also asked, "Is there anything that I haven't gone over with you that you feel you want to ask me or you feel might be a problem, anything whatsoever?" Defendant raised no issues and asked no questions. Only after verifying that defendant fully understood the potential conflict, had been given enough opportunity to consult with both of his attorneys, and had no lingering questions or concerns did the court then asked defendant how he wished to proceed. Defendant replied, "I want to stay with Mr. Brackley" (6/10/04: 4-5).

It is clear from these proceedings that defendant was fully, if not obsessively, informed about the potential for conflict should he retain Mr. Brackley on his defense team. And, defendant chose to have Mr. Brackley's continued counsel. "Having determined to persist in that course of action, defendant may not subsequently contend that he was deprived of effective assistance of counsel because of a possible conflict of interest arising from that ... representation." People v. Ortiz, 49 N.Y.2d 718, 719 (1980).

Nevertheless, defendant asks this Court to grant him a new trial where he may be represented by counsel "who is not conflicted, or who does not appear conflicted" in the very manner discussed at extensive length in the Gomberg proceedings below. Unable to cite to any deficiency in the court's Gomberg inquiry and any subsequent affect on the conduct of the defense at trial, see People v. Harris, 99 N.Y.2d at 211; McDonald, 68 N.Y2.d at 9; Lombardo, 61 N.Y.2d at 103, defendant asks this Court to deem a "consanguineous relationship" between one of defendant's two attorneys and one of the People's witnesses a *per se* violation of his right to counsel that mandates reversal. However, New York State recognizes no *per se* rule requiring reversal for conflict-of-interest claims, even in cases in which the trial court has not held a Gomberg hearing. See People v. Winkler, 71 N.Y.2d 592, 597 (1988); McDonald, 68 N.Y.2d at 1.

More fundamentally, where, as here, the trial court conducts a proper Gomberg inquiry, the court is simply not entitled to second-guess the defendant's decision to retain his potentially conflicted attorney. "The object of the inquiry is not to determine whether the defendant should be permitted to waive his right to conflict-free counsel. The decision whether to waive the right is for the defendant to make. The court's role is simply to insure through adequate warnings that the defendant's decision has been made with awareness of his rights and the potential risks." People v. Salcedo, 68 N.Y.2d 130, 135 (1986), citing Macerola, 47 N.Y.2d at 263; see also People v. Rosa, 176 A.D.2d 188, 189 (1991).

-68-

Here, as even defendant does not dispute, "the trial court's inquiry was sufficiently searching to assure that [defendant's] waiver was informed and voluntary." Caban, 70 N.Y.2d at 696-697. Defendant having made an intelligent and volitional waiver of his attorney's potential conflict, the court had no power to deny him the counsel of his choice. Defendant cannot seek reversal for the judge's failure to impose a remedy the court was not empowered to provide.

In sum, the possible effects of any conflict inherent in Defense Counsel Patrick Brackley's fraternal relationship to one of the People's witnesses was greatly reduced by the fact that cross-examination of Ryan Brackley was undertaken by co-counsel, Lori Cohen. The court extensively warned defendant about the remaining potential for a conflict of interest, and defendant knowingly and voluntarily waived that potential conflict. Defendant is not entitled to a reversal of his conviction for having made that choice.

## POINT III

THE COURT PROPERLY ADMITTED CERTAIN DETAILS OF DEFENDANT'S STATEMENT THAT WERE NOT INCLUDED IN THE VDF BUT WERE LITIGATED AT THE SUPPRESSION HEARING (Answering Defendant's Brief, Point I, p. 42).

Defendant complains that the trial court improperly allowed Investigator George Daley to testify to certain details of a statement made by defendant, even though those portions of the statement had not been included in the People's pre-trial

notice to the defense.  Defendant further complains that the court denied his attorney adequate access to the record in order to retrieve the information necessary to support her complaint about admission of those details.  In fact, the complained-of details of the statement had been elicited at the suppression hearing, and the defense raised no objection on the grounds of lack of notice, but litigated the statement's admissibility as a whole.  Moreover, counsel clearly had full access to the record, and there is absolutely no indication that the court ever impeded counsel's ability to refer to that record.  In short, defendant's claims are baseless.

The Relevant Proceedings

In their Voluntary Disclosure Form ("VDF"), the People gave notice of several of defendant's statements, including one given to Investigator Daley on February 10, 2004.  According to the VDF, defendant said that, after spending the day with Wilson and Carl/Keith, who were looking for Nelson, defendant left to go see a Denzel Washington movie and then returned to the Lincoln Projects without having actually seen the movie (VDF).

At the suppression hearing, Investigator Daley testified that defendant told him that, earlier on the day of the shooting, he had been "smoking pot and drinking and walking around the Lincoln area" with Wilson and Carl/Keith while they were "looking for someone."  Defendant claimed that he eventually decided "to break off and go see a Denzel Washington movie."  When Daley asked for the name of the

movie, defendant "wasn't quite sure of the title." After Daley elicited the location of the movie theater from defendant and then offered to "check over there and find out if the movie was playing that day." "At that point," defendant told Daley, "he did not attend the movie but went to play pool by himself" (H: 68-69). The defense raised no objection to Daley's account of defendant's statement and never argued a lack of notice about the statement as relayed by Daley during that proceeding (see Defense Letter in Support of Suppression 9/15/04). Justice Wittner denied defendant's motion to suppress all of his statements to law enforcement, including this one (Decision and Order 10/5/04).[35]

At trial, Investigator Daley was asked about defendant's statement. Daley began a short narrative in which he testified that defendant said he had been with Wilson looking for "someone" that Wilson "was having a problem with." Defendant said that he and Wilson had been "drinking and smoking pot" (Daley: 745). Following an unrecorded bench conference, the judge struck the testimony and instructed the witness to "start again" (Daley: 745-746).

The People consented to defense counsel's request to show the witness a copy of the VDF, which "contain[ed] some of the statement that [defendant] made." Counsel then asked the witness to "tell the jury what he said in regards to that."

---

[35] Under separate cover, respondent will supply copies of the hearing transcripts, the parties written arguments, and Justice Wittner's written decision and order.

Daley testified that defendant claimed he left Wilson at the projects and went to see a moving "with Denzel Washington in it," but defendant could not remember "the name of the movie or what time it played." The court overruled defense counsel's objection, but instructed the witness, "I'm going to ask you to confine yourself to what is outlined in [the VDF]" (Daley: 746-747).

Counsel asked Daley, "What else did he say to you that morning that's contained in the document?" The witness replied, "He said he went to a movie and then that he didn't go to the movie, he went and shot pool." Defense counsel objected on the grounds that "that's not in the statement." The court overruled the objection, stating, "It is." The court and counsel instructed the witness to "continue," and Daley restated that defendant "said he went and shot pool on Seventh Avenue, 125th Street. He was alone" (Daley: 747-748).

After the jury was dismissed for the day, counsel returned to the issue of the statement as noticed in the VDF. Justice Wittner explained that she had re-examined the suppression hearing transcript and found that, at that proceeding, the witness had, in fact, testified that defendant "said first he went to the movies and then he changed it, he played pool." Because that part of the statement had been "in the transcript" of the hearing proceedings, the court ruled that it was "not precluded" (Colloquy: 766).

Justice Wittner offered to strike from the trial record "anything that is not the subject of the VDF or suppression hearing" (Colloquy: 766). She instructed counsel to "get the transcript" of the trial proceedings that day and direct the court to any

such testimony, at which point the judge would "strike it" and "give a curative [instruction]" (Colloquy: 768).   On the next day of the trial, the court held an extensive colloquy with the attorneys regarding various evidentiary and procedural issues; at no point during that discussion did defense counsel mention any complaints about Daley's testimony (see Colloquy: 778-798).

Analysis

On appeal, defendant claims that Justice Wittner erroneously permitted Investigator Daley to testify about details of defendant's statement not included in the People's VDF.   In fact, however, since Investigator Daley testified to defendant's full statement before the suppression court, and defendant "argued for suppression of the statement, and had a full opportunity to litigate the issue …. any deficiency in the notice provided by the People was irrelevant, and the statement was properly admitted."   People v. Dillon, 30 A.D.3d 1135, 1136 (2006), citing People v. Kirkland, 89 N.Y.2d 903 (1996), People v. Rivera, 306 A.D.2d 186 (1st Dept. 2003), and People v. Evans, 258 A.D.2d 273 (1999).

Defendant's further complaint that the trial court "denied the defense timely access to the record in order to … preempt the admission of prejudicial evidence," by instructing counsel, "You can make your record afterward" (Defendant's Brief at 42), is simply wrong.   First, as suggested by defendant's lack of any citation to the record, the court gave counsel no such instruction during any discussion of Investigator

Daley's testimony about defendant's statement.  In any event, defense counsel clearly had the VDF– the document upon which she based her claims of lack of notice – in hand, since she provided it to the witness during this very portion of his testimony (Daley: 747).

Furthermore, during the subsequent colloquy in which the judge explained that she had admitted Daley's testimony at trial because it comported with his hearing testimony, the judge specifically cited to the hearing transcript.  Counsel, who had conducted the cross examination of Daley at the hearing several months earlier, gave no indication that she lacked any access to that transcript or was in any way denied an adequate opportunity to advance her arguments (Colloquy: 766-768, 778-798).

Finally, when the court offered to strike any of Daley's testimony that did not, in fact, comport with the statements noticed in the VDF or at the suppression hearing, counsel never identified any such testimony and certainly never claimed that she had been denied a copy of the daily trial transcripts or any other relevant portion of the record.  Counsel's failure to ask the court to strike any testimony, then, was clearly based on counsel's realization that she lacked any legal grounds for such a request, not because she lacked access to the relevant documents.  Simply stated, defendant's complaints about "timely access to the record" enjoy no record support.

In sum, the court properly admitted Daley's testimony about the unnoticed details of defendant's statement, since those details had been fully aired without objection at the suppression hearing.

POINT IV

THE COURT STRUCK DETECTIVE CLARKE'S
REFERENCES TO THE CONTENT OF AN
ANONYMOUS CRIME STOPPER'S TIP AND, UPON
DEFENDANT'S REQUEST, ADMITTED THE
CONTENTS OF THE DD-5 DEFENDANT HAD
WANTED TO USE TO IMPEACH HIM (Answering
Defendant's Brief, Point I, pp. 33-36).

Defendant complains that, after Detective Clarke "testified inconsistently with respect to the contents of an anonymous Crime Stopper Call which he had memorialized in a DD-5," the court improperly limited defendant's impeachment of the witness (Defendant's Brief at 33-34). In fact, however, the court not only struck Clarke's testimony about the anonymous tip, but ultimately permitted defendant to admit into evidence a stipulation regarding the actual contents of the DD-5 report. Having received the precise remedy he sought, defendant's current appellate complaints are unpreserved and puzzling.

The Relevant Proceedings

During direct examination, Detective Clarke testified that, on October 6, 2004, the Crime Stoppers Unit notified him about an anonymous tip received about this case. According to Clarke, the tipster reported that "a person named Rodney who was also known as Raw" was either "the shooter" or "with the shooter." The anonymous tipster provided a "detailed description" of Rodney a/k/a "Raw," and

-75-

said that he was "in front of 2140 Madison" (Clark: 637-638).  The court instructed

the jurors:

> I want to caution the jury that this is not being offered for
> the truth of what this anonymous person said on the tape
> but just to show how the officer went about his
> investigation

(Jury Instruction: 637).  Clarke then testified that, after receiving the Crime Stoppers

tip, he located Rodney Wilson and spoke to him at the precinct stationhouse (Clarke:

638-640).[36]

On cross-examination, Detective Clarke confirmed that he had prepared a DD-

5 about the anonymous Crime Stoppers tip, and defense counsel showed him a copy

of that document (Clarke: 690-693).  Counsel then asked Clarke to verify that the

tipster had not "really" reported that Wilson was "involved with somebody else"  in

the shooting but, "in fact" that he "was the shooter."  The court sustained the

People's objections to those questions (Clarke: 692-693).

At a sidebar conference, Justice Wittner stated that there was "no basis" for

admitting the contents of the call since it was "totally hearsay."  The judge reminded

counsel that the only reason there was any evidence of the call was to "show what [the

detective] did during the investigation, how he got to the defendant" (Colloquy: 694).

Defense counsel complained that the contents had already been admitted but had

---

[36] The court did not permit Detective Clarke to testify about what Wilson told him
(Clarke: 639-641).

been reported inaccurately. Counsel argued that, since the judge had permitted Clarke to testify on direct examination about the contents of the call, the defense should be able to cross examine the witness about what he had "written in the DD-5" about it (Colloquy: 695-696).

The judge noted that the defense had never objected to Clarke's direct examination testimony about the contents of the call, but apparently had instead adopted the "strategy" of not opposing its introduction so that they would then be in the position to "exploit it." Justice Wittner acceded that she had been "mistake[n]" in believing that Clarke's testimony about the call's content had been accurate, but made clear that she would not allow examination of the witness to devolve into eliciting competing versions of "hearsay and anonymous tips." Justice Wittner determined that neither party should have been permitted to elicit the contents of the Crime Stoppers call, and that she would thus "strike out" the direct examination question and answer about that matter, and issue a "curative instruction" to the jury (695-699). Defense counsel responded, "Okay" (699).

The judge instructed the jury:

> In this trial I confess to making an error on evidentiary rulings.
>
> I allowed the detective and maybe other witnesses to testify to what an anonymous person said about the case.
>
> That's hearsay. It's the most blatant, most obvious form of hearsay.

> We don't know who the person is.  The person isn't here.
> We can't cross-examine the person.
>
> Any statement that this detective relayed about an
> anonymous person is stricken from the record and you are
> totally to disregard it

(Jury Instruction: 699).[37]  Neither the People nor the defense raised an objection to
the instruction.

On the next day of the trial, outside of the jury's presence, defense counsel
again complained about Detective Clarke's testimony about the Crime Stoppers tip.
Counsel argued that the Clarke had been "lying" when he "testified specifically about
what the crime stopper tip was," and complained that the court's preclusion ruling
had prevented the defense from informing the jury about how Detective Clarke
"conducted his investigation" and about "his truthfulness on the stand" (Colloquy:
780-781, 787-788).  Counsel acknowledged that the court had also agreed to "remove
or strike all information regarding the crime stopper tip from the testimony," but
complained that it was "not an acceptable remedy" because, "You can't take it back.
They have heard it."   According to counsel, there were only three "acceptable"
remedies: to "take it back by saying the People did something improper by putting it
in in the first place," to "permit proper cross examination on this issue," or to "admit
the DD-5 which sets forth what the crime stopper tip actually was, with an instruction

---

[37] Prior to the presentation of evidence, Justice Wittner had also instructed the jury,
"You cannot consider testimony that was stricken from the record" (Jury Instruction: 7).

that you're not admitting it for the truth of what it says, but to set forth ... what [Detective Clarke] got as the crime stopper tip" (Colloquy: 781, 790-792).

After an unrecorded colloquy, Justice Wittner stated that she had given the defense the option of having stricken from the record the testimony regarding the Crime Stoppers tip or having all of that remain as part of the record, but "allow a stipulation" regarding the contents of the DD-5. Defense counsel "opted for leaving everything in the record" and having the DD-5 contents made a part of the record (Colloquy: 825, 827).

Defense counsel then read to the jury the following stipulation: "If called to the stand Detective Clarke would testify under oath that he wrote a DD-5 on October 6th 2003" that stated, "On this date at approximately 1700 hours Detective Del Castro, Crime Stoppers, notified the undersigned that an anonymous caller called and stated the shooter in this homicide is Rodney, A K A [R]aw, and his is wearing a black hooded sweatshirt and hanging out in front of 2140 Madison" (Stipulation: 830; Court Exhibit II: stipulation). The judge instructed the jury, "Stipulation means there's no facts in dispute[;] both sides agree to those facts" (Jury Instruction: 830).

Analysis

Defendant now complains that the court's handling of the issue regarding Detective Clarke's DD-5 denied him a fair trial. Defendant's complaints, however, are unpreserved for appellate review, since he received the precise remedy he

requested below.  Specifically, defense counsel proposed that the court should admit the contents of the DD-5, which recited the information Detective Clarke received about the Crime Stopper's tip (Colloquy: 791-792), and the court subsequently permitted the introduction of a stipulation regarding the contents of that DD-5 (Stipulation: 830; Court Exhibit II: stipulation).  Since defendant received the remedy he suggested and lodged no further complaints about the matter before the trial court, his current appellate complaints are not preserved.   CPL 470.05(2); People v. Gonzalez, 39 A.D.3d 434, 434 (1st Dept. 2007); People v. Cochran, 29 A.D.3d 365, 366 (1st Dept. 2006).

Of course, trial counsel had no reason to request any further relief.   The defense strategy at trial was to cast doubt on the People's evidence that defendant had been the actual shooter.  Therefore, defendant had an interest in having the jury hear any evidence in which anyone other than defendant was fingered as the shooter.  In this instance then, the defense raised no hearsay objection to Detective Clarke's testimony that the Crime Stoppers tipster had identified Wilson as "the shooter" or "with the shooter" (Clarke: 637).  Rather, as Justice Wittner noted, in an effort to "exploit" the hearsay, the defense opted to impeach Clarke by alerting the jury to the fact that, according to the detective's DD-5, the tipster had never indicated that Wilson might have been "with the shooter," but accused him of having actually been "the shooter" in this homicide (Clarke: 692-693; Colloquy: 695-696).

To be sure, the court did not initially permit the impeachment (Colloquy: 695-699). But, in the end, the defense was able to read a stipulation to the jury in which the parties acknowledged the contents of the DD-5, and specifically that Wilson was identified as the triggerman (Stipulation: 830; Court Exhibit II: stipulation). Having achieved their ends, the defense had no reason to raise any further complaints. And, defendant's vague complaints on appeal provide no insight into what more the trial court could have done to assuage the defense in this matter.

Notably, defendant actually, if unintentionally, succeeded in securing himself an evidentiary windfall through his trial-level complaints about Detective Clarke's direct testimony about the contents of the Crime Stopper's anonymous tip. First, when the defense initially, yet belatedly, complained that Clarke's testimony did not comport with his DD-5 report, the court responded by striking Clarke's testimony about the contents of the tip and instructed the jury to disregard it (Jury Instruction: 699), an instruction the jury is presumed to have followed. People v. Davis, 58 N.Y.2d 1102, 1104 (1983); People v. Singleton, 41 A.D.3d 117, 118 (1st Dept. 2007). Then, when the defense raised further complaints that the relief provided was insufficient (Colloquy: 780-781, 787-792), the court permitted the introduction of a stipulation regarding the contents of Detective Clarke's DD-5 about the tip, thereby revealing to the jury that an anonymous tipster had identified someone other than defendant as the gunman (Colloquy: 825, 827; Stipulation: 830; Court Exhibit II: stipulation). Thus, through manipulating their complaints about Clarke's testimony, the defense

succeeded in have this arguably exculpatory but thoroughly inappropriate hearsay evidence presented for the jury's consideration.

To be sure, in colloquies outside of the jury's presence, the judge had indicated that she intended, in effect, to rescind her prior instruction striking the detective's initial testimony about the content of the tip (Colloquy: 825, 827). But before the jury, the judge never altered her prior instruction that the jurors disregard that earlier evidence. And, the court offered no limiting instructions on the purposes for the stipulation regarding the DD-5 report of the contents of the call could be considered. Thus, as far as the jury was concerned, they were permitted to consider the fact that an anonymous tipster had identified someone other than defendant as the man who shot Nelson. And this was precisely the information the defense wanted the jury to hear. Defendant's appellate complaints are therefore entirely unwarranted.

Equally inexplicable are defendant's contentions that the court "demean[ed] the evidentiary value of the DD-5" (Defendant's Brief at 34). In fact, the judge's comments about which defendant now complains on appeal – "It's the most blatant, most obvious form of hearsay. We don't know who the person is. The person isn't here. We can't cross-examine the person" (Jury Instruction: 699) – were not directed at the DD-5. Rather, the judge directed those comments to Detective Clarke's testimony about "what an anonymous person said about the case" (Jury Instruction: 699). Indeed, the judge explicitly "confess[ed]" to the jury that she had made "an error on evidentiary rulings" by "allow[ing] the detective" to testify about such

-82-

matters, and she instructed the jurors to "disregard such testimony" (Jury Instruction: 699).   It was clear, then, that to the extent that the judge was "demeaning the evidentiary value" of anything, it was to the detective's testimony as elicited by the prosecutor on direct examination.

Furthermore, since it was the People who had elicited such testimony in the first place, it is clear that any admonishment was directed toward them, not the defense.   When Justice Wittner observed, "We don't know who the person is," and "We can't cross-examine the person" (Jury Instruction: 699), it is clear that she was referencing the impossibility faced by the defense in challenging the information provided by an anonymous tipster who did not testify at trial, as well as the difficulty faced by the jurors in evaluating that information.   Thus, even assuming that the judge's use of the pronoun "we" could have been interpreted to indicate some sort of alliance with one side over the other, the judge was obviously not siding with the People (see Defendant's Brief at 34), but was clearly indicating a concern on behalf of the defense and the triers of fact.   And, by striking testimony elicited by the prosecutor (Jury Instruction: 699), any possible negative judgments associated with the judge's instructions inevitably accrued to the People, not defendant.   Defendant's assertions to the contrary are simply unsupported by the record.

Defendant's additional complaint about the judge's definition of a "stipulation" is equally misguided.   The court instructed the jury that a stipulation "means there's no facts in dispute[;] both sides agree to those facts" (Jury Instruction: 830).   This was

nothing more than a precise and accurate instruction. See Criminal Jury Instructions: Evidence ("A stipulation is information the parties agree to present to the jury as evidence, without calling a witness to testify").

Defendant complains, however, that the judge's definition of a stipulation "skirted the question" of "what weight if any" the jury should give to the hearsay evidence and whether the court also agreed to those facts" (Defendant's Brief at 34-35, quoting 830). Defendant's complaints are perplexing. Under no imaginable situation would it have been appropriate for the judge to have commented on whether she herself "agreed to" the facts of the stipulation. Indeed, the judge properly instructed the jury, "As the judge I can't tell you what the facts are" (Final Jury Charge: 947). Moreover, the fact that the court did not go on to instruct the jury on "what weight if any to give" to give to that evidence cannot be deemed error since it is not within the court's purview to provide such an instruction. Rather, it is solely the triers of fact who are tasked with "assessing and weighing the evidence at trial." People ex rel. DeMauro v. Gavin, 92 N.Y.2d 963, 964 (1998).

Finally, defendant complains that Justice Wittner failed to ameliorate her so-called "prejudicial comments on the impeachment evidence" by delivering the type of "'extensive' instructions, tailored to address [the court's] excesses," as in United States v. Manko, 979 F.2d 900, 908 (2d Cir. 1992) (Defendant's Brief at 35-36). As shown, defendant has utterly failed to demonstrate any "excesses" here that would demand any particular instructions to remedy them. In any event, however, "the court

properly instructed the jury that the jury's view of the evidence controlled, regardless

of what the court said." Manko, 979 F.2d at 908.

Specifically, prior to the presentation of the evidence, the judge informed the

jurors, "[A]s the jury you are the sole judges of the facts in this case.  As the judge I

am the sole judge of the law" (Initial Jury Instructions: 8).  Regarding any evidentiary

rulings she might make, Justice Wittner told the jurors:

> Now, during this trial either side may make objections to
> questions or answers on the ground that they believe the
> question or answer is in some way improper and
> inadmissible.  If I agree, I say sustained, I don't allow the
> witness to answer.  Sometimes the answer is already given,
> I say sustained, strike it out.   You cannot consider
> testimony that was stricken from the record.  If I believe
> the question is proper, I say overruled and I allow the
> witness to answer the question.  Please do not resent the
> fact that during this trial the attorneys will be making
> objections on evidentiary grounds.  Please do not hold it
> against either side if I rule against them on these matters

(Initial Jury Instructions: 7-8).

And, during her final instructions, Justice Wittner further explained:

> In our system of justice … you and I have separate roles.
> You are the sole judges of the facts and I'm the sole judge
> of the law.  I am not permitted to give you my opinion as
> to the guilt or nonguilt of the defendant.… It is your own
> recollection, understanding and evaluation of the evidence
> at trial that controls the outcome of this case regardless of
> what either lawyer said in his summation or what I may say
> in explaining the facts.
>
> …

> During this trial it was necessary for me to rule on the admission of evidence and objection[s] made by attorneys. You must not i[nf]er from any rulings that I made that I hold any views as to the guilt or nonguilt of the defendant.
>
> …
>
> As the judge I can't tell you what the facts are. I can't tell you whether a witness is truthful or not truthful or reliable or not reliable, that's what you have to decide based on the evidence you've heard and as the exclusive judges of the facts.

(Final Jury Charge: 946-947).

It is clear that the judge here provided the "adequate and balanced instructions to the jury" required in a criminal trial. <u>People v. Bell</u>, 38 N.Y.2d 116, 120 (1975), <u>quoting</u> <u>People v. Johnson</u>, 6 A.D.2d 181, 183 (1st Dept. 1958) (<u>see</u> Defendant's Brief at 36). More specifically, Justice Wittner clearly followed the mandate that "care must be taken to guard against 'the possibility that the stated opinion of the trial court or even the suggestion of an opinion might be seized upon by the jury and eventually prove decisive.'" <u>Id.</u>, <u>quoting</u> <u>People v. Mendes</u>, 3 N.Y.2d 120, 121 (1957). Defendant's contentions to the contrary are unsupportable and must fail.

In sum, defendant sought admission of the contents of Detective Clarke's DD-5 regarding the contents of the anonymous Crime Stoppers tip, and the trial court granted that request. Defendant not only failed to raise any further complaints about the court's remedy, thus failing to preserve any appellate complaints on the matter, he now fails to provide this Court with any suggestion of what further remedies the trial

court should have imposed.  And, since the court correctly instructed the jury on the definition of a stipulation and on the court's neutrality about the import of facts admitted at trial, defendant's remaining complaints are entirely without merit.

POINT V

THE COURT PROPERLY PRECLUDED THE DD-5 REPORT PREPARED AFTER TAISHA MILLS IDENTIFIED DEFENDANT IN A PHOTO ARRAY (Answering Defendant's Brief, Point I, pp. 37-38, 46).

Defendant maintains that he laid a proper foundation to have Detective Perez's DD-5 report admitted as evidence of a prior inconsistent statement by Mills, and he thus faults the court for failing to admit the document into evidence (Defendant's Brief at 3, 37-38).  Defendant further faults the court for declining the jury's request to view the document during deliberations (Defendant's Brief at 46).  Defendant's complaints are partially unpreserved and entirely without merit.

