# United States District Court

Southern District of New York

—————

11 Civ. 03650 (VSB)(RLE)

**VONE WYNN,**

*Petitioner,*

*- against -*

**WILLIAM LEE,**
**Superintendent, Green Haven Correctional Facility**

*Respondent.*

## MEMORANDUM OF LAW
### IN OPPOSITION TO PETITION
### FOR A WRIT OF HABEAS CORPUS

CYRUS R. VANCE, JR.
District Attorney
New York County
Attorney for Respondent
One Hogan Place
New York, New York 10013
(212) 335-9000

By: Jessica Olive
JO-1903
Attorney of Record

KAREN SCHLOSSBERG
JESSICA OLIVE
    ASSISTANT DISTRICT ATTORNEYS
        Of Counsel

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................ 1

PRE-TRIAL PROCEEDINGS ........................................................................................ 5

EVIDENCE AT TRIAL ................................................................................................ 15

    The People's Case .................................................................................................. 15

    The Defense Case .................................................................................................. 51

DIRECT APPEAL ......................................................................................................... 53

ORIGINAL HABEAS PETITION ............................................................................... 55

CPL 440 PROCEEDINGS ............................................................................................ 58

AMENDED HABEAS PETITION .............................................................................. 61

STANDARD OF REVIEW ........................................................................................... 62

POINT I

    PETITIONER IS NOT ENTITLED TO RELIEF
    BASED ON HIS CLAIMS OF INEFFECTIVE
    ASSISTANCE OF COUNSEL. .............................................................................. 64

        A. Relevant Law .............................................................................. 65

        B. The State Courts' Finding that the Familial Relationship
        Between One of Petitioner's Attorneys and a People's Witness
        Did not Present an Unwaivable Conflict of Interest, and that
        Petitioner Did in Fact Waive Any Conflict, was Correct and Not
        an Unreasonable Application of Clearly Established Federal Law.
        .......................................................................................................... 66

        C. The State Courts Appropriately Rejected Petitioner's "New
        Evidence" of a Conflict of Interest ................................................. 75

D. Petitioner's Claim that Reynolds Perjured Himself at Trial by Mentioning a Detective that Petitioner Claims Does Not Exist is Procedurally Barred and Entirely Meritless. ................................... 79


POINT II

PETITIONER'S REMAINING COMPLAINTS CONCERNING THE EVIDENCE AND TESTIMONY INTRODUCED, AND THE COURT'S CONDUCT, AT HIS TRIAL AND SENTENCING ARE PROCEDURALLY BARRED; REGARDLESS, THEY ARE MERITLESS. ..................................................................... 83

A. Petitioner's Seven Evidentiary Claims ...................................... 85

B. The Denial of the Justification Charge ...................................... 92

C. Sentencing Considerations ........................................................ 94

CONCLUSION ............................................................................................. 99

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alleyne v. United States, 133 S. Ct. 2151 (2013) ................................................................ 96

Bell v. Cone, 543 U.S. 447 (2005)........................................................................................ 63

Blazic v. Henderson, 900 F.2d 534 (2d Cir. 1990) ............................................................. 93

Brown v. Rick, 2003 WL 22801397 (S.D.N.Y. Nov. 25, 2003)........................................... 62

Carey v. Musladin, 549 U.S. 70 (2006) ............................................................................... 68

Clark v. Perez, 510 F.3d 382 (2d Cir. 2008) ....................................................................... 86

Coleman v. Rick, 281 F. Supp.2d 549 (E.D.N.Y. 2003).................................................... 97

Coleman v. Thompson, 501 U.S. 722 (1991) ...................................................................... 86

Collins v. Scully, 755 F.2d 16 (2d Cir. 1985) ...................................................................... 87

Crane v. Kentucky, 476 U.S. 683 (1986) ............................................................................. 87

Cupp v. Naughten, 414 U.S. 141 (1973) ............................................................................. 92

Cuyler v. Sullivan, 446 U.S. 335 (1980)........................................................................ 68, 70

Davis v. Strack, 270 F.3d 111 (2d Cir. 2001) ..................................................................... 92

DiGuglielmo v. Smith, 366 F.3d 130 (2d Cir. 2004) .......................................................... 87

Estelle v. McGuire, 502 U.S. 62 (1991) .............................................................................. 87

Foman v. Davis, 371 U.S. 178 (1962) ................................................................................. 80

Gardner v. Florida, 430 U.S. 349 (1977) ............................................................................ 96

Garvey v. Duncan, 485 F.3d 709 (2d Cir. 2007)................................................................. 86

Grey v. Hoke, 933 F.2d 117 (2d Cir. 1991)......................................................................... 84

Harrington v. Richter, 562 U.S. 86 (2011)................................................................64, 66, 70

Holloway v. Arkansas, 435 U.S. 475 (1978) ....................................................................... 68

International Controls Corp. v. Vesco, 556 F.2d 665 (2d Cir. 1977) ............................ 62

Jackson v. Edwards, 404 F.3d 612 (2d Cir. 2005) ................................................. 92

Janick v. Superintendent, 404 F. Supp. 2d 472 (W.D.N.Y. 2005) ...........................96-97

Johnson v. Rosemeyer, 117 F.3d 104 (3d Cir. 1997) ........................................... 87

Jordan v. LeFevre, 206 F.3d 196 (2d Cir. 2000) ................................................ 84

Knowles v. Mirzayance, 556 U.S. 111 (2009).................................................... 63

Littlejohn v. Artuz, 271 F.3d 360 (2d Cir. 2001) ............................................... 80

Long v. Andrews, 2000 WL 1716443 (E.D.N.Y. Nov. 13, 2000) ................................ 93

Lopez v. Sanders, 302 F. Supp. 2d 241 (S.D.N.Y. 2004) ...................................... 97

Matteos v. West, 357 F. Supp. 2d 572 (E.D.N.Y. 2005) ...................................... 55

Mayle v. Felix, 545 U.S. 644 (2005)............................................................ 80

McMillan v. Pennsylvania, 477 U.S. 79 (1986).................................................. 96

Mickens v. Taylor, 535 U.S. 162 (2002)......................................................67-68

Moronta v. Griffen, 610 Fed. Appx. 78 (2d Cir. 2015) ........................................ 92

Murray v. Carrier, 477 U.S. 478 (1986) ....................................................... 85

O'Sullivan v. Boerckel, 526 U.S. 838 (1999) .................................................. 84

Ortega v. Duncan, 333 F.3d 102 (2d Cir. 2003) ............................................... 83

Overton v. Newton, 295 F.3d 270 (2d Cir. 2002) .............................................. 64

Pepper v. United States, 562 U.S. 476 (2011) ................................................ 96

Ponnapula v. Spitzer, 297 F.3d 172 (2d Cir. 2002)............................................ 87

Price v. Vincent, 538 U.S. 634 (2003) ........................................................ 62

Renico v. Lett, 559 U.S. 766 (2010) ......................................................63, 70, 97

Rivas v. Fischer, 687 F.3d 514 (2d Cir. 2012) ................................................ 80

Sanna v. Dipaolo, 265 F.3d 1 (1st Cir. 2001) ..................................................... 87

Schlup v. Delo, 513 U.S. 298 (1995) ................................................................ 85

Schriro v. Landrigan, 550 U.S. 465 (2007) ...................................................... 63

Smith v. Duncan, 411 F.3d 340 (2d Cir. 2005) .................................................. 84

Smith v. McGinnis, 208 F.3d 13 (2d Cir. 2000) ................................................. 80

Strickland v. Washington, 466 U.S. 668 (1984) ..............................65-69, 82-83

Sumner v. Mata, 449 U.S. 539 (1981) ............................................................... 64

Torres v. Berbary, 340 F.3d 63 (2d Cir. 2003) .................................................. 97

United States v. Armienti, 313 F.3d 807 (2d Cir. 2002) .................................... 70

United States v. Bass, 535 F.2d 110 (D.C. Cir. 1976) ...................................97-98

United States v. Carmona, 873 F.2d 569 (2d Cir. 1989) ................................... 97

United States v. Curcio, 694 F.2d 14 (2d Cir. 1982) ......................................... 74

United States v. John Doe #1, 272 F.3d 116 (2d Cir. 2001) .............................. 70

United States v. Levy, 25 F.3d 146 (2d Cir. 1994) ............................................. 70

United States v. Miller, 116 F.3d 641 (2d Cir. 1997) ........................................ 97

United States v. Perez, 325 F.3d 115 (2d Cir. 2003) ......................................... 74

United States v. Pugliese, 860 F.2d 25 (2d Cir. 1988) ...................................... 96

United States v. Rose, 216 F.3d 1074 (2d Cir. 2000) ........................................ 97

United States v. Schwarz, 283 F.3d 76 (2d Cir. 2002) ..................................71, 74

United States v. Vaughn, 430 F.3d 518 (2d Cir. 2005) ...................................... 97

Wasman v. United States, 468 U.S. 559 (1984) ................................................. 96

Wheat v. United States, 486 U.S. 153 (1988) .................................................... 71

White v. Keane, 969 F.2d 1381 (2d Cir. 1992) .................................................. 96

<u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) ............................................................ 63

<u>Williams v. New York</u>, 337 U.S. 241 (1949) ...................................................... 96

<u>Williams v. Taylor</u>, 529 U.S. 362 (2000) .......................................................... 63

<u>Wood v. Georgia</u>, 450 U.S. 261 (1981) ............................................................. 68

## STATE CASES

<u>People v. Gomberg</u>, 38 N.Y.2d 307 (1975) ..........................................2, 7, 11, 54, 67, 71

<u>People v. Kirkland</u>, 89 N.Y.2d 903 (1996) ........................................................ 90

<u>People v. Steele</u>, 26 N.Y.2d 526 (1970) ............................................................ 93

<u>People v. White</u>, 272 A.D.2d 239 (1st Dept. 2000) ........................................... 91

<u>People v. Wynn</u>, 14 N.Y.3d 807 (2010) ......................................................... 3, 55

<u>People v. Wynn</u>, 15 N.Y.3d 811 (2010) ......................................................... 3, 55

<u>People v. Wynn</u>, 67 A.D.3d 423 (1st Dept. 2009)
.............................................................3, 53-55, 67, 87-88, 90-93, 95, 98

<u>People v. Wynn</u>, M-396 (1st Dept. [Mazzarelli, J.]) ...................................... 4, 59

<u>People v. Wynn</u>, M-5380 (1st Dept. [Manzanet-Daniels, J.]) ...................... 4, 61

## FEDERAL STATUTES AND RULES

28 U.S.C. § 2244 ............................................................................................... 55

28 U.S.C. § 2244(d)(1) ...................................................................................... 80

28 U.S.C. § 2254 ............................................................................................... 99

28 U.S.C. § 2254(d) .................................................................................. 62-63, 66

28 U.S.C. § 2254(d)(1) ...................................................................................... 63

28 U.S.C. § 2254(d)(2) ...................................................................................... 63

28 U.S.C. § 2254(e)(1) ...................................................................................... 64

Federal Rules of Civil Procedure 15(a) ........................................................... 79

Federal Rules of Civil Procedure 15(c)(1)(b) ................................................ 80

## STATE STATUTES

CPL 440 ....................................................................................................... 58, 80

CPL 440.10 ................................................................... 3-4, 56-60, 75-76, 80-81

CPL 460.15 ............................................................................................. 4, 61, 76

CPL 470.05(2) ................................................................................................. 86

CPL 710.30(3) ................................................................................................. 90

Penal Law § 35.15(2)(a) .................................................................................. 93

Penal Law § 125.25(1) ................................................................................... 1-2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

11-CV-3650 (VSB) (RLE)

VONE WYNN,

Petitioner,

-against-

WILLIAM LEE,
Superintendent, Green Haven Correctional Facility,

Respondent.

## MEMORANDUM OF LAW IN SUPPORT OF ANSWER OPPOSING PETITION FOR WRIT OF HABEAS CORPUS

### INTRODUCTION

Petitioner Vone Wynn seeks a writ of habeas corpus to set aside a judgment of the Supreme Court, New York County (Charles Solomon, J. at conflict-of-interest inquiry; Bonnie G. Wittner, J. at hearings and trial), entered on March 24, 2005. By that judgment, petitioner was convicted, after a jury trial, of Murder in the Second Degree (Penal Law § 125.25[1]), and was sentenced to an indeterminate prison term of 25 years to life. Petitioner is currently incarcerated at the Green Haven Correctional Facility.

In the early morning hours of September 26, 2003, petitioner's cousin, Rodney Wilson, got into an argument with Jonadial Nelson in a courtyard of the Lincoln Public Housing Project in upper Manhattan. Nelson was with his girlfriend; Wilson

was with his girlfriend, petitioner, and another man. The argument escalated, and petitioner drew a gun. Nelson ran, but petitioner fired the gun, hitting Nelson six times in the arm and back. Wilson's girlfriend, as well as a passer-by who knew Wilson, saw petitioner firing the gun. Petitioner, Wilson, and the third man fled the scene. Nelson died from his wounds that same morning. After Wilson's girlfriend came forward to police several months later, petitioner was arrested on February 9, 2004. The passer-by who saw petitioner shoot Nelson identified petitioner in a line-up later that day. In oral statements to police and a videotaped statement to a prosecutor, petitioner admitted to having been present at the time of the shooting.

By New York County Indictment Number 662/2004, filed on February 11, 2004, petitioner was charged with Murder in the Second Degree (Penal Law § 125.25[1]). On June 10, 2004, the Honorable Charles H. Solomon conducted an inquiry pursuant to People v. Gomberg, 38 N.Y.2d 307 (1975), into a potential conflict posed by the fact that one of his defense attorneys was the brother of the Assistant District Attorney who had taken petitioner's statement and who might be called as a witness at his trial. Petitioner waived any conflict, choosing to keep the lawyer he had retained. The Honorable Bonnie G. Wittner presided over petitioner's jury trial, which began on February 17, 2005, and concluded on March 4, 2005, when the jury convicted petitioner as charged. On March 24, 2005, Justice Wittner sentenced petitioner as noted above.

The Appellate Division of the Supreme Court of the State of New York, First Department ("Appellate Division") affirmed the judgment of conviction on November 5, 2009. People v. Wynn, 67 A.D.3d 423 (1st Dept. 2009). On March 18, 2010, the New York State Court of Appeals (Jones, J.) denied petitioner leave to appeal. People v. Wynn, 14 N.Y.3d 807 (2010). Petitioner sought reconsideration and, on August 3, 2010, the New York Court of Appeals (Jones, J.) again denied petitioner leave to appeal. People v. Wynn, 15 N.Y.3d 811 (2010).

On May 9, 2011, petitioner filed the instant petition for a writ of habeas corpus. However, two months later, by a letter dated July 14, 2011, petitioner requested the court to stay the proceedings and hold the petition in abeyance in order for him to exhaust additional claims in state court, pursuant to New York State Criminal Procedure Law ("CPL") 440.10. At the time petitioner sent that letter, he had not yet filed any such motion in state court. In a Report and Recommendation dated September 7, 2011, Magistrate Judge Ronald L. Ellis construed petitioner's application as a motion to stay the proceedings as well as to amend his petition, and recommended that both be granted. Following respondent's objections, Judge Colleen McMahon adopted Judge Ellis' recommendation on November 7, 2011.

Almost three years later, on May 15, 2014, Judge Broderick ordered petitioner to file a motion in state court within 45 days or face dismissal. On June 24, 2014, petitioner filed a motion to vacate the judgment in the New York County Supreme

Court pursuant to CPL 440.10. On November 6, 2014, Justice Wittner denied petitioner's CPL 440.10 motion.

In December 2014, petitioner submitted an application to renew his CPL 440.10 motion to the New York County Supreme Court. Petitioner also filed an application pursuant to CPL 460.15 for permission to appeal the denial of his CPL 440.10 motion with the Appellate Division, which it denied on April 23, 2015. People v. Wynn, M-396 (1st Dept. [Mazzarelli, J.]). Justice Wittner denied petitioner's motion to renew his CPL 440.10 motion on August 14, 2015. In October 2015, Petitioner filed another CPL 460.15 application with the Appellate Division, which it denied on December 3, 2015. People v. Wynn, M-5380 (1st Dept. [Manzanet-Daniels, J.]).

On February 16, 2016, Judge Broderick ordered petitioner to file an amended petition. Shortly thereafter, on March 1, 2016, Thomas Francis Liotti entered his appearance as counsel for petitioner. Acting pro se, petitioner filed an amended petition that was received by the court on June 2, 2016. Counsel adopted the amended petition.

# PRE-TRIAL PROCEEDINGS[1]

## February 12, 2004: Criminal Court Arraignment

Following his arrest on February 9, 2004, petitioner was arraigned in Criminal Court on February 12, 2004.  At the arraignment, petitioner was assigned a Legal Aid Attorney named Keith Cavett (Exh. L ¶ 6).

## February 26, 2004: Supreme Court Arraignment

At petitioner's Supreme Court arraignment before the Honorable Charles Solomon on February 26, 2004, he was represented by Lori Cohen, Esq., of the 18-b panel.  (Exh. L ¶ 6).  The People were represented by ADA Ryan Brackley.

## April 8, 2004: Calendar Call

At the following appearance, on April 8, 2004, ADA William Schaeffer appeared on behalf of the People.  Petitioner was present in court.  Cohen again appeared on his behalf, but was accompanied by defense attorney Patrick Brackley, who had since been retained by petitioner (4/8/04: 1-2).  Justice Solomon noted that Patrick Brackley's retention "present[ed] somewhat of a novel issue" since his brother, Ryan Brackley, had been prosecuting the case earlier (4/8/04: 2).  ADA Schaeffer confirmed to the court that ADA Ryan Brackley would soon be leaving the District Attorney's Office but might be called as a witness at petitioner's trial (4/8/04: 2-3).

---

[1] The following factual recitation is largely taken from the People's Respondent's Brief, filed with the Appellate Division on July 7, 2009 (Exh. B).

Patrick Brackley informed the court that he believed that any potential conflict could be "worked out with [petitioner]'s consent should the case go to trial" in that "another attorney" could examine any "portion of the evidence" that involved Ryan Brackley (4/8/04: 2). Patrick Brackley asked that Cohen remain petitioner's attorney for "at least the next two appearances" so that petitioner would "have the benefit of another attorney to advise him about these issues." And Patrick Brackley stated that, should the court require a hearing regarding the potential conflict, he would request the presence of counsel to advise petitioner. The judge concurred that there would "have to be further inquiry of [petitioner]" at a later date (4/8/04: 3-4).