The Relevant Proceedings

In the People's case, Mills could not identify the man who shot Nelson because she did not see which of the men confronting Nelson had been the one to shoot him (Mils: 121-122, 133, 144, 150-152).  She testified that when Detective Perez showed her a photo array on October 8, 2003, she identified defendant as one of the men in the group that confronted Nelson on the night of September 25th, and told Perez

that, when the group fled, defendant had been the "last guy in the car" (Mills: 141-146, 152-153).   Mills denied telling Perez that defendant had been standing next to the shooter (Mills: 143-144, 148).

Detective Perez was called as a witness in the defense case and testified that he showed Mills an array of six photographs to see if she could identify anyone there as a "possible perpetrator" in Nelson's killing.  Defense counsel asked Perez to tell the jury what Mills said to him when she looked at the photo array, and Perez testified that Mills identified defendant "as one of the people involved in the shooting" (Perez: 843-844).  The court then allowed defense counsel to show Perez a copy of his DD-5 report in order to refresh his recollection of Mills's statements to him (Perez: 843-845).[38]  Counsel asked Perez, "Did she say to you, that after looking at the photographic array, that [defendant] was standing next to the shooter?"  The judge also asked the witness, "Did she say that?  It's a very simple question."  Perez testified that Mills did "say that" (Perez: 845).

---

[38] Later, outside of the jury's presence, defense counsel made a record of the relevant contents of the DD-5 report:

> [O]n the [eighth] of October [2003] along with detective Enriquez I went to 150 Broadway where we showed a photo array of possible people present at the scene of the homicide to [Taisha] Mills[.  Taisha] viewed the photo array and picked number three as one of the guys present at the time of the shooting.  Further she states that he was the third guy standing next to the shooter and was the last guy to get in the g[e]t away car.  Witness states that he jumped into the passenger side of the car

(Colloquy: 861).

Perez added that Mills had said "I think" before she told the detective that defendant had been standing next to the shooter  (Perez: 845).  Counsel asked Perez whether he had included that qualification – "I think" – in his DD-5 report.  After looking at his DD-5, Perez admitted that he had not included Mills's qualification there.  Perez explained, "[T]hose are my words.  It's not what she said….  I took everything she said and I compacted it into basically a sentence" (Perez: 845-847).

Counsel moved to admit the DD-5 report into evidence.  The judge responded, "All right.  We'll discuss that later.  At this point, no" (Perez: 848).  Before the beginning of the next day's proceedings, the court returned to the issue of whether the DD-5 should be admitted into evidence (Colloquy: 858).

One of defendant's attorneys argued that the report should be admitted "as a prior inconsistent statement of T[ai]sha [Mills]" (Colloquy: 860-861).  Defendant's other attorney suggested that the DD-5 should have been admitted to impeach Perez because his testimony "was a completely qualified response that in effect denied what was in his report."  Counsel explained that Perez "was called specifically for purposes" of examining a witness to the interview who had also prepared a police report "that has his signature on it."  Thus, counsel argued, when the witness did not testify in accordance with that signed report, the report itself should have been deemed admissible.  Counsel maintained that the effect of not admitting the report into evidence "would be to allow the officer to put in false testimony" or to deny the

-89-

defense the opportunity to "use a prior inconsistent statement to impeach the witness" (Colloquy: 861-862).

Justice Wittner declined to admit the document into evidence. Regarding the defense attempt to impeach Mills, the judge found that the DD-5 was not admissible as a prior inconsistent statement since it was "not a direct quote from her" but Perez's summary of her statement. Regarding any potential use of the document to impeach Perez, the judge observed that Perez had "admitted everything that [the defense] sought to introduce." Specifically, Justice Wittner cited to pages 844 and 847 of the transcript and concluded that Perez had "admitted" that Mills identified defendant "as the one standing next to the shooter" and that he did not write in his report that she had also said "I think" (Colloquy: 858-860, 862-863; see Perez: 844, 847).

During its deliberations, the jury sent a note to the court requesting, inter alia, Detective Perez's DD-5 report (Colloquy: 974, 977; Court Exhibit IV: jury note). The judge informed the jurors that Detective Perez's DD-5 was "not in evidence" and would thus not be provided (Jury Instruction: 977).

Analysis

The court permitted defendant to impeach Mills's testimony – that she had never informed Detective Perez that defendant had been standing next to the actual shooter – by calling Detective Perez to testify that Mills had, in fact, told him that she thought defendant had been standing next to the shooter. Defendant now faults the

-90-

trial court for declining to enter the actual DD-5 into evidence to further impeach Mills's trial testimony.  Defendant's complaints on this score, however, are entirely unfounded.  Simply stated, Detective Perez's DD-5 report was not admissible to impeach Mills, who did not prepare or sign the document.  People v. White, 272 A.D.2d 239, 240 (1st Dept. 2000) ("Since the victim did not sign or prepare the [Criminal Court] complaint, the complaint was not admissible as a prior inconsistent statement by him"); People v. Adams, 72 A.D.2d 156, 161 (1st Dept. 1980) (the firearm discharge report at issue had not been prepared by the witness and "thus could not be used to impeach him as *his* prior inconsistent statement" [emphasis in original]), aff'd, 53 N.Y.2d 1, cert. denied, 454 U.S. 854 (1981).

Furthermore, to the extent that defendant's appellate argument could be read to also fault the court for not admitting the DD-5 as impeachment of Perez's own testimony – rather than Mills's testimony – the court, in fact, acted well within its discretion by declining to do so.  After all, when Detective Perez initially failed to testify that Mills told him that defendant had been standing next to the shooter, he "admitted his inconsistency" when confronted with the DD-5 in which he recorded just such a statement.  "Therefore, the court properly exercised its discretion in denying defendant's application to introduce the [report] into evidence." White, 272 A.D.2d at 239 ("to the extent that the [Criminal Court] complaint contained a prior inconsistent statement by the officer as to the victim's description of the robbery, the

officer admitted his inconsistency"), citing People v. Piazza, 48 N.Y.2d 151, 163-165 (1979), and People v. Gonzalez, 253 A.D.2d 684 (1st Dept. 1998).

Finally, at no point in time did defense counsel raise any objection to the court's refusal to provide the jury with a copy of the DD-5 to the jury in response to its note during deliberation. Defendant's appellate complaint on that score (Defendant's Brief at 46) is thus unpreserved for appellate review. CPL 470.05(2); People v. Starling, 85 N.Y.2d 509, 516 (1995); People v. Santana, 40 AD3D 230 (1st Dept. 2007); People v. Gonzales, 244 A.D.2d 570, 570-571 (2d Dept. 1997). And, trial counsel's lack of objection is easily understood. Since Detective Perez's DD-5 had not been admitted into evidence, the court acted entirely appropriately in refusing to supply it to the jury during deliberations. See People v. Salaman, 231 A.D.2d 464 (1st Dept. 1996) ("The court 'meaningfully' responded to the jury's note and correctly informed the jury that they were not entitled to the Grand Jury transcript since it was not in evidence"); People v. Leon, 225 A.D.2d 481 (1st Dept. 1996) (the note requested a readback of matter not in the record).

In sum, since Mills had not prepared the DD-5 report regarding her statement to Detective Perez, the document could not be admitted into evidence to impeach her testimony. And, since Perez testified consistently with what he had written in his DD-5, that report could not be admitted to "impeach" his testimony. And since the DD-5 report was never admitted into evidence, the court properly denied the jury's request to view it during deliberations.

<u>POINT VI</u>

THE COURT PERMITTED THE DEFENSE TO ASK DALEY A QUESTION DESIGNED TO IMPEACH HAYSLETT'S TESTIMONY (Answering Defendant's Brief, Point I, pp. 38-40).

Defendant complains that the court "blocked defense efforts to impeach the credibility of Hayslett" (Defendant's Brief at 39). Specifically, defendant complains that, after Hayslett testified that she "did not lie" to the police during her November 14, 2003 interview because none of the officers "directly" asked her whether defendant shot anybody (see Defendant's Brief at 5, quoting Hayslett: 457-459), his attorney was not allowed to ask Daley whether he or any of the officers present during that interview had "ever ask[ed] her who committed the crime" (Defendant's Brief at 39, quoting Daley: 757-760). However, since the judge did, in fact, permit counsel to ask that question, defendant's complaints are unpreserved and curious.

To be sure, the judge initially sustained the People's objection when counsel asked Daley, "Did you or any of the other officers present during that questioning ever ask her who committed the crime?" (Daley: 759). Shortly thereafter, however, the judge held an unrecorded bench conference with the attorneys, following which was followed by this exchange:

> [Defense Counsel:] Did you hear anybody, during the time that you spoke with her ask her who committed the crime?
>
> [Daley:] You mean during the interview at our office?
>
> [Defense Counsel:] Yeah.

[Daley:] I don't remember if that was asked.

[Defense Counsel:]  You don't remember if anybody asked her, did [defendant] commit the crime?

[Daley:]  No, we asked her to tell us what she saw.

(Daley: 762).  In short, the court allowed defense counsel to ask the very question that defendant now complains on appeal counsel was forbidden from asking.  Defendant's complaints, therefore, are not supported by the record and must fail.[39]

Likewise, defendant's accusation that the judge engaged in "incessant interference and admonishment," that "indirectly command[ed] the evidence which the jury would receive and consider" (Defendant's Brief at 39-40), lacks record support.  While the judge did not permit counsel to make her arguments before the jury, she did permit counsel to make her in a bench conference.  There, counsel was obviously successful in persuading the judge to reverse her early ruling and allow counsel to ask the question that had not been permitted previously (Daley: 759, 761-762).  And, as the record clearly demonstrates, none of the court's interactions with defense counsel were marked with the "caustic, if not snide and sarcastic, remarks"

---

[39] Although defendant claims that his attorney "gave up" on her attempt to question the witness and complained that the court was "curtailing" her cross-examination of the witness (Defendant's Brief at 39), counsel's complaint to that effect was to another evidentiary ruling – whether counsel could show Daley a written statement from Hayslett's November 14th interview (see Daley: 762-763) – about which defendant does not complain on appeal.

that led the Court of Appeals to find error in the case of People v. De Jesus, 42 N.Y.2d 519, 521-522 (1977) (cited in Defendant's Brief at 40).

In sum, Justice Wittner allowed defense counsel to ask Daley the question that defendant now complains on appeal he was not permitted to ask. Since defendant's complaints about the matter are simply not supported by the record, they may not prevail on appeal.

POINT VII

> THE TESTIMONY ELICITED FROM LAMONT REYNOLDS ON REDIRECT EXAMINATION DID NOT CONSTITUTE A "PRIOR CONSISTENT STATEMENT" (Answering Defendant's Brief, Point I, pp. 41-42).

On appeal, defendant complains that Justice Wittner improperly allowed the prosecutor to elicit Reynolds's statements at a pre-trial search warrant proceedings as a "prior consistent statement" (Defendant's Brief at 42). In fact, however, the only potential error that may be found here was the judge's initial use of the label "prior consistent statement" in describing her ruling (Colloquy: 614). As the judge further – and more accurately – explained, the testimony was permitted as a clarification of the witness' testimony on cross-examination about those very same statements. And that purpose was entirely legitimate.

On direct examination, Reynolds testified that, in January 2004, Wilson tried to sell him the same gun with which Reynolds had seen defendant shoot Nelson

-95-

(Reynolds: 549-552). Reynolds also testified that, later, he gave sworn testimony about the gun in a search warrant proceeding (Reynolds: 553-554). Reynolds was not asked during his direct examination to provide any details about that prior testimony.

The defense, in an attempt to cast doubt on the witness' credibility, tried to demonstrate that Reynolds had provided a prior inconsistent statement to the search warrant court. In the process, counsel asked confusingly phrased questions about what Reynolds told the search warrant court about the date on which Wilson offered to sell the gun. These questions were interspersed with equally confusingly phrased questions about what Reynolds told investigators about Wilson's attempt to sell the gun. Faced with a barrage of befuddling leading questions, the witness provided correspondingly incongruous responses about the date on which Wilson offered to sell him the gun. Reynolds effectively testified that he had told the search warrant court that Wilson had tried to sell him the gun "several days after" the September 24, 2003 shooting (Reynolds: 572), "like a month after" the shooting (Reynolds: 573), the day before the January 21, 2004 search warrant proceeding (Reynolds: 578-579), and three weeks before the search warrant proceeding (Reynolds: 588-589).

The thoroughly disorienting nature of defense counsel's mode of questioning can only be appreciated through a reading of the entire portion of cross-examination (Reynolds: 565-579, 588-595). Justice Wittner, however, summed up the experience when she noted that counsel had been "so distorting and confusing of the witness" that even she "d[id]n't know what he said about exactly who he told what and when."

-96-

The judge told defense counsel, "I couldn't figure out – I'm pretty smart, I think – and I couldn't figure out what the guy was saying because you had him so coming and going. I couldn't understand what was going on, and I was sure you were doing that on purpose." Justice Wittner concluded that counsel had "totally misconstrued and distorted the testimony." Thus, she allowed the prosecutor "to get it clear in two sentences" what Reynolds had said to the search warrant court (Colloquy: 614-615).

On re-direct examination, the prosecutor directed the judge and defense counsel to the transcript of the search warrant application proceedings (Reynolds: 598-599), and the following exchange was then had:

> Q.  Do you remember being asked these questions and giving these answer[s] in that time period:
>
>> "THE COURT: And specifically, you also saw a firearm, a handgun in that apartment?"
>>
>> [Reynolds]: "Yes, I did."
>>
>> [THE COURT]: "Was that also this week?"
>>
>> [Reynolds]: "Yes."
>
> Do you remember being asked those questions?
>
> A: Yes.
>
> Q: Did you give those answers?
>
> A: Yes.

(Reynolds: 600).

On appeal, defendant repeats the judge's initial use of the phrase "prior consistent statement" to describe the testimony elicited by the prosecutor on redirect

examination, and complains that such evidence should not have been admitted to "rehabilitate the credibility of [the] witness" (Defendant's Brief at 42). Defendant, however, misses the point. Simply put, the testimony elicited by the prosecutor on redirect examination was not a "prior consistent statement"; it was merely a clarification of the testimony elicited on cross examination.

To be sure, Reynolds's redirect testimony that he told the search warrant court that Wilson offered to sell him the gun "this week" – referring to the week of the January 21st search warrant proceeding – was consistent with his direct testimony that Wilson had offered to sell him the gun in January. The mere fact of consistency, however, does not render the testimony an improper "prior consistent statement." A pre-trial statement that is consistent with a witnesses' trial testimony is improper only when it is offered to bolster that trial testimony. See People v. McClean, 69 N.Y.2d 426, 427 (1987).

Here, in contrast, Reynolds's prior statement to the search warrant court was initially offered by the defense on cross examination in order to impeach the witness' testimony on direct examination. In other words, the defense introduced Reynolds's pre-trial testimony as a prior *inconsistent* statement  The prosecutor's questioning of Reynolds on redirect examination about the *exact same statement* served only to "explain or clarify on redirect" those matters that were "put in issue for the first time on cross-examination." People v. Melendez, 55 N.Y.2d 445, 451-452 (1982).

Notably, this is not an instance in which the People's witness was impeached by a prior inconsistent statement and the prosecutor responded by introducing a new, third statement, consistent with the impeached testimony in order to "rehabilitate the credibility of [the] witness" (see Defendant's Brief at 42).   As the Court of Appeals long ago noted, allowing such a strategy could well permit litigation to "develop into contests between litigants as to which one could obtain the latest version" of a witness' pre-trial statements.   Crawford v. Nilan, 289 N.Y. 444, 451 (1943).   Here, in contrast, the defense created an "apparent inconsistency" through attempting to impeach the witness with his prior statement, and the People were therefore entitled to use the same statement "in order to explain and clarify" the matter.   People v. Norman, 173 A.D.2d 572, 573 (2d Dept. 1991).   Defendant cannot, then, be heard to complain about the People's redirect examination of the witness merely because, by asking the witness to confirm the exact two questions he was asked and answered at the search warrant proceeding, they achieved that permissible clarity quickly and efficiently.

It bears noting that defense counsel had attempted to impeach Reynolds with a statement he made during a recorded court proceeding.   While counsel's tangled examination style prompted the witness to provide conflicting testimony about the details of his testimony during that proceeding, the prosecutor did nothing more than refer to the transcript of that proceeding to ask Reynolds whether he had, in fact, answered the judge's questions during that court appearance as recorded in the

transcript. The prosecutor did not proffer the prior testimony to prove the truth of Reynolds's claims; the prosecutor simply clarified a matter that had become muddied during cross-examination. Since the prosecutor's questions on redirect examination did nothing more than elicit clarity about the prior testimony introduced by the defense, the judge acted well within her discretion by permitting the witness to answer. See Melendez, 55 N.Y.2d at 451-452.

In sum, the trial court properly permitted the prosecutor to ask the witness to verify what testimony he provided to the search warrant court about the time frame in which Wilson offered him to sell the gun. The questions did not elicit a "prior consistent statement" to bolster his trial testimony or to refute a different prior inconsistent statement elicited by the defense, but only served to clarify the witness' responses to the same line of questioning initiated by the defense.

POINT VIII

THE COURT DID NOT ADMIT EVIDENCE OF WILSON'S STATEMENT ABOUT DEFENDANT'S INVOLVEMENT IN THE SHOOTING (Answering Defendant's Brief, Point I, pp. 40-41).

Defendant complains that "the court incorrectly permitted Reynolds to testify that [Wilson] 'had his cousin [defendant] knock [Nelson] off'" (Defendant's Brief at 40; see also id. at 7-8, citing Reynolds: 537, 559). Defendant's complaint is

-100-

unfounded, however, since the court, in fact, sustained defendant's objections to that testimony and struck it from the record.

During direct examination, Reynolds testified that when he met up with Wilson in January 2004, Wilson said "that he was going to get [Nelson] killed." When Reynolds further testified that Wilson told him "that he had his cousin [defendant] knock [Nelson] off," defense counsel immediately objected (Reynolds: 537). In a recorded bench conference, the court ruled that Wilson's statement about his own plan to "get this guy [Nelson] killed" was admissible, but that any of statements regarding "what his cousin [defendant] did" were not admissible (Colloquy: 538-539, 542-543, 546-548). Before the jury, the court asked Reynolds to return to the question of what Wilson said about Nelson, and Reynolds repeated that Wilson told him "that he was going to get [defendant] to knock [Nelson] off." The court sustained the defense objection and granted the defense motion to strike the testimony (Reynolds: 549). The judge then instructed the jury that only "the last question answered" – referring to Reynolds's testimony about Wilson's statement of his own intention to "get [Nelson] killed" (Reynolds: 537) – was "in" evidence (Jury Instruction: 549).

Defendant now complains that the court "incorrectly permitted Reynolds to testify that [Wilson] 'had [defendant] knock [Nelson] off'" (Defendant's Brief at 40). Defendant's complaints are belied by the record. As shown, the court permitted Reynolds to testify only to Wilson's own intention to have Nelson killed. The court

did not permit Reynolds to testify about any statement Wilson made in which

defendant's involvement was mentioned.  And, when Reynolds attempted to testify to

the precluded statements, the court sustained the defense objection and struck the

offending testimony from the record.

In sum, since the complained-of statement was never admitted into evidence,

defendant has no grounds for complaining about it.


POINT IX

THE COURT PROPERLY DECLINED TO INSTRUCT
THE JURY ON THE DEFENSE OF JUSTIFICATION
(Answering Defendant's Brief, Point I, pp. 43-45)

Defendant complains that the trial court erred in refusing to charge justification

(Defendant's Brief at 43-45).  Defendant contends that there was "evidence sufficient

to support a reasonable belief that deadly physical force, directed at appellant's own

person or at a third person, was imminent" (Defendant's Brief at 44).  Defendant is

wrong.

It is well settled that a defendant is entitled to submission of a defense only if

he demonstrates that there is a reasonable view of the evidence which would permit a

jury to find that every element of the defense was established.  People v. Watts, 57

N.Y.2d 299, 301 (1982); People v. Moye, 66 N.Y.2d 887, 889 (1985); People v. Lewis,

116 A.D.2d 16, 19 (1st Dept. 1986).  To be sure, in determining whether such a

charge is warranted, the evidence must be viewed in the light most favorable to the

-102-

defense. <u>People v. Butts</u>, 72 N.Y.2d 746, 750 (1988); <u>People v. Padgett</u>, 60 N.Y.2d 142, 144-145 (1983). But, a reasonable view of the evidence cannot be grounded on "sheer speculation" or a "wholly arbitrary [and] irrational selection from the proof." <u>People v. Scarborough</u>, 49 N.Y.2d 364, 371-372 (1980). Indeed, when an instruction would essentially direct the jury "to resort to sheer speculation, it should not be given." <u>People v. Butler</u>, 84 N.Y.2d 627, 632 (1994) (internal citations omitted). Thus, while it is not for a trial court to weigh the evidence in support of the defendant's view, the court also may not accept an "artificial or irrational" view of the evidence to support an otherwise unwarranted charge or defense. See <u>People v. Butts</u>, 72 N.Y. 2d at 750.

In particular, the justification defense, as set forth by statute, permits a person to use deadly physical force upon another person when and to the extent he:

> reasonably believes that such other person is using or about to use deadly physical force. Even in such case, however, the actor may not use deadly physical force if he knows that he can with complete safety as to himself and others avoid the necessity of doing so by retreating...

Penal Law § 35.15(2). This reflects the fact that the defense is premised on the notion that "killing is justified only as a last resort, an act impermissible as long as other reasonable avenues are open." See <u>People v. Jones</u>, 3 N.Y.3d 491, 494-95 (2004). Moreover, not only must a person have an actual, subjective belief that the use of deadly physical force is necessary, but the belief must also be objectively reasonable,

in that a reasonable person in the defendant's circumstances would have believed that deadly physical force was necessary. People v. Goetz, 68 N.Y.2d 96, 113-115 (1986).

Under these principles, there simply was no reasonable view of the evidence to support submission of a justification defense. To begin, defendant did not testify or put in any evidence. While a defendant can be entitled to the defense based on the People's evidence, People v. Steele, 26 N.Y.2d 526, 528 (1970), that was not the case here. "Here, the trial court properly refused to charge the jury on the justification defense because '[e]ven if defendant had actually believed that he had been threatened with the imminent use of deadly physical force, and there is no evidence that he had so believed,' the jury could not rationally conclude that his reactions were those of a reasonable man acting in self-defense." People v. Reynoso, 73 N.Y.2d 816, 818 (1988), quoting People v. Collice, 41 N.Y.2d 906, 907 (1977), and citing, Goetz, 68 N.Y.2d at 96.

Defendant's contention that the justification charge was warranted is based entirely on Hayslett's testimony in which she "described Nelson as a 'bully' and as 'gun-happy,'" reported Nelson's "verbal threat" to Wilson – "I don't use my hands" – and noted that Nelson "ke[pt] his hands in the pockets of his jacket" – which defendant now describes as "threatening behavior" (Defendant's Brief at 43-44). Such testimony – even assuming *arguendo* the accuracy of defendant's characterization of Nelson's words and actions as "threatening" – does not amount to proof of an imminent threat to the lives of anyone present.

To be sure, Hayslett testified that, based on Nelson's reputation and the fact that he kept his hands in his pocket during the argument with Wilson, she believed Nelson "had a gun" and would use it (Hayslett: 318-319, 330, 410, 462). It is clear, however, that even Hayslett did not believe that that possible threat was imminent. After all, she did not flee the area or impress upon Wilson that she was concerned for his immediate safety. Rather, she remained where she was and tried to catch Wilson's eye because she was concerned that Wilson, in the heat of the argument, might not have considered the possibility that his adversary was armed, and could end up escalating the argument and eventually induce Nelson to draw a gun (Hayslett: 318, 321, 414). At no time did Hayslett state or imply that she believed anyone to be in imminent danger of deadly physical force from Nelson.

Notably, no gun was ever found on or near Nelson. And no other witness provided any evidence whatsoever that Nelson appeared armed, let alone on the brink of opening fire on anyone. Nor was there any testimony about what defendant believed as he drew his own gun and fired on Nelson.

If anything, defendant's statements to police indicated that he did not view Nelson as threatening. Even while spinning exculpatory tales for police consumption and attempting to bargain with the prosecutor for less jail time based on a theory of "justifiable homicide," defendant never even bothered to describe Nelson as the least bit threatening. Indeed, under defendant's version of events, it was not Nelson who appeared ready to draw a gun, but Wilson's friend, Carl/Keith, who was pacing back

-105-

and forth and looked like he was "holding" a gun in his clothing.   And, when defendant claimed to have left the scene only to hear gunshots just moments later, he maintained equal confidence that Wilson was not the target of the bullets, since Carl/Keith had been there to protect him.   Thus, even at his most self-serving, defendant himself could not provide the merest hint that Nelson had posed an imminent and deadly threat.

Most telling, however, was the manner in which defendant shot at Nelson. None of the bullets that pierced Nelson's body had been fired from in front of him. Rather, one shot could have been fired as Nelson turned away, and the rest were fired into his back as he ran. At the time defendant opened fire, then, Nelson was not threatening anyone; he was running for his life.

In sum, even viewed in the light most favorable to the defense, the evidence presented at trial in no way supported the conclusion that defendant shot Nelson based on a reasonable belief that Nelson posed an imminent threat of deadly physical force.   Since the only way the jury could have reached such a conclusion would have been through rank speculation based on an irrational view of the evidence, the court properly declined to issue a justification charge.

## POINT X

THE JUDGE PROPERLY DECLINED TO PROVIDE THE JURY WITH GRAND JURY TESTIMONY NOT ADMITTED INTO EVIDENCE, AND HER MISSTATEMENT FOR THE REASON CAUSED NO PREJUDICE TO DEFENDANT (Answering Defendant's Brief, Point I, pp. 45-46).

For the first time on appeal, defendant complains that, in response to a jury note, the trial court incorrectly stated that Robin Hayslett did not testify before the Grand Jury (Defendant's Brief at 45-46).[40]   Defendant's complaint is both unpreserved and meritless.

The Relevant Record

At trial, the jurors learned that Hayslett testified against defendant before the grand jury (Hayslett: 368), but the transcript of it was not admitted into evidence at trial.  Twice during her cross-examination, the defense questioned Hayslett about her grand-jury testimony in an effort to impeach her trial testimony.  In the first instance, Hayslett testified on direct examination that, after she saw defendant fire his gun, she did not see Nelson "trying to run away" or "move at all" (Hayslett: 411), but admitted in cross examination that she had testified before the Grand Jury that, after

---

[40] In the same subsection of his brief, defendant also faults the court for failing to provide the jury with a copy of Detective Perez's DD-5 (Defendant's Brief at 46).  The reasons that defendant's complaint on that score is unpreserved and meritless was addressed in Point V of this brief, *supra.*

defendant's shots "rang out," Nelson "like ran, like took off" (Hayslett: 412-413).
Hayslett then explained that although she had not seen Nelson actually running away,
she "kn[e]w" that "everybody ran" because, when she and Mills looked up from
where they had dropped to the ground "nobody was there" (Hayslett: 414).