April 29, 2004: Calendar Call

At the next calendar date, April 29, 2004, both Cohen and Patrick Brackley appeared with petitioner, and ADA Christopher Conroy appeared for the People (4/29/04: 2). Patrick Brackley informed the court that Cohen would be conferring with petitioner "independently," and outside of Patrick Brackley's presence, regarding the potential conflict of interest (4/29/04: 3). Justice Solomon was not sure whether the involvement of defense counsel's brother in the case constituted an "inherent conflict," and he asked both the defense and prosecution to research the issue (4/29/04: 3-4).

May 13, 2004: Calendar Call

At the next court date, on May 13, 2004, Cohen and Patrick Brackley both appeared with petitioner, and ADA Conroy appeared on behalf of the People (5/13/04: 1-2). Cohen informed the court that she had spoken to petitioner at Rikers Island "regarding any possible conflict" and that he was "prepared to be allocuted" by the judge on that issue (5/13/04: 2). Justice Solomon adjourned the case until May 21st for "a Gomberg Hearing with respect to the potential conflict" (5/13/04: 3-4).[2]

May 21, 2004: Calendar Call

Both Patrick Brackley and Cohen appeared on May 21st with petitioner (5/21/04: 1-2). The court confirmed that Patrick Brackley had spoken to petitioner about counsel's brother's "involvement in this case" (5/21/04: 2). The judge did not conduct a full-blown hearing at that time, but began a "Gomberg inquiry" by asking petitioner to confirm his knowledge that his attorney, Patrick Brackley, was the brother of Ryan Brackley, who had conducted a videotaped interview of petitioner (5/21/04: 2-3). Justice Solomon informed petitioner that, should petitioner's motion to suppress that videotaped statement be denied and the statement be admitted into evidence at trial, the jury would be made aware that the interviewer in that videotape and petitioner's attorney were brothers (5/21/04: 3). The judge also informed

---

[2] Pursuant to People v. Gomberg, 38 N.Y.2d 307 (1975), trial judges in New York are required to ascertain whether a defendant is aware of a potential conflict of interest and nevertheless chooses to remain with the conflicted attorney.

petitioner that it was possible that Patrick Brackley would "be at counsel table" with petitioner while "his brother, Ryan Brackley," would be "on the witness stand in front of a jury" (5/21/04: 3).

The judge warned petitioner that "there's a danger" in "any case" where the defense attorney is related to a witness, because the "relationship" could prevent the attorney from asking "the questions that might be in [the client's] best interest." The judge warned that, in this particular case, "Mr. Brackley might not go after his own brother the way that he would go after another witness on cross-examination." The judge told petitioner that he did not know whether that would occur, but he asked whether petitioner understood that it was "a possibility," and petitioner said he did (5/21/04: 3-4).

Justice Solomon made clear that he was not taking a position on whether petitioner should keep Patrick Brackley as his lawyer. He told petitioner, "Whatever your decision is, it doesn't matter to me as long as you consider everything and then come to a decision as to how you want to proceed" (5/21/04: 5-6). The judge assured petitioner that he could certainly have Patrick Brackley represent him, but only with a full understanding of the "potential risks" and "potential conflict" that existed (5/21/04: 4-5). Justice Solomon also told petitioner that if he decided he would be "best suited with another lawyer," he would be given other counsel even if he could not afford to retain an attorney (5/21/04: 5).

Justice Solomon reminded petitioner that he faced "life imprisonment" for the charges against him, and stated, "This is a big decision for you and I want you to make an informed decision" (5/21/04: 5). The judge instructed petitioner to consult with Patrick Brackley and with Cohen, and told petitioner that he would ask him "more questions" about it at the next court date (5/21/04: 5-6).

Patrick Brackley assured the court that he "recognize[d] what the potential conflict" was, and that he did not believe that "under any circumstances," he would "ever cross-examine any member of [his] family on a case such as this" (5/21/04: 7-8; 10). Thus, were the case to go to trial, he intended to have Cohen remain available as co-counsel in order to conduct any necessary cross-examination of Ryan Brackley and to deal with any issues arising from the introduction of petitioner's videotaped statement (5/21/04: 9-10). Patrick Brackley stated that he "would not be involved in that portion of the trial" (5/21/04: 9).

May 27, 2004: Calendar Call

At the following court appearance, Justice Solomon acknowledged Patrick Brackley's proposition that Cohen "would conduct any cross-examination, if necessary, of … Mr. Ryan Brackley" and that "Mr. Patrick Brackley would not be involved in any way in cross-examining his own brother" (5/27/04: 3-4). The court noted, however, that that was "not the end of the inquiry" and that there would be "further inquiry today" (5/27/04: 4).

ADA Conroy expressed concern that the potential conflict between the Brackley brothers could extend to "more than just the cross-examination of the former prosecutor who happens to be the brother of the defense attorney." The ADA noted, for instance, that the defense could pursue a strategy in which they challenged "the conduct of a prosecutor in investigating and prosecuting a case," which would implicate former-ADA Ryan Brackley since he "conducted an investigation here, met many witnesses, [and] put the case into the grand jury." (5/27/04: 6). Although ADA Conroy did not believe that there was any actually "questionable conduct" by Ryan Brackley, he noted that such a "path of cross-examination" was "a pretty standard defense argument" and "frequently" pursued by defense attorneys regardless of the actual merits. Since ADA Conroy wished to avoid "the possibility that somewhere down the line" petitioner might decide to claim that his attorney did not pursue such a theory "vigorously" enough because the prosecutor at issue was his brother, he asked that petitioner be made "fully aware" of and "waive that issue if he want[ed] to continue with Mr. Brackley as his lawyer" (5/27/04: 6-9).

Cohen identified herself as a seventeen-year veteran of the defense bar and acknowledged having raised just such a defense "on several occasions." She had thus discussed that potential source of conflict, amongst others, when she had a one-on-one conversation with petitioner regarding Patrick Brackley's representation of him. Following that discussion, Cohen believed that petitioner was "fully aware" of "the

possible ramifications" and "possible conflicts" posed by having Patrick Brackley remain on the defense team (5/27/04: 9).

Justice Solomon asked petitioner to speak again with his family, Patrick Brackley, and Cohen, before the next court date. At that time, the judge would permit petitioner to ask the court any questions he might have "about this issue" and then ask him to make a decision about whether to keep Patrick Brackley as his attorney (5/27/04: 11-12).

## June 10, 2004: Gomberg Hearing

On June 10, 2004, Justice Solomon conducted a formal Gomberg inquiry. Patrick Brackley and Cohen both appeared with petitioner, and ADA Thomas Schellhammer appeared for the People. First, the judge reiterated the concern that former-ADA Ryan Brackley could be called as a trial witness and once again informed petitioner that he was entitled to a lawyer who was "not related to one of the potential witnesses at the trial" (6/10/04: 3). The judge noted that the defense had already determined that Cohen would be responsible for cross-examining Ryan Brackley, should he be called as a witness, but stated the possible concern that Patrick Brackley's mere presence "at counsel table" could render such representation "not as effective as a lawyer who is not affiliated in any way or associated in any way with Patrick Brackley" (6/10/04: 4). Petitioner affirmed that he understood the concern (6/10/04: 4).

Justice Solomon assured petitioner that he could still "have Mr. Brackley as part of [his] defense," but he had to be "aware of the risks" and "waive" them in order to do so (6/10/04: 4). Petitioner said, "Yeah" (6/10/04: 4). The following exchange then took place:

> THE COURT: So, again, [petitioner], you've thought about this over the last several weeks I take it?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And have you talked to M[s.] Cohen and Mr. Brackley about this?
>
> THE DEFENDANT: Yes.
>
> THE COURT: And do you have any questions of me?
>
> THE DEFENDANT: No.
>
> THE COURT: Is there anything that I haven't gone over with you that you feel you want to ask me or you feel might be a problem, anything whatsoever?
>
> THE DEFENDANT: No.
>
> THE COURT: Have you made a decision about this?
>
> THE DEFENDANT: Yes.
>
> THE COURT: How do you wish to proceed?
>
> THE DEFENDANT: I want to stay with Mr. Brackley.
>
> THE COURT: You said you want to stay with Mr. Brackley?
>
> THE DEFENDANT: Yes.

(6/10/04: 4-5). The judge then turned to Patrick Brackley, and the following exchange occurred.

> THE COURT: Again, just so we're clear, Mr. Brackley, should your brother, Ryan Brackley, be called as a witness for the prosecution in this trial, you will not be involved in the cross-examination of him, that's what you're saying?
>
> MR. [PATRICK] BRACKLEY: That's correct, Judge. I do believe the record reflects numerous times that it was myself who requested the presence of attorney Lori Cohen to speak with [petitioner] independent of myself and also for the purposes of cross-examination if ADA Brackley should be called at any time, assuming the statement is deemed admissible and assuming the case gets to that point and assuming he does testify, I believe M[s.] Cohen has graciously accepted that responsibility if that's acceptable to this court.

(6/10/04: 5-6). The judge permitted Brackley to remain as one of petitioner's attorneys (6/10/04: 6).

August 19 & 24, 2004: Suppression Hearing

At the Huntley/Wade hearing, which began on August 19, 2004 and concluded on August 24, 2004, both Patrick Brackley and Cohen appeared on petitioner's behalf, and ADA Schellhammer appeared for the People (H: 1-2, 60-61). Patrick Brackley told the Honorable Bonnie Wittner that Cohen would be questioning all of the witnesses (H: 2). He explained that the videotaped statement was at issue in the trial and had been conducted by former-ADA Ryan Brackley. Thus, "for the purposes of maintaining as much of a conflict-free environment as [they could]," the defense had opted to have Cohen question the witnesses (H: 2-3).

February 15, 2005: Pre-Trial Proceedings

Prior to voir dire, Justice Wittner verified that Patrick Brackley and Cohen would both be serving as trial counsel to petitioner. Patrick Brackley asked that they be referred to as "co-attorneys" and stated that Cohen might be examining some of the witnesses (2/15/05: 6-7). Following an "informal conversation off the record," Justice Wittner stated,

> I'm going to tell the jury that there is a very unusual circumstance here, that one of the witnesses to the trial used to be a[n assistant] district attorney and he happens to be the brother of one of the defense counsel.
>
> It's not anything that they should be concerned about. All legal issues have been taken care of, but just to make sure there is no problem, M[s.] Cohen is going to cross-examine that witness.
>
> That's all I'm going to say.

(2/15/05: 19). Patrick Brackley replied, "That's fine" (2/15/05: 19).

February 24 & March 2, 2005: Trial

After several of the People's witnesses had testified, and prior to the testimony of Ryan Brackley, Justice Wittner addressed the jury:

> I just want to bring to your attention something that has occurred during the trial. It's kind of unusual.
>
> You may have heard during the questioning reference[s] to ADA Brackley an assistant district attorney.
>
> He's no longer in the office. He is the brother of this defense[ ] attorney Patrick Brackley.

However, Mr. Brackley used to be with the District Attorney's Office. His only involvement was initially taking a statement from this defendant, which is going to come out later in the trial.

However, in another proceeding it's been determined that there is no conflict at this point for Mr. Patrick Brackley to be representing the defendant.

So, you are to draw no inferences one way or the other, and I just wanted to bring that to your attention because there's been talk about Mr. Brackley an [A]ssistant [District Attorney]

(617-618). Cohen conducted the cross-examination of Ryan Brackley during the People's case (Brackley: 816-822).

## EVIDENCE AT TRIAL[3]

### The People's Case

### The Victim, Jonadial Nelson, Began Dating Taisha Mills Over A Year Before He Was Killed.

On February 28, 2003, TAISHA MILLS met Jonadial Nelson through her best friend, who was also Nelson's niece (Mills: 90, 95; Trial Exhibit 14: photo of Nelson).[4] Nelson lived in the Lincoln Projects in upper Manhattan (Mills: 91, 94-96). Mills moved to New York City in August 2003 and began working as a contract coordinator for the Visiting Nurse Service of New York (Mills: 89-92).

---

[3] The following factual recitation is largely taken from the People's Respondent's Brief, filed with the Appellate Division on July 7, 2009 (Exh. B). Parenthetical references are to the minutes of petitioner's trial.

[4] Nelson was also known as "Jon-Jon" and is often referred to by that nickname, alternatively spelled "John-John," throughout the transcript.

Mills, who was about 25 years old at the time, fell in love with Nelson, and the couple saw each other two to three times a week. Mills was the mother of two young twins, so the couple usually spent their time with her children, watching movies at each other's homes or going out to dinner. Nelson had a "wonderful relationship" with Mills's children and was "very good to them." Mills described Nelson as her "best friend" who was "just a nice, caring person, very open to help people." Nelson "drank a lot," but became "laid back," rather than violent, when he did so. Mills had "never seen him upset, never seen him violent" (Mills: 90-93, 95-97).

<u>Robin Hayslett Met Petitioner Through Her Relationship With His Cousin, Rodney Wilson, And She Was Also Familiar With Nelson.</u>

ROBIN HAYSLETT, who was 41 years old at the time of trial, had moved to the Lincoln Projects in 2003 after she was kicked out of a drug treatment program that was part of her plea agreement from a 2002 arrest (Hayslett: 231, 252-260, 406).[5]

---

[5] Hayslett, who described herself as a drug addict, began smoking crack when she was 18 years old. She was initially able to continue working, but ultimately was unable to maintain consistent employment because "you can't hold a job and crack at the same time" since, "when you start smoking, you just be smoking" (Hayslett: 231, 233-234, 236-237). At the time of trial, Hayslett was incarcerated for a drug sale conviction (Hayslett: 229). She had 10 to 15 prior arrests, including 5 felony convictions (Hayslett: 229-230, 389).

When she was 15 years old, Hayslett was arrested for graffiti in Westchester and received a sentence of probation (Hayslett: 230). In 1985, Hayslett was attempting to buy drugs when a police officer intervened and she spit in his face; she was charged with disorderly conduct and resisting arrest (Hayslett: 230-231). Later, she was charged with drug possession (Hayslett: 237). In 1990, Hayslett was sentenced to 2 years in prison on a felony assault conviction, stemming from an incident in which she had been selling crack in Harlem, got into an altercation with a man who owed her money, and "end[ed] up cutting the guy" with a box cutter (Hayslett: 237-241, 390, 392-393). In 1994, Hayslett pled guilty to
(Continued…)

Knowing that she had never provided the courts with a Lincoln Projects address, Hayslett went there to stay with her sister-in-law in Apartment 10-B at 2140 Madison Avenue (Hayslett: 253, 257-258, 260-261, 347-348, 407).

Hayslett's sister-in-law introduced her to Rodney Wilson, who was also known as "Raw," and Hayslett began buying drugs from him. Eventually, Hayslett began selling drugs for Wilson from her apartment and the lobby of her building. (Hayslett: 263-265, 282-283). For a period of time, Wilson and his employees became the "biggest dealers in the projects" and other dealers complained that they were not making as much money as they once had. (Hayslett: 282-283, 285). In September 2003, Hayslett realized that she was several months pregnant by Wilson (Hayslett: 266-270, 309, 399-400, 403-404). When she discovered she was pregnant, Hayslett

_____

(…Continued)

selling drugs to an undercover officer and was sentenced to 2½ to 5 years in prison (Hayslett: 242-243). She entered prison in 1995, attended a drug program there for about 6 months, and was released in December 1996 (Hayslett: 243-245).

Hayslett, who was then married to a drug dealer, was introduced to Lincoln Projects by her sister-in-law when she was released from prison in 1996 (Hayslett: 245-246). Hayslett went there to get high because there were "places in the projects where you go to smoke." By 1998 or 1999, Hayslett was using drugs every day and made money by selling crack (Hayslett: 245-246, 248-249). In 1999 she "got arrested for misdemeanors like possession and trespassing"; she usually pled guilty and was sentenced to time served (Hayslett: 251). In 2000, Hayslett pled guilty to selling drugs to an undercover officer and spent 16 months in prison, getting paroled in June of 2002 (Hayslett: 251-254). After her 2002 arrest, Hayslett was sent to a drug treatment program, but was kicked out after 90 days, having been caught "sexually acting out" with a man. A warrant was issued for her arrest, and Hayslett fled (Hayslett: 252-260, 406).

continued selling crack for Wilson, but, at his behest, cut down on smoking crack and cigarettes and drinking alcohol (Hayslett: 309-310).

Hayslett met petitioner, who was Wilson's cousin, in June 2003. When Wilson first introduced Hayslett to petitioner, they all bought crack together. Since then, Hayslett had been with petitioner "a lot of times." Petitioner "hung out" with Wilson and often came to Hayslett's apartment looking for Wilson. Petitioner also called for Wilson on Hayslett's cell phone whenever he could not get through on Wilson's phone, so Hayslett often spoke to petitioner (Hayslett: 272-281, 359-360).

Hayslett was also familiar with Jonadial Nelson because she had seen him selling drugs in the lobby of her building. She knew him to be a "bully," a "drug dealer," and "gun happy" (Hayslett: 285-287; Trial Exhibit 1: photo of Nelson). The people at the Lincoln Projects, including Hayslett, "knew" that it was Nelson's "MO" to carry a gun, but Hayslett had never seen it (Hayslett: 407-408).

The Day Before He Is Killed, Nelson Tells Mills That He Has Begun Selling Drugs.

Mills had never seen Nelson sell drugs, but Nelson had told her that he had previously been incarcerated for drug arrests, including possession of narcotics (Mills: 91, 64). During a telephone conversation on September 24, 2003, Nelson told Mills that he was staying out that night because he was starting to sell drugs and he needed to get his money together. Mills understood that Nelson was selling crack-cocaine at the Lincoln Projects (Mills: 98, 134). Mills "didn't feel comfortable about that

situation" and wanted to talk to Nelson about it. The two arranged to meet the next day (Mills: 98).

Mills and Nelson met at 132nd Street and Fifth Avenue around 8:30 or 9:00 on the evening of September 25, 2003 and spent time with several other people until Mills told Nelson that she wanted to go home (Mills: 99-103, 125-126, 134; Trial Exhibit 6: diagram of Lincoln Projects). Nelson walked with Mills to the other side of the projects, so she could catch a cab on Madison Avenue. On their way, Nelson stopped to talk to a man Mills did not know.[6] Since the man had money to give to Nelson, Mills assumed that he had been selling drugs for Nelson (Mills: 103-104, 127; Trial Exhibit 6: diagram of Lincoln Projects).

## Hayslett Tries To Find Wilson To Give Him The Money From Her Drug Deals That Day.

Meanwhile, Hayslett had been selling drugs for Wilson that day. Wilson, who was at his mother's apartment in building 2201, called Hayslett, who was in her apartment in building 2140, to find out if she was finished selling for the night. He told her to bring the money downstairs to him (Hayslett: 307-308, 310, 312-313). When she came downstairs, Hayslett did not see Wilson. Petitioner was not there either, but Hayslett saw three men "leaning against" his car, which was parked on Fifth Avenue (Hayslett: 314). Hayslett recognized the "grayish" or "silver colored"

---

[6] Mills did not "hang out" at the projects and so did not know many people there (Mills: 103).

car because she had been in it "a lot of times" with petitioner (Hayslett: 272, 274-275). Hayslett asked the men where "Ra[w]"—referring to Wilson—was, but they did not respond. So Hayslett went to a store across the street to buy a soda or a beer and "kill a little time" (Hayslett: 314-315).