In the second instance, Hayslett had testified on direct examination that she
had spoken to defendant on the phone on the evening of September 26th (Hayslett:
386-387, 418-420), but upon cross examination, admitted that she had testified before
the Grand Jury that the call had occurred within two-and-a-half hours after the early
morning shooting (Hayslett: 459-461). She explained that, although she was clear
about what had "happened," she did not "remember dates and time[s]" well; but her
best recollection was that she spoke to defendant on the evening of September 26th
(Hayslett: 461-462).

During its deliberations, the jury sent a note to the court requesting, *inter alia*,
"Robin [Hayslett] – Grand Jury & on scene and afterwards" (Colloquy: 974, 977;
Court Exhibit IV: jury note). Following an unrecorded colloquy outside of the jury's
presence, the judge stated that the parties had agreed that the court would ask the
jurors to "clarify" their request regarding Hayslett's testimony (Colloquy: 975-976).
When the jurors returned, Justice Wittner told them that the she and the lawyers were
"a little unclear" about the jury's request regarding Robin Hayslett. The judge stated,
"She didn't testify in the Grand Jury." Referring to the jury's request for "on scene
and afterwards," the judge then asked, "Do you mean her testimony about what

-108-

happened on the scene and what happened after? Or do you mean something else?" (Jury Instruction: 978).

When the jury sent a subsequent note that requested Hayslett's "cooperation agreement (document)" (Colloquy: 981; Court Exhibit V: jury note), but no clarification of their earlier request, Justice Wittner told the jurors, "I need to know about Robin Hayslett, if you want it or don't want it or what parts you want" (Colloquy: 981-982). Following an evening recess, the jury sent a note requesting "Robin Hayslet[t's] testimony of the shooting from when she came out of the building to when she found herself running to 5th Ave." (Colloquy: 984-985; Court Exhibit VII: jury note). The parties agreed on the relevant portions of the record and that testimony was read back to the jury (Jury Instruction: 984-985).

Analysis

Defendant now complains on appeal that the court effectively denied the jury's request for certain "impeachment evidence" by its "mistaken" statement that Hayslett did not testify before the Grand Jury (Defendant's Brief at 46). As an initial matter, defendant's complaints are unpreserved for appellate review. At no point in time did defense counsel state an objection or exception to the court's statement that Hayslett did not testify before the Grand Jury. Defendant's complaints on these matters are therefore unpreserved for appellate review. CPL 470.05(2); People v. Starling, 85

N.Y.2d 509, 516 (1995); People v. Santana, 40 AD3D 230 (1st Dept. 2007); People v. Gonzales, 244 A.D.2d 570, 570-571 (2d Dept. 1997)

The lack of complaint from defense counsel is easy to understand. From the record, it is clear that the judge simply misstated the reason for refusing to give the jury the transcript of Hayslett's grand jury testimony. The actual reason was that the document had not been admitted into evidence. But, the jury had also requested the transcript of Taisha Mills's grand jury testimony, and the court had just instructed them – accurately – that Mills had not testified before the grand jury. Thus, when the court addressed the jury's request for Hayslett's grand jury testimony the court correctly declined the request, but apparently confused the witnesses and provided the explanation relevant to Mills – that she had not testified – rather than the explanation relevant to Hayslett – that the transcript was not in evidence.

Of course, in the end, the result was the same. The jury was properly denied access to a document not in evidence. Defendant cannot then show the serious prejudice required for a reversal based on a judge's failure to comply with a jury's request for information. People v. Lourida, 70 N.Y.2d 428, 435 (1987); People v. Rodriguez, 228 A.D.2d 391 (1st Dept. 1996).

Defendant, however, seems to suggest that the jury might have wanted readback of the portions of Hayslett's trial testimony in which she was impeached by her grand jury testimony. There is nothing in the record, however, to suggest that this speculative theory is correct. But, even if it were, neither of the two occasions in

-110-

which Hayslett was impeached with her grand jury testimony were in regards to matters crucial to her identification of defendant as the shooter – they simply addressed how she knew that Nelson had run away after being shot and the specific time that defendant called her after the shooting. Thus, even under defendant's strained effort to find error, he cannot show serious prejudice.

In any event, the jury later requested readback of Hayslett's testimony regarding "the shooting from when she came out of the building to when she found herself running to 5th Ave[nue]." Since that testimony would have included Hayslett noticing that Nelson had run from the scene after the gunshots but before Hayslett herself fled the scene, it would have also included defense counsel's impeachment of the witness with her grand jury testimony about the same moment. Thus, the jury have been provided readback of one of the two instances in which Hayslett's trial testimony was impeached with her grand jury testimony. And, had the jury indeed wanted readback of the other instance, nothing prevented them from sending another note requesting it.

Finally, even if the court's misstatement about Hayslett's grand jury testimony had proven "perplexing and confusing" to the jurors initially (see Defendant's Brief at 46), after re-hearing the trial testimony in which Hayslett's grand jury testimony was referenced, the jurors could simply have sent another note asking for further clarification. Since they did not, they obviously were either not confused or not interested in the remaining instance of impeachment. In short, nothing in the court's

-111-

responses to the jurors' notes "dissuaded the jury from considering any relevant testimony." People v. Peralta, 248 A.D.2d 300 (2d Dept. 1998).

In sum, Justice Wittner properly refused to provide the jury with the transcript of Hayslett's grand jury testimony because that document had not been admitted into evidence. The mere fact that the judge provided the jury with the wrong explanation for that decision did not cause any serious prejudice to defendant, as evidenced by the fact that neither of his attorneys ever complained or asked for a correction of the record.

## POINT XI

### THE COURT CONSIDERED PROPER FACTORS IN FASHIONING DEFENDANT'S SENTENCE
(Answering Defendant's Brief, Point Three, pp. 52-54).

Defendant complains that the sentencing court relied on "untrue and unreliable allegations of misconduct" which violated his due process rights (Defendant's Brief at 52). Specifically, defendant takes issue with the prosecutor's reference to allegations made by Tremain Davis, defendant's apparently estranged girlfriend, regarding threats he made to her (see Defendant's Brief at 30-31). Defendant's arguments about the admission of Davis's statements in the sentencing proceeding are partially unpreserved and entirely unavailing.

Davis's allegations against defendant had come to light due to a 2004 harassment conviction in the Bronx. As the prosecutor explained to the sentencing

judge, Davis reported that defendant had taken out the gun he used to shoot Nelson, put the gun to Davis's head, and told her, "I've already killed somebody before and I can do the same to you." Davis had also reported that defendant regularly "carried the murder weapon" and was "an active narcotic[s] trafficker" (Sentencing: 5). On March 2, 2004, defendant pled guilty to second-degree harassment; the Bronx court sentenced him to a conditional discharge and issued an Order of Protection in favor of Davis (Presentence Report: 2-3). At defendant's sentencing for the Nelson murder, the prosecutor asked the court to consider Davis's report of defendant's threats to her in assessing "the kind of person that we're dealing with in this case" (Sentencing: 5).

Defendant now labels Davis's claims as "untrue and unreliable," as well as "uncharged and entirely uncorroborated." Defendant also maintains that the prosecutor had no "good faith basis" for proffering them to the sentencing court since the record does not indicate that they had been relayed to him "personally." Defendant concludes that the court's reliance on Davis's statements violated his due process rights (Defendant's Brief at 52-54).

As a threshold matter, defendant's current complaints about the sentencing proceeding are largely unpreserved for appellate review. To be sure, defense counsel likened Davis's "hearsay" statement "those hearsay statements that ... ultimately led to this man's wrongful conviction" (Sentencing: 7), thus arguably preserving a complaint that Davis's allegations were "untrue" and "unreliable." Defendant never

contended, however, that it would be a violation of his due process rights for the court to consider them during the sentencing proceedings. His current constitutional claims on that score (Defendant's Brief at 52, 54) are therefore unpreserved for appellate review. See People v. Rosen, 96 N.Y.2d 329, 335, cert. denied, 534 U.S. 899 (2001).

Nor did counsel object to the proffer of Davis's allegations on the grounds that they were "uncharged and entirely uncorroborated," or that the prosecutor lacked a good faith basis for proffering them, as he now does on appeal (Defendant's Brief at 54). Rather, trial counsel maintained that "new case law" dictated that sentencing courts were forbidden from "taking into account anything that's outside of the purview of this jury" for the purposes of determining a proper sentence (Sentencing: 3-4). As the court properly noted, however, a sentencing judge is, in fact, permitted to consider evidence regarding a defendant's "background" and "character" even if that evidence was not proven beyond a reasonable doubt at trial (Sentencing: 4). People v. Naranjo, 89 N.Y.2d 1047, 1049 (1997); People v. Seplow, 226 A.D.2d 178 (1st Dept. 1996). Since the defense raised no further objections, and certainly did not raise the complaints defendant now proffers on appeal, his current arguments are not preserved for appellate review. See CPL 470.05(2); People v. Harrison, 82 N.Y.2d 693, 693-94 (1993); People v. El, 250 A.D.2d 395, 396 (1st Dept. 1998); People v. Caban, 246 A.D.2d 438, 439 (1st Dept. 1998).

Moreover, defense counsel's lack of objection to the substance of the prosecutor's report of Davis's allegations suggests that even counsel understood that the statements met the requirements for reliable information offered in good faith. Thus, any shortcomings in the record regarding the precise bases for the prosecutor's knowledge of Davis's statements appears to be due to the fact that defense counsel found nothing objectionable about them.  And, on appeal, any lack of clarity on the record due to defendant's failure to object cannot be construed in his favor.  See People v. Kinchen, 60 N.Y.2d 772 (1983).  Since defendant can provide no reason that the sentencing court should have found that Davis's allegations, as proffered by the People, were "'materially untrue' assumptions or 'misinformation,'" he may not prevail in his current appellate complaints. Naranjo, 89 N.Y.2d at 1049, quoting United States v. Pugliese, 805 F.2d 1117, 1123 (2d Cir. 1986), quoting Townsend v Burke, 334 U.S. 736, 741 (1948).

In any event, there is no indication that Davis's allegations constituted a significant factor in the judge's determination of defendant's sentencing.  Although Justice Wittner noted the "aggravating" factors mentioned by the prosecutor – including defendant's harassment of Davis and his prior youthful offender adjudication – the judge seemed less concerned with those than with the fact that she was unable to find any "mitigating" factors in defendant's history (Sentencing: 11-12).  Indeed, even at sentencing, defendant not only failed to express the least bit of

remorse for the loss of Jonadial Nelson's life, he actively denied any responsibility for his crime (Sentencing: 9-10).

Justice Wittner, who was the judge who presided over defendant's trial, made clear that her primary concern was the fact that defendant's shooting was "an unprovoked act of violence" against an "unarmed" victim. And, that concern was warranted since, as the prosecutor noted, defendant not only shot an unarmed man from behind six separate times, but had fired "into a crowd of people and could have injured any one of those people." In fact, defendant was conscious of the risk he had posed, since he had asked Hayslett, "I didn't hit you, girl, did I" the night after the shooting. As the prosecutor argued, the "sheer violence" of defendant's crime "speaks for itself" (Sentencing: 3).

Justice Wittner's determination of defendant's sentence in this case demonstrates the commonly acknowledged aphorism that the sentencing judge is in the "most advantageous position to determine the proper sentence." People v. Junco, 43 A.D.2d 266, 268 (1st Dept.), aff'd., 35 N.Y.2d 419 (1974); see also People v. Conyers, 189 A.D.2d 607, 609 (1st Dept. 1993). Defendant can demonstrate no abuse of discretion in the sentence imposed here. His appellate complaints must therefore fail.

In sum, the judge properly permitted admission of defendant's threats against Davis to be admitted in the sentencing proceedings. In any event, defendant's sentence was clearly based on the extreme violence of his crime, not any other

aggravating factor, and defendant provides no reason for this Court to find fault with the sentencing judge's determination.

CONCLUSION

The judgment of conviction should be affirmed.

Respectfully submitted,

ROBERT M. MORGENTHAU
District Attorney
New York County

DANA POOLE
  Assistant District Attorney
    Of Counsel

July 2009

<u>PRINTING SPECIFICATIONS STATEMENT</u>

The word count for this brief is 29574, excluding the Table of Contents and Table of Authorities.  The word processing system used to prepare this brief and to calculate the word count was Microsoft Word 2003.  The brief is printed in Garamond, a serifed, proportionally spaced typeface.  The type size is 14 points in the text and headings, and 13 points in the footnotes.

# Exhibit C

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

---

THE PEOPLE OF THE STATE OF NEW YORK,

                    Respondent,

-against-

VONE WYNN,

                Defendant-Appellant.

NOTICE OF ENTRY

Indictment No.    662/04

---

PLEASE TAKE NOTICE, that the within is a true copy of an Order duly filed and entered in the above-entitled action in the Office of the Clerk of the Supreme Court, Appellate Division, First Department on November 5, 2009.

Dated:  New York, New York
       November 13, 2009

                                 ROBERT M. MORGENTHAU
                                 District Attorney, New York County
                                 One Hogan Place
                                 New York, New York 10013
                                 (212) 335-9000

---

STATE and COUNTY of NEW YORK

_Keith A. Miller_ , being duly sworn, deposes and says, that on the _13_ day of _November_ 2009, I served the within Order and Notice of Entry on the attorney for appellant (named hereafter) by enclosing a true copy thereof in a first-class, post-paid wrapper, directed to the following address, which was designated by the attorney for that purpose, and depositing the same in an official depository of the United States Postal Service within New York State:

GAIL GRAY
770 Broadway
2nd Floor
New York, New York 10003

Sworn to before me this _13_ day of _NOVEMBER_ 2009

Notary Public

EILEEN NAPOLITANO
Notary Public - State of New York
NO. 01NA6188676
Qualified in Kings County
My Commission Expires _1-9-2012_



Mazzarelli, J.P., Andrias, Friedman, Nardelli, Moskowitz, JJ.

1354      The People of the State of New York,          Ind. 662/04
                              Respondent,

                         -against-

          Vone Wynn,
               Defendant-Appellant.

               ─────────────────────

Gail Gray, New York, for appellant.

Robert M. Morgenthau, District Attorney, New York (Dana Poole of
counsel), for respondent.

               ─────────────────────

     Judgment, Supreme Court, New York County (Charles H.

Solomon, J. at *Gomberg* inquiry; Bonnie G. Wittner, J. at

hearings, jury trial and sentence), rendered March 24, 2005,

convicting defendant of murder in the second degree, and

sentencing him to a term of 25 years to life, unanimously

affirmed.

     Defendant was not deprived of his right to conflict-free

counsel.  Defendant chose to retain an attorney who was the

brother of a former prosecutor who had handled the initial stages

of this case and who had taken a videotaped statement from

defendant.  Defendant made a valid waiver of any potential

conflict arising from this situation when, at several court

appearances and during a thorough inquiry pursuant to *People v*

*Gomberg* (38 NY2d 307 [1975]), the court warned him of the

possible disadvantages of this arrangement.  Moreover, defendant

also consulted with a second, conflict-free attorney regarding

                              54

                                             Poole

the decision to remain with the potentially conflicted attorney,
and it was the second attorney who cross-examined the lead
attorney's brother at both the suppression hearing and trial.
There is no merit to defendant's suggestion on appeal that,
despite all these precautions, there was an unwaivable conflict
(*see United States v Perez*, 325 F3d 115, 125-129 [2d Cir 2003]).

The court properly exercised its discretion when it
precluded defendant from introducing a document reflecting a
prior inconsistent statement after the witness had admitted
making the statement (*see People v Piazza*, 48 NY2d 151, 164-165
[1979]), and, with regard to another witness, when it permitted
the People to introduce evidence that defendant characterizes as
a prior consistent statement, but which actually clarified other
portions of the same statement that had been elicited on cross-
examination (*see People v Torre*, 42 NY2d 1036 [1977]).  The court
properly received portions of defendant's statement to a
detective for which the People had not provided timely notice,
because the detective testified about the complete statement at
the suppression hearing and defendant had a full opportunity to
litigate the issue, rendering irrelevant any deficiency in the
notice (*see e.g. People v Dillon*, 30 AD3d 1135, 1136 [2006],
*leave denied,* 7 NY3d 812 [2006]).  The court properly declined to
charge justification, since there was no reasonable view of the
evidence, when viewed most favorably to defendant, that defendant

believed, or had any reason to believe, that the victim was using or about to use deadly physical force (*see People v Goetz*, 68 NY2d 96, 105-106 [1986]; *People v Watts*, 57 NY2d 299, 301 [1982]). By failing to object, or by failing to request a further remedy following corrective action, defendant failed to preserve any of his remaining challenges to the court's conduct of the trial, and we decline to review them in the interest of justice. As an alternative holding, we also reject them on the merits.

The record does not establish that defendant's sentence was based on any improper criteria, and we perceive no basis for reducing the sentence or remanding for resentencing.

THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.

ENTERED: NOVEMBER 5, 2009

CLERK

RECEIVED
APPEALS BUREAU
2009 NOV 12 P 4: 55
DISTRICT ATTORNEY
NEW YORK COUNTY

56

# Exhibit D

## GAIL GRAY

*Attorney at Law*
770 Broadway - Second Floor
New York, New York 10003
(646) 495-6067
gail.gray@gmail.com

*BY HAND DELIVERY*

December 28, 2009

The Honorable Chief Judge Jonathan Lippman
State of New York Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, NY 12207

       Attention:    Stuart M. Cohen
                    Clerk of the Court

       Re:    *People v. Vone Wynn*
              Docket No.: 662/2004

Dear Judge Lippman:

On behalf of Vone Wynn, I apply for a certificate granting leave to appeal to the Court of Appeals from a decision of the Appellate Division, First Department, dated November 5, 2009, affirming his conviction for murder in the second degree. (*People v. Wynn*, 2009 NY Slip Op 07937) No previous application has been made to a Justice of the Appellate Division, First Department. Oral argument is not requested.

The decision of the First Department presents a compelling question of law requiring review and reconciliation. As it stands, there exist *per se* rules disqualifying judges and jurors by reason of consanguinity. N.Y. Jud. Law, § 14; N.Y. Crim. Proc. Law, § 270.20 (1)(c) Despite the institutional interests at stake in eliminating conflicts based on family ties, there is no concomitant rule disqualifying a defense lawyer who is the blood brother of the prosecutor.

When presented with this circumstance in the case at bar, the First Department did not find lead defense counsel disqualified, as a matter of law, by his consanguineous relationship with the prosecutor who conducted the initial investigation, obtained a videotaped statement and then testified at the trial. Significantly, reliance by the First Department on *United States v. Perez*, 325 F.3d 115 (2nd Cir. 2003) supports rather than

detracts from Mr. Wynn's position that "the courts do, of course, retain discretion to reject a defendant's knowing and intelligent waiver when an attorney's conflict jeopardizes the integrity of judicial proceedings." *Id.*, at 125. A careful review of the opinion affirming Mr. Wynn's conviction reveals the appellate court's focus on the "precautions" attending the waiver. (*People v. Wynn*, supra, at 2) However, it dismisses as unmeritorious the separate question whether Mr. Wynn's constitutional right to conflict-free counsel was defeated by trial counsel's familial relationship with the prosecutor who investigated the case, gathered critical evidence and then testified at trial.

Certification of this question provides an ideal opportunity to establish clear and uniform rules disqualifying institutional participants, including lawyers, whose consanguineous relationship with each other undermines reliability and fairness.

For the Court's review, copies are enclosed of appellant's brief, respondent's brief, the decision in *People v. Wynn,* 2009 NY Slip Op 07937 and proof of service of same on the undersigned on November 13, 2009.

Thank you for your consideration.

Very truly yours,

Gail Gray

cc:   Dana Poole, Esq.
      Assistant District Attorney
      Of Counsel
      District Attorney
      New York County
      One Hogan Place
      New York, NY 10013
      (w/out enclosures)

      Mr. Vone Wynn [05-A-1844]
      Green Haven Correctional Facility
      Post Office Box 4000
      Stormville, NY 12582
      (w/out enclosures)

2

# Exhibit E



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
**ONE HOGAN PLACE**
New York, N. Y. 10013
(212) 335-9000

**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

February 4, 2010

Honorable Theodore T. Jones
Judge of the Court of Appeals
Court of Appeals Hall
20 Eagle Street
Albany, New York 12207-1095

re:  People v. Vone Wynn
     N.Y.Co. Ind. No. 662/2004
     Application for Leave to Appeal

Your Honor,

I write in opposition to defendant Vone Wynn's application for leave to appeal to this Court. From among the various claims raised in defendant's appeal before the Appellate Division, defendant highlights his contention that he was denied conflict-free counsel because his defense attorney, Patrick Brackley, was the brother of the prosecutor, Ryan Brackley. Defendant goes on to suggest that this Court should propound a *per se* rule "disqualifying a defense lawyer who is the blood brother of the prosecutor." Beyond the fact that defendant provides no reason why any such *per se* rule is necessary in general, the facts here – many of which defendant conveniently omits – make clear that no such rule was required in this case, in particular.

The Underlying Crime And Prosecution

In the early morning hours of September 26, 2003, defendant's cousin, Rodney Wilson, got into a verbal altercation with Jonadial Nelson in a courtyard of the Lincoln Projects in upper Manhattan. Nelson was with his girlfriend; Wilson was with his girlfriend, defendant, and another man. As the argument escalated, defendant drew a gun and shot Nelson as he ran, hitting him six times in the arm and back. Wilson's girlfriend, as well as a passer-by who knew Wilson, saw defendant firing the gun. Defendant, Wilson, and the third man fled the scene. Nelson died from his wounds that same morning. After Wilson's girlfriend came forward to police several months later, defendant was arrested on February 9, 2004. The passer-by who saw defendant shoot Nelson, identified defendant in a line-up later that day. In oral statements to police and a videotaped statement Assistant District Attorney Ryan Brackley, defendant denied having been present at the time of the shooting.

By New York County Indictment Number 662/2004, filed February 11, 2004, defendant was charged with Murder in the Second Degree (Penal Law § 125.25[1]). ADA Ryan Brackley



DISTRICT ATTORNEY COUNTY OF NEW YORK

Honorable Theodore T. Jones                    2                    February 4, 2010

appeared at defendant's Supreme Court Arraignment, but thereafter the case was reassigned to another ADA because Ryan Brackley was leaving the District Attorney's Office.

At defendant's Supreme Court arraignment on February 26, 2004, defendant was represented by Lori Cohen, Esq. of the 18-b panel. She continued representing defendant throughout the course of the entire pre-trial and trial proceedings. At the April 8, 2004 calendar call, Patrick Brackley, Esq. also appeared on defendant's behalf. The Honorable Charles H. Solomon noted that defendant's newly retained attorney was the brother of Ryan Brackley, the originally assigned ADA who was no longer assigned to the case. Throughout subsequent calendar calls, Justice Solomon addressed the potential conflict with defendant and his two attorneys, and defendant consulted independently with Ms. Cohen regarding that conflict. On June 10, 2004, Justice Solomon presided over a <u>Gomberg</u> inquiry at which defendant waived the potential conflict.

On August 19 and 24, 2004, the Honorable Bonnie G. Wittner presided over a Huntley/Wade hearing regarding defendant's motions to suppress his statements and the identification evidence against him. Because defendant's videotaped statement to then-ADA Ryan Brackley was at issue in the hearing, defendant's counsel decided that Ms. Cohen should conduct the examinations of the People's witnesses. In a written order and decision dated October 5, 2004, Justice Wittner denied defendant's motions to suppress his statements and the identification evidence against him.[1]

Justice Wittner presided over defendant's jury trial, which began on February 17, 2005. At that trial, the People were represented by ADA Thomas Schellhammer. Defendant was represented by Patrick Brackley and Lori Cohen. Former ADA Ryan Brackley testified as a witness for the People; he was cross examined by Ms. Cohen. The trial concluded on March 4, 2004, when the jury convicted him of second-degree murder. On March 24, 2005, Justice Wittner sentenced defendant to an indeterminate prison term of 25 years to life.

<u>Defendant's Appeal to the Appellate Division, First Department</u>

Among his various complaints on direct appeal to the Appellate Division, defendant complained that he was denied his right to the assistance of conflict-free counsel. Specifically, defendant maintained that "the conflict arising from the consanguineous relationship between defense counsel and the prosecutor was so severe it amounted to a *per se* violation, rendering his waiver ineffective and mandating reversal (<u>see</u> Appellant's Brief, Point Two, pp. 47-51).[2] On November

---

[1] Following a mid-trial Rodriguez hearing on February 22, 2005, Justice Wittner had also denied defendant's motion to suppress the identification made by Robin Hayslett, Wilson's girlfriend.

[2] Additionally, defendant maintained that the court incorrectly declined to instruct the jury on the defense of justification, failed to respond adequately to certain jury requests during deliberation, and considered improper factors at defendant's sentencing. Defendant also raised numerous evidentiary complaints; specifically, that the court improperly admitted portions of his statement to police that were not included in the People's Voluntary Disclosure Form, limited his ability to impeach several of the People's witnesses, admitted a prior consistent statement of one of the People's witnesses, and admitted improper hearsay evidence.

DISTRICT ATTORNEY  COUNTY OF NEW YORK

Honorable Theodore T. Jones                    3                    February 4, 2010

5, 2009, the Appellate Division, First Department unanimously affirmed the judgment against
defendant.  People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009).  The Appellate Division
specifically rejected defendant's claim that he had been deprived of his right to conflict-free
counsel, finding:

> Defendant chose to retain an attorney who was the brother of a
> former prosecutor who had handled the initial stages of this case
> and who had taken a videotaped statement from defendant.
> Defendant made a valid waiver of any potential conflict arising
> from this situation when, at several court appearances and during a
> thorough inquiry pursuant to People v Gomberg (38 NY2d 307,
> 342 N.E.2d 550, 379 N.Y.S.2d 769 [1975]), the court warned him
> of the possible disadvantages of this arrangement.  Moreover,
> defendant also consulted with a second, conflict-free attorney
> regarding the decision to remain with the potentially conflicted
> attorney, and it was the second attorney who cross-examined the
> lead attorney's brother at both the suppression hearing and trial.
> There is no merit to defendant's suggestion on appeal that, despite
> all these precautions, there was an unwaivable conflict (see United
> States v Perez, 325 F3d 115, 125-129 [2d Cir 2003]).