Nelson Is Summoned To Meet Wilson In An Alleyway.

After Nelson talked to the man who had apparently been selling drugs for him, Nelson and Mills soon reached the exit of the projects. There, two men approached Nelson and told him that "Raw" wanted to "speak to him." Nelson asked the men "where is he at," and one of the men said, "[I]n front of his building." Mills did not know who "Raw" was, and Nelson did not say anything about him. Mills followed Nelson down Fifth Avenue and into a "little alleyway." As they turned into the alley, a man spotted them and immediately turned back around. Mills had never seen him before and had not seen him since (Mills: 105-107, 127; Trial Exhibit 6: diagram of Lincoln Projects).

Wilson, Petitioner, Hayslett, Nelson, And Mills Converge In The Alleyway.

At about the same time, Hayslett was returning through the entrance to the projects sometime after midnight, when she saw Wilson and petitioner coming out building 2201 (Hayslett: 315-316, 409, 326-327, 329, 348, 350; Trial Exhibit 2: photo of building 2201; Trial Exhibit 3: photo of alley; Trial Exhibit 6: diagram of Lincoln

Projects; Trial Exhibits 25A, C: photos of building 2201).[7]  Petitioner said to Wilson, "[Y]o, I'm out here, fuck this bullshit," and then he walked away (Hayslett: 316, 327, 409; Trial Exhibit 3: photo of alley).  Petitioner greeted Hayslett as he walked past her. Just then, Nelson arrived with a woman Hayslett had never seen before (Hayslett: 316, 410).  Hayslett knew that there was "some kind of bad blood" between Wilson and Nelson (Haslett: 287-288, 407).

Mills, who was still with Nelson when he reached his destination near 2140 Madison and 2101 Fifth Avenue, saw Wilson and petitioner, whom she had never seen before and identified at trial.[8]  Mills also noticed a "crack head lady" who looked like she wanted to buy drugs and was "trying to get the attention of the petitioner" (Mills: 106-107, 109-110, 122, 124, 128-129; Trial Exhibits 7A-B: diagrams; Trial Exhibit 15: photo of Wilson; Trial Exhibit 16: photo of petitioner).

Wilson And Nelson Argue.

Nelson and Wilson approached each other until they were standing face-to-face.  Petitioner stood back, "a little closer to the building," near Wilson (Mills: 112, 129; Trial Exhibits 7A-B: diagrams; Trial Exhibits 25A, C: photos of building 2201). Nelson said to Wilson something to the effect of, "[Y]o, I heard you were looking for

---

[7] Hayslett identified petitioner at trial (Hayslett: 272).

[8] Mills noted that petitioner's hair was different at the time of trial in that, on September 26th, his "braids were coming down instead of going straight back" (Mills: 107, 109-110).

-21-

me" (Hayslett: 316-317) or "[W]hat's up, you wanted to talk to me" (Mills: 107).

Wilson denied that he had wanted to talk to Nelson.  Nelson asked, "[W]hy would

somebody tell me that you wanted to talk to me, I come over here and now you are

telling me you don't want to talk to me" (Mills: 107-108).  Wilson said that, based on

what he had been told by another man called "Air," he believed that Nelson had been

looking for him (Hayslett: 316-317).

LAMONT REYNOLDS—who was familiar with Nelson and knew Wilson

"[f]rom the hood" (Reynolds:  506-508, 513, 517-521, 559-560, 564; Trial Exhibit 1:

photo of Nelson)—was walking down 135th Street at the time and noticed Wilson

and Nelson "arguing" near the playground at Fifth Avenue (Reynolds: 510-511, 526-

527; Trial Exhibit 2: photo of building 2201; Trial Exhibit 3: photo of alley).

Reynolds heard Nelson deny that he had been looking for Wilson (Reynolds: 512-

513).

Wilson and Nelson continued "arguing back and forth exchanging words"

(Hayslett: 317, 322).  Mills could tell that Nelson was "getting a little aggravated" and

that the situation "was going to get tense" (Mills: 108).  During the argument, Wilson

was waving his hands as if the two men were about to fight, but he was not holding a

gun or anything else (Mills: 108-109; Hayslett: 319-320; Reynolds: 514-515).

Although Reynolds recalled that Nelson was "waving his hands too" (Reynolds: 515),

Hayslett noticed that Nelson kept his hand in the pocket of the gold-colored hoodie

he was wearing (Hayslett: 318-319, 330; Trial Exhibit 4: photo of hoodie).

Hayslett thought that Nelson had a gun, even though she never saw a gun or anything else in his pocket (Hayslett: 319, 410, 462-463). And, from Nelson's "reputation," Hayslett thought that he was going to "use" the gun (Hayslett: 410-411, 462). Hayslett decided to step behind Nelson to warn Wilson by "[e]ye contact" that she thought Nelson had a gun (Hayslett: 318, 321, 414).

Petitioner Shoots Nelson.

During the argument, Wilson's "attitude changed" and he moved closer to Nelson. Wilson told him, "[N]ah, I ain't want to talk to you because you know … I don't fuck with you like that" (Mills: 108, 113). At the same moment, Hayslett took a step to catch Wilson's attention. She was then "eye-to-eye" with petitioner, and, as she "looked [petitioner] dead in his eyes," he began shooting a gun. The bullets fired so close to Hayslett that, if she had moved "one more step," they "might have hit" her (Hayslett: 322-323, 411, 414).

Reynolds heard shots firing. Reynolds turned around and, from about 30 to 35 feet away, saw petitioner "point a gun shooting at [Nelson]" (Reynolds: 515-516, 523, 530-531; Trial Exhibit 16: photo of petitioner).[9] The gun in petitioner's hand was a silver .357 caliber handgun, and sparks flew from it as petitioner fired (Hayslett: 322-323; Reynolds: 523).

---

[9] Reynolds, who knew petitioner only as Wilson's cousin and not by name, identified petitioner in court (Reynolds: 515-516, 580).

As he was shooting, petitioner continued walking forward (Hayslett: 323). Nelson ran away from petitioner, jumping over a fence. At that point, Reynolds saw Nelson "get hit by the bullets." Now bleeding, Nelson "grabbed onto the gate and started crawling down" (Reynolds: 524-526; Trial Exhibit 4: photo of hoodie; Trial Exhibit 5: photo of bloody sidewalk near fence).

<u>After Mills And Hayslett Drop To The Ground, Petitioner And His Cohorts Flee.</u>

Mills had heard only one gun shot before she saw "a flash" and "everything just got dark" (Mills: 109, 113-115, 151). She and Hayslett "hit the floor" (Hayslett: 318, 324, 353, 414). After blacking out, the next thing Mills knew was that she was "on the floor" in a "sitting position," but she did not how she had gotten there and seemed to be "in a state of shock because [she] didn't really know what was going on at the time" (Mills: 114-117). Mills and Hayslett "stayed on the ground" until "everything got real quiet" (Hayslett: 324, 326, 353). Hayslett knew that Nelson had run away because when she "looked up, nobody was left there" (Hayslett: 413-414, 463). Hayslett and Mills "kind of like crawled to the Fifth Avenue entrance" (Hayslett: 324, 326, 328, 353).

Petitioner, Wilson, and a third man "with dreads" ran to a grey or silver-colored car parked on Fifth Avenue (Mills: 116-118; Hayslett: 324, 326; Reynolds:

527-528).[10]  Mills, who had "seen like three shadows dart past" her, looked at the car and saw petitioner "looking over" at her.  Mills recognized petitioner from the altercation between Wilson and Nelson.  She and petitioner "made eye contact" before petitioner got into the passenger side of the car which then drove off (Mills: 114, 116-118).

Mills Finds Nelson Bleeding On The Ground.

Realizing that Nelson was no longer with her, Mills ran back into the projects the same way she had exited.  As Mills was running, she heard someone say that "somebody is lying over there."  Mills found Nelson, who was on the ground with his eyes closed.  He was still breathing, but "started to make a gurgling noise."  Blood was seeping through his sweater and onto his hands (Mills: 113-115, 118-119, 127, 130; Trial Exhibit 6: diagram of Lincoln Projects; Trial Exhibits 7A-B: diagram).

Mills "started screaming and crying" (Mills: 119).  Hayslett heard Mills "scream" Nelson's name, saying, "John-John, no" (Hayslett: 324-325, 354).  Mills "stood over him" and told Nelson to "just be strong, keep breathing" (Mills: 118, 130, 135).  A "lady" put something under Nelson's head, and someone handed Mills a cell phone which she used to call her best friend – Nelson's niece – to tell her that her uncle had just been shot (Mills: 119-120, 130).  Hayslett stayed away from the scene

---

[10] Hayslett saw "some guys jump in the car," but "it was dark and [she] didn't know who it was" (Hayslett: 324, 326).

and instead, "walked all the way around" and came through the Madison Avenue entrance (Hayslett: 354). In the meantime, a crowd began to gather (Mills: 120).

<u>The Police Respond To The Scene And Speak To Mills.</u>

Police Officers KAREN SMITH and DIANA PERRY were called to the scene shortly after 2:00 a.m. A crowd of 10 to 15 people had gathered. Nelson, who had several gunshot wounds, was still alive, but was lying on the ground and bleeding. The officers called to make sure that Emergency Medical Services were on the way (Smith: 35-38, 44-45, 47-49, 59-60; Perry: 476, 482; Trial Exhibit 1: photo of Nelson; Trial Exhibit 2: photo of building 2201; Trial Exhibit 6: diagram of Lincoln Projects).

Mills was still with Nelson and "[c]rying hysterically." Officer Smith was able to calm Mills enough to speak with her (Smith: 38-39, 59-60, 64; Perry: 477-478, 483). Mills told the officer that she was Nelson's girlfriend and had been with him when a man walked up to them and told them to go around the corner.[11] Mills reported that she and Nelson had gone to talk to the men and that immediately afterward, she heard the shots. Mills could not tell the officers who shot Nelson because she had not seen "where the shot came from"; she "[j]ust remembered the flash … and the noise" (Smith: 40-42; Mills: 121-122).

---

[11] On the following day, Mills was interviewed by Detective THOMAS CLARKE (Mills: 138; Clarke: 626, 672-674). Clarke recalled that Mills told him that Nelson had been selling crack in front of the building when a man walked up and said that somebody wanted to speak to him (Clarke: 626)

Mills described the three men she saw just before hearing the shots, including Wilson, petitioner, and the first man she saw in the alleyway (Smith: 40; Mills: 121, 131, 42). Mills did not know the names of the men she saw, but, according to Smith, noted that the third man "frequented Lincoln." Mills told the officer that the three men had run past her on Fifth Avenue and left in a grey, four-door car (Smith: 40-42, 63).

No Other Witnesses Come Forward At The Scene.

Nobody in the crowd around Nelson matched the descriptions of the three perpetrators provided by Mills, so Officer Smith radioed the descriptions. She and Officer Perry then began asking the people in the crowd if they saw anything (Smith: 37, 42-43). Everybody questioned by the officers denied having seen or heard anything (Smith: 43; Perry: 477).

As Hayslett completed her more circuitous route to Nelson's location, an officer stopped her to ask if she had seen anything. Hayslett lied, telling the officer, "[N]o." She then "kept on going" (Hayslett: 325, 354, 456; Trial Exhibit 5: photo of bloody sidewalk near fence).

Reynolds, who had run into one of the buildings after petitioner shot Nelson, came back outside after the police arrived. Reynolds did not know any of the responding officers and did not speak to any of them (Reynolds: 522-523, 527-528, 531). Instead, Reynolds, a registered confidential informant who had worked with

Detective Mike Paul for about 15 years, called Detective Paul 40 to 60 minutes after

Nelson was shot (Reynolds: 498-499, 532).[12]

Reynolds did not reach Paul until the next morning, at which point he reported

that "somebody got shot over here." Reynolds said that Wilson's cousin—

petitioner—was the person who did the shooting, and that he could both describe

and identify petitioner. Reynolds did not know the third man who had been with

[12] In 1989, when he was 17 years old and in jail on a petit larceny charge, Reynolds met Detective Paul, who helped Reynolds get out of jail and gave him some money in exchange for help with a homicide case; Reynolds later pled guilty and received a sentence of time served (Reynolds: 487-488, 498-499). Since that time, Reynolds reported to Paul about crimes he saw "going down on the street" (Reynolds: 500, 505-506). About 10 times, Reynolds received about $1000 or $1500 for providing information (Reynolds: 501-502, 505). If Reynolds did not receive money, Paul would sometimes help him out of "trouble" (Reynolds: 502). Reynolds had not received any money for the testimony he had previously provided in petitioner's case and he would not be receiving money for the testimony he was providing at petitioner's trial (Reynolds: 504, 602).

Since 1989, Reynolds had been arrested several more times on charges of domestic violence and driving with a suspended license. In 1992 or 1993, Reynolds got into a fight with his wife, who told police he had "pushed her and she fell"; even though he denied pushing her, Reynolds pled guilty and was sentenced to time served, which was about 15 days (Reynolds: 488-489). He was arrested in 1995 or 1996 for driving with a license that had been suspended for "about 51 violations," including lack of insurance; he pled guilty and received a sentence of 90 days in jail and 5 years probation (Reynolds: 489-491). In 1999, while he was still on probation, he was arrested again for driving with a suspended license; he pled guilty, spent 90 days in jail, and had his probation reinstated (Reynolds: 491-492). In 2001, he was arrested after a verbal fight with his child's mother, when she claimed he had stolen her money although he had not; Reynolds spent no time in jail and the case was dismissed when she dropped the charges against him (Reynolds: 492-494). He was arrested again in 2002 for another domestic violence charge against the same woman, but she dropped the charges again (Reynolds: 494).

At the time of trial, Reynolds was incarcerated upstate. He had been arrested again for driving with a suspended license and was found to be in possession of "two dime bags of weed" and "some money" (Reynolds: 486-487, 495-496). Reynolds had sold marijuana about 5 or 6 times in the past without having been arrested, and he had illegally possessed and sold guns, but was not arrested for those crimes (Reynolds: 496-498, 505).

petitioner and Wilson that night. Paul told Reynolds that the homicide was not his case and not in his jurisdiction, but he said he would put Reynolds in touch with the proper authorities (Reynolds: 528-529, 533-534, 567-568, 582-585).

Nelson Is Taken To The Hospital Where He Dies.

From the scene, Emergency Medical Services took Nelson to Harlem Hospital in an ambulance (Smith: 38; Mills: 119; Perry: 478). Mills stayed behind with police, but Officer Perry followed Nelson to the hospital (Smith: 62; Mills: 130; Perry: 478-479).[13] At the hospital, Nelson was "taken to the trauma room and they were desperately trying to save him" (Perry: 478). When the medical staff removed Nelson's clothes, they brought Perry a piece of plastic wrap holding "chunks of crack-cocaine" that they found in his jeans (Smith: 51-53; Perry: 478-481; Trial Exhibit 10: crack-cocaine). Before she left the hospital at about 6:00 a.m., Perry received a paper

---

[13] At some point, police took Mills to a show-up of "someone on the highway that fit the description," but it "wasn't him" (Mills: 131). Later that night, the police took her to the precinct stationhouse to view photographs, but Mills did not recognize anyone who had been involved in the shooting (Mills: 131-132).

Several hours after the shooting, investigators from the Crime Scene Unit, including Detective PAUL WALSH, responded to the scene and took photographs of the evidence from where Nelson's body had been found (Smith: 38, 43, 44-46, 49; Walsh: 160-164, 170-173; Trial Exhibit 4: photo of Nelson's hoodie; Trial Exhibit 5: photo of bloody sidewalk near fence; Trial Exhibit 17: gold hoodie with bullet holes). Officers found no usable fingerprint evidence. Detective Walsh searched the area where Nelson's body was found as well as the pathway and grass nearby, but found no ballistics evidence. Although Walsh spoke to officers on the scene, he did not find out where the shooting had occurred and he did not necessarily know the relevant areas to search (Walsh: 161-162, 165-168, 170, 174-179).

bag that contained Nelson's clothing and boots. No gun was included in Nelson's personal effects, and, as far as Perry knew, Nelson had not possessed a gun that night (Perry: 480).

Mills was at the stationhouse when she learned that Nelson had died (Mills: 133). In all, Nelson had been shot six times (Doctor KRISTEN LANDI, Office of the Chief Medical Examiner: 72). The shot that killed Nelson had entered the right side of his back and exited the left side of his chest, tearing through his kidney, bowel, stomach, and liver (Landi: 74-75, 79-82; Trial Exhibits 9, 11, 13: autopsy photos).

In addition to the fatal shot, Nelson suffered a "graze wound" that extended from his left hand and up his arm. Another bullet had penetrated the inside of his left arm and exited near his elbow. Three bullets had entered his body just above his left buttock. Two of those bullets exited the left side of his chest. None of the bullets remained in Nelson's body (Landi: 73-75, 79-84; Trial Exhibits 11, 13: autopsy photos).[14]

The majority of the gunshot wounds, including the fatal shot, were consistent with the gun having been fired from behind Nelson on his right side. None of the entrance wounds were on the front of Nelson's body. The medical examiner could tell that Nelson had been moving when he was shot, but could not determine the

---

[14] The medical examiner found a bullet in Nelson's back that had "been there for a while" and was not related to this shooting (Landi: 78-79). The autopsy also revealed that Nelson's blood alcohol level indicated that he had ingested alcohol and was "on the clearing side of it" (Landi: 87-88).

order in which each of the bullets had hit him. It was possible that Nelson was shot in the arm from the front and then turned before the other shots were fired (Landi: 75, 85-87).

<u>Hayslett And Wilson Spend The Night In A Hotel, Then Return To Selling Drugs.</u>

After the shooting, Hayslett went to a friend's home. Wilson called her at about 3:30 that morning and they went to a hotel to spend the night (Hayslett: 416-417). Hayslett woke up at about 1:00 in the afternoon. She returned to her apartment, and Wilson went to his mother's home. At about 3:00 or 4:00 that afternoon, Wilson brought Hayslett crack-cocaine to sell and told her that he would be at his grandmother's house with petitioner and to call him there if she needed more drugs to sell. Hayslett sold drugs for the rest of the day. People in the projects were "talking about what happened, but it ain't change nothing, people was still buying drugs" (Hayslett: 354-360).