### Defendant's Application for Leave to Appeal

In his application for leave to appeal to this Court, defendant suggests that this case presents the
question of whether a defense attorney who has a "consanguineous relationship with the
prosecutor" must be disqualified from representing a defendant at trial.  Defendant, however,
elides over numerous facts which demonstrate there is no issue presented by this case warranting
this Court's review.

First, the "prosecutor" at issue in defendant's claim was not the trial prosecutor.  He was, instead,
"the former prosecutor who had handled the initial stages of this case and who had taken a
videotaped statement from defendant" and had appeared only as a witness at defendant's trial.
Wynn, 67 A.D.3d at 423.

Second, the attorney about whom defendant now complains – Patrick Brackley – was specifically
*retained* by defendant, who then, as the Appellate Division noted, made a "valid waiver of any
potential conflict arising from this situation when, at several court appearances and during a
thorough inquiry pursuant to People v. Gomberg (38 NY2d 307, 342 N.E.2d 550, 379 N.Y.S.2d
769 [1975]), the court warned him of the possible disadvantages of this arrangement."  Wynn, 67
A.D.3d at 423.  Indeed, from Patrick Brackley's initially appearance in the case – at the first
calendar call following defendant's Supreme Court arraignment – the presiding judge continually
addressed the potential conflict presented by the fact that Patrick's brother, Ryan Brackley, had
been the prosecutor initially assigned to the case and had interviewed defendant soon after his
arrest.  In no less than five calendar calls, the Honorable Justice Solomon discussed the
ramifications of this potential conflict with defendant and his two attorneys, before holding a

DISTRICT ATTORNEY COUNTY OF NEW YORK

Honorable Theodore T. Jones                    4                         February 4, 2010

Gomberg hearing on June 10, 2004, at which defendant stated his clear understanding of the potential conflict and waived it (see Respondent's Brief at 53-61).

Third, prior to his Supreme Court arraignment, defendant had been assigned representation by Lori Cohen, Esq., of the 18-b panel, and she never stopped representing defendant throughout the pre-trial and trial proceedings, even after defendant retained Patrick Brackley (see Respondent's Brief at 53-62). Indeed, as the Appellate Division noted, defendant had "also consulted with a second, conflict-free attorney regarding the decision to remain with the potentially conflicted attorney, and it was the second attorney who cross-examined the lead attorney's brother at … trial." Wynn, 67 A.D.3d at 423.

As is clear from the facts of this case, the trial court here protected defendant's right to be represented by the counsel of his choosing. The judge was well-aware of the obvious potential conflict and, with the aid of defendant's assigned counsel, scrupulously ensured that defendant was fully advised about the potential conflict and that his waiver was thoroughly voluntary. Moreover, as the defense team was equally aware of the potential conflict inherent in having one brother cross-examine another, defendant's attorney's again protected defendant's interests by opting to have Ms. Cohen, rather than Patrick Brackley, cross-examine Ryan Brackley at trial.

In short, there is no doubt that the Appellate Division correctly determined that there was "no merit to defendant's suggestion on appeal that, despite all these precautions, there was an unwaivable conflict." People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009).

Since this case presents no issue warranting this Court's review, the People respectfully request that your Honor deny defendant's application for leave to appeal to this Court.

Respectfully submitted,

Dana Poole
Assistant District Attorney
212-335-3686

cc:
Gail Gray, Esq.
770 Broadway – Second Floor
New York, NY 10003

# Exhibit F

# State of New York
# Court of Appeals

BEFORE: HON. THEODORE T. JONES

Associate Judge

THE PEOPLE OF THE STATE OF NEW YORK,

Respondent,

-against-

VONE WYNN,

Appellant.

*Poole*
*666/04*

**CERTIFICATE
DENYING LEAVE**

I, THEODORE T. JONES, Associate Judge of the Court of Appeals of the State of New York, do hereby certify that upon application timely made by the above-named appellant for a certificate pursuant to CPL 460.20 and upon the record and proceedings herein,* there is no question of law presented which ought to be reviewed by the Court of Appeals and permission is hereby denied.

Dated:  March 18, 2010
         White Plains, New York

_____
Associate Judge

**\*Description of Order:** Order of the Appellate Division, First Department, entered November 5, 2009, affirming a judgment of the Supreme Court, New York County, rendered March 24, 2005.

# Exhibit G

*Closed*

# State of New York
# Court of Appeals

RECEIVED
APPEALS BUREAU

2010 AUG -4 P 2: 41

DISTRICT ATTORNEY
NEW YORK COUNTY

*Poole*

BEFORE: HON. THEODORE T. JONES, Associate Judge

---

THE PEOPLE OF THE STATE OF NEW YORK,

　　　　　　　　　　　　　　　　　　Respondent,

　　　　　-against-

VONE WYNN,

　　　　　　　　　　　　　　Appellant.

**CERTIFICATE GRANTING
RECONSIDERATION AND,
UPON RECONSIDERATION,
DENYING APPLICATION
FOR LEAVE TO APPEAL**

*662/04*

---

　　　　　I, THEODORE T. JONES, Associate Judge of the Court of Appeals of the State of

New York, hereby certify that the application by the above-named appellant for reconsideration of

the March 18, 2010 certificate denying application for leave to appeal* pursuant to section 460.20

of the Criminal Procedure Law is hereby granted and, upon reconsideration, the application for leave

to appeal be and the same hereby is denied.

Dated:　August 3, 2010
　　　　　White Plains, New York

_____
Associate Judge

# Exhibit H



Mr. Vone Wynn
05-A-1844
~~Green Haven~~ Correctional Facility
P.O. Box 4000
Stormville, New York 12582

July 14, 2011

**COPY**

Hon.Colleen McMahon (CM)
District Judge
United States Courthouse
500-Pearl Street
New York, New York 10007

Re: *Request for a Stay/abeyance of Petition 11 Civ.3605 (CM).*

Dear Hon.McMahon,

I am in receipt of your June 6, 2011 Order to answer pursuant to §28 U.S.C. § 2254. In your order it is requested that the respondent file and serve an answer to the petition within 60 days of the date of this order. In light of the fact that the people still have a substantial period of time to answer I am asking that you grant a stay/abeyance as an appropriate exercise of this court's equitable powers to stay my petition to allow me to return to state court via CPL §440.10 to address newly discovered information that was not available during the earlier proceedings. (See: Attached Affidavit recently obtained by a private investigator).

A District court should grant the requested stay of the federal proceedings and hold the petition in abeyance pending exhaustion of the unexhausted claims if (1) "petitioner has good cause for his failure to exhaust," (2) "his unexhausted claims are potentially meritorious", (3) "there is no indication that the petitioner engaged in intentionally dilatory litigation tactics,". The petitioner herein satisfies every prong required in the granting of a stay/abeyance, the following stated information will support petitioner's request.

1

Allow me to expound on the significance of this document, and the relevance of it to the instant matter herein. During the grand jury proceedings, and the trial, this woman (Robin Hayslett a/k/a Robin Finley) testified under oath that she witnessed the petitioner shot and kill Jonadial Nelson.

Robin Hayslett, a predicate felony offender who sought leniency in exchange for her cooperation in petitioner's case, testified falsely severely prejudicing petitioner to a fair trial. The relevance of the information most recently obtained by a private investigator Mr. Gary Ticher of 99 Tulip Ave, suite 309, Floral Park, New York 11001, is of much significance in light of the fact that it illustrates that there was an extreme conflict of interest regarding (Patrick Brakly's) counselor's participation in the coercion of the perjured testimony adduced in both the grand jury, and the trial by Robin Hayslett. (See: Cover letter attached to enclosed affidavit). As a result of my receiving this information regarding the perjured testimony of a key prosecution witness, it is imperative that I return to state court and address this matter by way of a Post Conviction motion, not only for preservation but to allow the trial court an opportunity to address this matter via a evidentiary hearing.

I'd be remiss if I failed to note that Ms. Hayslett, and Lamont Reynolds, a registered informant who was regularly paid for his information, were the only witnesses to identify petitioner as the shooter. The credibility of these witnesses is a key factor in petitioner's conviction, he was unequivocally prejudiced by their false testimony, thus warranting a grant of permission to have this petition held in abeyance pending the resolution of the matter.

2

I do not wish to detain your honor no more than necessary to stress the validity of my request, this request is not meritless, and it is required in order for me to afford the state court's a meaningful opportunity to consider the allegations of a severe legal error.

Your time and consideration has been greatly appreciated and I patiently await your decision.

Mr.Vone Wynn Pro-Se
Green Haven Corr.Fac.
P.O.Box 4000
Stormville, New York
                12582

3

# Exhibit I



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000



**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

July 27, 2011

The Honorable Ronald L. Ellis
United States Magistrate Judge
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

re:   Vone Wynn v. William Lee
11 Civ. 3650 (CM) (RLE)

Your Honor,

I submit this letter in opposition to petitioner's July 14, 2011 application to stay the proceedings relating to his petition for a writ of habeas corpus and to hold his petition in abeyance so that he may exhaust an entirely new claim in state court. Since petitioner has demonstrated neither good cause for his failure to have exhausted this claim already nor that his unexhausted claim has any merit, petitioner's request for a stay and to hold his petition in abeyance should be denied.

Should Your Honor deny petitioner's request for a stay and abeyance, I additionally request an extension of time to respond to the habeas petition until October 14, 2011. This is respondent's first request for an extension, and petitioner's consent has not been sought since he is an incarcerated, pro se litigant. Although Judge Colleen McMahon's order directing a response by August 15, 2011 was filed on June 17, 2011, the clerk's office did not serve a copy of the petition or the supporting documents on this office until June 23, 2011, a week later. And although we immediately began efforts to retrieve the documents necessary to respond upon

## DISTRICT ATTORNEY COUNTY OF NEW YORK

The Honorable Ronald L. Ellis            2            July 27, 2011

receiving Judge McMahon's order, as of today we have not received the full transcript of petitioner's trial from the state court. Moreover, as noted below, although petitioner appears to raise only three grounds for habeas relief, he actually raises ten separate complaints in his habeas petition. It will therefore require a fair amount of effort to respond adequately to all of those claims.

By petition for a writ of habeas corpus, filed on May 9, 2011, petitioner seeks to set aside his custody stemming from a March 24, 2005 judgment of the Supreme Court, New York County, by which he was convicted, after a jury trial, of Murder in the Second Degree (New York Penal Law § 125.25[1]). Petitioner was sentenced to an indeterminate prison term of 25 years to life.

In the petition for habeas relief, petitioner asserted the same ten claims his appellate attorney raised on direct appeal: (1) that one of his attorneys suffered from a *per se* conflict of interest due to his filial relationship with one of the prosecutors, (2) that the trial court improperly admitted details of a statement made by petitioner, even though those details were not included in the State's Voluntary Disclosure Form, (3) that the trial court improperly limited petitioner's impeachment of a detective with the contents of an anonymous Crime Stopper Call memorialized in a police form, (4) that the trial court improperly precluded evidence of a prior inconsistent statement made by one of the State's witnesses, (5) that the court improperly limited cross-examination of one of the State's witnesses, (6) that the court improperly permitted a prior consistent statement made by one of the State's witnesses, (7) that the court improperly permitted a State's witness to testify to hearsay that another individual induced petitioner to kill the victim, (8) the court improperly refused to instruct the jury about a justification defense, (9) that the court issued an improper response to a jury request during deliberation, and (10) that the court considered inappropriate factors in determining petitioner's sentence.[1] These claims were considered on their merits by the Appellate Division, First Department, which unanimously affirmed the judgment of conviction against petitioner. People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009). On March 18, 2010, the New York Court of Appeals (Jones, J.) denied petitioner leave to appeal. People v. Wynn, 14 N.Y.3d 807 (2010). On August 3, 2010, the New York Court of Appeals (Jones, J.) again denied petitioner leave to appeal upon reconsideration. People v. Wynn, 15 N.Y.3d 811 (2010).

---

[1] In his petition, petitioner referenced the table of contents of his appellate attorney's brief, which lists three point headings. In fact, however, within those three headings, appellate counsel raised a total of no fewer than ten separate grounds for relief.

DISTRICT ATTORNEY  COUNTY OF NEW YORK

The Honorable Ronald L. Ellis              3                                    July 27, 2011

Now, in a letter dated July 14, 2011, petitioner has requested that this Court stay the habeas proceedings and hold the petition in abeyance so that he can exhaust an additional claim in a New York State Criminal Procedure Law (CPL) 440.10 motion in state court. In his application, petitioner states his intention to file a CPL 440.10 motion, but according to the records of the District Attorney's Office, petitioner has yet to file any such motion. Presumably, petitioner ultimately plans to ask this Court to amend his petition to add that claim.[2]  To be sure, where a habeas petition contains both exhausted and unexhausted claims, a district court may, in its discretion, stay the petition and hold it in abeyance while the petitioner exhausts his claims. Rhines v. Weber, 544 U.S. 269, 277-78 (2005); Wager v. Ercole, 2009 WL 1659741, *2, 2009 U.S. Dist. LEXIS 50060, *4 (S.D.N.Y. June 12, 2009).[3]  It appears,

---

[2]  Assuming without conceding that this Court will determine the timeliness of petitioner's claims based on the date of the New York Court of Appeals' determination of petitioner's request that it reconsider its denial of leave to appeal, see Vega v. Bellnier, 2010 WL 4484377, *1, 2010 U.S. Dist. LEXIS 121535, *4 (E.D.N.Y. November 1, 2010); Mathieu v. Giambruno, 2008 WL 383509, *9, *12, 2007 U.S. Dist. LEXIS 99197, *23, *32 (S.D.N.Y., July 12, 2007), adopted by 2008 U.S. Dist. LEXIS 9722 (S.D.N.Y. February 8, 2008); Matteos v. West, 357 F.Supp. 2d 572, 575 (S.D.N.Y. 2005), AEDPA's one-year filing limitation will expire on November 1, 2011.

If this Court were to determine that the judgment against petitioner became final upon the Court of Appeals' initial denial of leave to appeal on March 18, 2010, his one-year filing limitation ran out on June 16, 2011. As any requests to amend his petition would thus be untimely, and petitioner would be required to show that his new claim "relates back" to the claims in his original petition, in that his new claim is "tied to a common core of operative facts" at issue in his original petition. Mayle v. Felix, 545 U.S. 644, (2005). This petitioner cannot do. Presumably, petitioner would claim that his new ground for relief – that one of his attorneys suborned perjury from one of the State's witnesses – relates to his claim that that same attorney's representation of him was inherently conflicted because of his filial relationship with one of the prosecutors who was assigned to petitioner's case in its initial stages (see Petition, Ground II). But, defendant's conflict claim before the state courts centered on his contention that the filial relationship at issue constituted a *per se* conflict because of inherent "personal and primal interests" that are "as strong, if not stronger, than lucrative retainers and fear of prosecution" (Petitioner's State Court Brief at 50). Petitioner's new-found claim, on the other hand, specifies a concrete conflict – his attorney allegedly suborning perjury that would assist the prosecution. Petitioner's new allegations clearly do not involve the same "conduct, transaction, or occurrence" as the allegations already included in his petition. See Mayle, 545 U.S. at 656.

[3]  Copies of unpublished decisions are attached to the copy of this letter being sent to petitioner.

DISTRICT ATTORNEY COUNTY OF NEW YORK

The Honorable Ronald L. Ellis          4                    July 27, 2011

however, that it is an "open question" in the Second Circuit whether a petition containing only exhausted claims may be stayed to permit exhaustion of new claims. See Wager, 2009 WL 1659741, *2, 2009 U.S. Dist. LEXIS 50060 at *4; Piper v. Smith, 2009 WL 857602, *2, 2009 U.S. Dist. LEXIS 26512, *5 (S.D.N.Y. March 30, 2009); see also Townes v. Lacy, 68 Fed. Appx. 217, 218 (2d Cir. May 23, 2003) (summary order). Here, the petition that petitioner seeks to stay contains only exhausted claims, and petitioner asks to raise and exhaust a new issue that was not included in the petition. This Court does not need to resolve the question of whether the petition, consisting of only exhausted claims, may be stayed, though, since even if a stay were permissible, it is not warranted in this case.

Petitioner has not even bothered to explain his failure to exhaust his new-found claim before filing his petition for a writ of habeas corpus, and he certainly has not demonstrated good cause. See Rhines, 544 U.S. at 277. Petitioner has done nothing more than submit an affidavit from a private investigator regarding a conversation he allegedly had with Robin Hayslett, one of the State's main witnesses against petitioner. Hayslett was the girlfriend of, and sold drugs for, petitioner's cousin, so she had met petitioner several times prior to the murder in this case. Moreover, she testified against petitioner at trial. Petitioner has failed to explain why he never bothered to interview Hayslett before May of this year in order that he could have already exhausted his claims in State Court. Moreover, petitioner cannot demonstrate that his claim has any potential merit. After all, he has submitted nothing but hearsay that consists of a facially preposterous claim that his own attorney induced a witness to testify falsely against petitioner. Granting petitioner's request would therefore frustrate the purpose of AEDPA's time limitations. Rhines, 544 U.S. at 277 ("Staying a federal habeas petition frustrates AEDPA's objective of encouraging finality by allowing a petitioner to delay the resolution of the federal proceedings" and "undermines AEDPA's goal of streamlining federal habeas proceedings by decreasing a petitioner's incentive to exhaust all his claims in state court prior to filing his federal petition"); Duncan v. Walker, 533 U.S. 167, 180 (2001) (the purpose of § 2244[d][2] "tolling the limitation period for the pursuit of state remedies and not during the pendency of applications for federal review" is that it "provides a powerful incentive for litigants to exhaust all available state remedies before proceeding in the lower federal courts").

In sum, petitioner has not demonstrated good cause for his delay in raising his new claim or that there is any potential merit to it. Indeed, even as of the time petitioner filed his request for a stay and abeyance, he had yet to initiate any proceedings in state court regarding the new claim. Granting a stay to allow

### DISTRICT ATTORNEY · COUNTY OF NEW YORK

The Honorable Ronald L. Ellis                5                                July 27, 2011

petitioner to exhaust that issue is therefore unwarranted.  Petitioner's application to stay the proceedings and hold his habeas petition in abeyance so that he may litigate a CPL 440.10 motion should therefore be denied.

Respectfully submitted,

Dana Poole (DP-7172)
Assistant District Attorney
212-335-3686
pooled@dany.nyc.gov

cc:     Vone Wynn
        DIN 05-A-1844
        Green Haven Correctional Facility
        594 Rt. 216
        Stormville, New York 12582-0010

# Exhibit J

CLU— Poole
appeals

Mr. Vone Wynn
05-A-1844
Green Haven Correctional Facility
P.O. Box 4000
Stormville, New York 12582


August 11, 2011


Hon.Colleen McMahon (CM)
District Judge
United States Courthouse
500-Pearl Street
New York, New York 10007


*Re: Reply to District Attorney's July 27, 2011 correspondence opposing petitioner's request to have his petition stayed.(11 Civ.3650 (CM)).*


**VONE WYNN**,hereby declares under the penalty of perjury, that the following is true:

I am the petitioner in this action and submit this reply to the people's opposition in reference to my request to stay my petition, dated: July 14, 2011. My request for a stay was based on the fact that petitioner had ascertained newly discovered evidence by way of an affidavit from the prosecutions chief witness attesting to the fact that she (Robin Hayslett) had committed perjury when she testified falsely to seeing petitioner shoot and kill Jonadial Nelson. The issue is clearly meritable and warrants the attention of the trial court not simply for exhaustion, but adjudication of the matter in it's entirety.

There is good cause for petitioner's failure to exhaust the matter thus far, (2) and there is no indication that petitioner is engaging in intentional dilatory litigation tactics. More importantly, "good cause" has been found where a petitioner files a "protective" habeas petition, i.e., one filed prior to the expiration of the 1 year deadline --- while a state collateral challenge is pending due to the petitioner's uncertainty as to whether the collateral challenge will toll the 1 year limitation. See; <u>Rhines v. Weber.</u> 408 F.Supp 2nd 844 (2005); <u>Fernandez v. Unites States District Court for the Southern District of New York</u>, 2006 U.S.Dist. LEXIS 1316 at p.6 (S.D.N.Y. January 18, 2006): <u>Smith v. Wolf</u>, 2005 U.S. Dist LEXIS 21428 (S.D. Ohio, Sept 27, 2005); <u>Menzies v. Friel</u>, 2005 U.S LEXIS 38035 (D. Utah Sept 1, 2005). Applying these principles here, WYNN'S, diligent pursuit of his collateral challenge amply constitutes "good cause" warranting the requested stay.

1

1.  In opposition to the request to have the petition stayed, the people contend that petitioner has not demonstrated good cause for his failure to exhaust this particular claim. Moreover, they further state that petitioner's claim is of no merit and that the request for a stay should be denied. Petitioner in his appellate brief contended that he was deprived of a constitutional right to 'conflict' free counsel, it is evident that counsel was <u>not</u> conflict free in regards to the instant matter before this court.

2.  The matter herein is truly of merit, it is also of the same "conduct" as well as "occurrence" which "relates back" to the claims in the original petition, therefore it would be permissible for your honor to grant a stay. This claim concerns the facts underlying the original claim filed in the petition regarding trial counsel.

3.  Petitioner's failure to have the issue exhausted, was the result of financial constraints that hindered petitioner's efforts to pursue this issue in a more timely fashion. In furtherance, petitioner was not made aware of this pertinent information until he most recently received court generated documents via a family member.

4.  Petitioner filed a protective petition for fear of being time barred, while attempting to have the witness interviewed by a reputable private investigator so that the information attested to could be substantiated by sworn testimony of the investigator. The Supreme court established that a district court has power to stay a habeas petition to permit a state prisoner to exhaust issues in state court if the prisoner demonstrates, <u>inter alia</u> , "good cause" for his failure to exhaust his state remedies.

2

Although the Supreme court did not define "good cause" the Southern District has identified the relevant factors the court should consider. See; Whitley v. Ercole, 509 F.Supp 2d 410 (S.D.N.Y. Sept 19, 2007). ("Neither the Supreme Court nor any circuit court has defined what constitutes 'good cause' for failure to exhaust.");Fernandez v. Artuz, No.00 Civ 7601, 2006 WL 121943 (S.D.N.Y.).

5. For the people to assume that this information is of no validity, and that the claim made by a witness that testified as a chief witness is "preposterous" is a fore drawn conclusion that this could not happen when in fact it did. I will be the first to tell you that when I learned of this attorney's facilitation in inducing the witness to testify falsely against petitioner I was completely shocked.

6. As to why this witness was not pursued sooner is due to the fact that petitioner had no idea where this person was to have a private investigator attempt to find her. At the present time there is additional information being obtained via a private investigator that will illustrate additional perjury by a witness who was a paid confidential informant who has absolutely no credibility at all. There were only two witnesses to the crime, both of whom have extensive criminal histories, and consistently made deals with the prosecution. Now there is one who admits committing perjury in order to get a drug program as oppose to a prison sentence. Your Honor, I ask you how could this not be of merit ?, besides that factor, petitioner is a pro-se litigant who should not be held to the stringent rule of a professional attorney. See: Haines v. Kerner, 404 U.S 519, I ask that you consider this factor as well prior to a determination.

7. Despite the people's position that the issue is of no merit petitioner can easily illustrate that the issue is of great merit, and once the matter is litigated it will be abundantly clear how significant exhaustion of this matter is.

8. Additionally the prosecution has made it clear to this court that they are not yet prepared to address the issues in the petition. In their opposition they request an extension of time to respond to the court's order due to the fact that they have yet to attain the full transcript of petitioner's trial. This factor serves to support petitioner's position that in no way would the granting of this request impede the process of this petition, or the court's calendar for that matter. For this very reason, petitioner respectfully request that this court grant him a stay of the petition.

9. Determining the timeliness of the claim based on the date the New York Court of Appeals denied the request for reconsideration, would be the proper avenue to utilize in the calculation regarding the tolling of the time. The people's reliance on the Vega case as well as Mathieu, is misplaced, in Mathieu there was no question of law in regards to the time being tolled as a result of petitioner's appeal in the New York Court of Appeals, at that time there was no review for a writ of error coram nobis. In Vega, he was clearly time barred due to an extremely late filing, neither of the cases relied on by the people pertaining to the matter of tolling the time are relevant, and of no comparison to the matter herein.

10. Petitioner's conviction rests on the statements of two witnesses, Robin Hayslett, a predicate felon who sought leniency in exchange for her cooperation, and Lamont Reynolds, a registered confidential informant who was regularly paid for his information.

4

It should also be noted that there was absolutely no forensic evidence that implicates any involvement of petitioner to the crime.

11. For all of the fore stated reason that amplify the need for this stay to be granted, it is respectfully requested by petitioner that your honor recognize the relativity to the original claim in petitioner's direct appeal addressing the right to conflict free counsel. I believe that counsel's inducing perjured testimony from this witness clearly establishes the relevance to the appellate argument pertaining to the right of conflict free counsel in the trial stages, to this instant matter where counsel surely was in conflict to the petitioner, and his defense. The significance of returning to the trial court with this newly discovered information, to have the matter adjudicated in front of the very trial court that was deprived this pertinent information during the proceedings is the proper venue for this issue to be addressed.

cc/file
cc/District Attorney County of New York
   Ms. Dana Poole ADA (DP-7172)

Respectfully Submitted

Mr. Vone Wynn 05A1844
Pro/Se Petitioner
Green Haven Corr. Fac.
Stormville, NY 12582

5

# Exhibit K

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

THE PEOPLE OF THE STATE OF NEW YORK

                      Respondent,

        -against-

Von Wynn,

                  Defendant.

NOTICE OF MOTION TO VACATE
JUDGMENT..........................................

PURSUANT TO N.Y. CRIM. PROC.
LAW 440.10(1) (g) (h).......................

Ind. No. 662/2004

PLEASE TAKE NOTICE, that upon the sworn affidavit of Von Wynn, duly sworn to the 24th day of June, 2014, the documents attached thereto, and upon the accusatory instrument and all proceedings heretofore had herein a motion will be made in the Supreme Court of New York County, located at 111 Centre Street, New York, N.Y. 10013, on 24h day of July, 2014, at 10:00 o'clock in the forenoon of that day or as soon thereafter as the undersigned can be heard for an Order pursuant to C.P.L. § 440.10 (1)(g)(h), vacating the judgment of conviction entered on March 24, 2005 against the above-named defendant on the grounds:

1. New evidence has been discovered since being found guilty after trial which could not have been produced by defendant at trial which is of such character that had it been discovered at the time of trial the verdict would have been more favorable to the defendant.
Defendant contends that there was an extreme conflict of interest regarding defense counsel's participation in the coercion of perjured testimony adduced in both the grand jury, and trial by prosecution's witness.