<u>Hayslett Talks To Petitioner And Wilson On The Phone.</u>

The evening after the shooting, petitioner called Hayslett on her cell phone (Hayslett: 360, 386-387, 418-420, 459, 461-462).[15] Petitioner asked whether she had seen Wilson. Hayslett responded, "[N]o, I thought he was with you." Petitioner asked, "[D]id I hit you, you all right, you ain't hurt?" Hayslett assured petitioner that

---

[15] Before the grand jury, Hayslett testified that petitioner had called her about twenty minutes after she met up with Wilson just after the shooting (Hayslett: 460).

he did not hit her and that she was "good" (Hayslett: 360-361, 387). Hayslett did not speak to petitioner after that (Hayslett: 467).

Later, Hayslett spoke to Wilson, who was at his grandmother's house. Hayslett told Wilson that petitioner had called for him. Wilson asked Hayslett, "[N]obody ain't saying nothing to you, nobody ain't messing with you?" and Hayslett told him, "[N]o, I am all right." Wilson asked if Hayslett wanted to "leave town with him" and Hayslett said, "[N]o." Wilson warned her, "[Y]ou can't say nothing," and Hayslett told him, "[A]ll right" (Hayslett: 357-358, 360-361).

Detective Clarke Is Led To Wilson, Who Leads Clarke To Petitioner.

On the day after Nelson was shot and killed, Detective Thomas Clarke was assigned to investigate the case (Clarke: 622-623, 655), and then-Assistant District Attorney RYAN BRACKLEY was assigned to prosecute it (Brackley: 800-802).[16] Detective Clarke spoke to Mills, canvassed the area of the shooting, and contacted people who had called 911 that night. But he was unable to locate anyone who said they saw the homicide, and he had no suspects identified at that time (Mills: 138; Clarke: 623-625, 636, 673, 687).

---

[16] By the time of trial, Brackley had left the District Attorney's Office and was a lawyer at a large commercial firm in Denver, Colorado (Brackley: 798). Prior to Brackley's testimony, the trial judge informed the jury that he was the brother of petitioner's trial attorney, Patrick Brackley, but that, "in another proceeding" it had been determined that there was "no conflict" in Patrick Brackley's representation of petitioner. The judge therefore instructed the jury to "draw no inferences" about the relationship between the two men (617-618).

On the evening of October 6, 2003, Detective Del Castro of the Crime Stoppers Unit notified Detective Clarke that an anonymous person had called the tip line and informed the police that the shooter in the Nelson homicide was a man known as "Rodney" or "Raw." The anonymous tipster stated that Rodney/Raw was "wearing a black hooded sweatshirt and hanging out in front of 2140 Madison" (Stipulation: 830). Clarke went to that location and found Wilson, whom he then interviewed at the stationhouse (Clarke: 638-641; Trial Exhibit 15: photo of Wilson). During the interview, Wilson said that his cousin—petitioner—had been present at Nelson's shooting (Clarke: 702-703).

On the same day, Mills viewed more than 100 photographs at the police station and identified a picture of Wilson as the man who had argued with Nelson before the shooting (Mills: 132, 140-141; Clarke: 707-708). Mills also told Clarke that, since the shooting, she had heard that Wilson's cousin was the one who had fired the gun (Clarke: 703, 708). Based on the information he had gathered, Clarke decided to interview Hayslett and petitioner (Clarke: 641).

Wilson Instructs Hayslett To Lie To Police And She Complies.

After being questioned by the police about the shooting, Wilson warned Hayslett that the police were also going to question her, because he had told them that he had been with her that night. Wilson instructed Hayslett about what she should say to the police (Hayslett: 289-290, 357-358).

On October 7th, Detective Clarke went to Hayslett's apartment and brought her to the stationhouse to be interviewed about the incident (Hayslett: 288-289, 358, 362; Clarke: 645, 706).[17] Hayslett, whom Clarke described as "very evasive," lied to them (Hayslett: 289, 305-306, 358, 422, 457; Clarke: 645, 650). The police asked her if she had been present when Nelson was killed, and she told them she had not and that she "didn't know nothing" (Hayslett: 289-290). An officer told her, "[W]ell, your boyfriend already told us everything" (Hayslett: 362). Hayslett responded, "Yes, I was there with him, but I didn't see nothing" (Hayslett: 362, 421-422; Clarke: 650). Hayslett said that Nelson had appeared to have had a gun (Hayslett: 472). And she reported that petitioner had also been present (Clarke: 703). Hayslett told police that that she saw three men jump into a silver station wagon after the shots were fired, but she claimed that petitioner and Wilson were not among those three men (Hayslett: 422). Hayslett did not provide a written statement to police (Clarke: 706).

Afterward, Hayslett told Wilson that she "told them what he said to say," and Wilson "was like all right" (Hayslett: 362-363). Hayslett had followed Wilson's instructions to lie to the police because she was "still in the mix of everything that is going on." Hayslett was "on the streets still using, selling drugs in the projects. And nobody in their right mind is going to say anything in that position." At the time, she

---

[17] Hayslett initially testified that the police had come to speak to her the morning after they had spoken to Wilson (Hayslett: 362). During cross-examination, Hayslett did not dispute defense counsel's characterization of the police interview having occurred either a week later or on October 7th (Hayslett: 420, 457, 471).

was still "involved with" Wilson and selling drugs for him, and she "had to go back with" him after meeting the police. Had she told the police what she saw, Wilson and his cohorts would have known she was the one who had given them up, making her the "next candidate" for their violence. She explained, "If I watch you do something to one person, what makes you think that you are not going to do it to me?" (Hayslett: 289, 294-295, 363, 433).

<u>Detective Clarke Interviews Petitioner And Releases Him.</u>

On October 6th, Detective Clarke went to the address he believed to be the home of petitioner's grandmother. No one was home, so the detective left a business card with a note for petitioner to contact him. When Clarke got to the precinct at 8:00 a.m. on the morning of October 8th, petitioner was there to speak to him. At that point, Clarke did not consider petitioner a suspect, but just a witness to the Nelson shooting. Petitioner was "very hostile," and told Clarke, "I don't appreciate you coming to my house. I don't appreciate you looking for me. I don't know anything about this. I wasn't there." At one point during the interview, petitioner told Clarke, "[I]f I'm not under arrest I want to leave." Clarke replied, "[A]ll right, I guess you can leave," but the two men ended up speaking for "quite a while" (Clarke: 641-642, 644, 700-702, 704-706).

Petitioner claimed that he had not been at the Lincoln Projects at the time of Nelson's shooting. Rather, petitioner said that he had been with Wilson—his

cousin—at the home of his aunt—Wilson's mother—until about 2:00 a.m. that morning when he left and took the train at the Lenox Avenue station. Petitioner admitted that he was close with Wilson, but said he had not spoken to Wilson since September 26th. Petitioner said that he did not know why Wilson told Clarke that petitioner was present at the shooting. Petitioner knew that Wilson and Nelson had a lot of "beef" with each other since they had both been selling crack in front of building 2140 in the Lincoln Projects. Petitioner said that Wilson had not contacted him about Nelson getting shot. At the end of the interview, Detective Clarke got petitioner's contact information from him, and petitioner left the stationhouse (Clarke: 643-644, 704-706).

Mills Identifies Petitioner In A Photo Array.

While Clarke was speaking with petitioner on October 8th, he sent Detectives Perez and Enriquez to visit Mills at her job and show her a photo array with petitioner's photograph in it (Mills: 141-146, 152-153; Clarke: 709-710). Mills identified petitioner. Detective Perez asked Mills where she had seen petitioner and whether he had been "at the scene," but he never asked if petitioner had been the shooter. Mills told Perez that petitioner had been "the last guy in the car." Mills did

not tell Perez that petitioner had been standing next to the shooter (Mills: 143-145, 148).[18]

Wilson Offers To Sell The Murder Weapon To Reynolds.

After Nelson's shooting, Reynolds did not see Wilson again until January 2004 (Reynolds: 536-537, 606-607). Wilson told Reynolds that he had gotten Nelson killed (Reynolds: 537). Wilson displayed a gun that Reynolds recognized as the same .357 caliber gun used to shoot Nelson. Reynolds—who had previously been given guns by people who "didn't want them" and wanted him to "get rid" of them—was asked by Wilson if he knew anyone who would want to buy the gun for $700. Reynolds said he did not know of anyone, but would check into it and "get back to him." Wilson said he would take $600 (Reynolds: 496-497, 551-552, 589).

Reynolds contacted Detective Paul to tell him about Wilson's offer to sell the gun that had killed Nelson. Paul instructed Reynolds to make efforts to buy the gun, but when Reynolds twice saw Wilson after that, the gun was never discussed (Reynolds: 552-555, 577-578, 603, 607; Clarke: 653).

On January 21, 2004, Detective Clarke arrested Reynolds on an unrelated domestic violence case (Reynolds: 565-566, 607; Clarke: 651, 729-733).[19] This was the

_____

[18] Sometime after petitioner's arrest, Mills spoke to Leroy Sweeney, an investigator for the defense. And later, both Sweeney and Defense Counsel Patrick Brackley came to speak with her about the case. Mills told Sweeney and Brackley that she had not seen who shot Nelson. She did not tell them that she saw a man pulling the trigger of the gun and that it had not been petitioner (Mills: 137-138, 146-149, 151-154, 154).

first time that Clarke—who had been informed several months earlier by Detective Paul that Reynolds was a confidential informant who was also an eyewitness to the homicide—had spoken to Reynolds directly (Clarke: 646-648, 700, 716-717, 725-727, 729, 731, 734-736; Brackley: 803-804).[20]   Reynolds told Clarke that he had seen the person who killed Nelson.  Reynolds did not know the shooter's name, but had been told by Wilson that he was Wilson's cousin (Reynolds: 534-536, 586).  Reynolds also told Clarke that Wilson had tried to sell him the gun "several days" after the shooting (Clarke: 735-736).

Based on his conversations with Reynolds, Clarke obtained a search warrant to search for Rodney Wilson and the gun that was used in the homicide (Reynolds: 553-554, 566, 571-572, 574-576, 597-598, 603, 607; Clarke: 652, 732, 734, 736; Brackley: 809, 817, 821-22).   The police were not successful in locating Wilson or the gun (Clarke: 652-654, 732; Brackley: 809).  When the police arrived at Wilson's apartment, they arrested four "crackheads," who later explained that Wilson had gone to "re-up" his crack supply and had taken the gun with him.  Detective Clarke tried looking for Wilson afterward, but learned that he was "gone" (Clarke: 652-654).

---

(…Continued)

[19] Reynolds denied any physical fight, but admitted that he had gotten into an argument with the mother of his child, and she wanted him out of the home.  Since Reynolds did not want to leave, the police "had to arrest" him and take him to the stationhouse (Reynolds: 534-535).  The woman did not, however, want to press charges (Reynolds: 535, 575-576).

[20] Detective Paul did not involve himself in the domestic violence arrest (Reynolds: 570-571).

<u>Hayslett Eventually Agrees To Cooperate With Law Enforcement.</u>

Hayslett continued selling drugs for Wilson during October 2003. At some point, however, she fled the projects because she was afraid that Nelson's friends or family were going to retaliate against Wilson by coming after her. She "hid out" with some friends on 119th Street. About two weeks later, when she was staying in a hotel on 112th Street, Wilson found her, beat her up, and took her "back uptown." Wilson threatened that, if Hayslett did not get her "shit together," he would tie her up and throw her in the river. Hayslett was still pregnant at the time, and Wilson told her, "[F]uck the baby," accusing Hayslett of not caring about the fetus since she was "smoking, this, that and the other." Hayslett returned to the Lincoln Projects and continued selling crack-cocaine for Wilson (Hayslett: 363-366).

Around November 14, 2003, Hayslett was arrested. The arrest stemmed from an incident in August when a woman had stolen money from Wilson so Hayslett "beat her up," and the woman called the police. Ultimately, the assault case was dismissed in February, but that dismissal had nothing to do with her cooperation in the instant case against petitioner. Despite the case being dismissed, Hayslett was kept in custody due to the warrant that had been issued when she left the drug program related to her arrest in 2002 (Hayslett: 290-292, 367, 395-397, 424, 426-428, 458).

On the night of her arrest, Hayslett provided the police with another statement about Nelson's shooting (Hayslett: 428-430; Clarke: 650, 711-712, 738; Trial Exhibit

B: Hayslett's statement). Hayslett was high at the time and did not remember most of what she told them (Hayslett: 431-32, 444-455, 458; Clarke: 650).

In November, while she was in jail, Hayslett's pregnancy ended in miscarriage (Hayslett: 367-368). The following month, Hayslett, who was still in jail, decided to tell the police what she knew about the Nelson shooting. The drugs were out of her system, and she was "having nightmares about the incident" and she wanted to "turn [her] life around" (Hayslett: 267). Her conscience was "messing with" and "bothering" her. Now drug-free and feeling safer, she decided to "just tell Mr. Brackley everything that happen[ed]." Hayslett first spoke to ADA Brackley, who told her that if she was honest and helped him, that he would help her (Hayslett: 293, 298, 430).[21]

After she spoke to ADA Brackley, Hayslett also spoke to detectives working on the case and, this time, she told them the truth (Hayslett: 293, 306). A detective told her, "[I]f that is what you [are] sure you want to do, if you help me then I am gonna help you" (Hayslett: 367). Although she knew that she was facing a serious jail sentence on her own case, her willingness to speak to the detectives had "nothing to do with the jail." She explained, "I could do the three to six, that ain't – that's not why I talked to these detectives. I talked to the detectives because my conscience is

---

[21] Hayslett confirmed that ADA Brackley was not the same Brackley who was representing petitioner at trial, but she believed he was his brother (Hayslett: 293).

not letting me sleep and I witnessed something that to me is not right" (Hayslett: 294).

After speaking with the detectives, Hayslett conferred with her lawyer and later entered into a cooperation agreement and testified before the grand jury (Hayslett: 295-297, 304-305, 339, 368, 435-435; Brackley: 804-805; Trial Exhibit 23: Hayslett's cooperation agreement).[22] Hayslett understood the cooperation agreement to mean that she was required "[t]o tell the truth, to cooperate and to be honest." In exchange for her cooperation, Hayslett would be allowed to enter a drug treatment program (Hayslett: 297-298). If she were to leave the program, she would "go upstate" for 3 to 6 years, and if she violated the rules of the program, her prison term could be 3½ to 7 years. She also faced prison if she lied or got arrested (Hayslett: 303-304).

Hayslett wanted to get into drug treatment because she wanted to "get [her] life back." Hayslett was "tired." She had been using drugs for "a long time" and had "seen a lot of things," but she had never witnessed anything like Nelson being killed. She said, "I want to stop using this time. I want to stop getting high. I want to get out of the environment that I would be in, away from the projects and that lifestyle." She explained, "I wanted to learn how to attack this disease, this addiction that I have, to cope with it and to deal with it" (Hayslett: 299-301).

---

[22] Hayslett's attorney was present in court during her trial testimony (see 332).

ADA Brackley arranged for Hayslett to get into a drug program prior to her testimony at petitioner's trial, and she entered the Project Green Hope treatment program on June 28, 2004 (Hayslett: 301, 368-369; Brackley: 821-822). She did not use drugs while in the program. She was a full participant this time "because when you want to do something it makes it easier to get done." She learned "a lot" about her addiction and herself (Hayslett: 302-303, 369-370, 373-374).

As part of the program, Hayslett went to school and completed job training. Eventually, she began working at the Kelly Hotel on 127th Street and Amsterdam Avenue. Hayslett regularly visited her family on the weekends while she was in treatment, unlike when she had been selling crack in the Lincoln Projects and would not contact her family because "I didn't want them to see me the way I was" (Hayslett: 302-303, 369).

At the direction of the prosecutor, Hayslett kept in contact with Wilson's mother, writing letters to her and letters for her to give to Wilson, so that "things wouldn't seem unnormal." She did not tell anyone in the treatment program that she was cooperating with the District Attorney's Office in this case because she was afraid that if she told anyone, that person "might tell somebody else then people might come after" her. Instead, she told people that she had been able to get into the program because her lawyer had helped her by talking to the judge in her case and had managed to get her back into the program (Haslett: 370-372, 424-425, 427).

In December 2004 or January 2005, Hayslett "got scared" because "[g]irls in the facility and the counselors kept saying that some guys was coming around there looking for" her. Hayslett was afraid of petitioner, Wilson, and their family, and she "thought that they was coming to get [her] in the program." She therefore left the program and did not tell the detectives or the prosecutor, thereby breaking her promise (Hayslett: 374-376, 438-440).

Hayslett "hid out" at a friends home in Harlem and lost her job (Hayslett: 376). She soon started selling crack again, although she did so on 132nd Street, about five blocks away from the Lincoln Projects. She was not selling crack for Wilson, and she did not know where he was. She "went around the projects sometimes" to find out if anybody was "looking for" her. On February 10, 2005, she was arrested in the projects and was brought to see the prosecutor. She had since been held in jail (Hayslett: 376-377, 441-442).[23]

Hayslett hoped to return to the drug treatment program after her testimony, but she did not know what would happen to her. She understood that it would be up to the prosecutor and the judge to determine her fate, and that the factor that they would consider is whether she was "[b]eing honest and telling the truth." The prosecutor had told her that when they went to see the judge, "depending upon what

---

[23] Hayslett's trial testimony occurred on February 22 and 23, 2005.

the judge says, he would try to get [her] back into the program" (Hayslett: 298, 443, 470).

Hayslett denied testifying because she stood to "benefit" from her cooperation. She explained, "I can do state time. It is easier for me to do state time than it is to sit here and be honest and tell the truth about what I saw," since "I don't know what [petitioner] may have in store; his family have in store for me, I still don't know. So it would be more safer and more easier for me to do three to six than to sit here and do this" (Hayslett: 434-435). When asked if she was testifying because she would "get something out of it," Hayslett said, "I get to tell the truth, I get to claim my conscience and I get to free myself, that is what I actually get" (Hayslett: 454).

Petitioner Is Arrested On February 9, 2004 And Identified By Reynolds; Petitioner Denies Knowledge Of The Homicide.

Petitioner was arrested at about noon on February 9, 2004. Detective Clarke provided petitioner with his Miranda warnings, and petitioner "adamantly" denied any knowledge of the homicide (Clarke: 656-657, 715). Petitioner was placed in a lineup. Reynolds identified petitioner as "the guy who killed [Nelson]" (Reynolds: 555-556, 569, 580, 601).[24] After the lineup, Detective Clarke informed petitioner that he had been identified and would be brought to Central Booking to be processed and charged with murder (Clarke: 658-659).

---

[24] Mills never viewed a lineup (Mills: 132).