As a result of receiving this information regarding the perjured testimony of a key prosecution witness, it is imperative that a hearing be granted to determine the facts and merits of defendant's claims, as he was prejudice by the conduct of both his trial counsel, and the prosecution who was trial counsel's brother.

2. Defendant was denied his right to a fair trial which resulted in being denied his right to due process, when defendant's trial counsel had a preexisting relationship with the prosecutor who conducted an investigation, and handled the initial stages of the case which created a conflict of interest.

3. And for an Order, pursuant to the New York Criminal Procedure Law § 440.30(5), to produce the defendant at any hearing conducted to determine this motion; and

4. Such other and further relief as this Court may deem just and proper.

PLEASE TAKE JUDICIAL NOTICE, pursuant to <u>NY CPLR Rule 4511 and 2214 (b)</u> answering affidavits, with supporting papers, if any, shall be served at least seven days before the calendar date to enable Defendant to reply before such time, and for any other and further relief as this court may deem just and proper.

Dated: June 24, 2014
Stormville, New York 12582-4000

RESPECTFULLY SUBMITTED,

N. Wyn

MR. VON WYNN
PRO-SE
GREEN HAVEN CORR. FAC.
P.O. BOX 4000
STORMVILLE, N.Y. 12582-4000

TO: A.D.A. Dana Poole
One Hogan Place
New York, N.Y. 10013

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

---

THE PEOPLE OF THE STATE OF NEW YORK

<table>
<tr><td>Respondent,</td><td>AFFIDAVIT  IN  SUPPORT  OF<br>NOTICE OF MOTION TO VACATE<br>JUDGMENT..........................................</td></tr>
<tr><td>-against-</td><td></td></tr>
<tr><td>Von Wynn</td><td>PURSUANT TO N.Y. CRIM PROC.<br>LAW 440.10(1)(h)(g)........................</td></tr>
<tr><td>Defendant.</td><td>Ind. No. 662/2004</td></tr>
</table>

---

STATE OF NEW YORK )
COUNTY OF DUTCHESS ) ss.:

I, Von Wynn, being first duly sworn deposes and says:

    1. I am the defendant herein mentioned in the above entitled caption, I am currently incarcerated in the Green Haven Correctional Facility, located at P.O. Box 4000, Stormville, N.Y. 12582-4000.

    2. I make this affidavit in support of my motion pursuant to C.P.L. § 440.10(1)(g)(h), for an Order vacating the judgment of conviction in the entitled matter upon the ground that I was: Denied my right to a fair trial which resulted in being denied my right to due process, when the prosecutor had a preexisting relationship with trial counsel, who was trial counsel's brother, this relationship created a conflict of interest.

    3. Robin Hayslett, a predicate felony offender who sought leniency in exchange for her cooperation in petitioner's case, testified falsely severely prejudicing petitioner to a fair trial. The relevance of the information most recently obtained by a private investigator Mr. Thomas Bridges of much significance in light of the fact that it illustrates that there was an extreme conflict of interest regarding defense counselors participation in the coercion of the perjured testimony adduced in both the grand jury, and trial by Robin Hayslett. As a result of my receiving this information regarding the perjured testimony of a key prosecution witness, it is imperative that a hearing be granted to determine the facts and merits of defendants claims, as I was prejudiced by the conduct of both trial counsel, and the prosecution who was trial counsel's brother.

## PROCEDURAL HISTORY

4. Defendant was indicted by a New York County Grand Jury, and convicted before the Honorable Judge Bonnie Wittner, after a trial by jury in which defendant did not testify. Defendant was represented by Mr. Patrick Brackley located at 233 Broadway New, York 10279.

5. Defendant was convicted by a jury trial of the sole count of Intentional Murder in the Second degree in violation of Penal Law § 125.25 (1).

6. Defendant was sentenced on March 25, 2005 to the following term of inprisonment 25 years to life.

7. A timely appeal was taken, and affirmed in New York County on November 5, 2009. Defendant was represent on appeal by Ms. Gail Gray, located at 770 Broadway New York, New York 10003. See People v Wynn 67 A.D.3d 423, 888N.Y.S.2d 38.

8. Leave to appeal was petitioned for and denied on March 24, 2010. Counsel for defendant was same as above. People v Wynn 14 N.Y.3d 807, 899 N.Y.S.2d 142.

9. On May 13, 2011 Defendant's Habeas Corpus Petition was filed, which is presently pending.

Defendant contends that the case brought forth before this honorable court is a novel case with perplexing issues. Though on the onset of things it appeared that a Gomberg hearing would cure any conflicting errors, but at most it merely camouflaged it.

Defendant also argues that he cannot be held or placed in a box according to the Gomberg standard. As stated, this is a novel case where there was no co-defendants in which there was an issue of joint representation, and nor was counsel conflicted by the means of his own criminal investigation. Defense counsel was the lead district attorney's brother who investigated the case, and also took statements from defendant.

Here, a chronological order of events will show there was a serious conflict of interest issue at the very beginning that was non waiverable nor curable.

On September of 2003, Assistant District Attorney Ryan Brackley became personally interested in the apprehension, and conviction of the perpetrator of a crime that occurred in the Lincoln Projects because he had no idea who that person was. In support of this assertion, defendant has attached as exhibit (A), which states:

"A. The first thing that I did was sit down and make a telephone call to detective Thomas Clarke of the 25th precinct.

Q. And just--when was that?

A. It was in September. I don't remember the exact date, but, it was the day after the--It would be the day after the homicide. Frankly I remember reading the police blotter, the Post that there had been a shooting.

Ms. COHEN: Objection.

COURT: Overruled.

Q. Why would this Homicide particularly have been of interest to you in the Homicide investigation?

Q. Were you having an investigation--did you have an ongoing investigation, at that time?

A. When I joined the Homicide Investigation Unit, I became part of an active investigation in the Lincoln Projects and this particular--

THE COURT: all right that's enough. Thank you (TT. Pg. 800-801)."

February 9, 2004 Defendant was arrested for the murder of Jonadial Nelson and was subsequently charged with one count of intentional murder. Two months after arraignment, Mr. Patrick Brackley was retained and several months after that a Gomberg hearing was required.

Defendant asserts, that from May 21, 2004, to May 27, 2004, there was an on the record discussion concerning the impact of his conflict of interest claim of the "so called Gomberg inquiry."

At the hearing counsel for defendant was asked by the Court if he had spoken to his client regarding his brother's involvement in this case. In which Counsel informed the Court that he did. The Court then informed defendant of the following:

"THE COURT: Mr. Wynn, you should understand that Mr. Brackley, your lawyer, Patrick Brackley, has a brother named Ryan Brackley, who you know spoke to you.

THE DEFENDANT: Yes.

THE COURT: And there was a question and answer session that was videotaped and the People at trial after they have a hearing in the case, if it's determine that that statement should be admitted in front of a jury the People will seek to offer that statement in front of a jury. Obviously, they're going to know, the jurors will, that Patrick Brackley, your lawyer, and Ryan Brackley, the Assistant D.A, who's leaving the office, by the way, are brothers. There's a danger here for you. I want you to be aware of this." See, pg 2-3 L.24-25 exhibit (B).

It stands to reason that this warning to defendant about the conflict of interest that existed between the Brackley brothers was mere formality. Certainly, the law requires that "...Where a constitutional right to counsel exists...there is a correlative right to representation that is free from conflicts of interest." Wood V Georgia, 450 U.S. 261, 271, 101 S.Ct. 1097, ); see also in Cuyler v. Sullivan, 466 U.S. 335, 336 100 S.Ct. 1708, it states"...But it held that a criminal defendant is entitled to reversal of his conviction whenever he makes " 'some showing of a possible conflict of interest or prejudice, however remote....' Also (citing Holloway v. Arkansas, 435 U.S. 475,483, n. 5 98 S.Ct. 1173,55. When a defendant has retained counsel of his or her own choosing, "judicial restrictions on exercise of this fundamental right will be carefully scrutinized.

In People v. Carncross, 14 N.Y.3d 319,323,901 N.Y.S.2d 112, 927 N.E.2d 532 (2010), the Court held that "[i]n protecting a defendant's Sixth Amendment rights, a trial Court may, on occasion properly disqualify an attorney of a defendant's choosing due to that attorney's conflict, actual or potential, even in the face of defendant's waiver of such conflicts."

The starting point of this conflict must focus on defendant's choice of Mr. Brackley to be his counsel. A Gomberg hearing was conducted assuming that Mr. Brackley would act on the behalf of defendant free of conflict despite any assumption of a potential or actual conflict. The presumption therefore was that Mr. Brackley be permitted to represent Defendant. However, this presumption "may have been overcome by a showing of a serious or potential conflict.

Here, there was no doubt that the potential for conflict existed, and this fact is also supported in the May 21st hearing of exhibit (B) discussion at pg. 6 L. 5-15, which states:

"MR. CONROY: Yes, Judge, two things. One of which I'd like to approach on with Mr. Brackley, but one of which is just to make clear that my office after having considered this issue, and I think it's actually a little bit larger than what you just described, could have been removed as the law requires this application.

"THE COURT: Should be off the case.

Mr. Conroy, explained by informing the Court of the following:

"MR. CONROY: Should be off the case due to the nature of this relationship and it's appearance. It's obviously not that we believe that there is or would be any wrongdoing, but it's just -- it's an appearance of conflict that I'm not -- I'm not entirely sure and I've talked to other people in my office, we're not entirely sure can be cured in this case and that brings me to my second point on which I'd like to approach.

THE COURT: Again, what I'd like you to do is you can submit to me in writing --

MR. CONROY: Okay.

THE COURT: -- Why you feel this way  and under seal so it won't be part of the record unless there's a conviction here.

MR. CONROY: I may do that ex parte initially and then you can decide whether --

THE COURT: It can be.

MR. CONROY: Okay.

THE COURT: It certainly can be ex parte under seal and if has to be disclosed at some point, it will be.

MR. CONROY: Okay.

THE COURT: But, again, for appellate purposes if there should be a conviction in this case, I think, everything that goes into whatever decision is made should be recorded so-to-speak.

MR. CONROY: Okay.

THE COURT: Okay. Yes.

MR. BRACKLEY: Judge, the only thing I have to say is I recognize what the potential conflict is. It was me, in fact, who requested that Mr. Von Wynn have another lawyer, because obviously, it's one thing to say that there wont be a conflict, and obviously, this is an extremely significant case for him and his family, and it just so happened that that was the case. So I think, Judge, It's --I don't object to Mr. Conroy making whatever applications--I know him to be a fine assistant district attorney, if it turns out that whatever he has there in any way something that Mr. Wynn might not even want to waive or even be able to waive, I'll be just as involved in making that decision myself. I would rather that have him get the best that he can get without any possible inferences made against him or for him for that matter, that this is sort of a novel situation. I'm not willing to turn my back on him at this point, but I don't want to put him in a position where despite whatever relationship we have, I don't want him to have any problem over this because this is his life. So I will take whatever schedule you want, Judge."

Defendant states, that this compassionate display from Mr. Brackley for his due process interest was well felt. However, the issue is that there was a conflict of interest, and this admission from not only the Court but, the people or rather Mr. Conroy, to deal with this matter ex parte, establishes that there was no real interest to protect defendant's due process

interest, particularly in light of the use of the ex parte application. Here, there is no doubt, that the right to meaningful representation, ensures not only meaningful representation but also the assistance of counsel that is conflict-free and single-mindedly devoted to the client's best interest. See, People v. Payton, 100 A.D.3d 786, 955 N.Y.S.2d 72 (N.Y.A.D. 2 Dept. 2012. That Court held:

> "Where a defendant makes a conflict-based claim of ineffective assistance of counsel, two questions arise: (1) a court must determine whether there was a potential conflict of interest; and (2) a defendant must show that the conduct of his defense was in fact affected by the operation of the conflict operated on the representation.

Here, Court failed to determine whether there was a potential conflict of interest and the record demonstrates the Court was aware there was a certified conflict of interest. The May 21, 2004 "so-called Gomberg inquiry" attached as exhibit (B) is proof of this fact. There is no doubt that conduct of trial counsel was in fact affected by the operation of the conflict of interest, and that the conflicted operated on the representation. This fact is supported by the May 27, 2004, adjournment date which the inquiry, attached as exhibit (C). The purpose for that hearing was based on two reasons. One, defense wanted to make a bail application, and there was also an issue with respect to a potential conflict of interest.

This inquiry was more designed to pursuade defendant to waive his conflict of interest claim. This record is also repeated with the many attempts to convince defendant to waive his conflict of interest claim. The May 27, 2004, inquiry is lengthy which is why defendant has attached it as exhibit (C), so this Court will be able to review contents in which defendant was asked to understand a potential conflict of interest violation, that was already understood could not be cured. The issue here was, defendant was tricked into believing that Mr.Brackley was representing his best interest. However, several years later through assistance from a private investigator Defendant discovered evidence that his attorney Patrick Brackley assisted his brother who was the initial District Attorney, in ensuring defendant's conviction by coercing the state's main witness to falsely testify against him.

Defendant states, that had he been privy to this revelation before hand, there is no question that he would not have been apted to remain with Mr. Brackley. Since, a court always has the responsibility that [cases before it are] conducted within the ethical standard of the profession and that legal proceedings appear fair to all who observe them, this responsibility should be weighed in determining an application to disqualify an attorney where a conflict exist. This burden is not carried by the court alone. Lawyers have the duty to recuse themselves in cases where such spousal or other family relationships exists.

A lawyer may not represent a client if a reasonable lawyer would conclude that there is a significant risk that the lawyer's professional judgment on behalf of a client will be adversely affected by the lawyer's personal interest.  Concern with this rule arises when a lawyer represents a party and a member of the lawyer's family in an opposing party.  The existence of a family relationship between a prosecuting attorney and a criminal defense attorney may create a conflict of interest. As stated in the **Rules of Prof. Con Rule 1.8 (b)** A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise professional judgment therein for the protection of the client.  This statement was apparently known to A.D.A  Christopher Conroy at the May 21,2004, "so called Gomberg hearing" at pg 6 L. 5-15.

Thus, instead of the hearing Court explaining the possible existence of a potential conflict the Court was require to disqualify Mr. Brackley. Unlike in **People v. Abar, 99 N.Y.2d 406, 757 N.Y.S.2d 219 (N.Y. 2003)**. The Court of Appeals held:

> "Even if former prosecutor who became defendant's trial counsel had conflict of interest, and such conflict did not operate on conduct of the defense, and thus, did not amount to ineffective assistance of counsel, where defendant knew of counsel's prior position and agreed to continue with her representation, he affirmatively advised court at his plea allocution that he was satisfied with legal services provided by counsel, and counsel negotiated two favorable plea agreements on defendant's behalf."

Defendant avers, unlike People v Abar, citation omitted, where the Court of Appeals determined, that  defendant in that case did not suffer a conflict of interest nor did such conflict operate on conduct of the defense, and thus, did not amount to ineffective assistance of counsel. The defendant in that case knew of counsel's prior position and agreed to continue with her representation. In fact the defendant informed the court at his plea allocution that he was satisfied with the legal services provided by counsel, and counsel negotiated two favorable plea agreements on defendant's behalf. However, in the case before this Court, the record will demonstrate that this Court was fully aware that a conflict of interest existed and that it could not be cured. And although the May 27, 2004 proceedings will reveal, that defendant (Wynn) subsequently agreed to continue with Mr. Brackley's representation, however, this was before defendant had obtained a private investigator, who later discovered that the Brackley brothers approached the main witness Robin Hayslett and cohersing her to falsify evidence, and testify against the defendant.

In <u>Leonard Salemi v State of New York,</u> 350 U.S. 950,76 S.Ct NY 208, 100 L.Ed. 827, a standard was set to determine claims based on newly discovered evidence asserting actual innocence.

Here, the United States Supreme Court held:

> "New evidence may only be considered on motion to vacate judgment of conviction if it satisfies six criteria: (1) it must be such as will probably change the result if a new trial is granted, (2) it must have been discovered since the trial, (3) it must be such as could not have been discovered before trial by exercise of due diligence, (4) it must be material to the issue, (5) it must not be cumulative, and (6) it must not be merely impeaching or contradictory to former evidence."

There was no physical evidence found or introduced at trial. Conviction was relied solely on the testimony of two witnesses. Prosecution witness Robin Hayslett was the state's main witness by who's testimony was largely leaned upon to help secure a conviction. In the pursuit of seeking justice after unbelievably being wrongfully convicted of this crime, defendant's family hired the assistance of a private investigator. Since conviction, the search for Ms. Robin Hayslett had been a futile effort since she was allegedly homeless and had no forwarding address.

However, after finding out that Ms. Hayslett was back in prison, and provided with a NYSID number, and prison address, private investigator Thomas Bridges was successful in finding and interviewing her.

In that initial interview defendant found out the extreme length in which his defense attorney took to ensure a conviction. Defendant relied on a "whim and a prayer" in finding this needle in the haystack with the revelation that was unfolded with Ms. Hayslett's statement to the private investigator, see also exhibit (D).

Certainly there can be no doubt that had defendant been privy to this gross violation of the Brackley brothers cohersive tactics to have Robin Hayslett falsely testify against him, the waiver of conflict of interest would not have been made.

Not only is it imperative that this court grant for the purpose of proving defendant's innocence, it is also important to show the misconduct, and great length this attorney took to satisfy his unethical and personal needs. There may be others who suffered wrongful convictions from Mr. Brackley's unethical behavior.

"When a defendant claims that his or her trial counsel's representation was compromised by a conflict of interest the court must conduct a two part inquiry to determine first whether a conflict of interest exists, and second whether the conflict operated on the representation (see <u>People v Konstantinides,</u> 14 N.Y.3d 1, 10, 896 N.Y.S.2d 284).

Defendant submits, that he is fully cognizant, that there is a question of whether New York recognizes a free standing claim of actual innocence has not been conclusively determined (See, People v. Deacon, 96 A.D.3d 965, 946 N.Y.S.2d 613; People v. Jenkins, 84 A.D.3d 1403, 923 N.Y.S.2d 706; People v. Tankleff, 49 A.D.3d at 182, 848 N.Y.S.2d 286. However, the Court in Hamilton, citation omitted, has ruled that "[i]t is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit" People v. Bryant, 25 Misc.3d 1206 [A], 2009 WL 3134841, 2009 N.Y. Slip Op. 51986[U] [Sup.Ct., Bronx County]; People v Wheeler-Whichard, 25 Misc.3d 690, 884 N.Y.S.2d 304; People v. Cole, 1 Misc.3d 531, 765 N.Y.S.2d 477; Friedman v Rehal, 618 F.3d at 159).

The Due Process Clause in the New York State Constitution provides "greater protection then its federal counterpart as construed by the Supreme Court" (People v. LaValle, 3 N.Y.3d 88, 127, 783 N.Y.S.2d 485, 817 N.E.2d 341; see People v. Harris, 77 N.Y.2d 434, 439-440, 568 N.Y.S.2d 702, 570 N.E.2d 1051). Since a person who has not committed any crime has a liberty interest in remaining free from punishment, the conviction or incarceration of a guiltless person, which deprives that person of freedom of movement and freedom from punishment and violates elementary fairness, runs afoul of the Due Process Clause of the New York State Constitution (see, N.Y. Const., art I, § 6; see People v. Cole, 1 Misc.3d at 541-542, 765 N.Y.S.2d 477). Moreover, because punishing an actually innocent person is inherently disproportionate to the acts committed by that person, such punishment also violates the provision of the New York Constitution which prohibits cruel and unusual punishment (see, N.Y. Const., art I, § 5; People v. Cole, 1 Misc.3d at 541-542, 765 N.Y.S.2d 477). Thus, the Court concluded in Hamilton, that a freestanding claim of actual innocence may be addressed pursuant to C.P.L. § 440.10(1)(h), which provides for vacating a judgment which was obtained in violation of an accused constitutional rights (see People v. Caraway, 36 Misc.3d 124[A], 2012 WL 3156442, 2012 N.Y. Slip Op. 51466 [U]; People v. Wheeler-Whichard, 25 Misc.3d at 702, 884 N.Y.S.2d 304).

Defendant avers, that this is such a case before this Court here and now. There is no doubt that as a result of the conflict of interest claim, that resulted in a newly discovered evidence claim, which reveals that defendant was in fact actually innocent. A prima facie showing of actual innocence is made out when there is a sufficient showing of possible merit to warrant a fuller exploration by the court. See, Goldblum v. Klem, 510 F.3d 204, 219, cert, denied 555 U.S. 850, 129 S.Ct. 106, 172 L.Ed.2d 85, quoting Bennett v. United States, 119 F.3d 468, 469 [7th Cir.]. Here, the defendant has made a prima facie showing based upon the evidence of the private investigator, along with the record before this Court.

A claim of actual innocence may be asserted, either as a "gateway" to review of another claim which is otherwise procedurally barred, or as a "freestanding" claim justifying relief in and of itself.

WHEREFORE, defendant respectfully request that this Court vacate judgment and release defendant, as there is no question that there was an actual conflict of interest that prejudiced defendant, and resulted in defendant being denied his right to a fair trial, and his right to due process. As defendant is actually innocence, and should not be held to serve another day more than the time that he has served already. Or in the alternative, grant a hearing as there are matters that are evidentiary in nature, and requires a finding of fact, to address the merits of those claims being asserted here and now. And for further relief as this Hon. Court deems just and proper.

Sworn To Me Before This
24th Day of June 2014

NOTARY PUBLIC
KEITH J. SPOSATO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SP6246186
Qualified in Putnam County
My Commission Expires September 19, 2015

RESPECTFULLY SUBMITTED,

Von Wynn Pro-Se
Green Haven Corr. Fac.
P.O. Box 4000
Stormville, N.Y. 12582

# Exhibit L

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 61

PT 61 SEP 1⁄0 2014

---

THE PEOPLE OF THE STATE OF NEW YORK

-against-

VON WYNN,

Defendant.

AFFIRMATION IN
OPPOSITION TO
DEFENDANT'S
MOTION TO
VACATE JUDGMENT
PURSUANT TO C.P.L.
§440.10

Ind. No. 662/2004

---

DAFNA YORAN, an attorney admitted to practice before the Courts of this State, affirms under penalty of perjury that:

1. I am an Assistant District Attorney in the New York County District Attorney's Office and am assigned to the prosecution of the above-captioned case.

2. In the early morning hours of September 26, 2003, defendant's cousin, Rodney Wilson, got into a verbal altercation with Jonadial Nelson in a courtyard of the Lincoln Projects in upper Manhattan. Nelson was with his girlfriend; Wilson was with his girlfriend, Robin Hayslett a.k.a. Finley, defendant, and another man. As the argument escalated, defendant drew a gun and shot Nelson as he ran, hitting him six times in the arm and back and causing his death.

1

3. On October 6, 2003, defendant was interviewed by a detective and stated that he had not been present at the scene of the killing of Jonadial Nelson. On November 14, 2004, Robin Hayslett, who had also previously denied being present and observing the murder was incarcerated on another matter. Sometime in December of that year, Ms. Hayslett spoke to the then assigned prosecutor, A.D.A. Ryan Brackley, and told him that she had observed defendant, with whom she was familiar, shoot Mr. Nelson.

4. On February 9, 2004, defendant was interviewed again. He adamantly denied any knowledge of the homicide of Mr. Nelson. Defendant was then placed in a lineup and identified as the shooter by an eyewitness named Lamont Reynolds. Defendant was then interviewed again by detectives and admitted to being present at the scene of the confrontation, but insisted that he had left immediately prior to the shots being fired. However, defendant asked the detectives to explain to him the meaning of "justifiable homicide." On February 10, 2004, Defendant was interviewed by A.D.A. Ryan Brackley. Again, defendant claimed that he had left the scene immediately prior to the shooting, but asked how much time he would have to serve if the shooting was in self-defense. Defendant was then arrested.[1]

5. On February 11, 2004, Robin Hayslett entered into a cooperation agreement with the District Attorney's Office (Hayslett Cooperation Agreement attached as Exhibit B),

_____

[1] All of the facts cited in paragraphs 2-4 of this affirmation are taken from the summary of the trial transcript in the People's Response Brief to defendant's direct appeal which is attached as Exhibit A.

2

and testified in the grand jury regarding defendant's identity as the shooter of Mr. Nelson (Grand Jury Minutes of Ms. Hayslett's testimony attached as Exhibit C).

6. On the following day, February 12, 2004, defendant was arraigned in Criminal Court. At the arraignment, defendant was assigned a Legal Aid attorney named Keith Cavett (DANY Arraignment Info Sheet attached as Exhibit D). On February 26, 2004, defendant was arraigned in Supreme Court. He was then represented by Lori Cohen of the 18b Panel (Court Action Sheet attached as Exhibit E).

7. On April 8, 2004, a newly hired attorney appeared for the first time on behalf of defendant for the first time. That attorney was Patrick Brackley, the brother of A.D.A. Ryan Brackley who had been the original prosecutor on the case. By that point, it was clear that A.D.A. Ryan Brackley was leaving the District Attorney's Office and that the case would be reassigned (Minutes of the 4/8/2004 proceeding are attached as Exhibit F). The potential conflict regarding defendant's representation by Patrick Brackley were then thoroughly explored in the following several adjournments and a Gomberg hearing was conducted.

8. The case proceeded to trial before this Court on February 15, 2005. Defendant was represented by Patrick Brackley and Lori Cohen, and the prosecutor was A.D.A. Thomas Schellhamer. In the course of the trial, Robin Hayslett testified in accordance with her grand jury testimony that she had observed defendant shoot Mr. Nelson. Lamont Reynolds also testified that defendant was the shooter. Their testimony was

3

corroborated by another witness who had seen defendant at the scene but had not seen the actual shooting, the presence of defendant's grandmother's car at the scene, as well as defendant's admission that he was at the scene and his inquiries about the consequences of a shooting in self-defense. (See, Exhibit A). Defendant was convicted of Murder in the Second Degree, P.L. §125.25(1) and sentenced to a prison term of from 25 years to life.

9. On appeal, one of defendant's chief complaints was that he had been denied his right to the assistance of conflict-free counsel because of the fraternal relationship between his retained attorney and the former prosecutor. The Appellate Division, First Department, rejected defendant's conflict of interest claim as well as all of his other arguments and affirmed his conviction. People v. Wynn, 67 A.D.3d 423 (1ª Dept. 2009), leave denied, 14 N.Y.3d 807 (2010).