<u>Petitioner Admits To Detective Clarke That He Had Been Present During The Argument Between Wilson And Nelson, But Claims He Left Before Hearing Gunshots.</u>

A short time later, as Clarke was about to leave, petitioner asked to speak to him. At that point, petitioner "changed his story." He told the detective that, on the night of the shooting, he had been with Wilson and "another guy named Keith." The three men were looking for Nelson because Wilson "had a beef" with him. When they spotted Nelson, they approached him. Nelson said, "I heard you were looking for me," and Wilson replied, "I don't fuck with you like that, you know that."[25]  As "words were exchanged" between Wilson and Nelson, petitioner said, "I'm out" and started walking toward Fifth Avenue. When he heard gunshots, he ran to the train station at Lenox Avenue (Clarke: 659).

Detective Clarke had earlier obtained video surveillance of an area of Fifth Avenue adjacent to the scene of the shooting, where there was a grey car with its headlights on double-parked on the eastbound side of Fifth Avenue (Clarke: 623-624, 629-635; Trial Exhibit 6: diagram of Lincoln Projects; Trial Exhibit 26: video still; Trial Exhibits 27-28: enlarged video stills). Days after the shooting, Mills had identified that car as the one she had seen petitioner and his cohorts flee in after petitioner shot Nelson (Mills: 139-140). Detective Clarke showed petitioner a still

---

[25] The transcript shows that Clarke testified that Nelson made the comment, "I don't fuck with you like that," but it is clear from the context that Clarke was confusing the two men's names at that point in his testimony (Clarke: 659).

photograph from the video tape, and petitioner said that the car looked like one owned by his grandmother. Clarke asked petitioner if he had gotten into his grandmother's car when he left Wilson and Nelson on the night of September 26th. Petitioner replied, "I didn't get into the car, you know, [Wilson] borrows the car also" (Clarke: 659-660; Trial Exhibit 26: video still).

<u>Petitioner Tells Senior Investigator Daley That He Left Wilson Just Before The Shots Were Fired.</u>

The next morning, February 10th, Detective Clarke brought petitioner to meet with ADA Brackley (Clarke: 660). Before Brackley arrived, Senior Investigator GEORGE DALEY, of the New York County District Attorney's Homicide Investigation Unit, met with petitioner. Daley provided petitioner with his <u>Miranda</u> warnings. Petitioner agreed to speak with the investigator about Nelson's murder (Daley: 743-745, 752-753, 761; Trial Exhibit 31: <u>Miranda</u> warnings).

Petitioner first claimed that he and Wilson left the projects and went to 125th Street and 7th Avenue to see a "movie with Denzel Washington in it," but he could not remember the name of the movie. Petitioner then said that, in fact, he had not gone to a movie, but had gone to shoot pool at 125th Street and 7th Avenue. Petitioner said he then met up with Wilson at the Lincoln Projects and then "along came" Nelson "with a girl." Wilson and Nelson got into a heated argument in the alleyway behind a building on Fifth Avenue. Petitioner "felt that something was going to jump off," so he decided to leave. As he was crossing Fifth Avenue toward

the Chase Manhattan Bank, petitioner heard shots ring out.  He did not go back to find out what happened, but ran to the subway station on Lenox Avenue and took the train home to the Bronx (Daley: 747-748).

### During Questioning By Detective Clarke, Petitioner Asks For A Definition Of "Justifiable Homicide."

Detective Clarke also spoke to petitioner at the District Attorney's Office. Petitioner "kept telling" the detective that he was "just with" Wilson and "this other person Keith who he said did the shooting."  Petitioner said that, before the shooting, he had said, "I'm out" and left.  He had been on his way to the subway when he heard the gunshots.  Clarke told petitioner that he had heard that Nelson was a drug dealer and said, "If you felt that you were in fear of your life, you do have the right to defend yourself."  Toward the end of their conversation, petitioner "kept asking" Clarke to "explain to him justifiable homicide" and "what justifiable homicide would be like, if he was in fear, would he have the right to shoot"  (Clarke: 660-662).

### In Videotaped Statement To ADA Brackley, Petitioner Asks How Many Years He Would Spend In Jail If He Claimed It Was A Justifiable Homicide.

When ADA Brackley arrived outside the interview room, he heard petitioner say to Detective Clarke: "[W]ell, if it was self defense what will happen[?]  [C]an I go home if I just take a hit for the gun?" (Brackley: 811, 818).  Brackley decided to allow Daley and Clarke to finish speaking with petitioner and then he entered the room as the video camera started recording (Brackley: 812; Trial Exhibit 30: videotaped

statement). Petitioner immediately told the prosecutor he was willing to "do anything" in order to be able to "go home with the least amount of time" (Trial Exhibit 30).

The prosecutor then introduced himself, confirmed that petitioner had been given his <u>Miranda</u> warnings and voluntarily waived his rights, and asked petitioner to "tell the truth" about "what happened." Petitioner referred to having heard about "justifiable homicide" and asked the prosecutor, "Just hypothetically speaking, if I go with that, how many years does that hold?" The prosecutor refused to answer the question and asked petitioner to tell him "what happened" on the night of the shooting (Trial Exhibit 30).

Petitioner said that he had been with his cousin, Rodney Wilson, that day, walking around the projects with another man named Carl or Keith.[26] The other man "kept asking, 'where this nigger at?'" At the time, petitioner thought Wilson and Carl/Keith were "probably looking for a friend or something," but petitioner was now "piecing it together" that they were looking for "that guy that got shot" (Trial Exhibit 30).

Later, as they came out of building 2201 of the Lincoln Projects, petitioner, Wilson, and Carl/Keith encountered a "crowd" consisting of two men and two

---

[26] Petitioner said he had never heard his cousin called "Raw" other than by "the detectives" (Trial Exhibit 30).

women, none of whom petitioner had ever seen before. One of the men, who was there with a woman, began "confronting" Wilson, saying, "What's up?" and, "I heard you was looking for me." As Wilson and the man "exchanged words," Carl/Keith "kept walking back and forth, back and forth, back and forth." Petitioner "kind of figured he was holding a weapon," even though he had not seen Carl/Keith with a gun at any point during the day, because from the way that he held himself Carl/Keith looked like "quote unquote, he was holding." Petitioner described the scene as "kind of stand-off-ish" (Trial Exhibit 30).

Petitioner felt "something was going to happen," so he left, walking toward Fifth Avenue to go to the subway. He did not see his grandmother's car parked on Fifth Avenue. Petitioner had already crossed Fifth Avenue when he heard gunshots. Petitioner assumed his cousin was alright because he had "friends there" to protect him. Petitioner did not call Wilson later to find out if he was, in fact alright, because their mothers were sisters, so petitioner would have heard if anything was wrong. Petitioner did not see Wilson until a few weeks later, in church. Petitioner did not hear about the actual victim of the shooting until he spoke to police (Trial Exhibit 30).

About a half-hour into the interview, petitioner said to ADA Brackley, "I don't want to go to jail. I know this is a big case. Can you help me?" The prosecutor told him to tell the truth about what had happened on the night of the shooting. Soon afterward, petitioner asked to speak to Brackley "personally … without the cameras and the microphone and everything." Brackley agreed, but asked to bring Investigator

Daley into the room. Petitioner consented to Daley's presence and confirmed that he wanted the video recording to cease; the video camera was turned off (Daley: 748, 750-751; Brackley: 812-813; Trial Exhibit 30).

During the break in the recording, petitioner "started a negotiation" with Brackley, asking if he could "go home" if he admitting possessing a gun or claimed that the shooting was in self-defense. Petitioner never directly admitted to shooting Nelson, but Brackley understood his questions to mean that he had shot him in self-defense. Brackley told petitioner he would not negotiate with him and would only discuss it on camera so it was clear he was not making any promises (Brackley: 813-814, 819-821). Petitioner talked about Carl/Keith, saying he did not know the man, but that he "look[ed] like" petitioner and wore his hair in similar braids (Daley: 751, 754-755).[27]

After about six minutes, the videotape resumed, and petitioner asked, "Can you help me?" ADA Brackley explained on camera that petitioner had asked "if I could help you if you told me certain things," but that Brackley had told petitioner he did not want to talk about that (Trial Exhibit 30).[28]

_____

[27] Neither the name Carl nor Keith had ever come up in the course of the investigation. After this conversation, Brackley tried unsuccessfully to ascertain his identity (Brackley: 814-815).

[28] At trial, Brackley did not recall petitioner having said anything about Keith or Carl when the video camera was turned off, but stated that he would have "put it on the tape afterward," if petitioner had, in fact, done so (Brackley: 815).

Petitioner insisted that he had not seen the shooting, but had "hear[d] things" that made him know that a friend of Wilson's named Keith was responsible. Petitioner said he would try to get Keith to turn himself in (Trial Exhibit 30).

About 43 minutes into the interview, petitioner was "finished" speaking to the prosecutor and the videotape was stopped. About 35 minutes later, the videotape resumed. Regarding the break in recording, Brackley explained, "I kept getting up to leave and you kept asking me if I could help you." Brackley had refused to "negotiate" with petitioner about the matter, and eventually had had the video camera turned back on (Trial Exhibit 30). On camera, petitioner indicated that he wished to speak to a lawyer, and Brackley ended the interview (Daley: 750-751; Brackley: 815; Trial Exhibit 30).

<u>The Defense Case</u>

Detectives EUSEBIO PEREZ and Enriquez were asked by "the lead detective" to show a photo array to Taisha Mills.[29] Perez explained to Mills that they were going to show her an array of pictures of suspects, that she should look at each one, and she should determine whether she could identify any of them as the possible perpetrator. From the array of six photographs, Mills identified petitioner as one of the people involved in the shooting (Perez: 840-843).

---

[29] The transcript misspells Detective Perez's first name as "Eseubio" (838).

Mills was "crying, nervous, rambling and wasn't sure of anything" other than that petitioner was "one of the guys there" (Perez: 849-851). Mills "basically" told Perez, "[Y]es, that the guy, he was there, he was there. Umm, he was in the bunch" and "I think he was the last guy to get in the car, in the passenger side." Mills was "basically confused trying to get her thoughts gathered together" (Perez: 844, 848-849). She "basically" said that "this is the guy that did this," but she was not 100 percent certain (Perez: 847). At one point, Mills said that she thought that petitioner had been standing next to the shooter (Perez: 845). After meeting with Mills, Perez prepared a DD-5 report in which he "put the gist of what she said." He explained, "[T]hat statement is my words, a brief summary of the things she said." He did not include her qualification of "I think" regarding the statement that petitioner had been standing next to the shooter (Perez: 844-845).

LEROY SWINNEY, who had retired from the New York Police Department, was a licensed private investigator. He was contacted by Defense Counsel Patrick Brackley, who wanted him to speak to Taisha Mills, who purportedly had information that would exonerate petitioner. Swinney located Mills and questioned her. Mills confirmed that petitioner was not the shooter, but had been the person standing next to the shooter. Swinney later spoke to Mills again; Brackley and an associate of his were also present. Mills "repeatedly" reiterated that petitioner was not the shooter (Swinney: 831-834, 836-838).

## DIRECT APPEAL

On direct appeal to the Appellate Division, petitioner complained that (1) he was denied his right to the assistance of conflict-free counsel, (2) the court incorrectly declined to instruct the jury on the defense of justification, and (3) the court considered improper factors at petitioner's sentencing (<u>see</u> Exh. A).

Petitioner had also raised numerous evidentiary complaints in his direct appeal: that the court improperly (1) prevented petitioner from impeaching a detective with the contents of an anonymous Crime Stopper call memorialized in a police form; (2) limited cross-examination of another one of the State's witnesses; (3) permitted a State's witness to testify to hearsay that another individual induced petitioner to kill the victim; (4) issued an incorrect response to a jury note during deliberations; (5) admitted details of a statement made by petitioner even though those details had not been timely disclosed; (6) precluded evidence of a prior inconsistent statement made by one of the State's witnesses; and (7) permitted evidence of a prior consistent statement made by one of the State's witnesses.

The Appellate Division affirmed his judgment of conviction on November 5, 2009 (Exh. C). <u>People v. Wynn</u>, 67 A.D.3d 423 (1st Dept. 2009). The court determined that petitioner was not deprived of his right to conflict-free counsel simply because his retained attorney was the brother of a former prosecutor who had handled the initial stages of the case and had taken a videotaped statement from petitioner. The court found that this situation did not present an unwaivable conflict,

and that petitioner had validly waived any potential conflict. Specifically, the court noted that the trial judge had advised petitioner of the possible disadvantages of the arrangement at several court appearances and during a thorough inquiry pursuant to People v. Gomberg, 38 N.Y.2d 307 (1975). The court also found that petitioner had consulted with a second, conflict-free attorney before making the decision, and that it was this second attorney who cross-examined the lead attorney's brother at both the suppression hearing and trial. Wynn, 67 A.D.3d at 423.

Moreover, the court held that the trial court properly declined to instruct the jury on justification, since there was no reasonable view of the evidence that petitioner believed, or had any reason to believe, that the victim was using or about to use deadly physical force. Finally, the court determined that petitioner's sentence was not based on any improper criteria, and the court declined to reduce the sentence or remand for resentencing. Id. at 424.

With respect to the evidentiary issues, the Court held that the first four issues mentioned above were unpreserved because petitioner failed to object or request any further remedy after corrective action. Alternatively, the court rejected those claims on their merits. The Court also found that (1) the trial court properly received portions of petitioner's statement to a detective for which the People had not provided timely notice, because the detective testified about the complete statement at the suppression hearing and because petitioner had a full opportunity to litigate the issue; (2) the trial court properly exercised its discretion when it precluded petitioner

from introducing a document reflecting a prior inconsistent statement, because the witness had admitted making the statement; and (3) the trial court did not admit a prior consistent statement of a People's witness, but rather admitted testimony clarifying the same prior statements that had been elicited on cross-examination. Id. at 423-24.

On March 18, 2010, the New York Court of Appeals denied petitioner leave to appeal (Exh. F). People v. Wynn, 14 N.Y.3d 807 (2010). On August 3, 2010, the Court of Appeals again denied petitioner leave to appeal upon reconsideration (Exh. G). People v. Wynn, 15 N.Y.3d 811 (2010).

ORIGINAL HABEAS PETITION[30]

On May 9, 2011, petitioner filed a petition for a writ of habeas corpus, raising the same ten claims his appellate attorney raised on direct appeal.[31] However, two months later, in a letter dated July 14, 2011, petitioner requested that the Court stay the proceedings and hold the petition in abeyance in order for him to exhaust an

---

[30] Petitioner filed his original petition on May 9, 2011. The New York Court of Appeals originally denied his application for leave to appeal on March 18, 2010, and denied his application for reconsideration on August 3, 2010. Assuming without conceding that this Court will determine the timeliness of petitioner's claims based on the date of the Court of Appeals' reconsideration determination, AEDPA's one-year filing limitation expired on November 1, 2011. See 28 U.S.C. § 2244; see also Matteos v. West, 357 F. Supp. 2d 572, 575 (E.D.N.Y. 2005). Even putting aside petitioner's application for reconsideration, the filing limitation would have expired on June 18, 2011. Thus, the original petition was timely.

[31] In his original petition, petitioner referenced the table of contents of his appellate attorney's brief, which lists three point headings. In fact, however, within those three headings, appellate counsel raised a total of no fewer than ten separate grounds for relief.

additional claim in state court, pursuant to CPL 440.10 (Exh. H). The sole basis for that request was an affidavit from an investigator who stated that he had interviewed Robin Hayslett on May 12, 2011 while she was incarcerated at Rikers Island (see Docket Entry 62, Exh. A). According to the investigator, Hayslett had claimed that, one month following her arrest in late 2004 or early 2005, Patrick Brackley visited her and convinced her to falsely testify against petitioner in order to help Brackley's brother, ADA Ryan Brackley. The affidavit claimed that Hayslett told the investigator that Patrick Brackley told her that he would make sure that she received a lighter sentence in her own case if she did so. Finally, the affidavit alleged that Hayslett told the investigator that after she testified against petitioner, she received a lighter sentence in her case, including drug treatment. At the time petitioner sent the letter to this Court including the affidavit, he had not yet filed any such motion in state court.

The People opposed petitioner's request in a letter dated July 27, 2011, and petitioner filed a reply in a letter dated August 11, 2011 (Exhs. I, J).[32] In a Report and Recommendation dated September 7, 2011, Magistrate Judge Ronald L. Ellis construed petitioner's application as a motion to stay the proceedings as well as to amend his petition, and recommended that both be granted (Docket Entry 10). However, Judge Ellis recognized that petitioner "offers only hearsay evidence of this

---

[32] In petitioner's reply, he also claimed that he had "additional information" regarding "perjury by a witness who was a paid confidential informant who has absolutely no credibility at all" (Exh. J at 3 ¶ 6).

misconduct," and that "such an act on the part of a defense attorney seems too egregious to be believable" (Docket Entry 10 at 4). Following respondent's objections, Judge Colleen McMahon adopted Judge Ellis' recommendation on November 7, 2011 (Docket Entry 14).

After 16 months had elapsed with no contact from petitioner, Judge McMahon's chambers requested that respondent determine whether petitioner had, in fact, filed a CPL 440.10 motion in state court. By letter dated March 20, 2013, respondent confirmed that petitioner had not and by letter dated April 9, 2013, petitioner also confirmed that he was still investigating his claims before filing a motion (see Docket Entry 15). After an additional 10 months elapsed, Judge Vernon S. Broderick ordered an update regarding whether petitioner had filed a CPL 440.10 motion in state court (Docket Entry 15). By letter dated February 28, 2014, respondent confirmed that petitioner had not and, by letter dated March 16, 2014, petitioner himself again confirmed that he was still investigating his claims and had not yet filed any motions in state court (Docket Entries 16, 19). Thus, on April 4, 2014, Judge Broderick transferred this matter to the Civil Suspense Docket (Docket Entry 20). Following Respondent's request to reconsider that order, on May 15, 2014, Judge Broderick gave petitioner 45 more days to file a CPL 440.10 motion in state court (see Docket Entries 21-24).

## CPL 440 PROCEEDINGS

In June 2014, petitioner filed a motion to vacate his conviction in the New York Supreme Court pursuant to CPL 440.10 (Exh. K). The sole ground of his motion was the aforementioned 2011 affidavit of an investigator claiming that he had interviewed Robin Hayslett and that she stated that she had been convinced to testify against petitioner by Patrick Brackley on behalf of his brother ADA Ryan Brackley, and that she consequently falsely testified against petitioner. Petitioner claimed that this showed a unwaivable and "extreme conflict of interest" that denied him his right to due process and a fair trial (Exh. K at 1).

The People submitted an affirmation and an accompanying memorandum of law in opposition to petitioner's motion on September 16, 2014 (Exh. L). The People argued that the allegations attributed to Hayslett—that Patrick Brackley convinced her to testify against petitioner—were demonstrably false, because Hayslett entered into a cooperation agreement and testified in the grand jury in a manner consistent with her later trial testimony <u>prior</u> to Patrick Brackley's engagement and entrance into the case. The People also asserted that the affidavit from the investigator containing Hayslett's alleged statements was pure hearsay, and that the statements attributed to Hayslett were vague and conclusory.