10. On May 13, 2011, defendant filed a Habeas Corpus petition in federal court advancing the same arguments which had been rejected by the Appellate Division, First Department. On July 14, 2011, defendant moved for a stay in his Habeas Corpus Petition to give him the opportunity to file a Motion to Vacate Judgment pursuant to CPL §440.10 in state court. The basis for that request was an affidavit from an investigator who states that he had interviewed Robin Hayslett on May 12, 2011, and that she claimed that Patrick Brackley had convinced her to testify against defendant in order to help his brother A.D.A. Ryan Brackley and that she therefore

4

testified falsely against defendant.[2]  While acknowledging that defendant "offers only hearsay evidence of this misconduct, and that such an act on the part of a defense attorney seems too egregious to be believable," the Court agreed to stay his petition (Federal Court's stay order attached as Exhibit G).  On April 9, 2013, having still failed to file a motion to vacate judgment in this Court, defendant wrote to the federal court asking for time to do further investigation since if he were to file such a motion based on the above-described affidavit alone "he would not obtain the desired result" (Defendant's April 2, 2013 letter attached as Exhibit H).  The federal court gave defendant until July 1, 2014, to file the motion to vacate judgment in state court.

11. On June 24, 2014, defendant filed the instant motion to vacate judgment pursuant to CPL §440.10.  The sole grounds is the aforementioned 2011 affidavit of an investigator claiming that he had interviewed Robin Hayslett and that she stated that she had been convinced to testify against defendant by Patrick Brackley on behalf of his brother A.D.A. Ryan Brackley, and that she consequently falsely testified against defendant (Defendant's Exhibit D).  Defendant contends that the said affidavit demonstrates an actual conflict which he did not waive in his attorney's representation of him, and that Robin Hayseltt's recantation of her trial testimony demonstrates his actual innocence.

---

[2] That affidavit is the basis for defendant's instant motion to vacate judgment and is attached to defendant's motion as Exhibit D.

5

12. This affirmation and the accompanying memorandum of law are submitted in opposition to defendant's June 24, 2014 motion to vacate his judgment of conviction. The claim that Robin Hayslett was convinced to testify against defendant by his attorney is not only too egregious to be believed but belied by the fact that Robin Hayslett entered into a cooperation agreement and testified in the grand jury in a manner consistent with her later trial testimony prior to Patrick Brackley's engagement and entrance into the case. Therefore, the allegation attributed to Hayslett -- that Patrick Brackley convinced her to testify against defendant -- must be false, her hearsay vague recantation cannot be credited, and defendant's motion to vacate the judgment against him should be denied without a hearing.

September 15, 2014

> Cyrus R. Vance, Jr.
> District Attorney
> New York County
>
> By: _____
> Dafna Yoran
> Assistant District Attorney
> Of Counsel
> 212-335-9573

## Memorandum of Law

Defendant's motion to vacate judgment is based exclusively on a three year old affidavit which contains an unsworn, vague and patently incredibly recantation by one of the two witnesses who had identified him at trial. Defendant himself acknowledged in a letter to a federal court that by filing a motion to vacate judgment based solely on that affidavit "he would not obtain the desired result" (Defendant's April 2, 2013 letter attached as Exhibit H). And, indeed, defendant should not "obtain [his] desired result" based on this affidavit, and his motion to vacate judgment should be denied without a hearing.

In the affidavit upon which defendant's motion is based (appended to defendant's motion as Exhibit D), an investigator swears that in 2011 he interviewed Robin Hayslett, a.k.a. Finley, who was one of the two eyewitnesses who had identified defendant as the shooter at his trial over six years earlier. According to the investigator, Ms. Hayslett told him that approximately one month after her arrest in 2004 or 2005, she was approached by defendant's attorney, Patrick Brackley, and that he told her that if she cooperated with his brother A.D.A. Ryan Brackley by testifying against his client, the defendant, then Patrick Brackley would make sure that she received a lighter sentence in her own case. According to the investigator, Ms. Hayslett said that she "made a deal" with Patrick Brackley to testify against defendant

7

and testified falsely against him in order to get a lighter sentence in her own case. (Defendant's Exhibit D).

As the federal court handling defendant's Habeas Corpus petition noted, this alleged conduct by a defense attorney is "too egregious to be believable" (Federal Court Decision, Exhibit G).   After all, for a defense attorney to secure the cooperation of a witness against his own client would violate all rules of ethics and would be grounds for his disbarment.   There is no conceivable possibility that the familial relationship between Patrick Brackley and the former prosecutor provided the defense attorney with a sufficient motive to actively work to secure witnesses against his own client.   That familial relationship has, however, fueled defendant's imagination ever since his conviction at trial.   Indeed, despite his insistence on hiring and keeping Patrick Brackley as his attorney (against the court and the prosecutor's advice), and despite his extensive, explicit and repeated waivers of the conflict raised by Brackleys' fraternal relationship, defendant has nonetheless based his post-conviction state and federal litigation primarily on that relationship.   That defendant has been so focused on the Brackleys' relationship renders suspect an affidavit made on his behalf which alleges such gross and inexplicable misconduct based on that relationship.

In any event, the allegations attributed to Robin Hayseltt in the affidavit at issue are disproved by the record.   According to the investigator, Ms. Hayseltt claimed that

8

she was approached by Patrick Brackley, who identified himself as defendant's attorney, and that she *consequently* and *subsequently* decided to falsely testify against defendant in order to get a lesser sentence (Defendant's Exhibit D). However, that sequence of events is impossible.

Robin Hayslett signed a cooperation agreement with A.D.A. Ryan Brackley which guaranteed her a lesser sentence in exchange for cooperation on February 11, 2004 (Cooperation Agreement, Exhibit B). On the same day, she testified against defendant in the grand jury, identifying him as the shooter (Grand Jury Minutes, Exhibit C). At that time, defendant was not yet represented by any attorney. Indeed, defendant had not been arraigned in criminal court until the next day, February 12, 2004. At that point, he was assigned a Legal Aid attorney named Keith Cavett (DANY Arraignment Info Sheet attached, Exhibit D). In the subsequent two weeks, defendant's case was transferred to another attorney, Lori Cohen, and On February 26, 2004, Ms. Cohen represented defendant at his Supreme Court. (Court Action Sheet attached, Exhibit E). It was only sometime after his supreme court arraignment that defendant hired Patrick Brackley. Patrick Brackley appeared along with Lori Cohen on behalf of defendant for the first time on April 8, 2004 (Minutes of the 4/8/2004 proceeding, Exhibit F). Since Patrick Brackley had not yet been retained and had no connection to the defendant or to his case prior to the date that Robin Hayslett's entered into a cooperation agreement with A.D.A. Ryan Brackley and testified in the

9

grand jury, the central allegation attributed to her in the affidavit in question – that she entered that cooperation agreement and testified against defendant because she had been convinced to do so by defendant's attorney Patrick Brackley – must be entirely false.[3]

That the allegation in the affidavit with regards to Patrick Brackley is obviously fictional, renders the hearsay statement of Robin Hyslett's recantation suspect as well. "[I]t is ancient learning that '[there] is no form of proof so unreliable as recanting testimony.'" People v. Donald, 107 A.D.2d 818 (2nd Dept. 1985) quoting, People v. Shilitano, 218 N.Y. 161 (1919). In fact, post-trial recantations are considered so unreliable that New York courts have regularly denied motions to vacate judgment based on recantations without conducting hearings. See, People v. Lugo, 25 A.D.3d 460 (1st Dept. 2006); People v. Burgos, 19 A.D.3d 1126 (4th Dept. 2005); People v. Cintron, 306 A.D.2d 151 (1st Dept. 2003); People v. Edmonson, 300 A.D.2d 317 (2nd Dept. 2002); People v. Bermudez, 243 A.D.2d 367 (1st Dept. 1997); People v. Davenport, 233 A.D.2d 771 (3rd Dept. 1996); People v. Baxley, 194 A.D.2d 681 (2nd Dept. 1993); People v. Allison, 119 A.D.2d 1005 (4th Dept. 1986); People v. Donald, 107 A.D.2d 818 (2nd Dept. 1985). Certainly, in this case, where the recantation contains a false accusation an evidentiary hearing is unwarranted.

---

[3] It bears note that by the time Patrick Brackley entered the case on behalf of defendant, it was clear that Ryan Brackley was leaving the District Attorney's Office and that the case would be reassigned (Minutes of 4/8/2004 appearance, Exhibit E). Therefore, defendant's imagined motive for Patrick Brackley's alleged misconduct – to help his brother in the prosecution of defendant – could not possibly be true.

The Appellate Division, First Department's 2006 decision in <u>People v. Cintron</u>, 25 A.D.3d at 460, is instructive.   In that case, the defendant submitted an uncorroborated recantation affidavit which was made ten years after trial and featured accusations of "highly improbable" gross misconduct by the prosecutor.  The Appellate Division, First Department upheld the trial court's decision to deny the Cintron defendant's motion to vacate judgment without conducting an evidentiary hearing.  In the instant case, too, defendant submitted an uncorroborated affidavit which was made over six years after trial, and which features accusations of highly improbable – in fact, impossible according to the timeline – gross misconduct by the defense attorney and the prosecutor.   Pursuant to <u>Cintron</u>, defendant's motion to vacate judgment should therefore be denied without a hearing as well.

The conclusion that defendant's motion should be denied without a hearing is further supported by the fact that Robin Hayslett's recantation is unsworn, conclusory (there is no information in the affidavit regarding the facts of the underlying case other than then the statement that the testimony against defendant was "false"), and does not alter the testimony of the other witness at trial who identified defendant as the shooter. <u>See</u>, <u>People v. Edmonson</u>, 300 A.D.2d at 317 (hearing was unnecessary for a "conclusory recantation" by a witness); <u>People v. Davenport</u>, 233 A.D.2d at 771 (hearing unnecessary where recantations were unsworn, inherently suspect, and did not alter the testimony of another eyewitness).

11

That defendant couches his arguments in terms of an unwaived conflict of interest, contending that he would not have waived his attorney's conflict at the Gomberg hearing had he been aware of the allegations of gross misconduct made in the affidavit, does not alter the nature of the affidavit as an unsworn, patently unreliable recantation, which is insufficient to warrant a vacateur of judgment or an evidentiary hearing. People v. Dukes, 106 A.D.2d 906 (4th Dept. 1984) ("[t]hat a portion of the recanted affidavit alleges misconduct by police and prosecution [] does not alter its nature as recanted evidence, which we reject as incredible").

In sum, defendant's motion to vacate judgment is based entirely on an unsworn, conclusory and suspect recantation, which contains false accusations of gross misconduct on the part of defendant's attorney. Consequently, defendant's motion should be denied without a hearing.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

-against-

VON WYNN,

Defendant.

AFFIRMATION IN OPPOSITION TO DEFENDANT'S MOTION TO
VACATE JUDGMENT PURSUANT TO C.P.L. §440.10

IND. NO.    662/2004

Cyrus R. Vance, Jr.
District Attorney
New York County
One Hogan Place
New York, New York 10013
(212) 335-9000

Dafna Yoran
Assistant District Attorney
Of Counsel

1

# Exhibit M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 61

#71

------------------------------------------------x
THE PEOPLE OF THE STATE OF NEW YORK,          :

        -against-                              :          Ind. 0662-2004

Von Wynn                                       :

                DEFENDANT          :
------------------------------------------------x

BONNIE G. WITTNER, J.:

    Defendant alleges that defense attorney Patrick Brackley convinced an eyewitness to testify falsely against the defendant to help his brother, ADA Ryan Brackley, who was previously assigned to this prosecution. Only hearsay evidence was offered in support of his Writ of Habeas Corpus now pending in the S.D.N.Y. Nevertheless, the Federal Court has given defendant the opportunity to move to set aside the verdict of guilty. In his instant motion, defendant has not submitted an affidavit from the eyewitness, Robin Hayzlet, or attorney, Patrick Brackley.

    As the Federal Court said, defendant has offered "only hearsay evidence of this misconduct [suborning perjury], and that such an act on the part of a defense attorney seems too egregious to be believable." [Exhibit G to People's response].

    Accordingly, the motion is denied without a hearing because it is made solely by defendant and is unsupported by other reliable evidence. CPL. 440.30 (4)(d).


Dated: November 6, 2014
      New York, NY

                            _____
                              BONNIE G. WITTNER, JSC

# Exhibit N

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
_____
THE PEOPLE OF THE STATE OF NEW YORK

                          Respondent,

            -against-

Von Wynn

                         Defendant.
_____

> AFFDAVITT IN SUPPORT OF NOTICE
> OF APPLICATION FOR RENEWAL OF
> MOTION PURSUANT TO C.P.L §440.10
> (1)(g)&(h)& CPLR 2221 (e)......................

STATE OF NEW YORK)
COUNTY OF DUTCHESS) ss:

      I, Von Wynn, Being first duly sworn deposes and says under the penalty of perjury, that:

      1.  I am the defendant herein mentioned in the above entitled caption, and as such I am fully familiar with the facts and circumstances recited from the New York County District Attorney's Office in response to defendant's June 24, 2014, motion pursuant to C.P.L. § 440.10 (1)(g)&(h), to vacate the judgment, and my own personal knowledge of the facts and circumstances herein recited.

      2.  This affidavit is submitted in support of the annexed application for renewal of defendant's motion pursuant to C.P.L. 440.10 (1)(g)&(h) to vacate judgment. The Court's order and Decision held that: *"defendant alleged that his defense attorney Patrick Brackley convinced an eyewitness to testify against the defendant to help his brother, ADA Ryan Brackley who was previously assigned to this prosecution. Only hearsay evidence was offered in support of his Writ of Habeas Corpus now pending in the S.D.N.Y. Nevertheless, the Federal Court has given defendant the opportunity to move to set aside the verdict of guilty. In his instant motion, defendant has not submitted an affidavit from the eyewitness Robin Hayslett or attorney Patrick Brackley."*

      3.  In Direct contrast with this decision made by the court, defendant avers that the enclosed notarized affidavit is contrary to the court's judgment. There can be no dispute as to this recent affidavit given by Robin Hayslett that defendant was prejudiced. Submitted with this renewal is a copy of Robin Hayslett's recently obtained affidavit, along with the search results for detective Mike Paul submitted as exhibit (A).

      4.  In opposition with this assertion made by the people which stated *"Robin Hayslett's recantation was unsworn, conclusory and that there was no information in the affidavit regarding the facts of the underlying case other than the statement that the testimony against defendant was false and does not alter the testimony of the other witnesses at trial who*

*identified defendant as the shooter."* Defendant avers that the enclosed notarized affidavit disputes the people's imposition mentioned in their Affirmation and Opposition. A review of Robin Hayslett's affidavit demonstrates that she was approached by defendant's attorney, Patrick Brackley and was informed that if she cooperated with defense attorney and his brother, then she would receive a lighter sentence. This cooperation agreement also entailed saying what she was instructed to say at trial.

5. There is no doubt that this application for renewal requires special scrutiny and to grant his application from this court as defendant has satisfied the requirements which are set forth in CPLR 2221 § (e)(2) which states: *"Shall be based upon the new facts not offered on the prior motion that would change the prior determination; and 3. Shall contain reasonable justification for the failure to present such facts on the prior motion."* Defendant's family hired the assistance of a private investigator after being wrongfully convicted, and avers that his reasonable justification for failure to present such facts on the prior motion is partly due to financial constraints in obtaining the private investigator. After being hired, private investigator Gary Teicher attempted to locate and interview Prosecution witness Lamont Reynolds, Robin Hayslett, and a detective named Michael Paul. The search for these three people became a time consuming process, and in the beginning, locating Robin Hayslett had been a futile effort since she was allegedly homeless, and had no forwarding address. However, after finding out that Ms. Hayslett was in prison, and provided with a NYSID number, private investigator was successful in locating and interviewing her in 2011 but, she was somewhat reluctant to sign the affidavit fearing repercussions for perjured trial testimony, and thereafter, private investigator ultimately conducted another search in an attempt to have her sign a new affidavit. Next, private investigator Tiecher conducted an unsuccessful search for Lamont Reynolds which turned up negative results since he could not be found. He then worked on locating Detective Mike Paul since Lamont Reynolds claimed to have been working for him as a confidential informant. However, the results of that investigation proved that Mike Paul did not exist at the time of the crime, which contradicted Lamont Reynolds testimony, and only recently had this information become available. See Exhibit (A) for the search results of Mike Paul attached with Robin Hayslett's sworn affidavit, and also exhibit (B) for a history of said private investigation from 2011 to present including her original unsigned affidavit.

6. To clear up any misconception or propriety, defendant updated and made the federal court aware as to the status of the investigation in numerous correspondences which is documented as exhibit (C), as not only to the status and update of investigation, but also in great detail of the progress of the investigation to discount any mistaken thoughts or offense. At the beginning stages of the investigation communication was sent to the Hon. Colleen McMahon requesting to hold his Habeas Corpus in abeyance, and the reason why.

A review of the contents of that communication stated the following: *"My request for a stay was based on the fact that petitioner had ascertained newly discovered evidence by the way of an affidavit from the prosecution witness attesting to the fact that she (Robin Hayslett) had committed perjury when she testified falsely to seeing petitioner shoot and kill Jonidal Nelson."* Defendant submitted this communication on August 11, 2011. On October 3, 2012, defendant continued updating District Court as to the status of his on going investigation: *"The purpose of this correspondence is to inform your Honor of the fact that investigation has yet to be completed in his request to locate the witnesses that are needed to bring petitioner's claim to the forefront..."* There is also communication submitted on April 2, 2013, to the Hon. McMahon informing her of the following: *"to derail any misconception regarding the fact that petitioner has yet to file, it is imperative that your Honor be informed that petitioner has an on going investigation being done by private investigator Gary Teicher, of Floral Park, New York. Mr. Teicher has been working with petitioner since 2011. Relative to his pursuit of information of two witnesses, one who admitted to being a confidential informant at trial, handled by a detective Mike Paul who has never attested to this fact, nor did he testify at trial regarding said information. The relativity of this is based on the ground that confidential informant Lamont Reynolds was in Albany N.Y. on the very day that he testified to witnessing petitioner commit the crime. In furtherance, the mysterious Mike Paul has yet to be verified as Reynolds handler, and even existing for the matter.* As a matter of fact, trial counsel never investigated any of these factors prior to trial, and had he done so, the result would have been undoubtedly different. Correspondence dated March 16, 2014, was sent to the Hon. Broderick updating the then new District Judge as to the status and reply of defendant's investigation: *"The purpose of this correspondence is to inform your honor of the fact that the investigation has yet to be completed and the quest to locate the witnesses that are needed to bring petitioner's claim to the forefront is an extensive and time consuming process."* And lastly, correspondence dated May 5, 2014, to Hon. Judge Broderick states: *"The factors in delaying this process is locating a detective to whom a confidential informant reported the crime who may not exist. Trying to locate both witnesses who has no forwarding address who very well may be homeless, and lastly financial constraints in which two private investigators can be very costly."*

7. Defendant avers that the court's imposition that defendant failed to provide an affidavit by his attorney Patrick Brackley is not a requirement particularly due to the nature of the actual conflict of interest charge being lodged against defense attorney Brackley. Certainly due to such allegations, it would be virtually impossible to obtain an affidavit from Patrick Brackley. Thus in this instant case, the failure to provide an affidavit from Atty. Brackley cannot and should not be a reason for denying defendant's motion in light of the accusation against said attorney.

In *People v. Radcliff* 289 A.D.2d 533, 749 N.Y.S.2d 257, the court held:

> "*Defendant was not required to present affidavit of trial counsel to support his motion to vacate his conviction, where motion was based on counsel's alleged ineffectiveness in failing to communicate favorable plea offer to him.*"

8. The application initially submitted to this court on June 24, 2014, was adverse and hostile to defendant's trial attorney and requires the defendant to secure an affidavit from defense attorney or explain why trial counsel approached Robin Hayslett and encouraged her to provide false testimony against defendant would be wasteful and unnecessary. Likewise it has been held that most courts has not required affidavits of counsel, where as defendant is raising an ineffective assistance claim based on or an alleged error or omission of trial counsel. See, *People v. Park,* 211 A.D.2d 828, 621 N.Y.S.2d 379; *People v. Gonzalez,* 160 A.D.2d 724, 554 N.Y.S.2d 48.

9. Equally true, is that in *People v. Gil,* 285 A.D.2d 7, 729 N.Y.S.2d 121 (N.Y.A.D. 1st Dept. 2001), the first department held: *"Defendant was not required to submit affidavit from trial counsel, explaining counsel's tactics, to support defendant's motion to vacate conviction on the grounds of ineffective assistance of counsel; trial counsel had been disbarred prior to motion, and trial record, showing that trial counsel had agreed to trial on day of defendant's arraignment without any prior investigation or pretrial discovery and after waiving all suppression motions, permitted review on defendant's motion."*

Defendant submits that the issue before this court was clear from the inception of defendant's motion, submitted June 24, 2014, that defendant incurred a conflict of interest violation predicated upon the misconduct of Patrick Brackley. In fact, this concern was made clear by ADA Conroy in defendant's original motion in which the following was stated at the May 21, 2004 hearing at pg 6 L. 5-15 Mr. Conroy stated: *"MR. CONROY: Yes, judge, two things. One of which I'd like to approach with Mr. Brackley, but one of which is just to make clear that my office after having considered this issue, and I think it's actually a little bit larger than what you just described could have been removed as the law requires this application.*

*THE COURT: Should be off the case.*

*MR. CONROY: Should be off the case due to the nature of this relationship and it's appearance It's obviously not that we believe that there is or would be any wrong doing, but it's- it's the appearance of conflict that I'm not –I'm not entirely sure and I've talked to other people in my office, we're not entirely sure and be cured in this case and that brings me to my second point on which I'd like to approach."*

10. Certainly, ADA Conroy knew that defendant was in the mix of a conflict of interest situation, although he suggested that he believed there would be no wrong doing, but it was the appearance of a conflict. However, that belief is now refuted by the sworn and signed affidavit from Robin Hayslett, which supports that this matter of conflict of interest could not be cured.

11. Defendant avers, that even Mr. Brackley conceded that his representation would result in a conflict of interest. Here is what Mr. Brackley said: *"MR. BRACKLEY: Judge, the only thing I have to say is I recognize what the potential conflict is. It was me, in fact who represented that Von-Wynn have another lawyer, because obviously this is an extremely significant case for him, and his family, and it just so happened that that was the case. So, I think, judge, It's—I don't object to Mr. Conroy making whatever applications— I know him to be a fine assistant district attorney, if it turns out whatever he has there in anyway something that Mr. Wynn might not even want to waive or even be able to waive, I'll just be as involved in making that decision by myself. I would rather have him get the best he can get without any possible inference made against him or for him for that matter, that this is of a novel situation. I'm not willing to turn my back on him at this point, but I don't want to put him in a position where despite whatever relationship we have, I don't want to have over it because this is his life. So I will take whatever schedule you want, judge."*

12. Defendant avers, that the affidavit that is now attached to this application for renewal dispels Mr. Brackley's concerns for the defendant. Certainly, had Patrick Brackley, disclosed that he approached Robin Hayslett on behalf of his brother Ryan Brackley, and convinced her to falsify testimony against defendant, there would have been no question that Patrick Brackley would have surely been facing ethical charges and disciplinary action.

13. Thus, it is defendant's position, that this Court prematurely denied defendant's motion without affording him the opportunity to procure this information without a hearing pursuant to C.P.L. § 440.30(4)(d), stating: *"Accordingly, the motion is denied without a hearing because it is made solely by defendant and is unsupported by other reliable evidence."* Since then, defendant has provided the sworn and signed affidavit from Robin Hayslett and other supporting evidence. This Court is now collateral estoppel and bound by it's judgment which claimed defendant failed to supply sworn affidavits from Robin Hayslett and defendant's attorney Patrick Brackley. This Court is asked to take judicial notice that it's order and decision stated: *"In this motion, defendant has not submitted an affidavit from eyewitness Robin Hayslett or Patrick Brackley."* Defendant has since provided the sworn affidavit from Robin Hayslett and other reliable evidence and should not be required by law to provide an affidavit from his attorney Patrick Brackley.

This court must now reverse it's order and decision pursuant to C.P.L. § 440.30 (3)(a)(b)&(c), which states:

*"Upon considering the merits of the motion, the court must grant it without conducting a hearing and vacate the judgment or set aside the sentence, as the case may be if:*

*(a) The moving papers allege a ground constituting legal basis for the motion; and*

*(b) Such ground, if based upon the existence or occurrence of facts, is supported by sworn allegations thereof; and*

*(c) The sworn allegations of fact essential to support the motion are either conceded by the people to be true or are conclusively substantiated by unquestionable documentary proof."*

14.   In the original 440. moving papers alleging grounds constituting legal basis for the motion and that such ground is based upon the occurrence of facts, and is supported by sworn allegations thereof. Robin Hayslett's affidavit and the sworn allegation of fact essential to support the motion and has been conceded to be true by the people. This is substantiated by unquestionable documentary proof which has all been provided to this court in defendant's original 440.

15. Defendant will rely on the law as demonstrated in his original motion, along with his reply to the people's Affirmation in Opposition to defendant's motion. The issue before this court is clear defendant asserted that he received ineffective assistance of counsel based on the initial, actual conflict of interest claim which had been established earlier on in defendant's case.

*WHEREFORE*, for all the reasons set forth herein, defendant urges this court to grant renewal pursunat to CPLR § 2221 (e)(2). As stated in his original motion to vacate judgment, defendant respectfully request that this court vacate judgment and release defendant, as there is no question that there was an actual conflict of interest that prejudiced defendant, and resulted in defendant being his right to a fair trial, and his right to due process. As defendant is actually innocent, and should not be held to serve another day more that the time that he has already served. Or in the alternative, grant a hearing as there are matters that are evidentiary in nature, and requires a finding of fact, to address the merit of those claims being asserted here and now. and for further relief that this court deem just and proper.

Von Wynn
Green Haven Corr. Fac
Post Office Box 4000
Stormville, N.Y 12582

Sworn to before me This

_____Day Of December, 2014

NOTARY PUBLIC

# Exhibit O

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 61

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK<br><br>-against-<br><br>VON WYNN,<br><br>Defendant. | AFFIRMATION IN OPPOSITION TO DEFENDANT'S APPLICATION FOR RENEWAL OF MOTION PURSUANT TO C.P.L. §440.10<br><br>Ind. No. 662/2004 |

DAFNA YORAN, an attorney admitted to practice before the Courts of this State,

affirms under penalty of perjury that:

1. I am an Assistant District Attorney in the New York County District Attorney's

Office and am assigned to the prosecution of the above-captioned case.

2. In the early morning hours of September 26, 2003, defendant's cousin, Rodney

Wilson, got into a verbal altercation with Jonadial Nelson in a courtyard of the Lincoln

Projects in upper Manhattan.  Nelson was with his girlfriend; Wilson was with his

girlfriend, Robin Hayslett a.k.a. Finley, defendant, and another man. As the argument

escalated, defendant drew a gun and shot Nelson as he ran, hitting him six times in the

arm and back and causing his death.