On November 6, 2014, Justice Wittner denied petitioner's CPL 440.10 motion, citing the fact that petitioner had provided only hearsay evidence in support of his claim, and had not submitted an affidavit directly from Hayslett or his trial counsel,

Patrick Brackley (Exh. M). In December 2014, petitioner filed an application for permission to appeal to the Appellate Division, First Department, which the court denied on April 23, 2015 (Exh. R). People v. Wynn, M-396 (1st Dept. [Mazzarelli, J.]).

Less than a week after Justice Wittner denied petitioner's initial CPL 440.10 motion for failure to provide more than hearsay evidence in support of his claim, petitioner obtained an affidavit signed by Hayslett, dated November 12, 2014 (see Docket Entry 62, Exh. D). The contents of the signed affidavit were taken, almost word-for-word, from the previous affidavit signed by the investigator (compare Docket Entry 62, Exh. A with Exh. D). And according to petitioner's private investigator, the affidavit was previously prepared by petitioner and read to Hayslett (Docket Entry 62, Exh. E at 3). Hayslett told the investigator that she was "instructed on what to say at the time of [petitioner's] trial" and that "if she did not cooperate she would receive additional jail time relating to her own case" (Docket Entry 62, Exh. E at 3). Hayslett asked whether signing the affidavit "would help with [petitioner's] case" and the investigator told her "it would" (Docket Entry 62, Exh. E at 3). Hayslett refused to give the investigator her home address, and ultimately signed the affidavit at a Starbucks in Manhattan (Docket Entry 62, Exh. E at 3-4).

Thus, in December 2014, petitioner filed in Supreme Court an application to renew his CPL 440.10 motion, and attached the November 12, 2014 affidavit in support (Exh. N). For the first time in his motion to renew, petitioner also alleged

that a detective mentioned at trial "did not exist at the time of the crime" because petitioner's investigators were not able to locate him. At trial, one of the eyewitnesses against petitioner, Lamont Reynolds, testified that the morning after the shooting, he reported his observations to Detective Mike Paul, who said the crime was not in his jurisdiction, but that he would refer Reynolds to the appropriate authorities. In the motion to renew, petitioner attached a letter from his private investigator that stated that the only two detectives named "Michael Paul" who were on the force around the time of the crime worked at the 10th and 17th Precinct, and not in East Harlem, where the crime took place. Thus, petitioner claimed that this showed that Detective Paul did not exist and that, therefore, Reynolds committed perjury at trial.

The People filed an affirmation in opposition to petitioner's motion to renew his CPL 440.10 motion on June 11, 2015 (Exh. O). The People repeated their arguments from their earlier opposition and also pointed out that the affidavit, though signed by Hayslett, was prepared by petitioner. The People also argued that, because Reynolds testified that Detective Paul told him that the crime was not in his jurisdiction, it was likely that the Detective Paul in question was one of the two detectives who had worked at the 10th and 17th Precincts. The People also argued that the mere fact that petitioner's investigators were unable to locate either of these detectives, who had both since retired, did not support petitioner's claim that Detective Paul did not exist or that Reynolds had offered perjured testimony.

Justice Wittner denied petitioner's motion on August 14, 2015 "based on [the] People's affirmation in response" (Exh. S) In October 2015, Petitioner filed an application for permission to appeal that denial to the Appellate Division pursuant to CPL 460.15 (Exh. T), which the court denied on December 3, 2015 (Exh. V). People v. Wynn, M-5380 (1st Dept. [Manzanet-Daniels, J.]).

## AMENDED HABEAS PETITION

On February 16, 2016, Judge Broderick ordered petitioner to file an amended petition. Shortly thereafter, the Court received a "memorandum of law" from petitioner dated February 15, 2016 (Docket Entry 54). That memorandum incorporated all but one of petitioner's arguments made on direct appeal as well as the two new claims raised in state court. Subsequently, on March 1, 2016, Thomas Francis Liotti entered his appearance as counsel for petitioner (Docket Entry 55). In a letter dated March 23, 2016, respondent requested clarification regarding whether petitioner intended this "memorandum" to be his amended petition, thereby triggering respondent's obligation to respond (Docket Entry 56). On March 24, 2016, petitioner's attorney filed a letter with the court stating that petitioner was still "intending to file an amended petition" (Docket Entry 57).

Petitioner filed an amended petition that was received by the court on June 2, 2016, which his counsel adopted (Docket Entries 59, 62, 63). The amended petition focused on petitioner's two new state claims: (1) that petitioner was constructively denied his right to counsel because his attorney, Patrick Brackley, possessed a conflict

of interest, as demonstrated by petitioner's claim that Patrick Brackley convinced Robin Hayslett to testify falsely against petitioner in order to benefit his brother, ADA Ryan Brackley; and (2) that petitioner received ineffective assistance of counsel because his attorney never investigated whether Lamont Reynolds committed perjury by testifying about Detective Paul, who petitioner claims did not exist. Petitioner's amended petition does not otherwise set forth the arguments appellate defense counsel made on direct appeal.[33]

### STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), all federal claims that were "adjudicated on the merits" by the state courts must be reviewed under the standard of review codified in 28 U.S.C. § 2254(d). Price v. Vincent, 538 U.S. 634, 638 (2003). The AEDPA "dictates a highly deferential standard for evaluating state-court rulings," which "demands that state-court

---

[33] Due to petitioner's multiple filings, it is somewhat confusing what claims he wishes this Court to review. In his amended petition, petitioner addressed only the two claims newly raised in state court. Under Rule 15(a), an amended petition supersedes the original, rendering it of no legal effect. See Brown v. Rick, 2003 WL 22801397 at *3 n.3 (S.D.N.Y. Nov. 25, 2003) (citing International Controls Corp. v. Vesco, 556 F.2d 665, 669 (2d Cir. 1977)). Thus, petitioner may have forfeited his other claims on this ground. However, petitioner stated that he was "submit[ting] this amended petition along with the original application, and adding thereto what has already been presented" and requested this Court to "review the original petition and the claims presented below" (Docket Entry 62 at 4). As a result of this confusion, the People will simply address all of petitioner's claims, regardless of when or how they were raised in the course of this habeas proceeding.

decisions be given the benefit of the doubt." Bell v. Cone, 543 U.S. 447, 455 (2005) (internal quotation marks and citations omitted).

Under § 2254(d), habeas relief may only be granted if the state court rendered either "a decision that was based on an unreasonable determination of the facts" or "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1),(2). The term "clearly established Federal law" refers solely to "the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 365 (2000). As such, a state court's failure to apply relevant Circuit Court precedent does not provide a basis for relief. See Renico v. Lett, 559 U.S. 766, 779 (2010).

Under the "unreasonable application" clause of § 2254(d)(1), relief is available if the state court has "correctly identifie[d] the governing legal rule but [has] applie[d] it unreasonably to the facts of a particular prisoner's case." Williams v. Taylor, 529 U.S. at 407-08; see also Wiggins v. Smith, 539 U.S. 510, 520 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. Instead, the unreasonableness standard commands a "substantially higher threshold" than mere error. Schriro v. Landrigan, 550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. 111 (2009). Indeed, habeas relief should be granted only where there is "no possibility fairminded

jurists could disagree that the state court's decision conflicts with th[e Supreme] Court's precedents." Harrington v. Richter, 562 U.S. 86, 102 (2011). This standard is "meant to be" "difficult to meet[.]" Id.

The factual findings of the state courts are "presumed to be correct," and that presumption may only be overcome by a showing of "clear and convincing evidence" to the contrary. 28 U.S.C. § 2254(e)(1); see also Overton v. Newton, 295 F.3d 270, 275 (2d Cir. 2002); accord Sumner v. Mata, 449 U.S. 539, 551 (1981).

POINT I

### PETITIONER IS NOT ENTITLED TO RELIEF BASED ON HIS CLAIMS OF INEFFECTIVE ASSISTANCE OF COUNSEL.

Petitioner primarily seeks habeas relief based on three claims of ineffective assistance of counsel. First, he contends that his attorney's familial relationship to the former prosecutor alone created an unwaivable conflict of interest that constructively deprived him of counsel (Docket Entry 62 at 7, 14-16). Second, he contends that this supposed conflict actually affected his representation because his attorney, petitioner maintains, actually encouraged the People's main witness to testify against petitioner at trial (Docket Entry 62 at 16-21). Third, he claims that his lawyers failed to investigate or explore whether two People's witnesses committed perjury when they mentioned a detective who, petitioner claims, did not exist (Docket Entry 62 at 21-

23).[34]  However, the state courts were unquestionably correct to reject each of these claims, and their decisions were not contrary to, or an unreasonable application of, Supreme Court precedent.

## A. Relevant Law

Under the Sixth Amendment of the United States Constitution, every criminal defendant has a right to effective assistance of conflict-free counsel.  To show a denial of this constitutional right, a defendant must demonstrate that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed" by the Sixth Amendment and that he was prejudiced by counsel's errors.  <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984).  Counsel is "strongly presumed" to have rendered adequate assistance and, to overcome that presumption, a defendant must identify "acts or omissions" that fell "outside the wide range of professionally competent assistance."  <u>Id.</u> at 689-90.  A defendant must further demonstrate that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  <u>Id.</u> at 694.  A "reasonable probability is a probability sufficient to undermine confidence in the outcome."  <u>Id.</u>

When an ineffective assistance of counsel claim is raised in habeas review, the burden on the petitioner is even higher.  The standards created by <u>Strickland</u> and

---

[34] For the first time, petitioner also alleges that his attorneys were ineffective for failing to present at trial the fact that Reynolds's girlfriend allegedly stated that Reynolds was in Albany at the time of the murder (Docket Entry 62 at 22).  This claim was never raised in state court—or this Court—and is therefore entirely unexhausted and procedurally barred.

§ 2254(d) are both "highly deferential" and "when the two apply in tandem, review is 'doubly' so." Harrington v. Richter, 562 U.S. 86, 105 (internal citations omitted). "The Strickland standard is a general one, so the range of reasonable applications is substantial." Id. Thus, "the question is not whether counsel's actions were reasonable" under Strickland, but rather, "whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. at 105.

B. The State Courts' Finding that the Familial Relationship Between One of Petitioner's Attorneys and a People's Witness Did not Present an Unwaivable Conflict of Interest, and that Petitioner Did in Fact Waive Any Conflict, was Correct and Not an Unreasonable Application of Clearly Established Federal Law.

After arraignment, petitioner retained an attorney who was the brother of the Assistant District Attorney who had initially been assigned to investigate the homicide, had interviewed petitioner after his arrest, and eventually testified in the People's case at trial. This fraternal relationship did not appear to concern petitioner before or during trial, but it has fueled petitioner's imagination ever since his conviction. In the instant petition, petitioner alleges that this relationship alone created an unwaivable conflict of interest that constructively denied him counsel (Docket Entry 62 at 7).[35]

---

[35] Petitioner also contends that the People "conceded" in state court that there was an unwaivable conflict (Docket Entry 62 at 14-16). However, the prosecutor merely expressed concerns to this effect prior to the court's full inquiry and petitioner's waiver (see 5/27/04: 6-9; 6/10/04: 4-5).

The Appellate Division determined that this situation did not present an unwaivable conflict, and that petitioner had validly waived any potential conflict. Wynn, 67 A.D.3d at 423. Specifically, the court noted that the trial judge had advised petitioner of the possible disadvantages of the arrangement at several court appearances and during a thorough inquiry pursuant to People v. Gomberg, 38 N.Y.2d 307 (1975). The court also found that petitioner had consulted with a second, conflict-free attorney before making the decision, and that it was this second attorney who cross-examined the lead attorney's brother at both the suppression hearing and trial. The Court of Appeals denied petitioner's application for leave to appeal on this same claim.

The state court decisions in this regard do not constitute an unreasonable application of clearly established law as determined by Supreme Court precedent. As discussed above, claims of ineffective assistance of counsel, including conflict of interest claims, are generally evaluated under the Strickland standard. However, in circumstances where "assistance of counsel has been denied entirely or during a critical stage of the proceeding," the Court will presume that the defendant was prejudiced and forego an analysis into whether the deficient representation had a probable effect upon the verdict. Mickens v. Taylor, 535 U.S. 162 (2002).

The Supreme Court has determined that such a presumption of prejudice exists when a defense attorney actively represents multiple co-defendants. When a court overrules a timely objection to multiple representation, automatic reversal is required.

Holloway v. Arkansas, 435 U.S. 475, 488 (1978). When there is no objection, a defendant must establish that "a conflict of interest actually affected the adequacy of [defense counsel's] representation." Cuyler v. Sullivan, 446 U.S. 335, 349 (1980). Further, the court must make an inquiry when it "knows or reasonably should know that a particular conflict exists," Sullivan, 446 U.S. at 347; see also Wood v. Georgia, 450 U.S. 261 (1981). However, the court's failure to make such an inquiry does not require automatic reversal or otherwise lessen the defendant's burden to show that the conflict actually affected his representation. Mickens v. Taylor, 535 U.S. 162, 170-74 (2002). Instead, in the face of an actual conflict, "only inquiry will enable the judge to avoid all possibility of reversal by either seeking waiver or replacing a conflicted attorney." Id. at 173.

The Supreme Court has recognized that lower courts have applied the Sullivan framework to many different types of conflict-of-interest cases. But it specifically stated in Mickens that "the language of Sullivan itself does not clearly establish, or indeed even support, such expansive application." Id. at 175. Thus, it is an "open question" as to whether the Sullivan framework applies outside of multiple representation cases. Id. at 176. Therefore, the "clearly established federal law" at issue where, as here, the conflict at issue was of a different nature is Strickland. See, e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (finding that the state court did not unreasonably apply clearly established federal law because, although the Supreme

Court had articulated the standard for state-sponsored courtroom practices, it had never addressed a claim concerning private-actor courtroom conduct).

Under the Strickland standard, petitioner's claim clearly lacks merit. Indeed, other than the Hayslett affidavit discussed below, petitioner has never specifically alleged how his attorney's familial relationship with one of the People's witnesses affected his representation of petitioner. And he has certainly never claimed that, but for that conflict, petitioner would have been acquitted. Nor could he, because Patrick Brackley was not petitioner's only legal representative during the pre-trial and trial proceedings; petitioner was also represented by Cohen, who was responsible for, inter alia, conducting the cross-examination of Ryan Brackley. Petitioner does complain that the "overwhelming presence of family bond" prevented Cohen from "zealously" cross-examining Ryan Brackley (Docket Entry 62 at 18), but that complaint is clearly belied by the record, which shows that Cohen effectively questioned Ryan Brackley about the petitioner's video-recorded statements and asked whether his goal was "to get [petitioner] to confess to the crime" (816-822).[36] And the evidence against petitioner, in the form of multiple eyewitnesses to the shooting, was nothing short of

---

[36] Petitioner also complains that Patrick Brackley referred to Ryan Brackley as a "very fine guy" in summation (Docket Entry 62 at 16), but the record actually demonstrates that Patrick Brackley delivered a cogent and compelling 48-page summation that attacked numerous aspects of the People's evidence (867-915). Indeed, this comment was offered in a brief moment of levity while he was in the midst of denigrating the credibility of Lamont Reynolds, an eyewitness to the crime (895).

overwhelming, rendering an acquittal highly unlikely under any circumstances. It is clear that petitioner cannot meet Strickland's rigorous standards, let alone show that the state court decisions were unreasonable under § 2254(d)'s "highly deferential" standard. Harrington, 562 U.S. at 105. Thus, the state courts' decisions denying petitioner's claim do not constitute an unreasonable application of clearly established federal law.

It bears repeating that habeas claims are evaluated under the holdings of the Supreme Court only, and not under Circuit Court precedent. Renico, 559 U.S. at 779. However, even if this Court were to assess petitioner's claims under Second Circuit precedent, petitioner's claim would still plainly fail. To begin, the Second Circuit has determined that a per se violation of ineffective assistance of counsel due to a conflict of interest occurs only when trial counsel is not authorized to practice law or is implicated in the crime for which the defendant is on trial. United States v. Armienti, 313 F.3d 807, 810 (2d Cir. 2002); United States v. John Doe #1, 272 F.3d 116, 125 (2d Cir. 2001). Thus, even under Second Circuit precedent, petitioner's claim that his attorney's familial relationship with the former prosecutor created an unwaivable conflict falls flat.

Moreover, any theory under the Sullivan framework that prejudice may be presumed because petitioner's attorney had "an actual conflict of interest that adversely affected the attorney's performance," United States v. Levy, 25 F.3d 146, 152 (2d Cir. 1994), would also fail due to the trial court's searching inquiry and

petitioner's valid waiver of any conflict posed by the representation. Indeed, the Second Circuit recognizes that a defendant may "waive his right to conflict-free counsel in order to retain the attorney of his choice." United States v. Schwarz, 283 F.3d 76, 95 (2d Cir. 2002); see also Wheat v. United States, 486 U.S. 153 (1988).

That is precisely what happened here. Petitioner was extensively advised and warned—by the court, Cohen, and Patrick Brackley—about the potential for conflict by retaining Patrick Brackley, and petitioner waived any potential conflict after a Gomberg inquiry. Indeed, over the course of two months, Justice Solomon addressed this issue at no fewer than six court appearances (4/8/04; 4/29/04; 5/13/04; 5/21/04; 5/27/04; 6/10/04). In doing so, the judge was careful to assure petitioner that he was free to have Patrick Brackley continue representing him so long as he did so with the knowledge of the potential risks (5/21/04: 4-6). Moreover, the judge informed petitioner that, should he decide against keeping Patrick Brackley as his attorney, he was still entitled to legal representation, including by assigned counsel should he be unable to afford to retain counsel (5/21/04: 5). Petitioner was repeatedly warned about the potential conflict that could arise should Patrick Brackley be faced with advocating on petitioner's behalf and against the testimony of his own brother (4/29/04: 3-4; 5/21/04: 3-4; 6/10/04: 3-4). Specifically, the judge warned that Patrick Brackley "might not go after his own brother the way that he would go after another witness on cross-examination" and might possibly refrain from asking questions in petitioner's "best interest" due the fraternal relationship. The judge

could not "know" for certain that Patrick Brackley would, in fact, pull his punches, but duly warned petitioner of the "danger" of that "possibility" (5/21/04: 3-4).