1

3.  On October 6, 2003, defendant was interviewed by a detective and stated that he had not been present at the scene of the killing of Jonadial Nelson.  On November 14, 2003, Robin Hayslett, who had also previously denied being present and observing the murder was incarcerated on another matter.  Sometime in December of that year, Ms. Hayslett spoke to the then assigned prosecutor, A.D.A. Ryan Brackley, and told him that she had observed defendant, with whom she was familiar, shoot Mr. Nelson.

4.  On February 9, 2004, defendant was interviewed again.  He adamantly denied any knowledge of the homicide of Mr. Nelson.  Defendant was then placed in a lineup and identified as the shooter by an eyewitness named Lamont Reynolds.  Defendant was then interviewed again by detectives and admitted to being present at the scene of the confrontation, but insisted that he had left immediately prior to the shots being fired. However, defendant asked the detectives to explain to him the meaning of "justifiable homicide."  On February 10, 2004, Defendant was interviewed by A.D.A. Ryan Brackley. Again, defendant claimed that he had left the scene immediately prior to the shooting, but asked how much time he would have to serve if the shooting was in self-defense. Defendant was then arrested.[1]

5.  On February 11, 2004, Robin Hayslett entered into a cooperation agreement with the District Attorney's Office (Hayslett Cooperation Agreement was attached to the

---

[1] All of the facts cited in paragraphs 2-4 of this affirmation are taken from the summary of the trial transcript in the People's Response Brief to defendant's direct appeal which was attached to the People's September 15, 2014, response to defendant's prior motion to vacate judgment as Exhibit A.

People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit B), and testified in the grand jury regarding defendant's identity as the shooter of Mr. Nelson (Grand Jury Minutes of Ms. Hayslett's testimony were attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit C).

6.   On the following day, February 12, 2004, defendant was arraigned in Criminal Court. At the arraignment, defendant was assigned a Legal Aid attorney named Keith Cavett (DANY Arraignment Info Sheet was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit D). On February 26, 2004, defendant was arraigned in Supreme Court. He was then represented by Lori Cohen of the 18b Panel (Court Action Sheet was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit E).

7.   On April 8, 2004, a newly hired attorney appeared for the first time on behalf of defendant. That attorney was Patrick Brackley, the brother of A.D.A. Ryan Brackley who had been the original prosecutor on the case. By that point, it was clear that A.D.A. Ryan Brackley was leaving the District Attorney's Office and that the case would be reassigned (Minutes of the 4/8/2004 proceeding were attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit F). The potential conflict regarding defendant's representation by Patrick Brackley were then thoroughly explored in the following several adjournments and a Gomberg hearing was conducted.

3

8.    The case proceeded to trial before this Court on February 15, 2005.  Defendant was represented by Patrick Brackley and Lori Cohen, and the prosecutor was A.D.A. Thomas Schellhamer.  In the course of the trial, Robin Hayslett testified in accordance with her grand jury testimony that she had observed defendant shoot Mr. Nelson.  Lamont Reynolds also testified that defendant was the shooter.  Their testimony was corroborated by another witness who had seen defendant at the scene but had not seen the actual shooting, the presence of defendant's grandmother's car at the scene, as well as defendant's admission that he was at the scene and his inquiries about the consequences of a shooting in self-defense.  (See, Exhibit A, attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment).   Defendant was convicted of Murder in the Second Degree, P.L. §125.25(1) and sentenced to a prison term of from 25 years to life.

9.    On appeal, one of defendant's chief complaints was that he had been denied his right to the assistance of conflict-free counsel because of the fraternal relationship between his retained attorney and the former prosecutor. The Appellate Division, First Department, rejected defendant's conflict of interest claim as well as all of his other arguments and affirmed his conviction.  People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009), leave denied, 14 N.Y.3d 807 (2010).

10.  On May 13, 2011, defendant filed a Habeas Corpus petition in federal court advancing the same arguments which had been rejected by the Appellate Division, First

4

Department.  On July 14, 2011, defendant moved for a stay in his Habeas Corpus Petition to give him the opportunity to file a Motion to Vacate Judgment pursuant to CPL §440.10 in state court.  The basis for that request was an affidavit from an investigator who states that he had interviewed Robin Hayslett on May 12, 2011, and that she claimed that Patrick Brackley had convinced her to testify against defendant in order to help his brother A.D.A. Ryan Brackley and that she therefore testified falsely against defendant.[2]  While acknowledging that defendant "that such an act on the part of a defense attorney seems too egregious to be believable," the Court agreed to stay his petition (Federal Court's stay order was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit G).

11.  On June 24, 2014, defendant filed a motion to vacate judgment pursuant to CPL §440.10.   The sole grounds was the aforementioned 2011 affidavit of an investigator claiming that he had interviewed Robin Hayslett and that she stated that she had been convinced to testify against defendant by Patrick Brackley on behalf of his brother A.D.A. Ryan Brackley, and that she consequently falsely testified against defendant (Defendant's Exhibit D, which was attached to his June 24, 2014 Motion to Vacate Judgment).  Defendant contended that the said affidavit demonstrated an actual conflict which he did not waive in his attorney's representation of him, and that Robin Hayseltt's recantation of her trial testimony demonstrated his actual innocence.

---

[2] That affidavit was attached to defendant's June 24, 2014 Motion to Vacate Judgment as Exhibit D.

12. (On September 15, 2015,) the People submitted an affirmation and an accompanying memorandum of law in opposition to defendant's June 24, 2014 motion to vacate his judgment of conviction, arguing that defendant's motion should be denied because the claim that Robin Hayslett was convinced to testify against defendant by his attorney is not only too egregious to be believed but belied by the fact that Robin Hayslett entered into a cooperation agreement and testified in the grand jury in a manner consistent with her later trial testimony prior to Patrick Brackley's engagement and entrance into the case. The People argued that the allegation attributed to Hayslett — that Patrick Brackley convinced her to testify against defendant — must be false, her hearsay vague recantation cannot be credited, and defendant's motion to vacate the judgment against him should be denied without a hearing.

13. On November 6, 2014, this Court denied defendant's motion to vacate judgment, citing the fact that defendant had provided only hearsay evidence in support of his claim that his trial attorney had convinced an eyewitness to falsely testify against him.

14. On December 5, 2014, defendant submitted the instant Application for Renewal of Motion Pursuant to C.P.L. §440.10. In support of his application, defendant attaches an affidavit signed by Robin Hayslett on November 12, 2014 (attached to defendant's Application as Exhibit A). According to the investigator who secured Ms. Hayslett's signature, the affidavit had been previously prepared by defendant, but was read to Ms.

6

Hayseltt and she signed it (see p. 3 of Gary Teicher's November 11, 2014 letter to defendant, attached to Defendant's Application as part of Exhibit A).   The affidavit repeats defendant's prior allegations that in late 2004 or early 2005, Robin Hayslett was approached by defendant's attorney, Patrick Brackley, who promised her that she would receive a lighter sentence in her own case if she cooperated with his brother, A.D.A. Ryan Brackley, and that she consequently testified falsely against defendant (see Defendant's Application Exhibit A). In further support of his application for renewal, defendant alleges that a detective who had had contact with another witness against him, about whom testimony was elicited at trial from both the witnesses and the case detective, "did not exit at the time of the crime" because defendant's investigators were not able to locate him (Defendant's Application, at paragraph 5).

15.  This affirmation and an accompanying memorandum of law are submitted in opposition to defendant's Application for Renewal of Motion Pursuant to C.P.L. §440.10.  As argued in the People's response to defendant's prior motion to vacate judgment, the claim that Robin Hayslett was convinced to testify against defendant by his attorney is not only too egregious to be believed but belied by the fact that Robin Hayslett entered into a cooperation agreement and testified in the grand jury in a manner consistent with her later trial testimony months prior to Patrick Brackley's engagement and entrance into the case.  Therefore, even though the allegation that Patrick Brackley struck a deal with Robin Hayslett for her to testify against defendant

7

is now sworn, it is still vague and patently false.   Equally devoid of merit is defendant's

claim that a detective who was referred to at his trial "didn't exist" in 2004 because his

investigators could not locate him.   Therefore, defendant's Application for Renewal of

Motion Pursuant to C.P.L. §440.10 should be denied without a hearing

June 11, 2015

Cyrus R. Vance, Jr.
District Attorney
New York County

By:

Dafna Yoran
Assistant District Attorney
Of Counsel
212-335-9573

8

## Memorandum of Law

Defendant's June 24, 2014 Motion to Vacate Judgment was based on an affidavit in which an investigator swore that in 2011 Robin Hayslett told him that she had been approached by defendant's attorney, Patrick Brackley, in 2004 or 2005 and that he told her that if she cooperated with his brother A.D.A. Ryan Brackley by testifying against the defendant, he would make sure that she received a lighter sentence in her own case; that she consequently "made a deal" with Patrick Brackley to testify against defendant in exchange for a lighter sentence in her own case and that she then testified falsely against defendant. (Defendant's Exhibit D, which was attached to his June 24, 2014 Motion to Vacate Judgment). Defendant's instant Application for Renewal of his motion to vacate judgment is based on a 2014 affidavit actually signed by Robin Hayslett putting forth the identical allegations. While these allegations are now sworn, they still constitute nothing more than a vague and patently false recantation of one of the two eye witnesses against defendant at trial. As such, they do not warrant a hearing.

As the federal court handling defendant's Habeas Corpus petition noted, this alleged conduct by a defense attorney is "too egregious to be believable" (Federal Court's stay order which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit G). After all, for a defense attorney to secure the cooperation of a witness against his own client would violate all rules of ethics and would be grounds for his disbarment. There is no conceivable

9

2004 (Cooperation Agreement, which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit B).  On the same day, she testified against defendant in the grand jury, identifying him as the shooter (Grand Jury Minutes, which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit C).  At that time, defendant was not yet represented by any attorney.  Indeed, defendant had not been arraigned in criminal court until the next day, February 12, 2004.  At that point, he was assigned a Legal Aid attorney named Keith Cavett (DANY Arraignment Info Sheet which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit D).  In the subsequent two weeks, defendant's case was transferred to another attorney, Lori Cohen, and On February 26, 2004, Ms. Cohen represented defendant at his Supreme Court.  (Court Action Sheet attached, which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit E).   It was only sometime after his supreme court arraignment that defendant hired Patrick Brackley.  Patrick Brackley appeared along with Lori Cohen on behalf of defendant for the first time on April 8, 2004 (Minutes of the 4/8/2004 proceeding, which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit F). Since Patrick Brackley had not yet been retained and had no connection to the defendant or to his case prior to the date that Robin Hayslett's entered into a cooperation agreement with A.D.A. Ryan

11

Brackley and testified in the grand jury, the central allegation inn Hayslett's affidavit – that she entered that cooperation agreement and testified against defendant because she had been convinced to do so by defendant's attorney Patrick Brackley – must be entirely false.[4]

That the allegation in the affidavit regarding Patrick Brackley is obviously fictional renders Robin Hyslett's recantation suspect as well. "'[I]t is ancient learning that '[there] is no form of proof so unreliable as recanting testimony.'" People v. Donald, 107 A.D.2d 818 (2nd Dept. 1985) quoting, People v. Shilitano, 218 N.Y. 161 (1919). In fact, post-trial recantations are considered so unreliable that New York courts have regularly denied motions to vacate judgment based on recantations without conducting hearings.' See, People v. Lugo, 25 A.D.3d 460 (1st Dept. 2006); People v. Burgos, 19 A.D.3d 1126 (4th Dept. 2005); People v. Cintron, 306 A.D.2d 151 (1st Dept. 2003); People v. Edmonson, 300 A.D.2d 317 (2nd Dept. 2002); People v. Bermudez, 243 A.D.2d 367 (1st Dept. 1997); People v. Davenport, 233 A.D.2d 771 (3rd Dept. 1996); People v. Baxley, 194 A.D.2d 681 (2nd Dept. 1993); People v. Allison, 119 A.D.2d 1005 (4th Dept. 1986); People v. Donald, 107 A.D.2d 818 (2nd Dept. 1985).   Certainly, in this case, where the recantation contains an obviously false accusation, an evidentiary hearing is unwarranted.

---

[4] It bears note that by the time Patrick Brackley entered the case on behalf of defendant, it was clear that Ryan Brackley was leaving the District Attorney's Office and that the case would be reassigned (Minutes of 4/8/2004 appearance, which was attached to the People's September 15, 2014 response to Defendant's prior Motion to Vacate Judgment as Exhibit E). Therefore, the stated motive in Hayslett's affidavit for Patrick Brackley's alleged misconduct – to help his brother in the prosecution of defendant – could not possibly be true. It further bears note that Robin Hayselt swears in her affidavit that she was approached by Patrick Brackley in "late 2004 or early 2005" but, as stated above, she had already entered a cooperation agreement and testified in the grand jury against defendant on February 11, 2004. Therefore, she could not have decided to falsely testify against defendant because of a visit from Patrick Brackley in late 2004 or early 2005.

The Appellate Division, First Department's 2006 decision in People v. Cintron, 25 A.D.3d at 460, is instructive. In that case, the defendant submitted an uncorroborated recantation affidavit which was made ten years after trial and featured accusations of "highly improbable" gross misconduct by the prosecutor. The Appellate Division, First Department upheld the trial court's decision to deny the Cintron defendant's motion to vacate judgment without conducting an evidentiary hearing. In the instant case, too, defendant submitted an uncorroborated affidavit which was made ten years after trial, and which features accusations of highly improbable – in fact, impossible according to the timeline – gross misconduct by the defense attorney and the prosecutor. Pursuant to Cintron, defendant's motion to vacate judgment should therefore be denied without a hearing as well.

The conclusion that defendant's motion should be denied without a hearing is further supported by the fact that Robin Hayslett's recantation is conclusory (there is no information in the affidavit regarding the facts of the underlying case other than the statement that she testified "falsely" against defendant), and does not alter the testimony of the other witness at trial who identified defendant as the shooter. See, People v. Edmonson, 300 A.D.2d at 317 (hearing was unnecessary for a "conclusory recantation" by a witness); People v. Davenport, 233 A.D.2d at 771 (hearing unnecessary where recantations were unsworn, inherently suspect, and did not alter the testimony of another eyewitness).

13

That defendant couches his arguments in terms of an unwaived conflict of interest, contending that he would not have waived his attorney's conflict at the <u>Gomberg</u> hearing had he been aware of the allegations of gross misconduct made in the affidavit, does not alter the nature of the affidavit as a patently unreliable recantation, which is insufficient to warrant a vacateur of judgment or an evidentiary hearing. <u>People v. Dukes</u>, 106 A.D.2d 906 (4th Dept. 1984) ("[t]hat a portion of the recanted affidavit alleges misconduct by police and prosecution [] does not alter its nature as recanted evidence, which we reject as incredible").

Equally devoid of merit is defendant's claim that a detective who was mentioned at his trial "did not exist at the time of the crime" (Defendant's Application at paragraph 5). At trial, the second eyewitness against defendant, Lamont Reynolds, testified that the morning after the shooting he reported his observations to Detective Mike Paul, who said that he did not have jurisdiction over the case, but referred the witness to the appropriate detectives (see pages 18-19 of the summary of the trial transcript in the People's Response Brief to defendant's direct appeal which was attached to the People's September 15, 2014, response to defendant's prior motion to vacate judgment as Exhibit A). Defendant concludes that this detective did not exist in 2004 because the only two detectives named Michael Paul who were on the force in 2004 worked at the 10th and the 17th precinct at the time, and not in East Harlem, where the crime took place (see letter from Gary Teicher in Defendant's Exhibit A). Of course, the witness had testified at trial that he had been

14

told by Detective Paul that he did not have jurisdiction over the crime, so it is in fact unlikely that Detective Paul worked in East Harlem at the time of the crime. Therefore, it makes sense that the Detective Paul in question was one of the two Michael Pauls who worked as detectives at the 10th precinct and the 17th precinct in 2004. That defendant's investigators were unable to locate either of these detectives, who have since retired, in no way supports defendant's conclusion that Detective Michael Paul "did not exit at the time of the crime."

In sum, defendant's application to renew his motion to vacate judgment is based on a conclusory and suspect recantation that contains accusations of gross misconduct on the part of defendant's attorney, which are easily disproved with documentary evidence establishing the timeline of the case. Moreover, defendant's claim that a detective mentioned at his trial did not exist at the time of the crime is baseless. Consequently, defendant's motion should be denied without a hearing.

15

# Exhibit P

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK

Respondent

VON WYNN

Defendant-Appellant.

NOTICE OF APPLICATION TO JUSTICE OF THE APPELLATE DIVISION FOR CERTIFICATE GRANTING LEAVE TO APPEAL TO APPELLATE DIVISION........ N.Y. CRIM PROC. LAW.........................
§ 460.15.......................................................
Ind. 662/04.................................................

PLEASE TAKE NOTICE, that the above named defendant appellant will make an application before the Hon. Judith J. Gishe at her chambers, located at 27 Madison Avenue, New York, New York, 10010, on the 11th day of December 2014, at 10:00 in the forenoon of that day for a certificate pursuant to New York Criminal Procedure Law § 460.15 granting permission to appeal and certifying that the above entitled cause involves questions of law and fact which ought to be reviewed by the Appellate Division, First Department and allowing an appeal to said Court from the order of the Supreme Court of the State of New York , New York County entered on the 6th day of November, 2014, denying a motion by the defendant made pursuant to C.P.L § 440.10(1)(g(h)

to vacate judgment.

Dated: December 11, 2014
Stormville, New York 12582

RESPECTFULLY SUBMITTED,

Von Wynn
Green Haven Corr. Fac.
Post Office Box 4000
Stormville, N.Y. 12582

RECEIVED
DEC 23 2014
SUP COURT, APP. DIV.
FIRST DEPT.

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION: FIRST DEPARTMENT

THE PEOPLE OF THE STATE OF NEW YORK

                        Respondent,

VON WYNN

                    Defendant-Appellant.

AFFIDAVIT IN SUPPORT OF NOTICE OF APPLICATION TO JUSTICE OF THE APPELLATE DIVISION FOR CERTIFICATE GRANTING LEAVE TO APPEAL TO APPELLATE DIVISION............................
N.Y. CRIM. PROC. LAW § 460.25..............

STATE OF NEW YORK)
COUNTY OF DUTCHESS)ss.:

    I, Von Wynn, being duly sworn deposes and says:

    1. I am the defendant-appellant in the above entitled matter and I assume familiarity with all the facts and circumstances herein.

    2. This affidavit is submitted in support of an application pursuant to N.Y. Crim. Proc. Law § 460.15 and this courts rules § 670.6 (c), for a certificate granting permission to appeal to this court from an order of the Supreme Court, New York County (Hon. Bonnie Wittner, J.S.C.) dated November 6, 2014, denying defendant's motion to set aside his sentence pursuant to N.Y. Crim. Proc. Law. § 440.10 (1) (g)(h).

    3. In accordance with the requirements of this court's rule § 670.6(c), the following information is supplied:

        *(a) The applicant is Von Wynn who is presently housed at the Green Haven Correctional Facility, Located at Post Office Box 4000, Stormville, New York 12582-4000*

        *(b) The New York County Grand Jury Indictment Number is 0662/04.*

        *(c) The question of law of fact which ought to be reviewed is whether the lower court properly denied a motion to vacate judgment pursuant to N.Y. Crim. Proc. Law § 440.10 (1)(g)(h), based on an actual conflict of interest which denied defendant-Appellant a fair trial according to the U.S. Constitution (5)(6)(14).*

        *(d) No prior application for such certificate has been made.*

## PROCEDURAL HISTORY OF THE CASE

4. Defendant-Appellant states with all due respect to this Honorable Court, and in the interest of brevity, defendant-appellant will petition this Court to refer to the procedural history as maintained in Def. Appellant's original motion pursuant to C.P.L. 440.10 (1) (g) (h), which has become a subject of this request for a certificate granting permission to appeal to this court as there is a question of law or fact claim that ought to be reviewed by this Hon. Court. In addition, appellant has also enclosed a copy of the renewal marked as exhibit (A).

## THE MOTION PURSUANT TO C.P.L. 440.10

5. Appellant states that in the interest of duration, defendant-appellant will not reprint his initial original motion due to the length of it but, instead will attach it as exhibit (A), along with appellant motion for renewal pursuant to C.P.L.R. § 2221(e)(2), and will only incorporate those arguments as contained in his motion in this request for granting his certificate for leave to appeal, as there is a question of law or fact claim that ought be reviewed by this Hon. Court.

## TRIAL COURT'S OPINION

6. Appellant states that a copy of the trial Court's opinion has been attached as exhibit (b) to this request for a certificate for permission granting leave to appeal. The purpose for attaching said document is based on the interest of duration. However, some references will be made to the trial court's opinion, as there lies a question of law or fact which claim ought to be reviewed, which is again the subject of this request for a certificate seeking permission granting appeal.

7. The Decision and Order from the lower court was based on the ground that the motion was denied without a hearing. In that dcision, the Court stated: "*Accordingly, the motion is denied without a hearing because it is made solely by defendant and is unsupported by other reliable evidence.*" First it should be noted as will be revealed in the attached exhibits that appellant was attempting to obtain the affidavit that is now the subject of this request for permission seeking a certificate for leave to appeal. In direct conjunction with this point, appellant will explain as brief as possible his efforts in hiring a private investigator, who then began to conduct his investigation. This investigation lead directly to the affidavit of Robin Hayslett and appellant did not receive this evidence until November 21, 2014. However the lower Court ruled on appellant's motion on November 6, 2014, and appellant did not obtain that determination until November 24, 2014, which resulted in appellant submitting a motion pursuant to C.P.L.R. § 2221(e)(2).

It is clear from the record that appellant was never given a chance to proffer this evidence, and based on the determination from the lower Court, the decision to deny was merely to silence appellant because of the misconduct of not only appellant's trial attorney, but also trial attorney's brother who was a A.D.A. for the people, and was familiar with the Court. This information has been amply demonstrated in the attached exhibits and appellant humbly petitions this Hon. Court to review the entire documents which will reveal a gross miscarriage of justice.  Since defendant has provided the sworn and signed affidavit from Robin Hayslett and other supporting evidence, which is supplied in appellant's motion for renew pursuant to C.P.L.R § 2221(e)(2), as referenced in the procedural history of this request granting this certificate for leave to appeal, and since the law does not require a defendant to provide an affidavit from an attorney, particularly when that attorney has been accused of violating his right to effective assistance of counsel, denying him his 6th amendment right. Appellant maintains that there is a question of law of fact which should be reviewed.

8. Defendant Appellant also states that he should not be held to the standard as set forth by trial court which was stated: *"defendant has not submitted an affidavit from the eyewitness, Robin Hayslett, or attorney, Patrick Brackley..."*  Defendant states that he should not be held accountable for obtaining an affidavit from former attorney based on the fact that an affidavit implicating said attorney in such a type of misconduct would go against all ethical standard, and would require disciplinary sanctions.

In *People v. Radcliff, 289 A.D.2d 533, 749 N.Y.S.2d 257,* the court held:

> *"Defendant was not required to present affidavit of trial counsel to support his motion to vacate his conviction where motion was based on counsels alleged ineffectiveness in failing to communicate favorable plea offer to him."*

9. Appellant submits, that the lower Court's premature decision to deny appellant relief without hearing or affording appellant an opportunity to procure an affidavit from Robin Hayslett, and compelling appellant to obtain, and provide an affidavit from his attorney knowing the full scope of appellant's claim of conflict of interest, acted to deprive appellant the opportunity to be heard, by the lower Court.  Appellant avers, that there is a severe  question of law or fact that should  be reviewed, as there is no doubt that appellant's right to effective assistance of counsel was violated, which resulted in appellant being denied his right to a fair trial, and acted to deprive him of his right to due process.   This Court is now asked to grant this certificate for leave to appeal as there is a question of law and fact claim that ought be reviewed.

WHEREFORE, for the foregoing reasons it is respectfully submitted that appellant's application for a certificate granting leave should be granted in all due respect.

Dated: December 11, 2014
Stormville, N.Y. 12582

RESPECTFULLY SUBMITTED

Von Wynn
Post Office Box 4000
Stormville, New York 12582

Sworn To Me Before This

11th Day of December

NOTARY PUBLIC
KEITH J. SPOSATO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SP6248188
Qualified In Putnam County
My Commission Expires September 19, 2015

# Exhibit Q



**DISTRICT ATTORNEY**
OF THE
**COUNTY OF NEW YORK**
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

January 30, 2015

Lester Dickinson
Motions Clerk
New York Supreme Court
Appellate Division
First Department
27 Madison Avenue
New York, New York 10010

Re:   People v. Von Wynn
      Ind. No. 662/04
      CPL Section 460.15 Response
      Calendar Date: 2/27/15

Dear Mr. Dickinson:

This letter is submitted in opposition to defendant's application for a certificate granting leave to appeal from an order of the Supreme Court, New York County (Bonnie Wittner, J.), dated November 6, 2014. That order denied defendant's motion to vacate the judgment pursuant to CPL Section 440.10.

By a March 24, 2005 judgment of the Supreme Court, New York County (Charles Solomon, J. at Gomberg inquiry; Bonnie G. Wittner, J. at hearings and trial), defendant was convicted, after jury trial, of Murder in the Second Degree (Penal Law § 125.25[1]) and sentenced him to an indeterminate prison term of 25 years to life.

In the early morning hours of September 26, 2003, defendant's cousin, Rodney Wilson, got into a verbal altercation with Jonadial Nelson in a courtyard of the Lincoln Projects in upper Manhattan. Nelson was with his girlfriend; Wilson was with his girlfriend, defendant, and another man. As the argument escalated, defendant drew a gun and shot Nelson as he ran, hitting him six times in the arm and back. Wilson's girlfriend, as well as a passer-by who knew Wilson, saw defendant firing the gun. Defendant, Wilson, and the third man fled the scene. Nelson died from his wounds that same morning. After Wilson's girlfriend came forward to police several months later, defendant was arrested on February 9, 2004. The passer-by who saw defendant shoot Nelson, identified defendant in a line-up later that

DISTRICT ATTORNEY COUNTY OF NEW YORK

2

day. In oral statements to police and a videotaped statement to a prosecutor, defendant denied having been present at the time of the shooting.