Significantly, however, the bulk of those specific concerns were personally addressed by Patrick Brackley, who was himself duly aware of the potential conflict. Thus, from the very beginning, Patrick Brackley made clear that "another attorney" would handle that cross-examination, thus eliminating the awkward entanglement of having a defense attorney questioning a member of his own family (4/8/04: 2, 5; 5/21/04: 7-10). Indeed, Patrick Brackley specifically asked that Cohen remain assigned to the case, first so that she could advise petitioner about whether to waive the potential conflict of Brackley's representation, and also so that she could cross-examine Ryan Brackley should he be called as a witness (4/8/04: 2-4; 4/29/04: 3; 5/21/04: 7-10; 6/10/04: 5-6). The court exercised wise discretion by not only permitting Cohen to remain as co-counsel, but insisting that petitioner consult with her about the choice of whether to continue retaining Patrick Brackley.

Of course, the judge correctly realized that the fact that Brackley would cede cross-examination of his brother to Cohen did not entirely erase the potential for conflict. Since Patrick Brackley's very presence "at counsel table" could possibly affect how the defense was conducted (6/10/04: 4), Justice Solomon ensured that petitioner was alerted to that possibility and provided extensive time for petitioner to consult with his attorneys before rendering a decision about whether to continue with Patrick Brackley despite the potential conflict.

Specifically, among other concerns, the prosecutor raised the concern that Patrick Brackley's retention could affect whether and to what extent the defense would challenge the prosecution's handling of the investigation into Nelson's murder. Indeed, Cohen acknowledged that, in her seventeen years as a member of the defense bar, she had raised just such a defense on "several occasions" in the past. She assured the court that she had discussed that potential source of conflict as well as many others when she met with petitioner outside of Patrick Brackley's presence. After her consultations with petitioner, Cohen believed that petitioner was "fully aware" of the "possible ramifications" and "possible conflicts" inherent in having Patrick Brackley remain on the defense team (5/27/04: 9).

After providing petitioner with yet another adjournment in which to contemplate his decision and discuss it with family, the court asked petitioner whether he understood the possible conflict that could arise from having a lawyer who was related to a witness against him. Petitioner confirmed that he did. Petitioner also affirmed that he had given the matter thought over the weeks of adjournments and had consulted with both of his attorneys about the matter. The judge permitted petitioner to ask any questions he might have for the court, but petitioner had none. The judge also asked, "Is there anything that I haven't gone over with you that you feel you want to ask me or you feel might be a problem, anything whatsoever?" Petitioner raised no issues and asked no questions. Only after verifying that petitioner fully understood the potential conflict, had been given enough opportunity to consult

with both of his attorneys, and had no lingering questions or concerns did the court then ask petitioner how he wished to proceed. Petitioner replied, "I want to stay with Mr. Brackley" (6/10/04: 4-5).

It is clear from these proceedings that petitioner was fully, if not obsessively, informed about the potential for conflict should he retain Patrick Brackley on his defense team. And petitioner chose to have Patrick Brackley's continued counsel. Thus, the court was simply not entitled to second-guess the petitioner's decision to retain his potentially conflicted attorney. After all, courts may not "'assume too paternalistic an attitude in protecting the defendant from himself,' and although the defendant's choice of counsel 'may sometimes seem woefully foolish' to the court, the choice remains his." United States v. Perez, 325 F.3d 115, 126 (2d Cir. 2003) (quoting United States v. Curcio, 694 F.2d 14, 25 [2d Cir. 1982]). And indeed, once a conflict has been validly waived, "the waiver cannot be defeated simply because the conflict subsequently affects counsel's performance; such a result would eviscerate the very purpose of obtaining the waiver." Schwarz, 283 F.3d at 95. Here, once petitioner made an intelligent and volitional waiver of his attorney's potential conflict, the court could not deny him the counsel of his choice.

Thus, petitioner clearly and validly waived any potential conflict posed by Patrick Brackley's continued representation, and the state court decisions finding as much do not constitute an unreasonable application of clearly established federal law

based on Supreme Court precedent, nor do they even conflict with Second Circuit law. Petitioner is not entitled to relief.

C. The State Courts Appropriately Rejected Petitioner's "New Evidence" of a Conflict of Interest

After both the Appellate Division and the Court of Appeals rejected petitioner's conflict-of-interest claim, petitioner presented "new evidence" of the conflict to the trial court in his CPL 440.10 motion. At first, petitioner presented only an affidavit from his investigator that, in an interview, Robin Hayslett told the investigator that Patrick Brackley convinced her to testify against petitioner. On November 6, 2014, Justice Wittner denied the motion, explaining that petitioner's claim was supported only by hearsay, and noting that he had not submitted an affidavit directly from Hayslett or from his trial counsel. However, petitioner then filed an application to renew based on an affidavit allegedly signed by Hayslett and dated only six days after Justice Wittner's decision. In opposition to petitioner's application to renew his CPL 440.10 motion, the People argued that the allegations attributed to Hayslett were transparently false, because Hayslett began cooperating with the People and against petitioner prior to Patrick Brackley's entrance into the case. The People also noted that the Hayslett affidavit was unreliable because it was actually prepared by petitioner and its contents were vague and conclusory. Justice Wittner denied petitioner's application to renew "based on [the] People's affirmation

in response." And the Appellate Division denied both of petitioner's applications for permission to appeal those denials pursuant to CPL 460.15.

The state courts correctly denied petitioner's CPL 440.10 motion and his motion to renew on the basis of Hayslett's affidavit. The affidavit in question was not only inherently unreliable, but it was also vague, conclusory, and completely belied by the undisputed timeline in this case. The circumstances surrounding the affidavit's acquisition were, by themselves, suspicious. Namely, petitioner obtained the initial affidavit from the investigator over six years after his conviction and sentence. And when the state court rejected this claim three years later, in part because petitioner had not presented an affidavit from Hayslett, petitioner suddenly produced a signed affidavit that matched almost word-for-word the affidavit previously signed by the investigator. These circumstances alone, which followed petitioner's failed complaints during direct appeal, render Hayslett's affidavit suspect.

Moreover, the sequence of events set forth by Hayslett's affidavit are patently disproved by the record. In it, Hayslett purportedly claimed that she decided to falsely testify against petitioner in order to get a lesser sentence after she was approached by petitioner's attorney Patrick Brackley "in late 2004 or early 2005" (Docket Entry 62, Exh. D). However, in reality, Hayslett had already signed a cooperation agreement with ADA Ryan Brackley, which guaranteed her a lesser sentence in exchange for her cooperation, months earlier, on February 11, 2004. That

same day, she testified against petitioner in the grand jury and identified him as the shooter (see Exh. L ¶ 5).

At that time, petitioner was not yet represented by an attorney. Even when he was arraigned in criminal court the next day, on February 12, 2004, he was assigned a Legal Aid attorney named Keith Cavett. Petitioner only hired Patrick Brackley sometime after his arraignment in Supreme Court on February 26, 2004. And Patrick Brackley appeared for the first time on behalf of petitioner on April 8, 2004. When Hayslett finally testified against petitioner at trial in early 2005, her testimony was consistent with her grand jury testimony from the year before (see Exh. L ¶ 12). Thus, since Patrick Brackley had not yet been retained and had no connection to the petitioner or to his case when Robin Hayslett entered into a cooperation agreement with ADA Ryan Brackley and testified in the grand jury, the central allegation in Hayslett's affidavit must be entirely false.

Moreover, by the time that Patrick Brackley entered the case on behalf of petitioner, it was clear that Ryan Brackley was leaving the District Attorney's Office and that the case would be reassigned (4/8/04: 2). Indeed, by the time of trial in early 2005, Ryan Brackley had left the District Attorney's Office and was a lawyer at a large commercial law firm in Denver, Colorado (Brackley: 798). Thus, Patrick Brackley would have had no motive, in late 2004 or early 2005, to help his brother in the prosecution of petitioner, because by that time, Ryan Brackley was no longer assigned to the case or even working at the District Attorney's Office. Thus, the concept that

Patrick Brackley would actively work to secure witnesses against his own client—for absolutely no discernable benefit to either him or his brother—defies credulity and was correctly rejected out of hand.

In addition to the fact that her claims are factually implausible, Hayslett's affidavit is also vague and conclusory. There is absolutely no information in her affidavit regarding the facts of the underlying case. She never explains what portion of her testimony was false or what she would have said if she had testified truthfully. Even the reasons she allegedly provided to the investigator for signing the affidavit did not touch upon petitioner's guilt or innocence: instead, she merely stated that petitioner "should not be in jail" (Docket Entry 62, Exh. E at 3). Moreover, the affidavit does not alter the testimony of the other eyewitness at trial, Reynolds, who identified petitioner as the shooter. And the contents of the affidavit contradict Hayslett's own sworn testimony at trial, where she stated that when Patrick Brackley visited her in Rikers Island, she told him that she "didn't have no involvement" and did not disclose that she was already cooperating with the District Attorney's Office (Hayslett: 372-73). Thus, for all of these reasons, the state courts aptly denied petitioner's claims without a hearing due to the affidavit's inherently suspect nature and factually impossible claims.

In sum, petitioner's newfound claim that his attorney Patrick Brackley actively endeavored for Hayslett to testify falsely against petitioner at trial is inherently unreliable as it is based on a vague and conclusory affidavit, and is entirely belied by

the fact that Hayslett entered into a cooperation agreement with the People and testified in the grand jury in a manner consistent with her later trial testimony prior to Patrick Brackley's engagement and entrance into the case. Thus, petitioner's claim is meritless and the state courts reasonably rejected it.

D. Petitioner's Claim that Reynolds Perjured Himself at Trial by Mentioning a Detective that Petitioner Claims Does Not Exist is Procedurally Barred and Entirely Meritless.

Next, petitioner claims that his defense attorneys provided him with ineffective assistance of counsel because they failed to investigate whether Detective Mike Paul, who was mentioned by Reynolds and Detective Clarke at trial, actually existed (Docket Entry 62 at 19-23). Based on petitioner's recent investigation, he claims that Detective Paul was "fictitious," that Reynolds and Detective Clarke therefore perjured themselves at trial, and that his attorneys were ineffective in failing to investigate or counter this perjured testimony (Docket Entry 62 at 19-23). Petitioner seems to also suggest a due process claim as a result of the alleged perjury itself.

Preliminarily, both of these claims are entirely procedurally barred. Petitioner did not mention them in his July 14, 2011 letter, which Judge McMahon construed as a motion to amend and stay his habeas petition (see Exh. H; Docket Entries 10, 14). Thus, petitioner has never sought to leave to amend his petition to include these related claims. See Fed. R. Civ. P. 15(a) (requiring leave to amend if twenty-one days have passed since the original petition was filed, or if a party has already amended its pleading once as a matter of course). Nor should this Court grant leave now.

Although Rule 15 requires that leave to amend be "freely given," district courts nevertheless retain the discretion to deny leave due to undue delay or if amendment would be futile. See Littlejohn v. Artuz, 271 F.3d 360, 363-64 (2d Cir. 2001) (citing Foman v. Davis, 371 U.S. 178, 182 [1962]). Here, amendment would be entirely futile since any such amended claim would be time-barred. Petitioner's one-year filing limitation ran out five years ago, in 2011, since his judgment of conviction became final no later than November 1, 2011.[37] 28 U.S.C. § 2244 (d)(1) (setting forth a one-year filing limitation for state habeas petitions). Moreover, his new claims certainly do not "relate back" to any of the claims in his original petition as they are not tied to any "common core of operative facts." Fed. R. Civ. P. 15(c)(1)(b); see Mayle v. Felix, 545 U.S. 644, 664 (2005). Further, petitioner's delay in raising these claims is certainly inexcusable; indeed, petitioner did not even mention this claim in state court until he filed his application to renew his CPL 440.10 motion in December 2014, more than three years after the commencement of his habeas action and his request to stay the proceedings.

---

[37] As noted above, see Footnote 30, petitioner's one-year filing limitation expired on June 18, 2011, or, if based on the Court of Appeals' reconsideration determination, November 1, 2011. That petitioner later filed a CPL 440 motion does not change this fact. While CPL 440 motions toll the limitation period, they do not re-set the clock once time has run out. See, e.g., Smith v. McGinnis, 208 F.3d 13, 17 (2d Cir. 2000). Nor would petitioner be entitled to additional time if, as he claims, he only recently discovered the factual predicate of his claims. See § 2244(d)(1)(d). After all, all of the facts underlying the claim were known or could easily have been discovered prior to or during trial. See Rivas v. Fischer, 687 F.3d 514, 534-35 (2d Cir. 2012).

Amendment is also not warranted as petitioner's claims are clearly meritless.  In state court, Justice Wittner denied petitioner's application to renew his CPL 440.10 motion "based on [the] People's affirmation in response," which attacked the factual basis for petitioner's claim that Detective Paul did not exist.  Thereafter, the Appellate Division denied petitioner's application for leave to appeal that denial.

The state courts were correct to reject this claim.  Petitioner cannot establish that Reynolds and Detective Clarke perjured themselves, nor that his attorneys provided deficient representation in failing to investigate and counter that perjury, because his underlying factual allegations concerning Detective Paul are patently meritless.  At trial, Reynolds testified that he had worked as a confidential informant for Detective Mike Paul for about 15 years prior to the murder, and that he spoke with him on the phone the morning after he witnessed petitioner shoot Nelson (Reynolds: 498-499, 532).  Reynolds testified that Detective Paul told him that the homicide was not his case and that he did not have jurisdiction over it, but that he would put Reynolds in touch with the proper authorities (Reynolds: 528-529, 533-534, 567-568, 582-585).  Detective Clarke testified at trial that Detective Paul then told him that Reynolds was a confidential informant who was an eyewitness to the homicide (Clarke: 646-648, 700, 716-717, 725-727, 729, 731, 734-736).

Petitioner now contends that Detective Paul did not exist.  His only basis for that claim is that petitioner's private investigator informed him that the only two detectives named "Michael Paul" who were on the police force around the time of the

crime worked at the 10th and 17th Precincts, and not in East Harlem, where the crime took place (Docket Entry 62 at 19-23, Exh. E). Even assuming the accuracy of that information, it does nothing to undermine Reynolds or Clarke's testimony. Contrary to petitioner's claim (Docket Entry 62 at 22), there was no evidence adduced at trial definitively establishing that Detective Paul was stationed at the 25th Precinct in East Harlem. In fact, Reynolds testified that Detective Paul told him that the East Harlem homicide did not take place within his jurisdiction (Reynolds: 528-529, 533-534, 567-568, 582-585). Thus, it would make sense that Detective Paul was one of the two Michael Pauls identified by petitioner's investigator, since the 10th and 17th Precincts were further downtown. As a result, petitioner has not even come close to showing that either Reynolds or Detective Clarke perjured themselves at trial by testifying about Detective Paul; surely, he has not established that his attorneys were somehow deficient for failing to investigate this entirely meritless claim.

Indeed, this would not have been a good use of counsel's resources for another reason: the testimony about Detective Paul had limited relevance to the salient facts of the trial. Instead, it merely served as part of a background explanation for how Reynolds reported his observations to the police, and how Detective Clarke came to know that Reynolds had witnessed the homicide. Thus, at the time of trial, there was absolutely no reason for defense counsel to doubt the detective's existence, or for his defense attorneys to employ resources to try to track him down. Strickland, 466 U.S. at 690 ("the court should recognize that counsel is strongly presumed to have

rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"). And even if Reynolds and Detective Clarke never mentioned Detective Paul, or if defense counsel had somehow managed to contradict their testimony on this ground, petitioner still would have been convicted in light of the overwhelming evidence against him. See Ortega v. Duncan, 333 F.3d 102, 108 (2d Cir. 2003) (when a government witness provides false testimony without the prosecution's knowledge, due process is violated only "if the testimony was material and 'the court [is left] with the firm belief that but for the perjured testimony, [petitioner] would most likely not have been convicted'"); see also Strickland, 466 U.S. at 694. Thus, petitioner is not entitled to habeas relief on this ground.

## POINT II

### PETITIONER'S REMAINING COMPLAINTS CONCERNING THE EVIDENCE AND TESTIMONY INTRODUCED, AND THE COURT'S CONDUCT, AT HIS TRIAL AND SENTENCING ARE PROCEDURALLY BARRED; REGARDLESS, THEY ARE MERITLESS.

In his original habeas petition, petitioner simply referenced the table of contents of his appellate attorney's brief. In that brief, in addition to the conflict-of-interest claim, petitioner raised seven separate complaints concerning the trial court's evidentiary rulings and conduct at trial. He also complained that the court incorrectly declined to instruct the jury on the defense of justification. Finally, he argued that the court considered improper factors at petitioner's sentencing.

It is not clear whether petitioner even wishes for this Court to review these claims since he has never argued them or even mentioned them in his petition, except for the fact that he attached the table of contents of his appellate brief to his original petition and incorporated most of them by page reference in his February 15, 2016 "memorandum of law." But even if he does, they are all procedurally defaulted. A petitioner cannot raise a claim on habeas review unless it has been fully exhausted. § 2254(b)(1)(A). Indeed, the purpose behind the exhaustion requirement is to "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). Thus, in New York, a petitioner must first present his claims to the Appellate Division, and then seek further review by raising those claims in his leave application to the Court of Appeals. Smith v. Duncan, 411 F.3d 340, 345 (2d Cir. 2005).

Here, petitioner's leave application letter to the Court of Appeals focused solely on the conflict-of-interest issue, and did not mention any of the other arguments that were made before the Appellate Division other than simply attaching his Appellate Division Brief (see Exh. E). Thus, petitioner has abandoned these claims, as simply "arguing one claim in his letter while attaching an appellate brief without explicitly alerting the state court to each claim raised does not fairly present such claims for purposes of the exhaustion requirement underlying federal habeas jurisdiction." Jordan v. LeFevre, 206 F.3d 196, 198-99 (2d Cir. 2000); see also Grey v. Hoke, 933

F.2d 117, 120 (2d Cir. 1991) ("The fair import of petitioner's submission to the Court of Appeals, consisting of his brief to the Appellate Division that raised three claims and a letter to the Court of Appeals arguing only one of them, was that the other two had been abandoned.").[38]  As a result, petitioner is procedurally barred from raising these claims in a federal habeas proceeding unless he can show either cause for his procedural default and resulting prejudice or that there has been a fundamental miscarriage of justice, such as an actual innocence claim.  Schlup v. Delo, 513 U.S. 298, 321-25 (1995); Murray v. Carrier, 477 U.S. 478, 495-96 (1986).  Petitioner has not even tried to make such a showing, and it would be impossible to do so on this record.  Thus, all of these claims are procedurally barred.

In any event, all of the state claims petitioner has abandoned are meritless, and will be discussed in turn.