By New York County Indictment Number 662/2004, filed February 11, 2004, defendant was charged with Murder in the Second Degree (Penal Law § 125.25[1]). On June 10, 2004, the Honorable Charles H. Solomon presided over a Gomberg inquiry at which defendant waived the potential conflict posed by the fact that one of his defense attorneys was the brother of the Assistant District Attorney who took his defendant's statement and might be called as a witness at trial. Following a Huntley/Wade hearing on August 19 and 24, 2004, the Honorable Bonnie G. Wittner, in a written order and decision dated October 5, 2004, denied defendant's motions to suppress his statements and the identification evidence against him. Following a mid-trial Rodriguez hearing on February 22, 2005, Justice Wittner denied defendant's motion to suppress the identification made by Robin Hayslett, Wilson's girlfriend. Justice Wittner presided over defendant's jury trial, which began on February 17, 2005, and concluded on March 4, 2004, when the jury convicted him as charged.

On direct appeal, defendant complained that he was denied his right to the assistance of conflict-free counsel, that the court incorrectly declined to instruct the jury on the defense of justification, that the court failed to respond adequately to certain jury requests during deliberation, and that the court considered improper factors at defendant's sentencing. Defendant also raised numerous evidentiary complaints; specifically, that the court improperly admitted portions of his statement to police that were not included in the People's Voluntary Disclosure Form, limited his ability to impeach several of the People's witnesses, admitted a prior consistent statement of one of the People's witnesses, and admitted improper hearsay evidence.

In an opinion dated November 5, 2009, this Court affirmed the judgment of conviction. In so doing, the Court held that defendant was not deprived of his right to conflict-free counsel because defendant chose to retain an attorney who was the brother of a former prosecutor who had handled the initial stages of this case and who had taken a videotaped statement from defendant. The Court found that defendant made a valid waiver of any potential conflict arising from this situation when, at several court appearances and during a thorough inquiry pursuant to People v Gomberg, 38 N.Y.2d 307 (1975), the court warned him of the possible disadvantages of this arrangement. Moreover, the Court found that defendant also consulted with a second, conflict-free attorney regarding the decision to remain with the potentially conflicted attorney, and that it was the

DISTRICT ATTORNEY COUNTY OF NEW YORK

3

second attorney who cross-examined the lead attorney's brother at both the suppression hearing and trial. Further, the Court determined that there was no merit to defendant's suggestion on appeal that, despite all these precautions, there was an unwaivable conflict. People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009)

Moreover, the Court also found that the trial court properly exercised its discretion when it precluded defendant from introducing a document reflecting a prior inconsistent statement after the witness had admitted making the statement. At the same time, the Court held that the trial court properly permitted the People, with regard to another witness, to introduce evidence that defendant characterized as a prior consistent statement, but which actually clarified other portions of the same statement that had been elicited on cross-examination. The Court also determined that the trial court properly received portions of defendant's statement to a detective for which the People had not provided timely notice, because the detective testified about the complete statement at the suppression hearing and defendant had a full opportunity to litigate the issue, and that the trial court properly declined to charge justification, since there was no reasonable view of the evidence that defendant believed, or had any reason to believe, that the victim was using or about to use deadly physical force. In addition, the Court held that, by failing to object, or by failing to request a further remedy following corrective action, defendant failed to preserve any of his remaining challenges to the court's conduct of the trial, and although the Court declined to review those claims in the interest of justice, as an alternative holding, the Court also rejected defendant's claims on the merits. Finally, the Court held that the record did not establish that defendant's sentence was based on any improper criteria, and it perceived no basis for reducing the sentence or remanding for resentencing. People v. Wynn, 67 A.D.3d at 423.

As pertinent here, in papers dated June 2014, defendant moved pursuant to CPL 440.10. Framing his claim as newly-discovered evidence, defendant argued that his trial counsel had coerced a witness, Robin Haslett, to testify falsely against defendant at trial. Defendant also asserted that he was denied a fair trial because his lawyer had a preexisting relationship with the prosecutor who conducted the initial investigation of the case.

In a written opinion dated November 6, 2014 and stamped November 18, 2014, Justice Bonnie Wittner denied defendant's motion. In so doing, the court found that defendant offered only hearsay evidence in support of his claim that his trial counsel had convinced a witness to testify falsely against him. In particular, Justice Wittner found that defendant had not provided an affidavit by

DISTRICT ATTORNEY COUNTY OF NEW YORK

4

his trial lawyer or by the witness, Robin Hayslett.[1] Thus, relying on CPL 440.30(4)(d), the court denied defendant's motion.

In papers dated December 2014, defendant now requests leave to appeal the denial of his post-judgment motion. Defendant advances essentially the same claims in his current motion that he did below.

However, for the reasons set forth in the court's decision, the court properly denied defendant's motion.

Since there exists no question of law or fact which ought to be reviewed by this Court, defendant's application for a certificate granting leave to appeal should be denied.

Respectfully submitted,

Patricia Curran
Assistant District Attorney
Appeals Bureau
(212) 335-4188

cc:   Vonn Wynn
      05-A-1844
      Green Haven Correctional Facility
      P.O. Box 4000
      Stormville, New York 12582

---

[1] Although defendant now includes a copy of an affidavit, dated November 12, 2014, from Robin Hayslett with his instant motion, since the court below found that defendant had not included such an affidavit with his motion pursuant to CPL 440.10, it appears that defendant did not timely provide that affidavit to the court below. In that event, the affidavit is not part of the record for this Court's consideration. See People v. Kinchen, 60 N.Y.2d 772 (1983).

# Exhibit R

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : FIRST JUDICIAL DEPARTMENT

BEFORE: Hon. Angela M. Mazzarelli,
      Justice of the Appellate Division

-------------------------------------------X
The People of the State of New York,

                                               M-396
                                               Ind. No. 662/04

             -against-                    CERTIFICATE
                                           DENYING LEAVE

Von Wynn,

                    Defendant.
-------------------------------------------X

      I, Angela M. Mazzarelli, a Justice of the Appellate
Division, First Judicial Department, do hereby certify that,
upon application timely made by the above-named defendant for a
certificate pursuant to Criminal Procedure Law, sections 450.15
and 460.15, and upon the record and proceedings herein, there is
no question of law or fact presented which ought to be reviewed
by the Appellate Division, First Judicial Department, and
permission to appeal from the order of the Supreme Court,
New York County (Bonnie G. Wittner, J.), entered on or about
November 6, 2014, is hereby denied.

                                            Justice

Dated:    New York, New York
         March 30, 2015

 APR 2 3 2015

# Exhibit S

Supreme Court
of the
State of New York

Part 61 -New York County

-----------------------------------------------------x

**The People of the State of New York**

-against-

VONE WYNN,

Defendant

-----------------------------------------------------x

**INDICTMENT: 00662-2004**

**MOTION FOR: CPL §440.10**

**CALENDAR DATE: August 13, 2015**

SEP 0 3 2015

DATE
I hereby certify that the foregoing
paper is a true copy of the original
thereof, filed in my office.

O**rdered** that upon the papers submitted, this motion is hereby

*Milton Adam Tingling*

County Clerk and Clerk of the
Supreme Court New York County
OFFICIAL USE

**GRANTED**_____

**DENIED** *based on Peoples' affirmation in
response, dated 16/11/15. I have received Defendant
motion and reply, dated June 26 2015.*

Date  8/14/15_____   Hon. _____

**Hon. B. Wittner**

PT. 61  AUG 1 4 2015

# Exhibit T

SUPREME COURT OF THE STATE OF NEW YORK

APPELLATE DIVISION-FIRST DEPARTMENT

RECEIVED
OCT 1 4 2015
APPELLATE DIVISION, SUPREME
COURT, FIRST DEPARTMENT

------------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK
                Respondent,

                                                  NOTICE OF

        against                                  APPLICATION

Von Wynn,

                      Defendant-Appellant,        Ind # 0662/04

------------------------------------------------------------------X

      **PLEASE TAKE NOTICE** that the above-named defendant-appellant will make application before the Appellate Division, First Department, at the courthouse located at 27 Madison Avenue, New York, NY 10010, on the 5th day of November 2015, at 10 o'clock in the afternoon of that day, for a certificate pursuant to N.Y. Crim. Proc. Law 460.15 granting permission to appeal and certifying that the above entitled cause involves questions of law and fact which ought to be reviewed by the Appellate Division, First Department, and allowing an appeal to the said court from the order of the Supreme Court, County of New York dated the 6th of November, denying, without a hearing a motion by the defendant made pursuant to N.Y. Crim. Proc. Law 440.10, and from each and every part of said order.

1

Dated: October 2, 2015.

Respectfully submitted,

Von Wynn 05A1844
Green Haven CF
Post Office Box 4000
Stormville, NY 12582

To:   Hon. Cyrus R. Vance
      New York County District Attorney
      One Hogan Place
      New York, New York 10037

2

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION-FIRST DEPARTMENT
-------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

                               Respondent,

-against-

Von Wynn,

                          Defendant-Appellant
-------------------------------------------------------------------X

**AFFIDAVIT IN SUPPORT OF APPLICATION FOR LEAVE TO APPEAL**

Ind # 0662/04

STATE OF NEW YORK   )

COUNTY OF DUTCHESS) ss.:

     I, Von Wynn, being duly sworn depose and state:

     1.    I am the above named defendant-appellant and make this affidavit in support of a motion for leave to appeal to this Court pursuant to CPL 450.15, 460.15, and 22 NYCRR 600.3, from a decision of the Supreme Court, New York County, Honorable Bonnie J. Wittner, rendered August 16, 2015, denying defendant's motion to vacate judgment of conviction pursuant to 440.10 (1)(g)(h). The motion contended that a conflict of interest existed between defense counsel and defendant during trial that defendant's private investigator recently obtained a signed affidavit from one of the prosecution's witness.

     2.    No previous application has been made.

1

3.      Defendant-Appellant attaches hereto and makes a part hereof:

  a.  Defendant's pro-se CPL §440.10 motion as Exhibit A;
  b.  Respondent's Affirmation  in Opposition to Defendant's motion as Exhibit B;
  c.  Order of Hon. Bonnie J. Wittner denying original 440.10 motion as Exhibit C;
  d.  Defendant's motion to renew his previously filed post-conviction motion pursuant to CPLR 2221 as Exhibit D;
  e.  Respondent's Affirmation in Opposition to defendant's renewal motion as Exhibit E; and
  f.  Order of Hon. Bonnie J. Wittner denying motion to renew as Exhibit F.

4.      The  sole question of  law and fact that the court ought to review is:

**WHETHER THE LOWER COURT ERRED IN DENYING WITHOUT A HEARING DEFENDANT'S MOTION TO VACATE JUDGMENT OF CONVICTION PURSUANT CPL §440.10(1)(g),(h) BECAUSE OF A CONFLICT OF INTEREST BETWEEN DEFENSE ATTORNEY AND DEFENDANT.**

## INTRODUCTION

5.      This case presents a serious conflict of interest issue and demonstrates precisely why siblings – one a prosecuting attorney and the other defendant's attorney – should not work on the same case.   Specifically, in September of 2003, while ADA Ryan Brackley headed an on-going drug investigation, a murder had occurred and ADA Brackley shifted his resources from the drug investigation to the homicide case.

2

6.    Police eventually arrested defendant for the homicide, and defendant subsequently retained Defense Attorney Patrick Brackley who informed defendant that his brother was ADA Ryan Brackley and that he could inquire into the strength of the People's case. He also stated that he would speak to the People's eyewitness, Robin Hayslett.[1]   After hiring the services of a private investigator, defendant learned from Robin Hayslett that defense counsel told her to testify against him and that defense counsel would make sure she received a lighter sentence.

7.    As stated more fully below, this Court should grant defendant permission to appeal the very important and serious questions of law that exist.

## PROCEDURAL AND FACTUAL HISTORY

8.    On June 24, 2014, Defendant-Appellant ("Wynn") filed in the New York County Court a pro-se motion pursuant to CPL 440.10(1)(g)(h).  Defendant contended that he uncovered new evidence through the efforts of a private investigator, in the form of an affidavit from a prosecution witness that there was misconduct on the behalf of his attorney in which he secured a conviction against his own client.  This same witness also recanted her testimony.  See Exhibit "A."

---

[1]  The lower court held a hearing pursuant to People v. Gomberg, 38 NY.2d 307, 379 NYS.2d 769 (1975).  The hearing required defendant to acknowledge any potential conflict that may arise in the course of trial.  After one year on the case, ADA Ryan Brackley retired from office then became a witness for the people.

3

9.    On September 26, 2014, respondent submitted their affirmation in opposition to defendant's post conviction motion. Respondent contended that the familial relationship had fueled defendant's imagination and that the affidavit from the witness was unsworn. Respondent also contended that defendant's <u>Gomberg</u> hearing was a valid waiver of the conflict of interest and no per-se or actual conflict of interest existed. See Exhibit "B."

10.    On November 6, 2014, Honorable Judge Bonnie Wittner denied defendant's 440.10 motion on the ground that: "In his instant motion, defendant had not submitted an affidavit from the eyewitness, Robin Hayslett, or attorney Patrick Brackley. The motion is denied without a hearing because it is made solely by defendant and is unsupported by other reliable evidence. CPL 440.30 (4)(d)." See Exhibit "C."

11.    On December 4, 2014, defendant filed in the lower court a motion pursuant to CPLR 2221, to renew the previously filed post-conviction because he obtained a sworn affidavit from Robin Hayslett attesting that she was approached by defendant's attorney and offered a deal to testify against defendant. See Exhibit "D."

12.    Furthermore, defendant obtained evidence that, contrary to another prosecution witness's assertions, NYPD detective Mike Paul did not exist. <u>Id</u>.

4

13.    On June 18, 2015, six months after filing his renewal motion, the people responded.  Stating amongst other things that the conflict of interest issue "fueled defendant's imagination ever since his conviction at trial." See Exhibit "E."

14.    On  August 14, 2015, Hon. Bonnie Wittner rendered a decision to defendant's CPLR 2221 renewal motion and, in a terse decision, denied defendant's motion for the reasons stated: "based on the people's affirmation and opposition your motion is denied."  See Exhibit "F."

5

## GROUNDS FOR REVIEW

### POINT I

DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL WHEN HE PROCEEDED TO TRIAL WITH A RETAINED ATTORNEY WHO WAS AFFLICTED WITH AN ACTUAL CONFLICT OF INTEREST ISSUE, WHICH COULD NOT BE WAIVED AND WAS SUPPORTED BY A PROSECUTION WITNESS.

15.   This Court should grant leave to determine the very serious question of whether defendant was deprived effective assistance of counsel which was the direct result of the conflict of interest issue inherited by two brothers who were originally on opposite sides of a murder trial.

16.   In People v. Abar, 99 N.Y.2d 406, 757 N.Y.S.2d 219, a conflict based ineffective assistance of counsel claim involves two inquiries: (1) the court must assess whether there was a potential conflict of interest in a defendant's representation, and (2) a defendant must show that the conduct of his defense was in fact affected by the operation of the conflict of interest, or that the conflict operated on the representation.

6

## ARGUMENT

17.    Defendant Wynn's case presents a novel issue which is a question of law or fact that ought to be reviewed.  The lower court incorrectly dismissed Wynn's post conviction motion on the ground that it was "conclusory and unsupported by unquestionable documentary proof."

18.    In his first 440.10 motion a claim of conflict of interest that lead to ineffective assistance was the issue that was supported by an unsigned affidavit. The fact that defendant submitted a premature post conviction motion accompanied by an unsigned affidavit was a direct result of the District Court Ordering Defendant to submit the motion in a timely manner.

19.    However, four days after his 440.10 motion was denied, an ongoing investigation which started in June of 2011, had reached it's conclusion on November of 2014.

20.    A renewal motion was submitted on the same ground which was the conflict of interest/ineffective assistance issue.  Supporting the same claim in this renewal was a sworn affidavit and evidence of a non-existent detective.

21.    The people responded by asserting the "fact that the defense attorney and prosecutor were brothers, sparked defendant's imagination into believing that they conspired against him." Nonetheless, Wynn was able to obtain, through the assistance of a private investigator a sworn affidavit from prosecution's main

7

witness (Robin Hayslett), not only recantation testimony, but also a statement about how Wynn's own attorney ensured his conviction with his brother.

22.    This fact was countered by the affirmation in opposition which stated: "Defense attorney Patrick Brackley had not yet been retained and the witnesses testimony at grand jury and trial were identical as had been maintained by the record."

23.    Wynn states that the district attorney's affirmation in opposition gave a painfully false impression.

24.    The witness had been re arrested before trial, after giving false grand jury testimony, and at deliberation after trial, the jury asked for read back of Ms. Hayslett's (the main witness) grand jury testimony only to have the Court respond by saying she didn't testify at the grand jury. This mislead the jury and could have been the deciding factor in determining if Wynn was guilty or not.

25.    As for the other point made by the people in their affirmation which stated: "therefore it makes sense that Detective Paul in question was one of two Mike Pauls who worked as detectives in the 10th and 17th Precinct in 2004. That defendant's investigators were unable to locate either of these detectives who have since retired, in no way supports defendant's conclusion that detective Mike Paul did not exist at the time of the crime."

inquiry.   Nevertheless, Wynn was allowed to proceed to trial with an afflicted attorney.

35.   Although the appearance of the conflict of interest had not yet been shown,   it was established through the private investigator that the conduct of his defense attorney was affected through loyalty to his brother when he struck a deal for the prosecution witness to testify against his own client.

36.   Although the court found the eyewitness recantation to be inherently unbelievable or unreliable, based on the totality of the circumstances, such a finding is unwarranted in the absence of a hearing.  People v. Jenkins, 84 A.D.3d 1403, 923 N.Y.S.2d 706 (2nd Dept).  Recanting testimony should be examined with the utmost scrutiny. Careful consideration of such evidence involves the following factors which is:

- a.   The inherit believability.
- b.   Witness demeanor.
- c.   Existence of corroborating testimony.
- d.   Reasons offered for both trial testimony and recantation.
- e.   Importance of facts.
- f.   The relationship to the defendant and witness.

These six factors can only be established through a hearing, which is why one is required.

12

37.    Wynn asserts that he was entitled to an evidentiary at the least on his motion to vacate judgment of conviction  based on newly discovered  evidence which could not be found during trial.

38.    Defendant prays that this court, which has the power to conduct a review of the lower court's denial of Wynn's 440.10 motion grant a hearing to determine whether the denial constituted an abuse of discretion as a matter of law.

39.    Wynn has satisfied all requirements of CPL 440.30 (3) (a)(b)&(c). And also satisfied the original denial of his initial 440.10 motion.

**WHEREFORE,** defendant Wynn prays that this court grant defendant-appellant leave to appeal the decision of the lower court, and such other relief the Court deem just and proper.

Dated: October 2, 2015

Von Wynn 03A1844
Green Haven C. F.
Post Office Box 4000
Stormville, N.Y 12582

Sworn to before me on

this  2nd  day of October ,2015

NOTARY PUBLIC

KEITH J. SPOSATO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01SP6248158
Qualified in Putnam County
My Commission Expires September 19, 2019

13

Von Wynn 05A1844
Green Haven Correctional Facility
Post Office Box 4000
Stormville, New York 12582

October 2, 2015

**RECEIVED**

OCT 1.4 2015

APPELLATE DIVISION, SUPREME
COURT, FIRST DEPARTMENT

Clerk of the Court
Appellate Division, First Department
27 Madison Avenue
New York, New York 10010

RE:   **People v. Wynn Ind #0662/04**

Dear Clerk:

  Please find enclosed the original and copy of an application for certificate granting leave to appeal pursuant to CPL §460.15.  Kindly assign this action to the appropriate Justice of the Court.

  As demonstrated by the annexed proof of service, all parties have been duly served.

  Thank you for your time and cooperation.

          Very truly yours,

          Von Wynn

## AFFIDAVIT OF SERVICE

STATE OF NEW YORK )
                        ) s.s.:
COUNTY OF DUTHCESS)

      I Von Wynn being duly sworn, deposes and says:

      1.     I am the defendant in this action and have served a copy of the leave to appeal and attached exhibits.

                    Upon The Listed Parties:

                    District Attorney Dafna Yoran
                    One Hogan Street
                    New York, New York 10013

by placing the above in a pre-paid envelope and depositing it in a United States Postal Mailbox within Green Haven Correctional Facility, P.O. Box 4000, Stormville, New York 12582 on the 2nd day of October, 2015, as due and sufficient service.

                                    Von Wynn
                                      Green Haven Corr. Fac.
                                      Post Office Box 4000
                                      Stormville, N.Y. 12582

Sworn to before me on this

2nd day of October, 2015

NOTARY PUBLIC

      KEITH J. SPOSATO
NOTARY PUBLIC-STATE OF NEW YORK
        No. 01SP6248188
    Qualified in Putnam County
My Commission expires September 19, 2019

# Exhibit U



**DISTRICT ATTORNEY**
COUNTY OF NEW YORK
ONE HOGAN PLACE
New York, N. Y. 10013
(212) 335-9000

**CYRUS R. VANCE, JR.**
DISTRICT ATTORNEY

November 12, 2015

New York Supreme Court
Appellate Division, First Department
27 Madison Avenue
New York, NY 10010

Re:   People v. Von Wynn
      Indictment No. 662/04
      CPL § 460.15 Response
      Calendar Date: 11/13/15

Attn: Motions Clerk

This letter is submitted in opposition to defendant's application for a certificate granting leave to appeal from an order of the Supreme Court, New York County (Bonnie Wittner, J.), dated August 14, 2015. That order denied defendant's motion to renew the court's November 6, 2014 denial of defendant's motion to vacate his conviction pursuant to Section 440.10 of the Criminal Procedure Law.

By a March 24, 2005 judgment of the Supreme Court, New York County (Charles Solomon, J. at Gomberg inquiry; Bonnie G. Wittner, J. at hearings and trial), defendant was convicted, after a jury trial, of Murder in the Second Degree (Penal Law § 125.25[1]) and sentenced to an indeterminate prison term of from 25 years to life.

On November 5, 2009, this Court unanimously affirmed defendant's conviction. People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009), lv. denied, 14 N.Y.3d 807, and reconsideration denied, 15 N.Y.3d 811 (2010). The Court held, in relevant part, that defendant was not deprived of his right to conflict-free counsel because defendant chose to retain an attorney who was the brother of a former prosecutor who had handled the initial stages of this case and who had taken a videotaped statement from defendant. The Court found that defendant made a valid waiver of any potential conflict arising from this situation when, at several court appearances and during a thorough inquiry pursuant to People v Gomberg, 38 N.Y.2d 307 (1975), the court warned him of the possible disadvantages of this arrangement. Moreover, the Court found that defendant also consulted with a second, conflict-free attorney regarding the decision to remain with the potentially conflicted attorney, and that it was the second attorney who cross-examined the

lead attorney's brother at both the suppression hearing and trial. Further, the Court determined that there was no merit to defendant's suggestion on appeal that, despite all these precautions, there was an unwaivable conflict.

By papers dated June 24, 2014, defendant moved to vacate his conviction pursuant to CPL 440.10. Defendant claimed that his trial counsel had coerced a witness, Robin Hayslett, to testify falsely against him at trial. Defendant also asserted that he was denied a fair trial because his lawyer had a preexisting relationship with the prosecutor who conducted the initial investigation of the case.

In a written decision dated November 6, 2014, Justice Bonnie Wittner denied defendant's motion pursuant to CPL 440.30(4)(d). As the court reasoned, defendant offered only hearsay evidence in support of his claim that his trial counsel had convinced a witness to testify falsely against him. In particular, Justice Wittner found that defendant had not provided an affidavit by his trial lawyer or by the witness. On April 23, 2015, this Court denied leave to appeal (M-396).

By papers dated December 5, 2014, defendant moved for renewal of his CPL 440.10 motion. In support of his application, defendant attached an affidavit signed by Robin Hayslett on November 12, 2014. According to the investigator who secured Hayslett's signature, the affidavit had been previously prepared by defendant but was read to Hayslett and she signed it. The affidavit repeated defendant's prior allegations that in late 2004 or early 2005, Hayslett was approached by defendant's attorney, Patrick Brackley, who promised her that she would receive a lighter sentence in her own case if she cooperated with his brother, ADA Ryan Brackley, and that she consequently testified falsely against defendant. In further support of his motion, defendant alleged that a detective who had contact with another witness against him, about whom testimony was elicited at trial from both the witnesses and the case detective, did not exist at the time of the crime because defendant's investigators were not able to locate him.

By papers dated June 11, 2015, the People opposed defendant's motion. The People argued that defendant's claim that Hayslett was convinced to testify against defendant by his attorney was too egregious to be believed. As the People reasoned, for a defense attorney to secure the cooperation of a witness against his own client would violate all rules of ethics and would be grounds for disbarment. Accordingly, the People maintained that there was no conceivable possibility that the familial relationship between Patrick Brackley and the former prosecutor provided the defense attorney with a sufficient motive to actively work to secure witnesses against his own client. In addition, the People argued that the allegations in Hayslett's affidavit were belied by the fact that Hayslett entered into a cooperation agreement and testified in the grand jury in a manner consistent with her later trial testimony months before defendant hired Patrick Brackley. Therefore, the People contended, the allegation that Patrick Brackley struck a deal with Hayslett for her to testify against defendant was patently false. Finally, the People argued that defendant's claim that a detective who was mentioned at his trial did not exist at the time of the crime was baseless.

2

By order dated August 14, 2015, Judge Wittner denied defendant's motion based on the People's affirmation in response.

Defendant now seeks leave to appeal from Justice Wittner's denial of his motion. However, for the reasons set forth in the People's response and adopted by the court below, defendant's motion was properly decided. Accordingly, there exists no question of law or fact which ought to be reviewed by this Court, and defendant's application for a certificate granting leave to appeal should be denied.

Respectfully submitted,

Sheila O'Shea
Assistant District Attorney
(212) 335-9325

cc:    Von Wynn
       05 A 1844
       Green Haven Correctional Facility
       P.O. Box 4000
       Stormville, NY 12582-0010

3

# Exhibit V

O'Shea

SUPREME COURT OF THE STATE OF NEW YORK
APPELLATE DIVISION : FIRST JUDICIAL DEPARTMENT

BEFORE: Hon. Sallie Manzanet-Daniels
        Justice of the Appellate Division
------------------------------------------X
The People of the State of New York,

                                        M-5380
                                        Ind. No. 662/04


            -against-                   CERTIFICATE
                                        DENYING LEAVE

Von Wynn,

                Defendant.
------------------------------------------X

     I, Sallie Manzanet-Daniels, a Justice of the Appellate

Division, First Judicial Department, do hereby certify that, upon

application timely made by the above-named defendant for a

certificate pursuant to Criminal Procedure Law, sections 450.15

and 460.15, and upon the record and proceedings herein, there is

no question of law or fact presented which ought to be reviewed

by the Appellate Division, First Judicial Department, and

permission to appeal from the order of the Supreme Court,

New York County, entered on or about August 14, 2015, is hereby

denied.

                    _____
                          Associate Justice

Dated:   November 23, 2015
         New York, New York

ENTERED:   DEC 0 3 2015

closed