### A. Petitioner's Seven Evidentiary Claims

On direct appeal, petitioner raised seven complaints concerning the trial court's evidentiary rulings and conduct throughout the trial, and contended that these alleged errors violated his due process rights under the state and federal constitutions. Specifically, petitioner claimed that the court improperly (1) prevented petitioner from impeaching a detective with the contents of an anonymous Crime Stopper call

---

[38] The People, Judge Ellis, and Judge McMahon all appeared to assume that petitioner's original habeas petition contained only exhausted claims (see Docket Entries 10, 14 at 3; Exh. I).  However, as petitioner did not raise these remaining claims in his leave application to the Court of Appeals, they are in fact unexhausted and procedurally barred.

memorialized in a police form; (2) limited cross-examination of another one of the State's witnesses; (3) permitted a State's witness to testify to hearsay that another individual induced petitioner to kill the victim; (4) improperly responded to a jury note during deliberations; (5) admitted details of a statement made by petitioner even though those details had not been disclosed in a timely fashion; (6) precluded evidence of a prior inconsistent statement made by one of the State's witnesses; and (7) permitted evidence of a prior consistent statement made by one of the State's witnesses.

But none of these claims entitles petitioner to relief on habeas review. As discussed, all of these claims are procedurally defaulted because they are unexhausted. Moreover, the first four claims are barred for another reason: the Appellate Division denied them on the ground that they were unpreserved as a matter of law. It is well established that, in habeas corpus proceedings, the federal courts will "not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). It is also well settled that CPL 470.05(2), New York's contemporaneous objection rule, presents exactly such an "independent and adequate" ground. See Clark v. Perez, 510 F.3d 382, 390-91 (2d Cir. 2008); Garvey v. Duncan, 485 F.3d 709, 714-720 (2d Cir. 2007).

Here, when petitioner advanced these four identical claims before the Appellate Division, the People argued that these claims were unpreserved for review (Exh. B at

79-81, 93-95, 100-102, 109-110). The Appellate Division agreed with the People's procedural argument with respect to all four claims, and declined to review the claims. Wynn, 67 A.D.3d at 424. Thus, since these four claims were rejected on independent state grounds, and petitioner has not even offered, let alone demonstrated, any of the circumstances which would excuse his procedural default, his request for habeas corpus relief on the basis of any of them should be rejected on this ground alone.

Even putting those procedural bars to the side, the claims do not warrant relief. After all, in general, a state court's evidentiary rulings do not implicate the federal constitution. See Crane v. Kentucky, 476 U.S. 683, 689 (1986) ("[w]e acknowledge also our traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts"). As the Second Circuit has stated, "not 'every error of state law can be transmogrified by artful argumentation into a constitutional violation.'" Ponnapula v. Spitzer, 297 F.3d 172, 182 (2d Cir. 2002) (quoting Sanna v. Dipaolo, 265 F.3d 1, 12 [1st Cir. 2001]); see also DiGuglielmo v. Smith, 366 F.3d 130, 136 (2d Cir. 2004) (alleged errors of state law "cannot be repackaged as federal errors simply by citing the Due Process Clause") (quoting Johnson v. Rosemeyer, 117 F.3d 104, 111 [3d Cir. 1997]). Rather, to establish that an evidentiary error deprived him of due process, petitioner must establish "that the error was so pervasive as to have denied him a fundamentally fair trial." Collins v. Scully, 755 F.2d 16, 18 (2d Cir. 1985); see also Estelle v. McGuire, 502 U.S. 62, 72 (1991).

Petitioner cannot meet that standard here. The four unpreserved claims require little discussion. While the Appellate Division rejected these claims because they are unpreserved, as an "alternative holding," it also rejected them on the merits. Wynn, 67 A.D.3d at 424. First, petitioner complained that, after Detective Clarke offered up inadmissible testimony during the People's case—the contents of an anonymous Crime Stopper call—the court improperly precluded petitioner from impeaching Clarke about inconsistencies between his testimony and the actual call (Exh. A at 33-35). However, as discussed in detail in the People's Respondent's brief (Exh. B at 75-86), in response to petitioner's protest, the court struck Clarke's testimony about the anonymous tip, instructed the jury to disregard it as unreliable hearsay, and permitted petitioner to admit into evidence a stipulation regarding the actual contents of the DD-5 report, all at petitioner's request. Thus, at the end of the day, the People were not able to introduce Clarke's testimony about the anonymous tip, but petitioner was still able to effectively impeach the witness. This result was much more beneficial to petitioner than to the People and could not possibly have deprived petitioner of a fair trial.

Petitioner next complained that the court improperly limited his cross-examination of Officer Daley when it did not allow defense counsel to ask him if he, or any of the other officers present, asked Hayslett "who committed the crime" during her November 14, 2003 interview (Exh. A at 39-40). However, as explained

more fully in the People's Respondent's Brief to the Appellate Division (Exh. B at 93-95), the court did allow defense counsel to ask this question (see Daley: 762).

Next, petitioner claimed that the court permitted a State's witness to testify to hearsay that another individual had induced petitioner to kill the victim (Exh. A at 40-41). However, as discussed in the People's Respondent's Brief to the Appellate Division (Exh. B at 100-102), the court, in fact, sustained petitioner's objections to any such testimony and struck it from the record (see Colloquy: 538-39, 542-43, 546-48; Reynolds: 549).

Fourth, petitioner complained that, in responding to a confusing jury note that mentioned Hayslett's grand jury testimony, the trial court incorrectly stated that Hayslett did not testify before the grand jury, thereby depriving the jury of impeachment material (Exh. A at 45-46). But the fact that the court apparently confused Hayslett, who did testify in the grand jury, with another witness, that the jury had also mentioned, who did not, could not have harmed petitioner, who never even alerted the court to the mistake. After all, as explained in the People's Respondent's Brief to the Appellate Division (Exh. B at 107-112), the court could not have provided the jury with Hayslett's grand jury testimony because it was never admitted into evidence. Moreover, the read-back of Hayslett's trial testimony that the jury did hear included the impeachment based on her grand jury testimony, to which the jury was likely referring in its note. Thus, as determined by the Appellate

Division, these four complaints are not only procedurally barred as unpreserved, but also meritless.

Petitioner's remaining three evidentiary claims are equally meritless. First, petitioner claimed that the court improperly admitted details of a statement made by petitioner even though those details were not disclosed in the time frame required by New York State procedural rules, specifically, CPL 710.30 (Exh. A at 42). Relatedly, petitioner complained that the court denied his attorney adequate access to the record in order to retrieve the information necessary to support her complaint about admission of those details. However, as explained in the People's Respondent's Brief to the Appellate Division (Exh. B at 69-74), the complained-of details of the statement had been elicited at an earlier suppression hearing, and the defense raised no objection on the grounds of lack of notice, but litigated the statement's admissibility as a whole. Under New York law, in that situation, lack of notice does not bar admission at trial. See CPL 710.30(3); see also, e.g., People v. Kirkland, 89 N.Y.2d 903, 904-905 (1996). Moreover, counsel clearly had full access to the record, and there is absolutely no indication that the court ever impeded counsel's ability to refer to that record. Thus, the trial court acted correctly and the Appellate Division was correct to deny petitioner's claim. See Wynn, 67 A.D.3d at 424.

Petitioner next faulted the trial court for declining to admit Detective Perez's DD-5 report as evidence of a prior inconsistent statement by Mills, and for declining the jury's request to view the document during deliberations (Exh. A at 3, 37-38, 46).

However, as discussed in further detail in the People's Respondent's Brief (Exh. B at 87-92), the DD-5 report could not be admitted into evidence to impeach Mills's testimony because she had not prepared it. People v. White, 272 A.D.2d 239, 240 (1st Dept. 2000) ("Since the victim did not sign or prepare the [Criminal Court] complaint, the complaint was not admissible as a prior inconsistent statement by him"). And since Perez testified consistently with what he had written in his DD-5, that report could not be admitted to impeach his testimony either. See Wynn, 67 A.D.3d at 423-24 ("the court properly exercised its discretion when it precluded defendant from introducing a document reflecting a prior inconsistent statement after the witness had admitted making the statement"). Finally, since the DD-5 report was never admitted into evidence, the court properly denied the jury's request to view it during deliberations.

Finally, petitioner claimed that the trial court improperly allowed the prosecutor to elicit statements from Reynolds on redirect examination as a "prior consistent statement" (Exh. A at 41-42). However, as explained in the People's Respondent's Brief (Exh. B at 95-100), defense counsel had elicited testimony from Reynolds concerning statements he made during the search warrant application proceedings, and the exchange was so confusing that, on redirect, the court permitted the People to clarify those statements. Thus, as the Appellate Division concluded, the testimony actually just "clarified other portions of the same statement that had been elicited on cross-examination." See Wynn, 67 A.D.3d at 424.

In sum, all of petitioner's complaints about the court's evidentiary rulings and conduct at trial are procedurally defaulted and meritless and none of them deprived petitioner of a fair trial.

## B.  The Denial of the Justification Charge

Petitioner also complained that the trial court erred in refusing to charge justification to the jury (Exh. A at 43-45).  However, this claim is also procedurally barred as abandoned, as discussed above.  It also does not entitle petitioner to habeas relief because it raises a question of state law.  Moreover, it is meritless.  As the Appellate Division determined, there was "no reasonable view of the evidence, when viewed most favorably to defendant, that defendant believed, or had any reason to believe, that the victim was using or about to use deadly physical force."  Wynn, 67 A.D.3d at 424.

The propriety of a state trial court's jury instructions is ordinarily a matter of state law that does not raise a federal constitutional question.  See Cupp v. Naughten, 414 U.S. 141, 146 (1973).  To prevail, petitioner must establish not just that an instruction was "erroneous, or even universally condemned," but that it amounted to a constitutional deprivation.  Moronta v. Griffen, 610 Fed. Appx. 78, 79 (2d Cir. 2015), quoting Davis v. Strack, 270 F.3d 111 (2d Cir. 2001), quoting Cupp, 414 U.S. at 146.  Even when a justification charge should be given because the evidence supports it, that does not automatically mean that a denial of the charge amounts to a due process violation.  See, e.g., Jackson v. Edwards, 404 F.3d 612, 624-25 (2d Cir. 2005)

(considering separately whether the erroneous failure to give the charge resulted in a violation of due process); Blazic v. Henderson, 900 F.2d 534, 541-42 (2d Cir. 1990) (determining that even though state court erred in not giving a justification charge, petitioner was not entitled to habeas relief because there was no constitutional due process violation). Clearly, where a proposed charge is not supported by the evidence, due process does not require that it be given. See Blazic, 900 F.2d at 541; see also Long v. Andrews, 2000 WL 1716443 (E.D.N.Y. Nov. 13, 2000) (no due process violation because evidence did not support justification charge).

Here, as the Appellate Division correctly noted, "there was no reasonable view of the evidence, when viewed most favorably to defendant, that defendant believed, or had any reason to believe, that the victim was using or about to use deadly physical force." Wynn, 67 A.D.3d at 424; see also Penal Law § 35.15(2)(a). To begin, petitioner did not testify or put on any evidence. While a defendant can be entitled to the defense based on the People's evidence, People v. Steele, 26 N.Y.2d 526, 528-29 (1970), that was not the case here. As discussed in the People's Respondent's Brief in the Appellate Division (Exh. B at 102-106), no witness provided any evidence whatsoever that Nelson was on the brink of opening fire. To be sure, Hayslett testified that, based on Nelson's reputation and the fact that he kept his hands in his pocket during the argument with Wilson, she believed Nelson "had a gun" and would use it (Hayslett: 318-319, 330, 410, 462). However, at no time did Hayslett state or imply that she believed anyone to be in imminent danger of deadly physical force

from Nelson. Hayslett never even attempted to flee the area or impress upon Wilson that she was concerned for his immediate safety. And notably, no gun was ever found on or near Nelson.

Nor was there any testimony about what petitioner believed as he drew his own gun and fired on Nelson. Even while spinning exculpatory tales for police consumption and attempting to bargain with the prosecutor for less jail time based on a theory of "justifiable homicide," petitioner never even bothered to describe Nelson as the least bit threatening. Most telling, however, is that none of the bullets that pierced Nelson's body had been fired from in front of him; instead, one shot could have been fired as Nelson turned away, and the rest were fired into his back as he ran. At the time petitioner opened fire, then, Nelson was not threatening anyone; he was running for his life.

In sum, the Appellate Division was correct to find that the evidence in no way supported the conclusion that petitioner shot Nelson based on a reasonable belief that Nelson posed an imminent threat of deadly physical force. Thus, the trial court's omission of a justification charge did not amount to a due process violation.

## C. Sentencing Considerations

Finally, petitioner complained that the sentencing court relied on "untrue and unreliable allegations of misconduct" in violation of his due process rights (Exh. A at 52-54). But this claim would not entitle petitioner to relief either, even if it were not also procedurally defaulted. At issue is the prosecutor's recounting of the allegations

underlying petitioner's 2004 second-degree harassment conviction for conduct against Tremain Davis, petitioner's apparently estranged girlfriend (see Exh. A at 30-31). As the prosecutor explained to the sentencing judge, Davis had reported that petitioner had taken out the gun he used to shoot Nelson, put the gun to Davis's head, and told her, "I've already killed somebody before and I can do the same to you." Davis had also reported that petitioner regularly "carried the murder weapon" and was "an active narcotic[s] trafficker" (Sentencing: 5). In satisfaction of these charges, on March 2, 2004, petitioner pled guilty to second-degree harassment and was sentenced to a conditional discharge. An Order of Protection was also issued in favor of Davis (Exh. B at 113). At petitioner's sentencing for the Nelson murder, the prosecutor asked the court to consider Davis's report of petitioner's threats to her in assessing an appropriate sentence for petitioner (Sentencing: 5).

On appeal to the Appellate Division, petitioner claimed that Davis's claims were "untrue and unreliable" as well as "uncharged and entirely uncorroborated" (Exh. A at 52, 54). Petitioner also maintained that the prosecutor had no "good faith basis" for proffering them to the sentencing court since the record does not indicate that they had been relayed to him "personally" (Exh. A at 54). The Appellate Division determined that petitioner's sentence was not "based on any improper criteria" and that there was "no basis for reducing the sentence or remanding for resentencing." People v. Wynn, 67 A.D.3d 423, 424 (1st Dept. 2009).

It has long been established that a judge has "wide discretion" in fashioning a sentence within the limits fixed by law. See, e.g., Alleyne v. United States, 133 S. Ct. 2151, 2163 (2013), quoting Williams v. New York, 337 U.S. 241, 246 (1949). And generally, "[n]o federal constitutional issue is presented" when a sentence is "within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992). To be sure, "the sentencing process…must satisfy the requirements of the Due Process Clause." Gardner v. Florida, 430 U.S. 349, 358 (1977) (Stevens, J. joined by Stewart, J. and Powell, J.). However, "the Supreme Court has not specifically delineated the scope of the inquiry a sentencing court must conduct." Janick v. Superintendent, 404 F. Supp. 2d 472, 482 (W.D.N.Y. 2005) aff'd, 253 Fed. Appx. 65 (2d Cir. 2007). Indeed, the Supreme Court has expressly declined to "constitutionaliz[e] burdens of proof at sentencing" and noted that "[s]entencing courts have traditionally heard evidence and found facts without any prescribed burden of proof at all." McMillan v. Pennsylvania, 477 U.S. 79, 91-92 (1986). Any information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination. See Williams, 337 U.S. at 249-50; United States v. Pugliese, 860 F.2d 25, 29 (2d Cir. 1988). Permitting such a broad scope "ensures that the punishment will suit not merely the offense but the individual defendant." Pepper v. United States, 562 U.S. 476, 488 (2011), quoting Wasman v. United States, 468 U.S. 559, 564 (1984).

In particular, it is certainly proper to consider the conduct underlying prior convictions when determining an appropriate sentence. See United States v. Rose, 216 F.3d 1074 (2d Cir. 2000), citing United States v. Carmona, 873 F.2d 569, 574 (2d Cir. 1989). Furthermore, judges are permitted to look at a defendant's past conduct even if the defendant was not convicted of the crime. Indeed, a judge may consider conduct for which a defendant was acquitted. See United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005); United States v. Miller, 116 F.3d 641, 685 (2d Cir. 1997).[39]

In short, there was nothing improper about the sentencing court considering petitioner's prior bad act. At sentencing, defense counsel never disputed the truth of the prosecutor's remarks about the facts underlying his 2004 conviction, which in itself is fatal to his due process claim. A defendant's failure to "dispute the truthfulness of the allegations at sentencing" is "highly significant," because "the absence of a denial itself provides an important indicia of reliability." United States v. Bass, 535 F.2d 110, 121 (D.C. Cir. 1976). Simply put, there is "no reason to bar sentencing judges from considering relevant information whose accuracy is not

---

[39] To be sure, the Second Circuit has held that facts used to affect a defendant's sentence must be proven by a preponderance of the evidence in Torres v. Berbary, 340 F.3d 63, 69 (2d Cir. 2003). However, as mentioned above, habeas claims are evaluated under the holdings of the Supreme Court only, and not under Circuit Court precedent. Renico, 559 U.S. at 779. Moreover, the Second Circuit's use of the preponderance-of-the-evidence standard in habeas matters has faced significant criticism for not being based on "clearly established federal law." See Lopez v. Sanders, 302 F. Supp. 2d 241, 246-48 (S.D.N.Y. 2004); see also Janick, 404 F. Supp. 2d at 484-86; Coleman v. Rick, 281 F. Supp.2d 549, 559-61 (E.D.N.Y. 2003).

disputed." Id.  Moreover, defense counsel never contended that it would be a violation of his due process rights for the court to consider Davis's statements during the sentencing proceedings.  Thus, any shortcomings in the record regarding the precise bases for the prosecutor's knowledge of Davis's statements appears to be due to the fact that defense counsel found nothing objectionable about them.

In any event, there is no indication that Davis's allegations constituted a significant factor in the judge's determination at sentencing.  Instead, the court's primary concern was the fact that the shooting was "an unprovoked act of violence" against an "unarmed victim" (Sentencing: 11).  And that concern was warranted since, as the prosecutor noted, petitioner not only shot an unarmed man from behind six separate times, but had fired "into a crowd of people and could have injured any one of those people" (Sentencing: 3).  As the prosecutor argued, the "sheer violence" of petitioner's crime "speaks for itself" (Sentencing: 3).  Thus, the Appellate Division correctly determined that petitioner's sentence was not "based on any improper criteria," and petitioner is not entitled to habeas relief.  See Wynn, 67 A.D.3d at 424.

## CONCLUSION

For the foregoing reasons, the writ of habeas corpus should be denied, and the petition should be dismissed pursuant to Rule 8(a) of the Rules Governing 28 U.S.C. § 2254 cases.

Respectfully submitted,

CYRUS R. VANCE, JR.
District Attorney
New York County
danyappeals@dany.nyc.gov

BY:    s/ Jessica Olive
Jessica Olive (JO-1903)
Assistant District Attorney
Attorney of Record for Respondent

KAREN SCHLOSSBERG (KS-7312)
JESSICA OLIVE (JO-1903)
        Assistant District Attorneys
            Of Counsel

July 26, 2016